University of California Berkeley School of Law

# Progress of the Safety and Welfare

# Remedial Plan:  R.J et al., vs Jones

**Barry  Krisberg   Ph.D.**

October 30, 2015

**Progress of the Safety and Welfare Remedial Plan: R.J. et al., v Jones**

Barry Krisberg Ph.D.

October 30, 2015

In March of 2014, the Illinois Department of Juvenile Justice (IDJJ) and the ACLU of Illinois submitted a joint Remedial Plan covering a range of issues including Safety and Welfare (S&W), Education and Special Education and Mental Health Care. The plan was approved in April of 2014 by the United States District Court for the Northern District of Illinois. This plan specified agreed-upon policy and practice changes in IDJJ on a wide variety of issues. Further, the plan and the Consent Decree defined deadlines for a number of very specific submissions and reports by the parties and by the court appointed experts. This report responds to a requirement that the court-appointed experts provide an annual update to the Court on the progress of implementing the Remedial Plan.

**Summary of Expert's Observations and Conclusions**

There are several important changes that might impact how the Remedial Plan will be implemented in the upcoming year. The IDJJ resident population continues to decline (dropping from 754 to 691 in Fiscal year 2015). There have also been a number of new laws that will take effect in January 2016 that may further reduce the IDJJ resident population and divert less serious offenders from IDJJ. These new laws include the diversion of all misdemeanants to counties, the diversion of IDJJ aftercare parolees facing new adult criminal charges to counties, and for many youths a reduction in the duration of aftercare.

1

There is a continuing major fiscal crisis affecting the Illinois state budget, but Governor Rauner has expressed his confidence in the top management of IDJJ and has actually sought to slightly increase funding for the department. The Governor has kept the top management team largely intact and there is stability in the vision and philosophy guiding IDJJ operations.

IDJJ has made major strides in drafting and implementing new policies that cover critical S&W areas on topics such as the use of confinement, mechanical and chemical restraints, and improvements in respecting the rights of youth residents. For example, the Governor has just appointed an independent Ombudsperson to monitor the well-being of all IDJJ youth residents. This new position is very much needed and more work should be done on strengthening the youth grievance process. The IDJJ has eliminated or reformed very questionable programs such as the Phoenix Program at IYC Harrisburg. Focus also should be placed on the efficacy of the Brown Shirts program at IYC Pere Marquette and the Alternative Housing Unit at IYC Kewanee. While these programs were instituted as alternatives to the use of confinement, there are serious concerns about whether these special programs are another form of confinement without the safeguards that are built in to new IDJJ policies relative to the traditional confinement units. IDJJ has indicated that it is implementing requirements for "Specialized Housing Units" to specify the admissions process and program plans for such units that may address these concerns. This will be subject to future monitoring by the S&W expert.

New policy directives are already improving practices at several of the facilities. The program content and services in the intake units has been improved. Living unit sizes are at or below those mandated in the S&W Remedial Plan. IDJJ has drafted improved protocols governing the treatment of LGBTQI youth. IDJJ has increased its level of compliance with the Prison Rape Elimination Act (PREA); however more education and support for the most vulnerable youngsters needs to be implemented.

There is a strong IDJJ commitment to improving aftercare services and to providing more staff devoted to this important activity. There is a need to better integrate the aftercare services in the facilities with those delivered post release.

IDJJ has sketched out its approach to building a Model Rehabilitation and Behavior Management System that includes the utilization of the Youth Assessment and Screening Instrument (YASI), improved individualized case management, more and strengthened resource groups, and more youth and family involvement in the treatment process. IDJJ has commenced the implementation of the Positive Behavioral Intervention & Supports (PBIS) in its school and living units. Areas of needed further strengthening of the treatment offerings include more attention to Cognitive Behavioral Therapy, Anger Management and Substance Abuse treatment and a major reshaping of the sex offender treatment programs. There are concerns that at some facilities, especially at IYC Kewanee, mental health treatment services are generally below par.

IDJJ offers several quality treatment interventions such as the SPARCS, DBT, the Wells Center, and Girls Moving Up that are operating at IYC Warrenville and IYC St. Charles. IDJJ has expanded programs at IYC Warrenville and IYC Pere Marquette that permit youth to participate in activities off grounds in the local community. Most impressive is the Youth Build Program that is a partnership between IYC Pere Marquette and a local community college.

There is an ongoing need for IDJJ to rigorously assess the quality of treatment resources and ensure that these meet the highest evidence based standards. IDJJ does not have a solid data based method of measuring the impact of its programs and making the required adjustments. The encouraging news is that IDJJ is clearly committed to moving to fill these operational gaps.

The biggest challenge for IDJJ going forward is the continued problem of insufficient staffing in terms of teachers and security staff that contributes to serious violations of IDJJ's education obligations, insufficient positive programming, and failure to provide basic care such as showers

and recreation, and excessive youth idleness. While IDJJ has attempted to secure more staff positions, there is still a major problem, especially at IYC St. Charles and IYC Kewanee, of enough staff working every day.

There also is a lack of adequate mental health staff at several IDJJ facilities such as IYC Kewanee. IDJJ is faced with managing many youth with long histories of severe mental health problems with meagre resources. More generally, IDJJ needs to ramp up its response and care for youth with physical, psychological and psychiatric disabilities.

IDJJ has begun increased training for its security and Youth and Family Specialists. The pace of this training needs to accelerate. The magnitude of changes in the IDJJ institutional culture are very large and greater buy-in by staff and improved morale will facilitate the complex and multifaceted implementation process. IDJJ has improved its internal review process for alleged staff misconduct and the process of upgrading staff accountability needs to be continued. One area of ongoing tension between youth and staff is the use of disciplinary actions for relatively minor youth misconduct. Further, staff are still learning how to use incentives rather than punishment as the main behavioral management approach. Greater consistency in staff interactions with youth should be emphasized.

**Audit Data and Methods**

As the S&W expert I visited each IDJJ facility between March and June of 2015. I also met with top IDJJ management staff in March 2015. Last year's S&W audit occurred just after the IDJJ Remedial Plan had been approved by the Court in April 2014. The visits were intended to establish a baseline of operations and policies before the IDJJ had the opportunity to fully implement many aspects of the Remedial Plan. This 2015 Report examines how IDJJ is complying with the specific elements of the Remedial Plan and identifies areas or progress and ongoing challenges in actualizing the Plan.

4

The 2015 site visits usually lasted about 2-3 days and included visual inspections of the living units, as well as discussions with large number of youth residents and staff at each facility. I typically offered feedback to IDJJ managers about my preliminary observations gathered during the site visits.

IDJJ provided me with the latest available data covering the characteristics of residents, staffing information and data on critical incidents, the use of various kinds of restraints and data on the use and duration of confinement at each IDJJ facility.

Besides the site visits, I also reviewed the latest facility reports that were produced by the John Howard Association and conducted an in-depth review of data submitted by IDJJ to the Performance-based Standards group. These PbS data were made available to me by IDJJ in both hard copies and online. The last PbS audits were conducted in April 2015 and there is an October 2015 round of audits being completed currently. The latest John Howard Association audits were generally from 2014.

I also had copies of all draft policies that were produced by IDJJ in response to the Remedial Plan agreement. I was consulted by the plaintiffs' and defendants' counsels on these draft policies and received detailed comments on these policies from plaintiffs' counsel at the ACLU. There were a series of phone conferences between the parties about their differences in the draft policies. I was encouraged to participate fully in these discussions and to offer my opinions and advice as needed. Top IDJJ management staff often asked me to share with them policies from other state juvenile corrections systems and to discuss the areas that I believed were crucial to adequate and successful policies and practices in the Safety and Welfare area.

The recent facility site visits were of a very different character than the round of facility audits conducted in 2014. My recent round of site visits in 2015 took place in the context of an approved Remedial Plan that was in process for a year. I wanted to assess the awareness and

support of IDJJ staff and managers for the needed transformations. Moreover, it was important to understand the concerns of IDJJ Central Office and facility managers, staff and youth about the required reforms, as well as perceptions of the ingredients for successful implementation.

