IN THE UNITED STATES DISTRICT COURT
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| R.J., et al., ) | |
| ) | |
| Plaintiffs, ) | No. 12-cv-07289 |
| ) | |
| vs. ) | Hon. Matthew F. Kennelly |
| ) | |
| Candice Jones, ) | |
| Defendant. ) | |

**MENTAL HEALTH**
**MONITOR UPDATE**

**Date of Report: November 2, 2015**

This report focuses on Part II of the remedial plan, which concerns mental health issues, and Part IV, which concerns confinement issues. This report's findings and recommendations are based on my monitoring of the IDJJ during the last year, including my facility site visits, interviews with IDJJ officials, staff, and youth, and review of IDJJ documents.

**Facility Assessments**

**IYC Chicago**

I inspected and evaluated IYC Chicago on March 31, 2015. They had a total of 61 youth at the facility. IYC Chicago is not an Intake program, nor does it define itself as a program for youth with significant mental health concerns. There are few youth with any significant mental health issues or significant acting out behaviors. If this were to occur they would be transferred to IYC St. Charles or IYC Kewanee.

They are not fully documenting Informed Consent utilizing the revised forms and information about dosage levels and side effects as required by revised policies. When one reviews the charts, one does not see documentation of side effects and goals of the medication. One also gets no concept that families/guardians have been fully informed. DJJ has appointed a Medical Director since my 2015 facility visits and reportedly will ensure full compliance with informed consent requirement. This will be a subject of monitoring in 2016.

There are relatively few youth on psychotropic medications. The psychiatric hours have not changed. The psychiatrist comes out 5 hours per week. She typically comes out Sundays like she had the year before. This psychiatrist is a child and adolescent psychiatrist.

1

There were no concerns identified regarding seclusion at IYC Chicago. In regards to youth who had recently been on confinement, the maximum amount of time on confinement was three and a half hours.

I did not see any Aftercare staff at IYC Chicago. These are the IDJJ staff who supervise youth in the community after their release from IDJJ secure facilities. The remedial plan requires coordination by mental health staff with other staff to plan community reentry. The remedial plan also requires aftercare planning to begin within two weeks of a youth's commitment to IDJJ. My strong concerns, as with my earlier monitor report, are that the Aftercare appointments are not being made for these youth while they are at their facility as part of the coordinated release planning. DJJ's revised policies for case planning required this coordination which will be monitored in the coming year.

They informed me they were going to begin implementing the Youth Assessment and Screening Instrument (YASI) screening tool, which is replacing the CANS (Child and Adolescent Needs and Strengths). They talked about a Positive Behavior Inerventions and Supports (PBIS) coach and having a monthly PBIS meeting. They felt the behavioral program is coming along though this is only beginning to be implemented. This will be a subject of monitoring in 2016. They are implementing the SPARCS program for some youth and for all youth having the SOS curriculum. They have a Wells (alcohol and substance abuse) Program at the facility, which has 22 beds. At the time of my interview, they had 18 youth in this program.

For one of the healthiest groups of youth in IDJJ, it appears IYC Chicago does an adequate job. IYC Chicago, with its central location will be among the most apt to get the staff they need, which appears to be why they have a full complement of staff which for the most part have stayed on. There also seems to be a full complement of security at this facility.

There are no family therapy sessions. There have been no changes in this since my earlier reports. No didactics and no structure have been put together to implement family sessions. This is still an area of deficit. The remedial plan requires family therapy as appropriate.

## IYC Warrenville

I inspected and evaluated IYC Warrenville on March 31 and April 1, 2015. All of the females who come to IDJJ are assessed and housed at IYC Warrenville. IYC Warrenville had a total of 32 youth when I visited. Their Treatment Unit Administrator continues to be Dr. Harbaugh.

Essentially nothing significant has changed at IYC Warrenville since my last evaluation. They are doing a variety of treatment interventions as they were doing previously, including DBT, SPARCS and family therapy, reportedly by telephone.

I am not impressed with family therapy at any facility in IDJJ. Until protocols can be put into place that youth follow, this is going to be a problem that needs to be followed up with. Like other facilities, they state they do some family therapy by telephone, but the assessment process with regard to the needed family therapy and the types of interventions implemented are essentially nonexistent. As with the other facilities, there needs to be a consistent process in place for family therapy. This is not yet in place.

At the time I was there, they reported there were no transgender youth. In the previous year there were 6 youth that potentially had that identification.