During these 2015 visits, I met with virtually all of the managers from each facility and had discussions with a cross-section of security staff. I conducted detailed meetings with the family and youth counselors and the mental health staff. I met with youth at each facility who were selected at random and discussed their views on needed changes. The meetings with youth residents were done in individual and confidential settings and staff were generally not present in these resident interviews. The youth input was spirted and candid. The IDJJ youngsters were not reluctant to give me honest feedback on how well they were treated. In the main, however, the youth did not appear to know many of the details about the Remedial Plan. The youth residents had observed changes in certain traditional IDJJ policies including the use of confinement. The ACLU gave me a list of IDJJ youngsters who they felt might be especially vulnerable and IDJJ permitted me to conduct confidential and private interviews with each of these young people.

I inspected all of the IDJJ confinement units, crisis care and medical units or other limited program living areas.  I toured a cross section of youth rooms in regular housing units to assess the general state of cleanliness and maintenance of these units.  I examined the quality of the clothing, blankets and bedding given to the youthful residents.

As with the earlier S&W audit, I evaluated whether the living areas were clean, well-lit and graffiti free.  Also examined were the physical conditions of education areas, counseling spaces, recreation areas, libraries, and day rooms. I requested and received data from the various facilities of the use of restraints, violent incidents and escapes and grievances filed by the youth. The facilities shared with me the logs of the family and youth counselors and a sampling

of treatment plans produced by the mental health staff. I was given copies of daily schedules for each of the units that I visited.

The results of this data collection and these audits will be presented below under the major categories of the Remedial Plan. I will concentrate on recommendations for next steps.

**Summary of Essential IDJJ Data Trends for Fiscal Year 2014-2015**

I requested data from IDJJ covering each of its facilities from July 2014 through June 2015. These data included the numbers and characteristics of youth residents, the number of security staff and data on serious incident reports during that same time period. While the data collection process within IDJJ in still a "work in progress", the quality and quantity of this information has been greatly advanced by the diligent work of IDJJ Central Office staff. During Fiscal year 2015, the total youth population in IDJJ decreased from 754 to 691. The IDJJ Aftercare/Parole population went down by 7% from 1241 to 1,153. There were very small population declines at IYC Chicago and IYC Pere Marquette (a decrease of 13 and 4 respectively). The number of residents at IYC Warrenville increased by one young person. The population at IYC Harrisburg dropped from 179 to 139; at IYC St. Charles the population increased from 235 to 244; and at IYC Kewanee the population declined from 191 to 153.

The IDJJ female youth residents, who are all housed at IYC Warrenville, constitute about 5% of the total youth population. The average age of IDJJ residents is about 17 years old. The majority of youth are between the ages of 17 to 20 years; approximately 1/3 of the youth are 16 years old or younger. No youth in IDJJ were over 20 years old. Roughly two thirds of the IDJJ residents were African American and another 13% were Latino. There were rarely more than 2 Asian American or Native American youth in IDJJ during FY 2014-2015. The number of Caucasian youth declined from 172 to 136. Latino youth increased from 82 to 96 during this time period.

Youth from Cook County comprised almost half of the youth in IDJJ (going from 42% to about 48 % in FY 2014-2015). Almost 1/4 of the youth were from Central Illinois. The vast majority (roughly 93%) of the youth were under juvenile court commitments, and about 7% were under Criminal Court sentences. The most frequent commitment offense was a Class 2 Felony, comprising about 1/3 of the youth; another 25% were charged with Class 1 felonies. About 11% of the youth had been charged with Murder or a Class X offense. At the end of the FY there were about 25 youth in IDJJ with Class A, B or C Misdemeanors.

Trends in Incidents, Reportable Offenses, Use of Restraints and Confinement

Data were not yet available for all of FY 2014-2015 and figures for the period before January 2015 are not fully accurate for all facilities. Below are the data for each facility from January 2015 through June 2015.

Reportable incidents include fights and assaults by youth on other youth or on staff that occur within the facilities. There were 557 such incidents in the first six months of 2015. From the month of January 2015 to June 2015, the number of incidents increased from 93 to 125 per month. Most of these incidents occurred at the larger facilities – IYC Harrisburg, IYC St. Charles and IYC Kewanee.

When comparing the extent of reportable incidents at the various IDJJ facilities, it is very important to calculate these rates per 100 youth in residence. It is also worth noting the various IDJJ facilities have different missions and manage different youth, so real comparisons must be done carefully. The facilities also differ in how many hours that youth are confined to their rooms as opposed to attending school or having recreation outside their living units. During the first half of 2015 there were changes in the number of youth that were housed at various IDJJ facilities.

The overall IDJJ incident rate per 100 youth for the first six months of 2015 was 13.3. IYC Warrenville possessed the highest incident rate at 28.5 per 100 as compared with IYC Pere Marquette and IYC St. Charles that had the lowest incident rates per 100 youth (6.9 and 9.7, respectively). IYC Harrisburg experienced a decline in the rate of reportable incidents from January 2015 to May 2015, but then had a very large number of such events in June 2015. It is worth noting that monthly figures at facilities vary considerably and that some increases may be due to better statistical reporting.

There were 942 youth that were reported as being injured at IDJJ facilities from January to June, 2015. It is worth noting that some of these injuries were sports-related and some may have been accidents. Almost 367 of these injuries involved youth at IYC St. Charles and 221 occurred at IYC Kewanee. Another 149 youth were injured at IYC Chicago. The rate of injuries to youth was highest at IYC Warrenville (48.6 per month) and IYC Chicago (39.9 per month) and lowest at IYC Harrisburg (8.9 per month). The injury rates at IYC St. Charles and IYC Kewanee were less than at other IDJJ facilities (25.9 and 19.9 respectively). Because of its small number of youth residents, injury rates at IYC Pere Marquette varied considerably. The monthly IYC Pere Marquette injury rate per 100 youth was 23.3.

It is difficult to offer a straightforward interpretation of these rates of youth injuries at various IDJJ facilities due to variations in reporting and definitions of serious injuries. The varying size of facilities may influence the aggregate data on the number of youth injuries. To provide some context for these figures, I examined data from the April 2015 PbS audit. These data revealed that several IDJJ facilities scored worse on the injury rate per 100 youth residents than the PbS national field average including IYC St Charles, the IYC Kewanee Sex Offender Units, IYC Chicago, and IYC Warrenville. By contrast IYC Harrisburg and IYC Pere Marquette were slightly better than the PbS average on injuries per 100 youth. The Reception Centers at IYC Saint Charles and IYC Warrenville and the general population units at IYC Kewanee were closer to the PbS field average on youth injuries.

9

This issue of youth injuries should be monitored by IDJJ very closely. The forthcoming October, 2015 PbS should offer more current data on this issue, Further, I believe that since IDJJ now has a Medical Director, it is imperative to conduct a detailed internal audit on the prevalence of youth injuries, the seriousness of these events and the quality of care available to injured young people.

Turning to youth on youth assaults in the first half of 2015, there were 148 youth on youth assaults, or an average of 27 per month. Most of the IDJJ facilities had similar rates per 100 residents of youth on youth assaults, although IYC Harrisburg's and IYC Warrenville's rates were higher than other IDJJ facilities (5.1 and 5.0, respectively) as compared to IYC Kewanee (3.3 per 100) and IYC St. Charles (2.9 per 100).

In addition to the youth on youth assaults, there were 77 fights among youth in the first half of 2015. Fights involve two or more youth but there is not a clear cut aggressor as in an assault. There were significant increases in the number of fights at IYC Harrisburg (from 13 in January to 27 in June) and at IYC St. Charles (from 3 in January to 20 in June). The overall IDJJ rate of youth fights per 100 was 7.3 for the first six months of 2015. IYC Warrenville, IYC Harrisburg and IYC Chicago have the highest rates of youth fights (12.8, 10.1 and 8.8 respectively). IYC Pere Marquette and IYC Kewanee have somewhat lower rates of youth fights (2.5 per 100 youth and 6.7 per 100 youth).