At the present time, they have 7 youth in the Wells Program (alcohol and substance abuse). They reportedly have space for up to 20 youth.

There was one youth I evaluated who essentially is on a behavioral plan that provided limited contact with other youth at the time of my site visit. She presented a very challenging case in that she is an aggressive youth who is unable to sustain herself at placement and unable to sustain herself safely outside of the unit they have her on alone. They have consistently attempted to get her off the unit and they have staff working with her repeatedly. They give her time out of her room. However, this has been something problematic. Once the IDJJ contracts with a board-certified child and adolescent psychiatrist, as required by the remedial plan, the facility staff hope to get more oversight and interventions regarding these types of situations. They have done a commendable job however in this case under the circumstances and DJJ subsequently reported that the youth had transitioned to a residential unit with other youth.

As with the other facilities, Aftercare was not visible. I got no sense that any type of Aftercare programming is put into place prior to the youth leaving. For example, there were no appointments or other types of interventions.

Warrenville also has a number of youth who are past or near their Administrative Review Dates, when youth are scheduled for parole review. This could be an area of potential concern in regards to why exactly the youth are still being confined to a juvenile correction facility.

They reported the facility psychiatrist does psychiatric assessments on all of the youth and follow-up where appropriate. IYC Warrenville has continued to feel they need more psychiatric hours to assist in the care of the youth. As discussed above, a major area of concern at IYC Warrenville has to do with Aftercare plans. I think that having more psychiatric services would be of benefit in regards to assisting and working with other mental health staff regarding planning, in particular with some of the more complex children.

3

**IYC Kewanee**

I inspected and evaluated IYC Kewanee on June 23 and 24, 2015. There were 152 youth present. IYC Kewanee houses male youth who have been classified as higher security risks or as juvenile sex offenders. These two groups include many youth with substantial mental health needs.

IYC Kewanee reported they are down a significant amount of security staff. As a result, youth in many of the dorms are typically kept in their rooms for extended periods of time. This is of significant concern.

Youth in Units 2A and 6B are reportedly spending up to 24 hours per day in their rooms, with some having up to 2 hours per day out of their rooms. I found no youth who had more than that amount of time out of their rooms in these alternative dorms. <u>Essentially these two dorms are acting as confinement</u>Youth continued to report that they are in their rooms for extended periods of time, upwards to 22 or more hours per day.

I was informed that there are three phases for these youth and on Phase 3 they should have at least 8 hours out of their rooms. In speaking with the youth, this is not occurring. However, even though Dorms 2A and 6B have been developed into two or three week programs, in reality youth are staying on these units for significantly longer. Even those youth in Phase 3 of this program, which are expected to get over eight hours of time out of their rooms per day, at most get one or two hours out per day.

I met with a group of youth after spending time on Unit 2A. The youth in this particular group are all either high school graduates or have obtained their GEDs. They felt they were being punished because there isn't the option of going to school; rather, they have to spend this time in their locked cells. They said there are no other options for them. Many of the youth informed me they are not able to go to their scheduled groups and they have become progressively more upset about this. There continued to be significant educational difficulties. I saw no signs of an educational process occurring in these dorms.

There was one youth that I met in Unit 6B who reportedly had been spitting on staff and was put to the ground. The youth reported that he was assaultive to staff but he then had a "spit mask" put over his head and was repeatedly beaten by staff, ultimately breaking several of his teeth. He had seen a dental assistant at the time I was there, but had not seen a dentist. The senior nurse reported to me that they would not fix his broken teeth in any type of more complete fashion until shortly before release, reporting that youth in general have a history of reportedly breaking their teeth again. There were reportedly tapes which had been reviewed, but I did not see these tapes.

4

The MISA Program (mental illness and substance abuse) has been stopped. I was informed they were going to have a general alcohol and substance abuse educational program for the facility. They were still assessing youth through the Gains Assessment for substance abuse, but staff were still in the training process while I was there. Essentially, the whole alcohol and substance use programming at IYC Kewanee seemed questionable at best.

Last year I brought up the issue that it was very difficult to understand any practical difference between the MISA Program and the Wells Program. There is no longer a MISA program. However, it is unclear what kind of substance abuse program is effectively working at IYC Kewanee.

I met with 4 Wells Program staff at IYC Kewanee. They reported they are reassessing all of the drug treatment programming and at this point only three youth had been identified to begin the Wells Program. They are going to do GAINS assessments on youth at IYC Kewanee to further assess who might be appropriate. Staff reported that once the GAINS is given, after one year it is no longer valid. Whatever type of general substance abuse education program is ultimately put together for the general population, this has not yet occurred. There were actually not any programmatic components that they could show me.