There were a total of 102 assaults on staff by youth in the first six months of 2015 or about 17 staff assaults per month. The vast majority (42%) of these assaults happened at IYC Kewanee. The next highest incidence of youth on staff assaults was at IYC Warrenville, where there were 22 assaults. There were 20 staff assaults at IYC Harrisburg and 18 at IYC St. Charles.

The rate per 100 youth residents of assaults on staff was 2.5 per 100. The rate of assaults was highest at IYC Warrenville and IYC Kewanee (9.8 and 3.9, respectively). By contrast the staff assault rate at IYC St. Charles was 1.2 per 100, and 1.6 per 100 at IYC Harrisburg.

Turning to the prevalence of using chemical or mechanical restraints, very intriguing patterns emerge. IDJJ uses chemical restraints very sparingly, but mechanical restraints are used very frequently. For example, there were 41 incidents involving chemicals in all of IDJJ during the first half of 2015, but there were 1,090 incidents involving mechanical restraints or about 6 uses of handcuffs, arm or leg shackles every day. Almost 40% of the uses of mechanical restraints were at IYC Kewanee and 29% occurred at IYC St. Charles. There more almost as many incidents of mechanical restraints at IYC Chicago as at IYC Harrisburg (116 compared to 115), although IYC Chicago had a much smaller youth resident population. Mechanical restraints were rarely used at IYC Pere Marquette and they were less frequently utilized at IYC Warrenville than at other IDJJ facilities.

IDJJ has taken several steps to reduce the use of Confinement in its facilities. This includes formal changes to agency policy that were submitted to and approved by the Federal Court as part of the R.J. vs Jones Remedial Plan and temporary administrative directives designed to immediately change practices. Reforms covering the use of confinement include restrictions of the reasons why confinement can be utilized, strict time limits on the duration of confinement, a more thorough management review of each instance of confinement and a clear direction to staff to seek alternative dispute resolution and the least restrictive alternative consistent with youth and staff safety concerns. It is worth noting that IDJJ staff are already responding to these changes and that more intensive staff training on the new approach began in 2015.

There were 1,697 incidents involving the use of confinement or Time Out in IDJJ during the first half of 2015. These numbers do not include the number of times that staff utilized "Cool Down" to manage youth behavior, but it is expected that these data will become available in the future. A "Cool Down" is when staff temporary separate a youth in a non-secure area providing counseling to them until the behavior issue is resolved. A "Time Out" occurs in a secure area. The IDJJ policy suggests that a "Time Out" should not be initiated when a "Cool Down" is a safe way to manage youth misconduct.

11

Two facilities, IYC Kewanee (32%) and IYC St. Charles (38%) accounted for the vast majority of these uses of confinement and Time Out. IYC Harrisburg accounted for 16% of all IDJJ uses of confinement in the first half of 2015.  Another 147 uses of confinement or Time Out occurred at IYC Chicago (almost 9%).  These restrictions on youth were less frequent at IYC Warrenville and IYC Pere Marquette (65 or 4% and 24 or 1%, respectively).

At every IDJJ facility except IYC Warrenville there appeared to be a significant increase in the use of confinement or Time Out in the second quarter of 2015 when compared to the first quarter of the year.  This trend is not necessarily due to the increased use of confinement and Time Out but may be due to more accurate reporting and improved data collection. In the future, IDJJ plans to have facilities record uses of confinement separate from Time Out and Cool Down. These more refined data should be available for September, 2015.

The average length of stay in confinement went down during the first six months of 2015 from 345 minutes (about six hours) to 121 minutes (about two hours); however this decline may also be a function of the counting issues discussed above.  Looking at information from June 2015 it appears that the longest average stays in confinement and Time Out were at IYC St. Charles (337 minutes), IYC Chicago (188 minutes) and IYC Kewanee (130 minutes). Due to the small numbers of youth at IYC Warrenville and IYC Pere Marquette, it is difficult to assess a trend in length of stay because these numbers vary widely from month to month.  The confinement time of one or two youths could greatly skew these averages. For example, the average stay in confinement at IYC Warrenville went from 262 minutes in May 2015 to 20 minutes in June 2015.

<u>Security Staffing Data</u>

IDJJ reports its staffing data in two ways. There are numbers for the security staff "headcount" and average numbers of security staff per shift. The "headcount" data reflects the number of

security staff who are actively on the payroll at the end of each month; also reported is the average number of security staff who are available at each facility at each shift. In general, the number of security staff at the three shifts is considerable lower than the "headcount" figures. For instance, IDJJ had 593 security staff on its "headcount" in January 2015 but there was an average of 371 security staff working shifts in that same month.

Returning to the data on security staff "headcounts", there was a decline of 23 security staff in IDJJ from July 2014 to January 2015. While the "headcount" numbers declined at IYC Chicago, IYC Harrisburg, IYC Kewanee, and IYC St. Charles, there was a drop of just one staff at IYC Pere Marquette and an increase in the "headcount" at IYC Warrenville.

Using these "headcount" figures from January 2015 to compute a youth to staff ratio reveals an overall IDJJ youth to security staff ratio of 0.5. These ratios varied from a low of 0.55 youth to staff at IYC Warrenville to a high of 1.01 youth per staff at IYC Harrisburg. The youth to security staff ratios at IYC Chicago and IYC Pere Marquette were 0.87 and 0.86. The ratio of youth to security staff at IYC St. Charles and IYC Kewanee was 0.71 and 0.70, respectively.

Data on the numbers of youth per security staff working all three shifts reveals a somewhat different picture. Information from June 2015 shows an overall ratio of youth to security staff of 1.9:1. Youth to staff ratio was 2.9 at IYC St. Charles, 2.35 at IYC Chicago, and 1.7 at IYC Harrisburg. The youth to staff ratio was roughly 1.8 at IYC Pere Marquette and 1.7 at IYC Kewanee, respectively. The staff to security staff ratio at IYC Warrenville was 1.2.

The R.J. vs Jones Remedial Plan set as a goal that there would be certain youth to staff ratios in the living units during waking hours and sleeping hours, respectively. It is important to note that the above figures compiled by IDJJ are not specific to the living units and may involve security staff who are doing perimeter security, managing visiting hours, performing security functions at the schools and health care wings, and transporting youth on writs and other

facility movements. It is anticipated that IDJJ will develop a system for calculating youth to staff ratios in individual living units in the next 12 months.

The First Shift from 6 am to 2 pm is often very busy since the youth are generally waking up, doing personal hygiene, going to education, including school movements, and there is an array of recreation, meals, counseling, health care and other activities going on. Typically the First Shift has the highest number of working security staff.

Looking at the average data from the First Shift for June 2015 shows a youth to staff ratio of 7.0 at IYC Chicago, 6.9 at IYC St. Charles, 4.2 at IYC Harrisburg, and 4.0 at IYC Kewanee. The First Shift ratio of youth to security staff at IYC Pere Marquette was almost 4.9 and it was 3.5 at IYC Warrenville.

Youth and Family Specialists

A supplemental order to the S&W Remedial Plan set as an immediate goal achieving a youth to Youth and Family Specialists ratio of no more than 20:1 at each facility by year end. The Court S&W expert recommended an even lower youth to staff ratio; it was agreed that IDJJ would reach this lower ratio in stages. The Youth and Family Specialists are key personnel in terms of the day-to-day care for the youth. It is planned that they would expand their work roles as the Model Rehabilitation program was fully implemented.

As of August 2015 there were 45 Youth and Family Specialist positions filled in all of IDJJ facilities and another 5 positions were posted for hiring.

There were 12 Youth and Family Specialist at IYC St. Charles, 10 Youth and Family Specialists at IYC Kewanee and 10 Youth and Family Specialists at IYC Harrisburg. At the smaller institutions, there were 6 Youth and Family Specialists at IYC Warrenville, 3 Youth and Family Specialists at IYC Chicago and 2 Youth and Family Specialists at IYC Pere Marquette.