At the present time, clearly alcohol and substance abuse issues are not being adequately taken care of at IYC Kewanee. Although there appears to be development of a potential change, this has not been implemented.

At the time I was there, 63 youth were on psychotropic medications. No one could give me the exact dates of when the psychiatrist comes. I was told that she would be coming out one of the days I was there. On that day I was told she was not coming, and there was nobody at the facility that could give me a reason why she didn't come or why they were not aware that she was not coming.

There is no family therapy and no family therapy program that has been implemented. Also, there still has not been any specific training for family therapy. Further, there has not been any structure to developing family therapy.

There were other isolated difficulties. There was a youth who was placed in confinement for apparently having mental health status changes. He may have been placed there for a crisis status initially. He remained there for 72 hours. The youth never left his room in the 72-hour period and never had a shower during the 72-hour period. He miraculously started doing better after 72 hours and returned to his dorm without a psychiatric assessment. It seemed evident there was not an acute mental health issue. Even if the youth had been noncompliant with his medication, the impact of the medications would not have occurred so quickly. This youth was placed in 72-hour crisis for barking like a dog and reportedly not being compliant with his psychiatric medications. The concern among other things with this confinement was that, in speaking with the youth, he was required to remain on

confinement until he took his medication. They were essentially forcing him to take his medication by keeping him in solitary confinement until he agreed, which ultimately happened after 3 days.

Staff at IYC Kewanee were aware of this incident. It was actually while interviewing this youth with Dr. Jaworski that this information was identified and then acknowledged by staff.

In my opinion, there continued to be a lack a sufficient number of mental health staff at IYC Kewanee. One of their rationales was that they had fewer youth at Kewanee, now at 152, and therefore needed less staff. Dorms 1C, 2C, and 4C are currently empty.

I am not convinced by any means that they have enough staff, and more importantly, trained staff. I spoke frankly with the mental health workers who acknowledged that there is not enough staff to help them out.

They felt that an equally frustrating problem is the lack of security and support staff to allow them to see patients. I was informed that over 30 security staff need to be hired at IYC Kewanee. I was informed that as a result of security staff not being there, there have been a variety of difficulties, including youth not getting the recreational time that they are supposed to have, and not being transported to treatment groups and other types of activities. This results in the youth spending excessive amounts of time in their small rooms, separated from the day-to-day activities, such as education and rec time, which they should normally be involved in.

Staff at IYC Kewanee has stopped doing the SPARCS group. They reported this has occurred because essentially they can't get the youth to groups, because there are not enough security staff. They hope to potentially do this at some point in the future. There was no structure as to when this might occur. Within my interviews at IYC Kewanee, there was an obviously significant paucity of treatment interventions. Some of the staff reported being able to have groups which are completed. However, the majority of mental health staff described not being able to complete groups, including substance abuse and other therapeutic interventions.

Although there is a dearth of staff and numerous open positions, staff reported that in general there are more staff than the last time I evaluated IYC Kewanee. Essentially, they have at least one mental staff person per Unit. However, every mental health worker said that treatment would be far better if each unit had more than one mental health staff. It would allow for better group work, more consistent individual work and coverage when another staff is ill or on vacation.

There is now an IDJJ Medical Director in place. There is still not an IDJJ child psychiatrist. I hope that appropriate staff are identified, and those staffing positions which need to be filled are filled, so youth can have their basic mental health treatment needs met.

6

The juvenile sex offender (JSO) program is housed on Units 2B and 3. An employee with a psychologist-2 position, who is not currently licensed but reportedly is working on their license, is taking care of the acute special treatment youth. These are the most acute special treatment youth in all of IDJJ. These are more acute than the special treatment youth who are sent to IYC St. Charles. IDJJ is using an unlicensed Masters Level Psychologist to oversee their treatment.

Unit 2B is for the high school graduates in the JSO program. Over 50 percent of these youth are waiting for placement in the community and are past their ARD date. Dorms 3A and 3B are JSO high school students who have not yet been placed, and Unit 3C is the JSO Honor wing. Staff reported they have been working with Onarga, a nearby residential facility, in regards to the New Beginnings Program. They reported this was beginning, but for reasons unclear thereafter it seemed to simply end. It is unclear what types of connections with community-based programs are being put together in an attempt to appropriately place youth.