Overall, IDJJ had a youth to Youth and Family Specialists ratio of 15.8. This ratio varied from IYC Chicago that had the highest ratio of youth to Youth and Family Specialists of 29.9 as compared to IYC Warrenville that possessed the lowest youth to staff ratio of 6.7. The youth to Youth and Family Specialists ratio at IYC St. Charles was 21.8 and it was 19.5 at IYC Pere Marquette. The youth to Youth and Family Specialist ratio at IYC Harrisburg and IYC Kewanee was 13.4 and 12.6, respectively. If all of the posted positions are filled promptly, all of the IDJJ facilities with the exception of IYC Chicago will be at or below the temporary caseload standard for Youth and Family Specialists established in the Remedial Plan's supplemental order.

**The Use of Confinement**

IDJJ rewrote its policy with respect to confinement and restricted movement. Draft policies have been approved by the Court and these new policies represent a vast improvement over previous ones that were vague and non-specific. The IDJJ worked very closely with the court appointed experts and the plaintiffs' counsel to refine these drafts before submission to the Court.

The new IDJJ policies state that youth are not to be treated as they have been historically in the confinement units. There must be provision for adequate out-of-room time and for the regular daily IDJJ services including schooling, recreation, personal hygiene, visiting, and access to mental health services. The new confinement policies require IDJJ to minimize the duration and the situational use of its confinement units. The number of reasons the youth can be placed in confinement has been simplified. The process of management review for placing youth in confinement has been clarified, building in more checks and balances to prevent arbitrariness.

The IDJJ has expressed a strong preference for the use of conflict resolution techniques to reduce the need for confinement. Staff were instructed by a departmental order to never use

confinement as punishment, but only as a means to protect the safety of youth residents and staff. This management policy states a strong preference for staff to employ the least restrictive option to manage youth misconduct.

These revised IDJJ confinement policy and operational changes are important because there is compelling and substantial evidence that housing adolescents in solitary confinement for long periods of time is very harmful to the mental health of these youth and that extended lockups achieve no valid correctional purpose. Solitary confinement is especially harmful to use with young people with mental health issues and histories of severe personal trauma.

It is my opinion that the duration in confinement and other restricted housing options should be much shorter than 24 hours, perhaps no longer than one staff shift. Youth in confinement should be able to spend as much time out of their rooms as youth in other living units. Beyond new policy statements, IDJJ has already moved to dramatically reduce the use of confinement units, especially for disciplinary purposes. Director Jones used a temporary order to restrict room confinement to less than one hour and to encourage the utilization of very short period of "Cool Down". IDJJ staff are encouraged to employ verbal de-escalation techniques and to use conflict resolution in lieu of locking youth up either in their rooms or in confinement units.

In the recent past, the use of confinement was common at IYC Kewanee, IYC Harrisburg and IYC St. Charles. This practice was less commonly observed at IYC Warrenville, IYC Chicago and IYC Pere Marquette. During my most recent round of site visits to all IDJJ facilities, there were no youth in confinement units for discipline at IYC St. Charles, IYC Kewanee and IYC Harrisburg. Facility logs showed that the duration of confinement was generally less than one day, with exceptions such as youth being held on mental crisis status at IYC Harrisburg and those at IYC Kewanee or IYC St. Charles awaiting transfer to the Illinois Department of Corrections or those awaiting movements on court writs. The Deputy Director of Operations has been regularly visiting every IDJJ facility and assisting staff in reducing the number of youth in confinement statuses.

16

While there was general support for the new IDJJ Central Office instructions on the use of confinement by the facility top managers, there remains substantial criticism of this approach by a wide range of security staff and Youth and Family Specialists. Even some of the mental health staff questioned the wisdom of the reduced reliance of confinement. Many IDJJ security, counseling staff and mental health personnel perceive that there had been a major increase in institutional violence since the restrictions on confinement were implemented. They pejoratively referred to the alternatives as "assault a staff, go to your room". There is little evidence from existing data that the changes in IDJJ confinement policies have adversely effected either staff or youth safety. As noted earlier, the chronic and serious understaffing among security personnel is more pertinent to staff perceptions of danger.

Corrections staff may equate changes in behavior management techniques with increased threats to staff. There is the false perception that there are fewer consequences for serious misconduct and that being placed in confinement is a valuable deterrent to aggressive and assaultive youth. There is a lack of clarity among staff as to the proper role of confinement or temporary separation of very dangerous youth from the routine disciplinary process that sanctions serious youth misconduct. Less confinement does not mean the absence of consequences for serious youth misbehavior.

Some staff state that IDJJ Central Office managers always take the side of the offending youth and assume that the staff are at fault. When facility staff place a youth in a Confinement status, they perceive that Central Office staff are "micro-managing" their decisions and undercutting the staff's credibility with youth. This is an area in which greater communication among facility managers and central Office staff is essential. It is also crucial that the top leaders at the various IDJJ institutions are unambiguous in their support of the IDJJ reforms and that they do not inadvertently send mixed messages to line staff or youth.

The new confinement policies were begun without in-depth staff training on why the practices needed to change. This training has now commenced in earnest during the Summer of 2015. Many staff expressed to the S&W expert their desire for more training in evidence-based tools to help them better respond to youth. As I have noted previously, if the primary repertoire of control was based in restraints, lock-up and punitive disciplinary practices, it is frightening when these are seemingly removed without suitable replacements.

Many staff believe that violence in the facilities also may be a result of youth idleness and the lack of meaningful positive incentives for good conduct. Persistent understaffing and the Illinois budget crisis has raised skepticism among some staff that there will be more funding for added security and treatment personnel or for more activities to keep the IDJJ young people productively engaged.

The important need for intensive and ongoing training for existing staff on managing troubled youth led IDJJ to hire a new Chief of Training and Professional Development to oversee this process. Training has started but will intensify and expand during the Fall of 2015. I would urge IDJJ to develop a cadre of long term IDJJ staff who embrace the new departmental philosophy and who should be the primary trainers. IDJJ staff who have embraced the direction of the IDJJ reforms should be given coaching and curriculum materials by leading national figures in juvenile corrections.

This new approach to the restrictions on the use of confinement and limited programs must be integrated with other training on the new IDJJ rehabilitation model and increased awareness from all staff on research on adolescent development the impact of childhood trauma and the value of utilizing the least restrictive option consistent with safety. Staff need to learn and practice the use of positive incentives and rewards as the most powerful ways to achieve behavioral compliance from young people. The IDJJ educators are already showing skill at implementing the Positive Behavioral Interventions & Supports (PBIS) to reduce disruptive conduct in IDJJ classrooms.

The current rift between facility managers and direct care staff at some facilities must be greatly reduced; otherwise some of the key new policy changes will be undercut. Long lasting reforms in juvenile corrections demand both strong advocacy by the top leadership, clear policies, reinforcement in daily implementation by middle managers and, ultimately strong buy-in by staff at every level of the organization. Staff need to live the reality that their work lives will get better as they reduce reliance on superficial tactics of control and isolation in favor of genuine rehabilitation and education behavior management strategies.

IDJJ has made an impressive start in reducing the use of Confinement and limited programming. The process of implementation will improve as staff comprehend that these changes are mandated by the Remedial Plan of the Consent Decree, and are not subject to the whims of the current director. As IDJJ moves forward towards a real therapeutic approach, the use of isolation and segregation should greatly diminish.

IDJJ must improve its documentation of the use of confinement and of limited programs. These data must be automated and shared on a daily basis with Central Office managers. The physical condition and sanitation of existing confinement units had not substantially improved since my last round of site visits in 2014. While it is encouraging that fewer youth are now placed in these rooms, the conditions in some of the rooms and living areas in confinement units and other limited housing programs at IYC Kewanee, IYC St Charles and IYC Harrisburg remain well below professional standards.

The ongoing problems of these rooms include inadequate lighting, poor ventilation, graffiti and gang signs that are scratched on the floors or written in permanent markers. Some of the rooms need upgrades in the water fixtures. During my site visits, I also observed occasional lapses in sanitation and cleanliness in confinement units and other limited program units at the larger IDJJ facilities. In general, the restrictive living units were in better condition in IYC Pere Marquette, IYC Warrenville and IYC Chicago.