Dorm 6A is now the protective custody wing. This wing was put into place to assist with the large number of youth who were staying on medical or fearful for one reason or another to go back to their units, and also spending additional time on crisis.

I was informed that Aftercare is responsible for finding placements and is required to meet with youth on a monthly basis. There was nothing actually identified in any of the files to show this was case. Youth did not support this either.

While at IYC Kewanee I spoke to a mental health worker who previously was an Aftercare worker. This person told me that as an Aftercare worker, he focused a lot of treatment in making sure the youth were appropriately placed in Aftercare. He felt that recidivism was down because of this. There is no clear data to support this. I had no information given to me as to whether or not Aftercare planning is put into place while the youth are in the facilities. The easiest follow-up data for this is to determine whether, if the appointments are put into place, youth actually go to their appointments, and whether they do so regardless. The point of having appointments in place is to ensure appropriate community treatment and thus to minimize recidivism.

There was a more complicated transgender youth who was 19-years-of age who was evaluated with Dr. Jaworski. The concern that Dr. Jaworski had is that there is an appropriate protocol set up for youth going through Intake who are transgender, for the youth to formally go through and for staff to evaluate. This youth did not go through that protocol. Staff immediately addressed this area of concern with this youth.

There were a number of other youth I met with who had complex mental health histories in association with suicidal ideations and self-mutilatory behavior and other difficulties. In my opinion, one of the biggest areas of concern with all of these

youth is the lack of mental health services that they can access at IYC Kewanee, which is increasing how their pathology is presenting.

In summary, there is a tremendous amount of confinement with youth that is occurring. The majority of youth are spending 22 or more hours a day in their rooms. I interviewed a number of youth who are presenting with depressive symptoms, along with self-mutilatory behaviors.

**IYC Harrisburg**

I interviewed staff at IYC Harrisburg and inspected the facility on June 29 and 30, 2015. IYC Harrisburg houses male youths from central and southern Illinois.

The staff were very pleasant. I met with the Director of Operations, the Assistant Superintendent of Programs, and numerous mental health staff. I reviewed the remedial plan with the staff again.

At the time when I visited Harrisburg, they informed me that a Treatment Unit Administrator, who will oversee mental health treatment at the facility, was likely hired. DJJ subsequently reported that the TUA had been hired. The remedial plan requires a TUA at each facility with a doctorate degree and appropriate licensure.

There were concerns after the longtime psychiatrist at IYC Harrisburg, Dr. Chandra, retired. The psychiatrist hired as a replacement did not start in the position Subsequently Dr. Chandra returned from retirement and is now seeing patients again. I was concerned because numerous youth had not been seen by a psychiatrist for over 30 days, at the time of my evaluation. In addition, there were youth who were acutely mentally ill that had not been evaluated by the psychiatrist because at the time I was there, there had not been a psychiatrist. Dr. Chandra was already leaving and was not coming in his full hours at that point.

At the time of my site visit there were 14 youth at IYC Harrisburg past the 30-day mark and needing to see a psychiatrist. Based on my subsequent conversation with Dr. Chandra, there are no longer youth who are overdue for psychiatric follow-up at IYC Harrisburg. The situation will continued to be monitored. There have been some attempts to utilize telepsychiatry, but this has been inconsistent. .
In January of 2015, there were 38 youth on psychotropic medications; 24 were on antidepressants, 7 were on antipsychotics, 8 were on antianxiety medications, 3 were on anticonvulsants, 2 were on Alpha 2 Agonists, 2 were on stimulants, 17 on non-controlled medication for ADHD. In May of 2015 there were 43 youth on psychotropic medication; 10 were on antipsychotics, 16 were on antidepressants, 20 on antianxiety medication, 1 on an anticonvulsant agent, 1 on an antihypertensive, and 29 on stimulant medications.

The psychiatric services are through their contractual agency. However, DJJ is ultimately responsible for what their contractual agency is doing and not doing.

8

Within the charts at IYC Harrisburg, they have had far more comprehensive consents which have been sent out to the parents. These are not formalized throughout IDJJ. However, the consents at IYC Harrisburg are comprehensive, addressing most side effects and goals regarding the medications.

The new Court-approved seclusion guidelines are in place at this point. There were two youth that I met who reported a process at IYC St. Charles where they were put in essentially confinement for 24-hours, released for a period of time, and then put back into confinement. There were also youth who stated they were in their own rooms for significant periods of time. There are not youth that are formally put on confinement for more than 24-hours. However, the concern for ongoing confinement issues continues.