19

**Security and Youth and Family Specialist Staffing Levels**

The Remedial Plan calls for IDJJ to move towards compliance with PREA security staffing ratios of 12:1 during waking hours and 20:1 during sleeping hours by October 2015 and to achieve even better ratios of security staff to youth by October 2017. There has been substantial progress in the recruitment of new staff and there have been several new graduating classes. IDJJ has prioritized the assignment to these new security staff to IYC St. Charles, IYC Harrisburg and IYC Kewanee.  While staff shortages remain an issue at IYC Chicago and IYC Pere Marquette, the problem is not of the magnitude that exists in the larger facilities. Only IYC Warrenville is closer to the security-youth ratios that are outlined in the Remedial Plan. As of April 2015, the PbS data showed that all IDJJ facilities except IYC Warrenville were worse than the PbS field average in terms of the ratio of direct care staff to youth.

During my site visits I was told that the new staff would mean fewer lockdowns of youth and that more young people could utilize day room and recreation areas because of the additional staffing. The Education expert was told about fewer cancellations of classes due to security staff shortages. Many of the new security staff had not yet been permanently assigned to living units at the time of my site visit.

While additional security staffing on a daily basis is clearly needed, the IDJJ has not completed a comprehensive staffing analysis that would identify the greatest need for additional staff by specific posts and for living units. It makes sense that more staff should be allocated to crisis units, living units for high risk youth, and in program areas that would increase the availability of programming for IDJJ young people.  The new staff are being assigned largely at the discretion of local chiefs of security and the superintendents. While Central Office must approve assignments to facilities, there are no clear criteria for the utilization of new staff. Further, retirements, staff transfers and those on limited work assignments continue to reduce the full impact of the new staff on programming and safety issues. During my site visits it was

20

still the case that the use of staff for transporting youth to courts on writs and the transfer of youngsters between IDJJ facilities continued to consume staff resources, taking them away from increasing safety and programming in the institutions.

I would urge that IDJJ complete a rigorous staffing analysis, preferably with the assistance of national juvenile corrections experts, that better defines the most efficient and productive assignment of new staff. IDJJ should also review the adequacy of supervision of new staff by mid-level managers and chiefs of security.

The infusion of new IDJJ staff also presents a great opportunity to train and orient these additional personnel towards the emerging new vision of IDJJ. There is an opportunity to equip them with tools and skills that are more consistent with the emerging treatment philosophy of IDJJ. Training for new staff has been revised and there are ongoing revisions and additions to the training provided to existing staff.

While progress at IDJJ in adding more security staff has been impressive, there has been less success in increasing the numbers of family and youth counselors and mental health professionals. The case loads of counselors and mental health professionals are well below the targeted levels. For example, the Remedial Plan calls for a ratio of 20:1 in youth to counselors by July 2015. While IYC Warrenville, IYC Chicago and IYC Pere Marquette are already close to these desired ratios, the caseloads for counselors at IYC Harrisburg, IYC Kewanee and IYC St. Charles are currently higher than the youth to staff ratios that will be required by the expanded role of the counselors in the emerging treatment and rehabilitation model.

The many of the current Family and Youth Specialists complain that they can rarely spend more than 30 minutes with clients per week, they have virtually no time for reaching out to families, and their ability to provide rehabilitative or reentry services is minimal. Currently the youth and family counselors are most occupied handling very elementary tasks for youth such as arranging for visits and phone calls, checking on commissary balances, and helping youth get

work assignments. Very few of the Youth and Family Specialists are currently producing meaningful case plans for youth and there are virtually no sustained case management services being provided. The counselors have not received much guidance on treatment interventions such as Motivational Interviewing and PBIS. IDJJ plans to commence intensive training on these topics and the expanded Youth and Family Specialist responsibilities towards the end of 2015.

As noted earlier, the Remedial Plan envisions a much larger role for the youth and family counselors that would include case planning, monitoring youth progress in rehabilitative programming, maintaining active engagement with families, and delivery of resource groups for the youth. Adequate performance of these additional responsibilities should require youth to counselor caseloads of no more than 10:1. But this goal will require a significant increase in the number of new IDJJ Youth and Family Specialist positions and might also have the unintended effect of draining staff from the already depleted security staff ranks. As an accommodation to the practical needs of IDJJ, the Safety and Welfare expert agreed to set a temporary caseload goal of 20:1 by July 2015. I will evaluate the adequacy of the increased numbers of Youth and Family Specialist counselors, advising the Court of whether the Remedial Plan caseloads should be even lower.

Although I would defer to the professional judgment of Dr. Louis Kraus, the Court's mental health expert, my impression is that there remains a major shortage of qualified mental health professionals at IYC Kewanee. The other IDJJ facilities are somewhat better staffed with mental health professionals. IYC St. Charles has an extensive and well organized mental health department on site. On the day of my site visit, IYC Kewanee did not have a single psychologist on duty.

The current mental health practitioners are doing the best that they can, but lack the requisite training and experience to provide in-depth assessments and treatment of youth who suffer from very serious and chronic mental health issues. IDJJ provides psychiatric services via a

contract with a private vendor. It did not appear to me that there were an adequate number of these hours available to meet youth needs.

Beyond the limitations of current staffing in the areas of counselors and mental health practitioners, there are very basic shortages in the needed infrastructure. The current Youth and Family Specialists and the mental health clinicians report having inadequate voicemail and computer resources. In an era of smart phones and portable tablet computers, the current staff are often tethered to desks with very antiquated Personal Computers. These computers are not networked and virtually all of the counseling and mental health records are paper files. The IDJJ has invested in an automated case management system, but this automation is not ready for use and staff need training in how it can be used. IDJJ is attempting to analyze and remedy the lack of technology at the institutions.

Most of the Information about IDJJ clients exists in a set of manual individual files that are not linked up. It is currently not possible to easily share information within or between IDJJ facilities, especially if youth have been transferred among these institutions or living units. Data on parole and reentry are also kept in separate and unconnected files.

IDJJ counseling and mental health staff also complained about the virtual absence of clerical assistance. They report spending many hours trying to locate information about youth who have been paroled or discharged.

IDJJ has plans to implement a detailed computerized information system to handle client data. It is likely that very preliminary implementation of this new system will begin in 2016, but full operational utility of the automated data system is not expected until well into the future.

More generally, the Youth and Family Specialist staff, especially at IYC Kewanee, IYC St. Charles and IYC Harrisburg, professed very limited awareness of the components of the Remedial Plan that might directly impact their work. Many of these Youth and Family Specialists are vocal

critics of the reduction in the use of Confinement and were concerned that the youth perceived that there were no consequences for misconduct. They complained that the leadership in Central Office was operating with "knee jerk reactions" to criticisms in the media and the court experts. These disgruntled staff were critical of what they perceived as the "priority of the day" by management.

While not absolutely opposed to increasing the amount and quality of treatment services for youth, the current counselors were not optimistic that anything would change as a result of the Remedial Plan. Many of these counselors were long term IDJJ employees and had been promoted from positions as security staff at the larger IDJJ facilities.  The Youth and Family Specialists seemed to have limited prior exposure to ideas about the basics of evidence-based rehabilitation approaches, or trauma informed therapy. By contrast, the counselors at IYC Warrenville, IYC Chicago and IYC Pere Marquette seemed more excited about the opportunity to enhance high quality treatment services. There was general concern among the counselors and mental health staff that the currently operated, albeit limited treatment programs would be abruptly ended by the reforms.

There was also great concern about the very short stays of some youth in IDJJ. Most of the counselors and mental health staff felt that they hardly got to know these young clients before these youth are transferred elsewhere.  Some of these young people would be better served in the community.  Also, the counseling and mental health staff felt they spend much of their time preparing reports for youth who were being moved to other facilities or who were being considered for discharge.  The counselors also felt that they did not have enough access to their clients due to the requirements of the education and security staff. The Youth and Family counselors are not assigned to specific living units because their clients move through a number of housing assignments while in IDJJ. This means that the counselors had to visit many different living units each day to keep track of their clients and this also reduced their interaction with the security staff.

24

Few of the Youth and Family Specialists or mental health practitioners presently play a leading role in the program planning or housing assignments of the youth. Their views might be solicited, but the security staff continue to exert the dominant role in the day-to-day programming for each youth.