Overall, Harrisburg had shown clear improvements. They had a full mental health staff. The mental health staff stated they are looking forward to having a treatment unit administrator who could helpfully give them centralized directions in regards to the ongoing treatment of the youth. Although, as mentioned above, a TUA had been hired, there was still no TUA in place. I hope at the time of my next evaluation, the TUA will be there and they can show me the implementations of what they are doing. At present, there continues to be ongoing treatment.

At the Intake section at IYC Harrisburg, there was still some confusion regarding how many groups versus individual treatment they were having and an explanation to me of what exactly they were doing. They had the staff to take care of these youth and they were clearly in the process of implementing the additional group mental health interventions within Reception and Classification, which was agreed upon in the remedial plan. Overall, IYC Harrisburg looked much improved.

There were still the same concerns regarding Aftercare. In southern Illinois there is a paucity of Aftercare. Staff spoke about Aftercare being there. However, when I spoke with mental health staff and tried to get a sense of involvement with Aftercare, setting up programming for the youth when they were discharged, etc., no one could say that Aftercare was interacting with them. My impression, based on the paucity of Aftercare programming, is that the necessary appointments that the youth need to have set up for them are not being done. There continues to be a high recidivism at IYC Harrisburg.

Overall, there is significant improvement. It is difficult to fully assess mental health, as they still do not have a Treatment Unit Administrator. In addition, because there is not an IDJJ child psychiatrist to assist with the staffing issues, it is difficult to fully assess this area. At the time of my site visit to IYC Harrisburg in June 2015, the IDJJ was not in compliance with the remedial plan regarding having the medical director in place, or in hiring a child psychiatrist. Since then, a medical director has been hired. I met with Dr. Kwak while at IYC St. Charles in September 2015. I thought he was quite competent and will hopefully do a fine job in this position.

**IYC Pere Marquette**

I inspected and evaluated IYC Pere Marquette on July 1, 2015. This is a step-down facility that houses a smaller number of lower-risk male youths.

I met with superintendent House, Bernard Nutsukpui, Head of Programming and Cheryl Motley, PhD, Treatment Unit Administrator.

Last year when I was at Pere Marquette they did not yet have a Treatment Unit Administrator. Dr. Motley is a new hire. She is really an exceptional hire. I was impressed with her intelligence, openness, breadth of knowledge, and ability to work with staff in developing programming.

IYC Pere Marquette also has a licensed clinical social worker that was hired approximately two weeks prior to my visit, which completes their complement of mental health workers.

I attempted to call their psychiatrist. She did not pick up at our scheduled time to speak. She is the same psychiatrist who was there the prior year. At the time of my assessment, she was working ten hours per month for IYC Pere Marquette. She would only come in once a month. Concerns expressed by staff included that there are children who come in with acute mental health concerns that are not seen by the psychiatrist for almost a month. In addition, there are some who have side effects to medication, who among other things will stop taking medications because of these side effects, because they are not able to see the psychiatrist for up to a month. In last year's evaluation I brought up this concern, and nothing was done about it. Having a psychiatrist coming only once a month is not adequate treatment for the youth. It presents significant risk for mental health concerns.

Shortly before completion of this report, I was informed that they are adding psychiatric hours to IYC Pere Marquette, and there will now be a total of 16 hours. This will result in the psychiatrist coming every two weeks rather than once a month. If this is implemented, I feel that it will be adequate. I am unsure when it will begin to be implemented.

At the time of my evaluation, the youth had been evacuated to the nearby Alton Mental Health Center because of the flooding of the Mississippi River. The staff and superintendent were trying very hard to work with the youth, putting together positives in regards to the temporary move. For example, on the day I came to see the youth, all of them were at the Cahokia Mounds on a field trip. I went out to the Cahokia Mounds to see some of the youth and then saw more after their return.

There was no Aftercare worker there. I was informed an Aftercare worker does come, but typically at the time of parole hearings or about once a month. They had

10

no information to say that anything was different from the prior year regarding setting up appointments for youth. From their understanding nothing is done. One of the concerns which I have, as with other institutions, is the expectation that appropriate Aftercare planning would be put into place with appropriate appointments made prior to the youth leaving. The reality is that until appropriate mental health, alcohol, and substance use appointments can be made while youth are awaiting parole or release, they will be at a high risk for recidivism. At this point, appropriate programming prior to parole has not occurred.