These structural and attitudinal problems with the counseling and mental health staff are very troubling. While the Remedial Plan calls for increases in the ratio of these vital staff to youth, and envisions a larger role for them in providing rehabilitation services, more and better educated staff in these positions will not entirely rectify the severe concerns that I have expressed above. It is my view that IDJJ needs to design a comprehensive strategy to replace and retrain many of these staff towards the new vision of IDJJ reflected in the Remedial Plan. Without such a plan and a dedicated retooling of the counselors and mental health staff, IDJJ will struggle to move forward on many aspects of the Remedial Plan.

**Towards a New IDJJ Rehabilitative Model**

A core component of the Safety and Welfare Remedial Plan is the commitment by IDJJ to "develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitative model to be used by all youths in all DJJ facilities…" This model is to include substance abuse, educational, mental health and behavioral management and other programming for youth. There should also be high quality services for youth in special treatment units and sex offenders.

The IDJJ Central Office retained the Vera Institute of Justice to assist them in identifying the potential parts of the treatment and rehabilitation model. There have been visits to other states such as Missouri, Indiana, Colorado and Washington to observe other well regarded juvenile rehabilitation programs and systems. Curriculum for various juvenile treatment programs has been received from the Office of Juvenile Justice and Delinquency Prevention as

well as the Annie E. Casey Foundation, the MacArthur Foundation, the Chicago Community Trust and the Tow Foundation, among others. The design of the new treatment model is in early stages of conceptualization.

The core components of the Model Rehabilitation Plan include a streamlining of the intake process and the full implementation by the YASI that will be supplemented by the MAYSI-II for behavioral health screening. Also important will be a Reentry Focused Case Planning Process and the implementation of a Comprehensive Behavior Management System.  IDJJ will further define its core treatment elements and work to ensure that the right youth are receiving the right services. Staff training in all aspects of the new Rehabilitation and Behavior Management System will be delivered to all IDJJ staff. IDJJ has committed to build a supportive staff culture in support of these new intervention approaches and to dramatically improve family participation and involvement in the all aspects of IDJJ services.

These reforms constitute an ambitious and multifaceted set of operational objectives for IDJJ top managers and for facility level managers as well. IDJJ has produced a very impressive description of the critical implementation steps and the projected timelines for achieving these goals. Some activities are already underway, but most of the major activities and staff participation in these efforts will occur in the last quarter of 2015 and early 2016. IDJJ has started offering briefing materials and "town hall meetings" for its staff and for IDJJ residents.

IDJJ has very wisely decided to pilot test the key parts of the treatment and behavior management transformation. The S&W Court Expert has recommended the pilot testing approach that has worked well in other juvenile justice systems such as California, Massachusetts, and Missouri. The testing process will identify unanticipated implementation issues and allow for appropriate refinements. Moreover, the pilot sites will produce a cadre of internal advocates and mentors for other staff as they attempt the needed changes.

It is recommended that IDJJ quickly put in place a rudimentary quality assurance process to measure progress in the desired areas.  It would be very valuable to retain an outside research consultant to study the implementation process and provide key organizational feedback to IDJJ top managers. It remains to be determined if IDJJ has sufficient numbers of the appropriate treatment and counseling staff to fully meet its ambitious treatment goals. Very important will be the quality implementation of the YASI and MAYSI-II screening tools that will better focus attention of the sorts of rehabilitation resources that will be required to meet the needs of IDJJ youngsters.

Many of the IDJJ policies in the rehabilitation arena are aspirational at this point. The agency does not currently possess a reliable and validated needs assessment system, but IDJJ is the process of procuring the Youth Assessment and Screening Instrument (YASI) that is used by all of the counties in Illinois. The actual content of the Individual Youth Development Plans is still a work in progress. Case Management training has not yet been offered on a systematic basis. At the time of my site visits there were ideas about case planning protocols that were being circulated by mental health staff and program staff, and these are promising beginnings.

As noted above, the capacity of the Youth and Family Specialists to develop and administer quality Youth Development Plans is still at a very rudimentary level.  There are some resource groups that are delivered episodically by the mental health practitioners, but these are of unknown value. Youth in the Wells Program are getting regular hours of substance abuse and other rehabilitative programs. There is an evidenced-based gender-responsive curriculum offered at IYC Warrenville. However, most IDJJ youth spend varying amounts of their time in school, with some recreation services and lots of unstructured time in the day rooms of living units playing board games or watching television. IDJJ continues to operate programs such as Alternative Placement and the Moral Recognition Program at Kewanee, the Brown Shirts at Pere Marquette and other occasional staff-initiated efforts.  The program for sex offenders was not well documented or delivered on a consistent basis. None of these programs has been the

subject of careful evaluation by IDJJ and their fidelity to other evidence-informed programs and the value to youth is questionable.

Young people at every IDJJ facility that I visited asked for more treatment and rehabilitation services. Many youth residents were especially interested in improving their life skills via Anger Management, Cognitive Behavioral Therapy and Substance Abuse groups. Other youth requested basic help in coping with life after release including advancing their educational levels, increasing vocational skills and job readiness, obtaining health care insurance, and getting a driver's license or other form of ID. Almost all youth with whom I met wanted more structured programming in preparation for release and returning home.

Almost all of the IDJJ youth that I interviewed complained that there was lots of "dead time" in daily schedules when they were sitting in their rooms or in day rooms, and they wanted much more contact with counselors and mental health clinicians. The IDJJ young people wanted more structured recreational opportunities such as intramural sports as well as exposure to music and art. I have recommended that IDJJ provide all of its youth a minimum of 8 hours per day of highly structured prosocial activities, and the Remedial Plan requires this.


**Effective Behavioral Management and the Use of Restraints**

IDJJ has committed to utilizing more positive incentives with its youthful residents and to reduce the use of chemical and mechanical restraints. New policies have been drafted that reflect this change in philosophy. Balancing positive rewards with sanctions at IDJJ facilities is consistent with the best research on juvenile justice and will help reduce the exposure of the agency under a number of federal laws such as PREA and the Americans with Disabilities Act. These laws seek to protect vulnerable youth from excessive, capricious and arbitrary punishments. IDJJ has made steady progress in defining appropriate policy statements in these areas; however, implementation of the behavioral management approach will take intensive

staff training and very careful monitoring of how staff respond to the most challenging youngsters in IDJJ facilities. I plan on devoting close attention to monitoring the implementation of the new techniques in the next year.

Research is clear that the utilization of mechanical restraints can be very harmful for youth who possess histories of severe trauma. In effect, the mechanical restraints can re-traumatize these vulnerable youngsters. Moreover, the use of mechanical restraints is inconsistent with an agency that is focused on promoting treatment and rehabilitation. Several youth corrections agencies do not use mechanical restraints except under emergency situations. Mechanical restraints should not be used with youth with severe disabilities except in emergencies. Staffing should be augmented so that staff conduct can be managed by personal interactions with young people. It is almost unheard of to witness the use of mechanical restraints in those youth corrections systems such as the Missouri Division of Youth Services that are committed to a humane and treatment-oriented approach to juvenile justice. As suggested by the IDJJ data presented above, the use of mechanical restraints is a concern at some IDJJ facilities, especially at IYC Kewanee and IYC St. Charles. There are also indications that mechanical restraints are utilized too frequently at IYC Chicago. Interestingly, the use of mechanical restraints has been significantly diminished at IYC Harrisburg even though the John Howard Association and the S&W Court Expert had expressed concern about these practices at IYC Harrisburg in earlier audits.

My prior monitoring reports and this current audit did not find a systemic problem with the use of chemical restraints in IDJJ. However, I believe the chemical restraints that include various chemical sprays and tear gas have almost no productive role in juvenile corrections agencies. There is a clear professional consensus that these control techniques can only be justified, if at all, to quell mass disturbances and riots. The use of chemicals should never be utilized to stop one-one-fights, as punishment, or for instances of youth defiance of staff instructions. Many states currently ban the use of chemical restraints in their youth facilities. Other locales prohibit their use with disabled youth, those with breathing issues, pregnant teens, or the mentally ill.