I reviewed files and spoke to youth on psychotropic medication. None of the youth reported being talked to about side effects of medications. The charts do not show that appropriate consent has been obtained. There is no documentation of side effects or goals being reviewed with parents or guardians.

Psychiatric care in general needs to be looked at closely. I hope once a child psychiatrist is in place, this can be looked at closely in regards to medications being prescribed, psychiatric follow up with the youth on medications, and appropriate medications for side effects.

## IYC St. Charles

I inspected IYC St. Charles on September 3 and 4, 2015. It is the largest IDJJ facility, and houses many youth with substantial mental health needs. IYC St. Charles currently has 222 youth.

The new seclusion policies had not yet been implemented. The Court approved them earlier this year.

A medical director, Dr. Kwak, had been hired. The child psychiatrist has not been hired. Therefore, specific staffing ratios still have not formally been identified as required in the remedial plan.

I met with a number of mental health professionals, as well as Interns and others. St. Charles continues to have the largest complement of mental health professionals. They are the only facility having a comprehensive internship program, mostly through the Adler School of Psychology.

In general, the psychiatric care appears adequate. In my opinion, there are youth there with complex psychiatric disorders. Having a department-wide, board-certified child and adolescent psychiatrist to consult with or to assist some of the more complicated treatment options, would make more sense. There is a significant use of mood stabilizers and neuroleptics with diagnoses such as Bipolar Disorder being prevalent, but not necessarily with diagnostic criteria to support the diagnoses.

11

St. Charles has a new superintendent, Brenda Welch, who is working hard in looking over some of the areas of strength and deficit.

One of the major difficulties with IYC St. Charles is that there is a tremendous lack of security staff. Although they are fully staffed on paper, many of the security staff are out on disability. Because of the lack of security staff, many of the therapy groups that are put together for the youth are not occurring. In reviewing therapists' schedules, it appears that at least a third of the groups are not occurring because there is no security staff to bring the youth to groups.

An even more significant concern is the tremendous amount of time that youth are kept in their rooms because of a lack of security. In speaking with youth in a number of the dorms, they will spend extraordinary amounts of time in their room in a consistent fashion. There are many youth who are spending upwards of 23 to 24 hours a day in their room, though they have not done anything that would justify any official form of "confinement."

In association with this, there is a paucity of educational staff which has greatly limited youth involvement at school. These youth are essentially on confinement. They are locked in their small somewhat damp rooms for the great majority of the day, many without any rec time, many without going to school, or if they do go to school for a very minimal number of hours, perhaps several days a week.
Mental health staff is concerned regarding some of the new confinement criteria and have felt that this is related to more significant behavioral issues with youth. In my strong opinion, the first and foremost area that has to be looked at is the painful amount of time they are confined to their cells.

Superintendent Welsh helped me understand how St. Charles is trying to address the issue of confinement. At the time of my assessment, they had developed sheets in draft form for IDJJ, related to the graduated interventions of "cool downs" (time with staff in an unsecure area away from other youth), "time outs" (time alone in a youth's own room or other secure area for up to four hours), and "confinement" (time alone in the confinement wing for up to 24 hours).

I met with the Reception and Classification Unit Administrator. He is working on issues of comprehensive background history for the youth and concern regarding limited understanding of cognition.

The treatment unit administrator was quite helpful. I met with him on both days I was at IYC St. Charles. Within Reception and Classification (R&C), there are three sets of groups that are running.

Last year, Positive Behavioral Intervention & Supports (PBIS) was just being implemented and was not yet being used. This was a statewide behavioral program. The remedial plan requires the IDJJ to adopt and implement a department-wide behavioral management system, and the Court has approved the IDJJ's plan to do so

12

by means of PBIS. The program itself is quite reasonable. The difficulty has to do with the actual implementation. As I evaluated St. Charles, as well as other facilities, the implementation appeared to be barely beginning, after a year. It seems as though there is some level of difficulty getting security staff to consistently use this behavioral program. I hope by next year's assessment this will be fully implemented.

There are two mental health spots open. One is a Psychology position in the Reception and Classification Unit and one is a Social Work position in the Special Treatment Unit.

They are now using the Forward Thinking Model in the Special Treatment Unit. This treatment option had been used in their substance abuse program. It is not specific to the general population, and for the first time shows different programming in the Special Treatment Unit. In addition, the special treatment unit has a different area where youth live. The two units are Lincoln and Adams Cottages. The Lincoln Cottage is for younger and less violent youth. The Adams Cottage is for older and more violent youth.