To prevent and minimize the use of mechanical or chemical restraint, the IDJJ must deliver high quality training to all staff who are involved in the direct care of young people. In addition to giving staff insights into adolescent social and intellectual development, the staff must receive high quality training in conflict de-escalation techniques. Further, security staff and Youth and Family Specialists should have timely access to mental health workers to assist them in resolving crisis situations.

Staff should be given practical guidance in how best to safely defuse potentially volatile situations without resort to restraints through the use of appropriate progressive behavior management techniques. All instances in which restraints are employed must be thoroughly documented in timely and well written reports that include the time, location and reasons for the use of restraints as well as whether less restrictive techniques were tried. Whenever possible, the use of mechanical restraints should be video recorded. Top managers at each facility must review each instance of the use of restraints for compliance with IDJJ policy and with sound juvenile correctional practice. The facility managers must seek the advice and counsel of security staff, treatment supervisors, educators and mental health clinicians, who have worked with the youth in question, to determine if there were less intrusive ways to protect the safety of all those involved.

I would urge that that each facility administrator with the leadership of the Deputy Director of Operations should review all incidents involving mechanical or chemical restraints at IDJJ facilities. Periodically, Central Office staff should also examine a sample of the incidents for suggestions for improved training or policy refinements. Systematic data on the use of chemical and mechanical restraints should be disseminated and discussed at regular staff meetings at the facility and Central Office level.

**Youth Grievances, Youth Rights and the Complaint Process**

The Remedial Plan called for IDJJ to maintain the hotline for PREA reporting, and to upgrade and improve the grievance process within 180 days of the Court's approval of the plan. IDJJ has made progress in ensuring that locked grievances boxes are placed in every living unit and that there is an adequate supply of forms available to IDJJ youth. I recommend that IDJJ also post clear and easy to read instructions in every living unit about the process by which young people may express potential grievances.

IDJJ has come close to meeting this standard about access to grievances. They have trained their staff in the basic grievance process. Youth have received some information about the complaint process. IDJJ supported the recently enacted legislation to create an independent juvenile ombudsman. This legislation was signed by the Governor and there is a person who will perform the Ombudsperson role throughout IDJJ. This person will report directly to the Governor and has been assured the requisite staffing resources to professionally meet their responsibilities. The new Juvenile Ombudsperson has already debriefed with each of the Court Experts about areas of focus and priority in terms of protecting youth rights.

My interviews with both youth and staff suggested that the most egregious staff behavior in terms of verbal abuse and inappropriate contact has been independently and professionally investigated. The current top management at IDJJ has expressed a "zero tolerance" standard for staff misconduct. Managers at the various IDJJ institutions have reinforced the agency-wide view. Some staff that were subject to these inquiries chose to retire from IDJJ, while others received warranted sanctions.

It is important to observe that very few DJJ youth reported to me that they were being physically or verbally harassed by staff. The overall youth assessment of IYC Warrenville staff was that, with few exceptions, the young people felt that they could report any problems with staff without fear of retaliation. One exception was during this year's audit of IYC Warrenville

31

when some of the girls repeated their concerns expressed in earlier audits that some of the staff were too rough with them.  Several of the IDJJ youthful residents explained that the lack of sufficient staff and the problem of single shifts put added pressure on security staff or Youth and Family Specialists, who did not have enough time to verbally engage the youngsters to resolve potential conflict situations. Shortages of staff eroded the amount of patience that security staff can invest with very needy youth. Indeed, some youth confided in me that there was a perceived sense by youth that they need to escalate their misconduct to get sufficient attention by staff.

Virtually all of the youth that I interviewed know how to file grievances but they were dubious that anything positive would result from filing grievances or complaints. Many of the youth perceive that the staff do not believe youth accounts of their problems and many youth were more comfortable with handling their concerns informally with individual staff rather than utilizing the formal grievance process. Other IDJJ residents seek out facility top managers or visiting Central Office staff in attempts to redress their complaints. For the young residents of IDJJ, the current grievance process is not credible and should be revamped. Very few grievances are ever filed by the youth and, consequently, grievance data are not utilized by managers to improve operations at the facility level.

Based on a sampling of filed grievances that I reviewed at each of the IDJJ facilities, it was interesting that most of the youth issues involved their failure to receive basic services such as showers, adequate recreation time, adequate clothing not in disrepair, access to commissary, and the extremely poor quality of the food. Youth were also concerned about their sense of inconsistency of some staff relative to institutional rules, especially when staff give disciplinary charges for relatively minor misconduct. Staff that are perceived as giving out "too many tickets" anger youth because the youngsters think that these sanctions led to increases in "set time" that extend youth incarceration in IDJJ facilities or some loss of privileges.

IDJJ youth are given a manual on their rights at intake, but these manuals were often misplaced and the description of youth rights and responsibilities should be easily accessible to youth and staff in each living unit. The established grievance and complaint process should be periodically clarified for youth and staff. Continuous training of staff and youth should be used to increase youth confidence in the integrity of the grievance and complaint process. The role of fair and open communication among staff and youth should be an integral part of the IDJJ rehabilitation model.

**IDJJ's Response to LGBTQI Youth**

The Remedial Plan requires IDJJ to create and implement a training program and to promulgate policies that would address the needs of LGBTQI youth. IDJJ has made substantial progress in the area. The training to staff on LGBTQI issues has been scheduled and conducted. There are a new set of Court-approved policies covering LGBTQI youth, including those with Gender Dysphoria. This includes an agency-wide protocol and review committee that considers the special needs of Transgender youth. I have requested and am waiting data from IDJJ on the results of the Gender Dysphoria review committee for the past year.

These LGBTQI policies are in keeping with current professional thinking in this field and draw upon excellent models from other jurisdictions. The key issue for ongoing monitoring is how these formal policy steps are being reflected in actual practices in IDJJ facilities. With the exception of IYC St. Charles, the lack of sufficient professional staff limits the attention that could be given to LGBTQI youth. Further, it remains to be seen if IDJJ can recruit community volunteers and advocates to help these youngsters to meet their social and emotional needs.

At the request of the ACLU, I personally interviewed two youth who self-identified as LGBTQI. In July 2015, these youth were housed at IYC Kewanee and IYC St. Charles. Many important concerns emerged from these one-hour face-to-face and confidential interviews. The youth with whom I talked complained, as did other youth at these facilities, that they were not getting

enough help or treatment. These youth described the very limited mental health services that were available to youth, especially at IYC Kewanee. These youth stated that typical days involved sitting in the day room of their living units.  There were no vocational or post-secondary educational opportunities for these young people.

None of the LGBTQI youth that I interviewed felt safe in IDJJ facilities. They reported being sometimes verbally harassed by staff and other youth. They doubted whether the staff were committed to keeping them safe. These youth also reported being subject to arbitrary staff policies that allowed only one LBGTQI youth at a time to be in the recreation area. There were also complaints by these youth that they were periodically excluded from certain institutional jobs, such as work in the kitchen area. One LGBTQI youth was not permitted to wear shorts because the staff felt that this young person's personal style was "too provocative". Some staff at IYC Kewanee confirmed the youth's account of this situation.

As with other youth at IYC Kewanee and IYC St. Charles, these young people were very concerned about where they might live after release from IDJJ. Traditionally IDJJ has experienced difficulty in locating suitable and available community placements for LGBTQI youngsters.  These youth wanted vocational and skills training that might assist them to obtain post-release housing and employment.


**Youth Viewpoints**

As part of this comprehensive review of Safety and Welfare issues, I conducted private and confidential interviews with youngsters residing in each of the IDJJ facilities.  In all, I spoke with more than 50 youth. While it was not possible for me to verify specific claims from youth who complained about maltreatment during the time that I was onsite, in every instance, I followed up with IDJJ managers and requested official documentation in terms of incident reports, some medical records, disciplinary actions, and housing units changes. IDJJ top managers were very

cooperative in researching these cases and sharing with me the requested information. In a few situations, IDJJ arranged for me to place subsequent phone calls with the affected young people to get an update on their status.