I spoke with the superintendent regarding the new structure of confinement time. It is essentially less than four hours for any individual. Beyond that it requires mental health interventions. Mental health staff has expressed concern, feeling there are no ramifications to the youth's behavior if confinement cannot be longer than this. The major area of concern from mental health's staff is the lack of security staff. Mental health staff reported that many youth are locked in their rooms for the majority of the day. A number of youth are lucky if they go to school one day a week. This is a travesty.

The irony in assessing the St. Charles facility is that even though they have described decreasing confinement to only four hours a day, essentially many of the youth are confined to their rooms (not able to attend school or rec time) for most of the day, regardless of the reason at hand.

I spoke with mental health staff about Aftercare. They reported that there are only the rarest of interactions with Aftercare at the facility. They described that Aftercare workers cover a large area, upwards of 250 square miles, and have court and other obligations which have limited their involvement with the youth at the facilities. St. Charles, as with the other facilities, is not setting up the appropriate appointments for Aftercare. There is absolutely no documentation to show this is occurring.

I attended a group with 9 youth at Kennedy College. The two staff running the group did an exceptional job. I was very impressed with the youth participation and saw it as a worthwhile and helpful endeavor. The mental health staff were experienced, insightful and empathetic.

After the group, I spoke with the youth. The remedial plan requires opportunities for all youth to spend at least eight hours per day outside of their rooms engaged in

13

supervised activities. The youth reported they have minimal time out of their room in a day. All nine of the youth said this relatively consistently. They reported their meals are being served in their rooms. They will get a brief break to take a shower, but beyond that they are typically in their rooms for 24 hours a day. Youth reported on September 3, 2015, they had four hours of rec time. They thought this was quite unusual. One of the youth even questioned whether or not they had more rec time because the staff knew I was visiting.

The maximal capacity of the Special Treatment Units is 46 beds. Currently they are far below capacity. There was some discussion previously about transferring some of the youth with more significant mental health concerns from IYC Kewanee to IYC St. Charles. At the present time, while some individual special treatment youth have moved, the program itself has not. The concern here is that there is a paucity of treatment providers at IYC Kewanee along with a dearth of security which leaves even more significant problems.

Mental health staff informed me that they have begun doing the assessments of youth who have been in crisis for 72 hours, as to whether or not they need to be hospitalized. This is required by the Court-approved IDJJ policies on mental health crisis confinement and psychiatric hospitalization. At the time of my site visit, there were two youth who had had these assessments. One youth was still on crisis confinement several days after the 72-hour assessment was completed. The youth had previously been evaluated by one of the psychiatrists at IYC St. Charles. I continue to have concerns about the coordination between the contractual psychiatrists and the mental health staff at the facility, particularly with youth on crisis status and in complex cases. There must be better coordination and collaboration.

The Special Treatment Unit has specialized components, beyond simply the individualized treatment approach they have developed, but also the development of a therapeutic milieu, the group and individual therapy
The youth in the Special Treatment Unit were the one group of youth that I saw spending a significant amount of time out of their rooms. When speaking with the youth, they described a positive interaction with staff that has been supportive and helpful.

Areas of concern include no family therapy, almost no telepsychiatry, and no teletherapy. I was not shown anything to support that Aftercare plans or appointments are put into place for the youth, making the likelihood of compliance with any kind of Aftercare services that much less.

The lack of security staff within the facility has been extremely detrimental to the well-being of the youth, requiring them to essentially be on confinement in their rooms for most days, sometimes all of the day.

14

There is nice documentation regarding the variety of individual sessions and group sessions being held. But group sessions are limited due to the paucity of security staff to get youth there.

I spoke with numerous mental health staff regarding LGBT youth. There is a committee that was formed within IDJJ to address youth that may be transgender. There is more of a focus within IDJJ and sensitivity regarding treatment issues and other areas of concern for these youth.

There were a number of mental health staff that described the facility at the present time as a travesty in regards to not being able to get the youth to school, their remaining in their rooms on confinement-like status, and not being able to get them to therapeutic groups.

In general, there truly seems to be motivation, as well as administrative directives focused on behavioral management and de-escalation. The complexity of course will be to see whether or not this can actually be consistently implemented, which has been a significant problem in the past.