For this report, I have selected a few youth whose stories are illustrative of the ongoing challenges faced by them and by others in IDJJ. It is important to stress that there are often many sides or perspectives on events that occur in IDJJ facilities. Investigating potential harm is a complex and time consuming process. Still, youth and staff perceptions are important. A central premise of Social Psychology is "What people define as real is real in its consequences". Further, humans form their self-perceptions from how others in their environment respond to them as well as the physical settings that they experience on a daily basis.

Here are some anecdotes gathered from IDJJ young people that deserve closer policy and programmatic scrutiny. I have kept the youths' identities confidential.

A 14 year old has had a very difficult time in IDJJ. This youngster has an extensive history of severe psychiatric problems and receives significant doses of several psychotropic medications. This youngster could qualify for group home placement in lieu of being at IDJJ, but there are apparently few qualified placement providers who are willing to take this young person.

At IDJJ this very troubled youth often gets into conflicts with staff and with other youth. These issues have often led to periods of room isolation, separation from other youth, and very limited prosocial programming. When I first met this youngster, they had not attended school for several weeks, but now there is a plan to provide at least one hour in a regular classroom and the remaining time receiving education on an individualized basis in their living unit.

This youth claimed regular maltreatment by staff that included being handcuffed in their room and being placed in an empty and cold locked room for 6 hours with no bedding or clothing.

These allegations were investigated by the Illinois child welfare agency. IDJJ completed its own external examination of this alleged staff misconduct.

A cursory review of this child's file reveals the extent of their mental health issues. While the staff in IDJJ are attempting to respond to day-to-day behavioral challenges, there did not appear to exist a comprehensive treatment plan to allow this young person to leave the IDJJ institutional setting to a more normal home-like environment. The IDJJ staff are attempting to increase the amount of schooling available to the youth without causing serious safety issues for the youth or others. This case suggests the need for intensive Central Office oversight and direct intervention in providing the best available mental health services for this youngster. It is likely that a future placement will require extensive mental health services and attention to achieve some successful reintegration in the community. The present IDJJ placement seems to be adding to and not solving many of this child's underlying problems. Staff attention and patience is being greatly strained to manage everyday interactions with the youth. It is an unsustainable situation.

An 18 year old awaiting transfer to the adult court system complained of excessive force used by staff during a movement of this youth to the health clinic. This youth incurred serious dental injuries while being physically restrained by staff. This youth was fitted with a "spit mask", although IDJJ policies in the use of this devices are vague. This youth received some dental care at IDJJ but will require more medical services in the near future.

The incident reports covering this event were less than complete. While there were several accounts of what occurred, these reports offer little insight into the reasons why the altercation took place or what alternatives might have been employed prior to physical or mechanical restraints. Part of the altercation was videotaped, but the tape was inconclusive. It may well be that overall staff shortages at the facility pressured the security staff to take immediate actions, when more time to engage in verbal de-escalation might have avoided the need for the greater use of force.

It is worth noting this youth has been placed in an Alternative Housing Unit for two weeks and that he had also been moved to Crisis Confinement as a result of other adverse interactions with staff. He claimed that he had his clothes removed in Crisis Confinement and had no mattress in the room. He reported that he actually preferred the old confinement unit because the duration of his stay there was shorter than in Alternative Housing and the staff "left you alone". This youngster had a history of serious and assaultive behavior before coming to IDJJ, but received very minimal treatment interventions for his severe anger management or behavior control problems.

This youth was subsequently placed in a regular living unit and then transferred to the Adult Parole authorities. Because of his ambiguous legal status, the IDJJ did not develop a detailed treatment plan and this youth received minimal education and counseling services while at IDJJ.

Under new laws that will begin in 2016, young people similar to this youth would be housed in a local county jail or at IDOC. This would reduce the pressure on IDJJ to manage this sort of youth, but it is unlikely that their level of care will improve.

A very different story emerges from two youth aged 16 and 17 years old who resided in general housing units and who were generally well behaved and attempted to follow most staff directions. Both of these youngsters complained about the lack of schooling. Either school was cancelled or they received one hour of school in the morning. The lack of security staff or teachers was given as the rationale for the inability of IDJJ to deliver legally mandated education. These youth explained that "single staffing" on the living units was a chronic occurrence.

Insufficient staff led to frequent lost opportunities to shower, minimal recreation time and inconsistent commissary services. One youth saw mental health personnel "as needed" and did not think the resource groups that were offered were appealing to him. The second youth did

see a psychologist once per week and felt that there were good treatment groups offered for only one hour per week. Long periods of idleness in their rooms or in living unit day rooms was a frustrating reality for both youngsters.

These youth complained that the lack of school, work assignments and other counseling activities made it very difficult for them to earn reductions in their sentences. Both youth reported that although they had signed up for a variety of positive activities, they were not selected by staff to participate in the limited program slots that were available.

**Key Implementation Considerations**

There are several policy conclusions that should be drawn from this progress report on the R.J. vs Jones Remedial Plan. First and foremost, large and constructive improvements at IDJJ are fully underway. The initial progress is most noticeable in redrafting policies in the areas of confinement and the use of restraints.  Actualizing these reforms will not happen overnight and sustaining the new methods of treating youth will require patience and a steadfast focus on the transformations that must be achieved.  While training and further staff development is important, it is crucial to the humane care of troubled youth that there occur a fundamental shift in the IDJJ organizational culture. Staff at all levels in IDJJ must move away from the conventional reliance on containment, confrontation and coercion and towards empathy, basic knowledge about adolescent mental and social development, and supportive relationships between staff and young people.

New leadership at IDJJ has already signaled its commitment to the needed culture shift. Part of this transformation will mean that IDJJ staff need to feel valued and included in the change process. There also must be strong systems of accountability and checks and balances for youngsters and agency personnel.  Change needs to be planned, managed and monitored closely. There must be clear lines of authority and responsibility for reform and these must be

grounded in the chain of command. The current IDJJ top managers comprehend that it is unwise to try to fix everything that is broken all at once. There is an increased use of pilot testing new policies and programs.

There must be sufficient resources dedicated to the humane care of troubled youth. Creating and nurturing an atmosphere of trust among the many individuals who will be involved in the reforms is a must. Presently, IDJJ is still struggling to overcome severe understaffing in the number of security staff on a daily basis. Moreover, increased personnel resources are needed at the level of middle managers, administrative support staff, teachers, counselors, and mental health professionals. These staffing issues have led to excessive cancellation of school, reduced recreation and counseling opportunities as well as deprivation of basic services in some IDJJ facilities.

There is presently too much idleness among IDJJ residents and the limited opportunities for pro-social activities leads to violence and tensions between the staff and youth. Making progress in upgrading the basic care of youth including mental health services can lay the foundation for the culture shift that is necessary. The conditions of the living units and the physical plant of the institutions still clearly communicate the diminished value the adults place on the young people that they serve. The current problems in the physical conditions of the IDJJ facilities remain an impediment to implementing a comprehensive rehabilitation model. Effective social and psychological treatment requires evidence-based curriculum but also rests on a proper treatment milieu and empathetic and motivated treatment personnel.

Helping young people prepare to successfully return to their communities is the centerpiece of high quality juvenile corrections programs. It is well known that young people who can see the way back to the community will be more enthusiastic customers of treatment and educational services. IDJJ also recognizes the urgent need for expanded aftercare services to support help youngsters to navigate the often complex and challenging transition home.

My opinion and substantial research and professional opinion points to making living unit populations even smaller than is currently the case. Creative solutions must be sought to rectify staff shortages and to provide enough security and other staff to offer IDJJ youngsters legally mandated services as well as more resources to acquire important and positive life skills. It is axiomatic that IDJJ staff resources must be sufficient to ensure the safe delivery of high quality programs and services.

IDJJ faces a daunting task of meeting the core elements of the Remedial Plan without the appropriate staffing resources. One potential policy option for Illinois is to reevaluate the youth who presently are in IDJJ, and especially those who reside in its facilities for very short stays, and determine if less costly, community-based care would be appropriate for these young people. New laws that will take effect in January of 2016 might assist in achieving this objective.