In summary, I am really quite impressed with the overall mental health staff at IYC St. Charles. The concerns are that they can't actually implement the mental health programming in a consistent fashion because of the paucity of security staff. The concern is that the youth remain in their room in what is a confinement-like status, because of the lack of security staff. The youth are minimally, if at all, attending school on even a near regular basis. All of which leads to higher risk for recurring mental health concerns, including Major Depression, Anxiety Disorders, and PTSD symptomatology, just to name a few.

## General Findings

As with my last evaluation, the parties and monitors have worked out and developed additional policies, service plans and procedures as part of the Remedial Plan and beyond.

However, there continue to be significant staffing concerns at IYC Kewanee. In my opinion, it makes the program somewhat dysfunctional and potentially dangerous.

There are also significant security staffing concerns at IYC St. Charles, which has also made the mental health programming somewhat dysfunctional, and essentially means keeping many of the youth in confinement. By this, I mean keeping them in their rooms for 22 to 24 hours a day, and not having them do the typical activities they might normally do, including education and rec time, among other things.

IYC Harrisburg has shown improvement. However, at the time of my evaluation, they were without a psychiatrist. The psychiatrist returned because the psychiatrist they were going to hire had some difficulties regarding his hours at the facility.

15

There were numerous youth who had not been seen in well over 30 days, including youth that were presenting with acute mental health concerns, as well as youth with potential medication side effects. A psychiatrist is now updating all of the patients.

The Remedial Plan requires IDJJ mental health and other staff to plan each youth's community reentry. This should include integration with community mental health services, in collaboration with IDJJ Aftercare. The Consent Decree requires the monitors to monitor this reentry planning. The majority of youth in the Department of Juvenile Justice have underlying special education issues and/or mental health concerns. I continue to be disturbed that community mental health appointments are not being set up for these adolescents before they leave IDJJ facilities. These are some of the highest risk adolescents we have in our state. They are in need of a variety of wrap-around services. The complete state of Illinois FY 2014 recidivism rate in regards to parole violations is at 52.5 percent, and the 3-year recidivism rate is at 54.5 percent. This rate overall continues to be quite high. In my interviews with youth, quite a number talk about no follow-up from Aftercare about mental health, alcohol, or substance use treatment. All have reported not having any of these appointments made prior to leaving.

There clearly were interventions at Reception and Classification regarding setting up groups. Most notable were the groups and interactions and development of this process at IYC Harrisburg and IYC St. Charles. They still have some work to do on this, but the progress was quite positive. The major difficulty at R&C is because of the paucity of security, the youth are essentially left on confinement when not doing some of the specific activities that are scheduled, such as groups or individual counseling.

In general, the most significant concern is the amount of confinement time that has now greatly increased because of what is rationalized as staffing issues. This needs to be fixed. At this point in time, after the second year of assessing the program, there is no excuse for this to be occurring. This will worsen mental health issues and propagate aggressive behavior, resulting in increased morbidity and even risk for mortality.

The last issue to be brought up has to do with the medical director and child psychiatry positions. The medical director was just hired at the time of my last evaluation at IYC St. Charles. He was just acclimating and was not yet in the position to talk about staffing issues or any other potential interventions. He appeared quite reasonable and previously experienced with IDJJ, having worked there as a physician.

They have not yet hired a child psychiatrist. They are going to begin looking at staffing issues without a child and adolescent psychiatrist. I have significant concern regarding an inability to yet hire a child psychiatrist. It is my understanding from IDJJ that one candidate I referred engaged in negotiations with IDJJ but ultimately declined to accept the position. In my opinion, there are relatively minimal financial

16

concerns that are playing a significant part here. One may be the potential hourly salary that they are willing to offer a child and adolescent psychiatrist, but the other concern is the lack of a reasonable search. I was informed that there is actually no budget for looking for a child psychiatrist. Child psychiatry is one of the areas of need in medicine. There are child psychiatrists that are available throughout the country, but one needs to advertise for the position. Not having an advertising budget and not advertising in the appropriate journals, such as the Journal of the American Academy of Child and Adolescent Psychiatry, will basically solidify not being able to find a child and adolescent psychiatrist. It is about a year since the remedial plan anticipated having this position in place.

To finish on a positive note, there has been a positive growth. I see this at IYC St. Charles and IYC Harrisburg, which were most noteworthy. Treatment at IYC Kewanee continues to be a significant concern. I am unclear why a facility that is most lacking in licensed mental health professionals and security would be the facility where we send our most significant mentally ill youth in IDJJ.

*[signature: Louis Kraus MD]*