**Progress of the Safety and Welfare Remedial Plan: R.J. et al., vs Montgomery**

**Expert Opinion of Safety and Welfare Issues**

**Barry Krisberg Ph.D.**

**University of California Berkeley**

**Institute for the Study of Societal Issues**

**Oct 31, 2016**

**Summary of Expert's Observations and Conclusions**

In March of 2014, the Illinois Department of Juvenile Justice (IDJJ) and the American Civil Liberties Union (ACLU) of Illinois submitted a joint Remedial Plan covering a range of issues including Safety and Welfare (S&W), Education and Special Education and Mental Health Care. The plan was approved by the United States District Court for the Northern District of Illinois. This plan specified agreed-upon policy and practice changes in IDJJ on a wide variety of issues. Further, the plan defined deadlines for a number of very specific submissions and reports by the parties and by the court appointed experts. This report responds to a requirement that the court-appointed experts provide an annual update to the Court on the progress of implementing the Remedial Plan.

IDJJ has continued progress towards implementation of the agreement in R.J. et al. vs Montgomery. Examples of very positive developments includes a major reduction in the number of youth in Illinois Department of Juvenile Justice (IDJJ) residential facilities and the numbers of young people on Aftercare caseloads. The decision to phase out the Illinois Youth Center Kewanee was prudent given law changes and the chronic problems in staffing and operating this facility. New policies limiting the use of confinement and other forms of limited programming are also consistent with professional standards. IDJJ leadership is strengthening its data collection capacity and providing more coaching and mentoring to facility supervisors. Efforts to monitor adverse incidents at IDJJ facilities are being encouraged and strengthened. The infusion of new staff and the initiation of core training on de-escalation of conflicts is a very good step forward.  IDJJ policies and practices with Lesbian Gay Bisexual and Transgender (LGBT) youth are moving ahead and seem to be taking hold in various facilities.

The information presented in this report, gathered from IDJJ quality assurance and the semi-annual Performance based Standards (PbS) audit and in-person site visits, illustrates that serious and severe problems remain, especially at the Illinois Youth Center Saint Charles. This facility is plagued with chronic and severe staff shortages on a regular basis. Many of the

1

identified problems at IYCSC are direct results of having too few staff available for duty and the relative inexperience of these staff. These staff shortages, especially in certain IYC Saint Charles living units, often result in youth not receiving schooling, insufficient amounts of large muscle exercise, and not getting showers on a daily basis.

By contrast, there have been many improvements at smaller IDJJ facilities such as the Illinois Youth Center Warrenville, the Illinois Youth Center Pere Marquette and the Illinois Youth Center Chicago. There have been some continued issues at the Illinois Youth Center Harrisburg, but not nearly at the same level that were observed last year.

Progress towards implementing a model treatment and rehabilitation program at IDJJ facilities is underway. IDJJ believes that there have been significant strides in this area, especially the training of staff in client assessment and case management planning. Staff training in the YASI assessment tool began in February, 2015 and training in the CaseWorks model began in September 2015. By November, 2015 both of these approaches were operational. Staff have received coaching and follow-up training that commenced in March, 2016 and this has continued on an ongoing basis since then. To date every Youth and Family Specialist and the Aftercare Case Specialists have received coaching and follow-up training as needed. Supervisors have also received this coaching and mentoring. Many staff at IDJJ are not opposed to the new treatment and rehabilitation approaches, but in my staff interviews, I found that many of them still have a very basic understanding of what will be expected of them in terms of delivering enriched treatment programming in the near future. There has been introduction of the Positive Behavior Incentive System (PBIS) as a behavior change system at most facilities and IDJJ retained a PBIS coach to work with the staff. This approach emphasizes the core idea that positive reinforcement and rewards are more likely than punishment to produce lasting behavior change among young people. The most progress in implementing PBIS has been accomplished in the school programs, but more needs to be done to expand the knowledge of PBIS in living units.

Due to the declining youth population, the caseloads for Aftercare staff are relatively low. The Aftercare specialists had an average caseload of 18 youth – 9 in a facility and 9 in the community.  They made 1327 contacts with youth in the community in July 2016, averaging about 3.5 personal contacts with the youth in the community per month. Preparation of youth for return home remains a work in progress. Aftercare staff explained to me that finding placements and dealing with violations of various conditions of release were very difficult and consumed a good deal of their time. There has been some progress in implementing treatment needs assessments, but staff knowledge of translating these assessments into meaningful corrections plans is still rudimentary.  The Mental Health Department has developed a new treatment protocol that has been approved by Dr. Kraus. This protocol required MH staff to be in contact with Aftercare staff at least 1-3 months prior to the young person's release.

While there have been improvements in terms of the IDJJ school programs, with the exception of IYC Saint Charles where school was cancelled or interrupted on a frequent basis, the available recreation, intramural sports, arts and music opportunities for most IDJJ youth are very minimal. Idleness, especially during weekends and school holidays, remains a significant challenge. IDJJ also needs to explore ways of increasing programming in the local communities for each of its facilities as a way to prepare young people for their return to the community. Community activities are being pursued at IYC Chicago, IYC Pere Marquette, and increasingly at IYC Harrisburg. Community outings are a weekly occurrence at IYC Pere Marquette and there are 5-6 outings per month at IYC Chicago and IYC Harrisburg. Community activities are much less frequently utilized at other IDJJ facilities.

IDJJ should continue to strengthen and improve its system of youth grievances and to find more ways to upgrade the perception of its young residents about the fairness and equity of their daily experiences. The availability and level of participation of the IDJJ Ombudsman is increasing and IDJJ Executive staff regularly meet with the Ombudsmen to discuss youth concerns.

IDJJ is facing many challenges in the coming year. These include law and policy changes and the transfer of youth to other IDJJ facilities in the wake of the IYC Kewanee closure. There have been significant changes in the top leadership of IDJJ. This administrative team has been working well together and their commitment to the key requirements of the R.J. remedial plan seems solid. However, several top IDJJ leaders have interim appointments and future changes are possible.

Finally, IDJJ faces many challenges in terms of upgrading the physical conditions of its facilities, especially the larger and older institutions. Living in many IDJJ facilities is still much like being in a youth prison, rather than being in a treatment setting. These harsh circumstances exert an adverse impact on both staff and youth.

**Audit Data and Methods**

As the Safety & Welfare expert I visited each IDJJ facility between April and July of 2016.   I also met with top IDJJ management staff in April 2016.

The 2016 site visits usually lasted about 2-3 days and included visual inspections of the living units, as well as discussions with large number of youth residents and staff at each facility. I typically offered feedback to IDJJ managers about my preliminary observations gathered during the site visits.

IDJJ provided me with the latest available data covering the characteristics of residents, staffing information and additional data on critical incidents, the use of various kinds of restraints and data on the use and duration of confinement at each IDJJ facility.

Besides the site visits, I also reviewed the latest juvenile facility reports that were produced by the John Howard Association and conducted an in-depth review of data submitted to IDJJ to the Performance-based Standards (PbS) group. These PbS data were made available to me by IDJJ

in both hard copies and online. The last PbS audits were conducted in April 2016 and there is an October 2016 round of audits being completed soon. The latest John Howard Association reports were generally from 2015.

I also had copies of all policies that were produced by IDJJ in response to the Remedial Plan agreement. Top IDJJ management staff often asked me to share with them policies from other state juvenile corrections systems and to discuss the areas that I believed were crucial to adequate and successful policies and practices in the Safety & Welfare area. There were no new general Safety & Welfare policies that were submitted to the Court since the filing of the 2015 monitoring reports.

As noted above, the facility site visits generally lasted between two to three days and these visits were of a very different character than the first round of facility visits. My recent round of site visits in 2016 took place in the context of an approved Remedial Plan that was in its implementation process for almost two years. I wanted to assess the awareness and on-going support of IDJJ staff and managers for the needed transformations. Moreover, it was important to understand the concerns of IDJJ Central Office and facility managers, staff and youth about the required reforms, as well as perceptions of the ingredients for successful implementation.

During these 2016 visits, I met with virtually all of the managers from each facility and had discussions with a cross-section of security staff. I conducted detailed meetings with the Family and Youth counselors and the Mental Health staff. I met with youth at each facility who were selected at random and discussed their views on needed changes. The meetings with youth residents were done in individual and confidential settings and staff were generally not present in these resident interviews. The youth input was spirited and candid. The IDJJ youngsters were not reluctant to give me honest feedback on how well they were treated. In the main, however, the youth did not appear to know many of the details about the Remedial Plan. The youth residents had observed changes in certain traditional IDJJ policies including the use of confinement. Also, the ACLU gave me a list of IDJJ youngsters who they felt might be especially

vulnerable and IDJJ permitted me to conduct confidential and private interviews with each of these young people.

I inspected all of the IDJJ confinement units, crisis care or other limited program living areas. I toured a cross section of youth rooms in regular housing units to assess the general state of cleanliness and maintenance of these units. I examined the quality of the clothing, blankets and bedding given to the youthful residents.

As with the earlier Safety & Welfare audits, I evaluated whether the living areas were clean, well-lit and graffiti free. Also examined were the physical conditions of education areas, counseling spaces, recreation areas, libraries, and day rooms. I requested and received data from the various facilities of the use of restraints, violent incidents, escapes and grievances filed by the youth. The facilities shared with me the logs of the Family and Youth counselors and a sampling of treatment plans produced by the Mental Health staff. I was given copies of the daily schedules for each of the units that I visited.

**Change and Continuity at IDJJ**

There were several important legislative changes that impacted IDJJ. As of January 1, 2016, most youth charged with Misdemeanors were barred from being committed to IDJJ. This amounts to about 20 youth in the average population. Interestingly about half these individuals are females. This alteration somewhat reduced the IDJJ institution population. Further, youth on Aftercare who violated IDJJ parole conditions or were suspended by picking up a new adult charge were no longer sent back to IDJJ, but were instead held in local corrections facilities or at their own residences depending on what the presiding judge orders. This especially impacted the population at IYC Kewanee where most of these young people had been previously housed. The dramatic decline in serious offenders at IYC Kewanee contributed to a recommendation that this facility be phased out. The average age of youth in IDJJ facilities has remained fairly stable in the current year, averaging about 17 years old. The offenses of youth

in Aftercare have become more serious as youth with serious felonies are being supervised longer.

Also, the legislature created new aftercare supervision terms for various offenses. This reduced the size of the IDJJ Aftercare population and also reduced the number of young people who were sent back to institutions based on violations of the conditions of community supervision. The population numbers presented later in this report show the sizable effect of these Aftercare policy changes on the caseloads of Aftercare workers and IDJJ facilities since a very large number of residents had been traditionally returned to custody on violations.

The Legislature also enacted two changes that will become effective in January 2017. The first diverted Class 4 property offenders from IDJJ facilities. The second change mandates that youth who are under the age of 17, and convicted in adult court, first come to IDJJ before they are transferred to IDOC facilities. It is anticipated that that some of these youth can serve out their terms in IDJJ facilities. Another law change was made to restrict youth who were charged with possession of a controlled substance from coming to IDJJ facilities unless this was part of a specific probation violation. These forthcoming changes might increase the IDJJ residential population by about 10 youth

As noted above, the Governor decided to phase out the operation of IYC Kewanee in part due the shifting population characteristics and also due to persistent difficulties in recruiting and retaining staff, especially mental health staff and education staff. There was strong opposition from some members of the local community who feared the negative economic aspects of the closure, but the Governor supported the closure. As of July 2016 the remaining youth at IYC Kewanee have transitioned to Aftercare or were transferred to other remaining facilities. A decision was also made to create male living units at IYC Warrenville and continue significant renovations at that facility.

Besides these law and policy changes, there were major leadership changes at IDJJ Headquarters. Director Candice Jones left and Deputy Director of Operations Jesse Montgomery was appointed as the Interim Director. The position of Deputy Director of Operations has been filled on an Interim basis by Kevwe Akpore, the former Superintendent of IYC Kewanee. Another personnel change involved the appointment of Marron Mahoney as the IDJJ Chief Legal Counsel, replacing Beth Compton who held that position for several years. There was also substantial continuity in the overall IDJJ leadership team. The Superintendents at IYC Chicago, IYC Warrenville and IYC Pere Marquette remained in place but Christine Rothwell became the acting Superintendent at IYC St. Charles in August 2016. Eva Moore is the Director of Aftercare and Heidi Mueller continues to serve as the Director of Programs. Other top leadership at IDJJ includes Marna Goodman who is the Chief of Professional Development and Training, Dr. Jennifer Jaworski who leads Mental Health Services and Gloria Davis who is the Superintendent of IDJJ Schools. The IDJJ Office of the Ombudsman is headed by Kathleen Bankhead.

**Summary of Essential IDJJ Data Trends for Fiscal Year 2015-2016**

I requested data from IDJJ covering each of its facilities from July 2015 through June 2016. These data included the numbers and characteristics of youth residents, the number of security staff and data on serious incident reports during that same time period. While the data collection process within IDJJ in still a "work in progress," the quality and quantity of this information has been greatly advanced by the diligent work of IDJJ Central Office staff. During Fiscal year 2015-2016, the total youth population in IDJJ decreased from 713 to 390. The IDJJ Aftercare and Parole population went down from to 1153 to 580.

As of June 30, 2016, there were 66 youth housed at the Illinois Youth Center Chicago (IYCC), 110 at the Illinois Youth Center Harrisburg (IYCH), 34 were still temporarily housed at the Illinois Youth Center Kewanee (IYCK), there were 39 youth at the Illinois Youth Center at Pere

Marquette (IYCPM), another 107 were held at the Illinois Youth Center Saint Charles (IYCSC), and 34 were at the Illinois Youth Center Warrenville (IYCW).

The characteristics of youth in various facilities during FY 2015-2016 is as follows: the IDJJ decided to phase out the operation of IYCK and these youth were transferred to other IDJJ facilities, primarily IYCSC and IYCH based on their home residence.  The Juvenile Sex Offenders who were at IYCK will be transferred to IYCH. The IDJJ female youth residents, who are all housed at IYCW, constitute about 4% of the total IDJJ youth population. Later in 2016, IYCW became a co-correctional facility. The average age of all IDJJ residents is about 17 years old. The majority of youth were between the ages of 17 to 20 years; approximately 42% of the youth are 16 years old or younger. There were few, if any youth, in IDJJ who were over 20.5 years old. Roughly 65 % of the IDJJ residents were African American and another 13% were Latino.  There were rarely more than very few Asian American or Native American youth in IDJJ during FY 2015-2016.

At the end of FY 2016-2016 youth committed from Cook County comprised almost 32% of the youth in IDJJ. Almost 27% of the youth were committed from Central Illinois and 21% were committed from Northern Illinois.  Only about 9% of the IDJJ youth were committed from Southern Illinois.

The vast majority (roughly 94 %) of the IDJJ residents were under juvenile court commitments, and about 6% were under Criminal Court sentences. The most frequent commitment offense was a Class 2 Felony, comprising about 38% of the youth; another 24% were charged with Class 1 felonies.  About 15 % of the youth had been charged with Murder or a Class X offense. At the end of the FY 2015-2016 there were no youth in IDJJ with Misdemeanors due to changes in state law. Only one youth charged with a Misdemeanor was a resident in IDJJ facilities during the year. For the past several months there were no such youth in IDJJ facilities.

As of June 30, 2016, there were 305 youth residents enrolled in school and another 24 who received high school diplomas, GED's or 8th grade diplomas from IDJJ. During the entire fiscal year a total of 251 youth received diplomas. This was an increase from 219 youth receiving diplomas in the last fiscal year, even though the IDJJ youth population has been going down.

<u>Trends in Incidents, Reportable Offenses, and the Use of Restraints</u>

Reportable Incidents are a measure of the disruption of the daily routines of youth corrections facilities. These include acts of violence between youth such as fights and assaults as well as youth assaults on staff. In general, assaults among youth are considered more serious than fights and often involve injuries. These data are reported by the facility staff to the Central Office on a daily basis. By their nature, Reportable Incidents impact the tranquility of daily institutional life and create fear among both staff and young people.

The rate of Reportable Incidents in IDJJ rose from 17.1 per 100 youth in June 2015 to 32.1. It is worth noting that rates are calculated based on the daily population and may fluctuate. These trends are also subject to changes to the characteristics of youth in each facility and the unique missions of each IDJJ institution. In general the frequency of serious incidents is lower in facilities with smaller living units, those with more direct care and counseling staff, and correctional programs that combat idleness via enriched educational, recreational, and treatment programs. While it can be anticipated that more rehabilitation services will reduce the frequency of serious institutional incidents, it is also true that many daily disruptions can reduce the efficacy of treatment, counseling and educational offerings.

Looking at the data for June 2016, some interesting differences among the IDJJ facilities emerge. For the rate of Reportable Incidents, IYCSC and IYCH had the highest rates per 100 youth at 47.4 and 40.3, respectively. The lower rates were observed at IYCC (2.9), IYCPM (15.5) and IYCW (19.5). The rate of Reportable Incidents at IYCK was 20.2 For Youth on Youth Fights, the highest rates were at IYCH and IYCSC, at 30.2 and 24.1, respectively. Lower rates of Youth

on Youth Fights were at IYCW (0), IYCPM (2.6) and IYCC (4.8). IYCK also had a low rate at (2.5), but this was likely due to very restricted youth movements. For Youth on Youth Assaults, the highest rates occurred at IYCPM (12.9) and IYCH (8.2). Lower Youth on Youth Assault rates were observed at IYCC (6.5), IYCW (6.5) and IYCSC (6.9). As with the data on fights, IYCK had a relatively low rate of Youth on Youth Assaults (4.6)

Considering Youth on Staff Assaults, IYCK had the highest rate in June 2016 at 12.6. The rates at IYCSC and IYCW were 16.4 and 13.0, respectively. Rates of Assaults on Staff were very low at IYCPM (0), IYCC (1.6) and IYCH (1.8),

During FY 2015-2016 there were a total of 60 incidents involving the use of pepper spray in all IDJJ facilities. Generally, the usage of Chemical Restraints increased over the Fiscal Year. By far, the majority of uses of Chemical Restraints happened at IYCSC, accounting for two-thirds of all of uses of pepper spray in IDJJ in FY 2015-2016. There were 21 incidents involving pepper spray at IYCH and 11 at IYCK. No chemical restraints were utilized at IYCC, IYCPM or IYCW.

The use of Mechanical Restraints such as handcuffs, leg shackles or spit masks were used far more frequently than chemicals in IDJJ facilities. There were 1,797 incidents of the use of Mechanical Restraints in FY 2015-2016. The vast majority of the use of Mechanical restraints occurred at IYCSC (721), IYCK (698) and IYCH (207). These three facilities accounted for 94% of all of the uses of Mechanical Restraints in IDJJ for that year. There were 101 incidents on Mechanical Restraints at IYCCC, 62 instances of Mechanical Restraints at IYCW and only one case of Mechanical Restraints at IYCPM. Over the course of the Fiscal Year there was a general decline in the use of Mechanical Restraints in IDJJ, especially at IYCK. As with other serious Incidents, assessing the use of restraints among different facilities must consider the diverse purposes of these facilities and the differing mix of youth housed at each IDJJ locale.

As discussed in more detail below, the use of restraints must be utilized as a last resort and only to protect the life and safety of young people and staff. Various professional standards urge

that use of alternatives to the restraints should be the first option or and that restraints should never be used as punishment. Staff need ongoing training and mentoring in responding to challenging daily situations. Youth corrections systems that are most committed to rehabilitative objectives work hard to eliminate or reduce the use of restraints.

Security Staffing Data

IDJJ reports its staffing data in two ways. There are numbers for the security staff "headcount" and average numbers of security staff per shift. The "headcount" data reflects the number of security staff who are actively on the payroll at the end of each month; also reported by IDJJ is the average number of security staff who are available at each facility at each shift. In general, the number of security staff at the three shifts is considerably lower than the "headcount" figures. This problem of staff shortages affects the life of incarcerated youth in several ways. The temporary shortage of security staff may mean that school cannot meet due to insufficient security for classrooms. The access of youth to recreation and other services may also be limited when there are not sufficient security staff on duty.

Although IDJJ has attempted to increase the number of security staff through hiring and additional training academies for new staff, the problem of security staff who are not available for work assignments due to various employee work rules was particularly acute at IYCSC where single staffing on living units was typical during the daytime hours. I would recommend that the Court review these employee rules and recommend changes that will ensure that staff shortages do not harm the safety and programming opportunities for IDJJ residents.

Using these "headcount" figures from June 2016 to compute a youth to staff ratio reveals an overall IDJJ youth to security staff ratio of 0.63. This means that there are more security staff on the roster than youth in residents. IDJJ believes that it is generally necessary to maintain 4-5 security staff for each security post because the facilities operate on a 24/7 basis and that management must plan for sick days and vacations as well. These ratios varied from a low of

0.44 youth to staff at IYCW, which is anticipated to increase its population with young males, to a high of 1.03 youth per staff at IYPM. The youth to security staff ratios at IYCC, IYCH and IYCSC were 0.87, 0.77 and 0.62, respectively. The ratio of youth to security staff at the now closed IYCK was 0.33.

It is important to note that the figures compiled by IDJJ are not specific to the living units and may involve security staff who are doing perimeter security, managing visiting hours, performing security functions at the schools, health care wings, and transporting youth on writs and other facility movements. It is anticipated that IDJJ will develop a system for calculating youth to staff ratios in individual living units soon. It is also worth noting that the ratio of youth to staff on particular shifts is much higher.

The First Shift from 6 am to 12 pm is often very busy since the youth are generally waking up, doing personal hygiene, going to education, including school movements, and there is an array of recreation, meals, counseling, health care and other activities going on. Typically, the First Shift has the highest number of working security staff. For example, in June 2016 there were 119 security staff on first shift at all IDJJ facilities and an average of 29 security staff at IYCSC, 15 staff at IYCC, 29 at IYCH, 10 at IYCPM and 14 at IYCW. These data reveal a youth to working staff ratio on the first shift all IDJJ facilities of 3.3. These youth to staff ratios at other IDJJ facilities were roughly 5.1 at IYCC, 4.9 at IYCH, 4.0 at IYCPM, 3.7at IYCSC and 5.5 at IYCW. Since some of these security staff are assigned to the school or are involved in transporting youth to other locations, the youth to staff ratios are even higher. These youth to working staff ratios should be accessed in terms of the number of needed security posts that are adequately covered. A more nuanced staff to youth analysis should consider differences in the population for specific living units. The most important consideration of the youth to staff ratios should be whether there are denial of core services to young people. Further, as IDJJ expands its offering in terms of treatment and rehabilitation programming, the adequacy of working staff to support these activities should be reexamined on a regular basis.

The prevalence of single staffing in living units was especially acute at IYCSC. This staffing problem meant that school was often cancelled, youth spent more time in their rooms, the recreation time was shortened and even showering time was restricted. Living units with less staff reduced the amount of positive interaction of young people with security at IYCSC. I observed incidents at IYCSC in which single-staffed units needed to quickly locate back up support from other staff including counselors or administrators to safely manage situations that involved restoring order after youth scuffles or other living unit disruptions. This same security staffing problem was less pronounced at the other large IDJJ facility (IYCH) due to the liberal use of overtime to increase the ranks of the on-duty security staff.

Youth and Family Specialists Caseloads

The Safety & Welfare Remedial Plan set as an immediate goal increasing the number of Youth and Family Specialists and achieving a youth to Youth and Family Specialists ratio of 20:1 by year end. The Safety &Welfare expert recommended an even lower youth to staff ratio, and it was agreed that IDJJ would reach this lower ratio in stages. The Youth and Family Specialists are key personnel in terms of the day-to day care for the youth. It is planned that they would expand their work roles as the Model Rehabilitation program was fully implemented.

As of July 2016 there were 35 Youth and Family Specialists in all IDJJ facilities, excluding IYCK. There were 4 Family and Youth Specialists at IYCC, 10 at IYCH, 2 at IYCPM, 14 at IYCSC, and 5 at IYCW. (As of July 2016 there were also 8 Family and Youth Specialists at IYCK that will be staying at the Department of Corrections.) The ratio of youth to Family and Youth Specialists was 9.1 for all of IDJJ and ranged from 19.0 at IYCC to 13.8 at IYCH, 17.0 at IYCPM, 7.6 at IYCSC and 6.8 at IYCW. It appears that IDJJ is on track to meet or exceed the agreed upon ratios of youth to Family and Youth Specialists. It seems probable, and in my opinion desirable, that IDJJ will continue to sustain or to lower these ratios of youth to Youth and Family Specialists in the years ahead.

**The Use of Confinement**

IDJJ agreed to rewrite its policy with respect to confinement and restricted movement. Draft policies were submitted and approved by the Court in April 2015. These new policies represent a vast improvement over previous ones that were vague and non-specific. The IDJJ worked very closely with the court appointed experts and the plaintiffs' counsel to refine these drafts before submission to the Court. There has been a resulting reduction in the use of the traditional confinement units. IDJJ utilizes a range of restricted programing options in lieu of automatic removal of a young person to confinement.  Most of these options are less restrictive than historical confinement practices and are, generally, of short duration.

The current IDJJ policies state that youth are not to be treated as they have been historically in the confinement units. There must be provision for adequate out-of-room time and for the regular daily IDJJ services including schooling, recreation, personal hygiene, visiting, and access to mental health services. The current confinement policies make very explicit the intent of IDJJ to minimize the duration and the situational use of its confinement units. The number of reasons the youth can be placed in confinement has been simplified. The process of management review for placing youth in confinement has been clarified, building in more checks and balances to prevent arbitrariness.

The IDJJ has expressed a strong preference for the use of conflict resolution techniques to reduce the need for confinement. Staff were instructed by a departmental order to never use confinement as punishment, but only as a means to protect the safety of youth residents and staff. This management policy states a strong preference for staff to employ the least restrictive option to manage youth misconduct such as room confinement, Time Outs and "Cool Down" periods.

These revised IDJJ confinement policy and operational changes are important because there is compelling and substantial evidence that housing adolescents in solitary confinement for long

periods of time is very harmful to the psychological health of these youth and that extended lockups achieve no valid correctional purpose. Solitary confinement is especially harmful to young people with mental health issues and histories of severe personal trauma.

It is my opinion that the duration in confinement and other restricted housing options should be much shorter than 24 hours, perhaps no longer than one staff shift. Youth in confinement should be able to spend as much time out of their rooms as youth in other living units. Beyond new policy statements, IDJJ has already moved to dramatically reduce the use of confinement units, especially for disciplinary purposes. IDJJ Director Candice Jones used a temporary order to restrict room confinement to less than one hour and to encourage the utilization of very short period of "Cool Down". IDJJ staff were encouraged to employ verbal de-escalation techniques and to use conflict resolution in lieu of locking youth up either in their rooms or in confinement units.

In the recent past, the use of confinement was common at IYCK, IYCH and IYCSC. This practice was less commonly observed at IYCW, IYCC and IYCPM. During my most recent round of site visits to all IDJJ facilities, there were no youth in confinement units for disciplinary reasons at IYCSC and IYCH. Facility logs showed that the duration of confinement was generally less than one day, with very rare exceptions such as youth being held on mental crisis status, those awaiting transfer to the Illinois Department of Corrections, or those awaiting movements on court writs. The Deputy Director of Operations has been regularly visiting every IDJJ facility and assisting staff in reducing the number of youth in confinement statuses. At IYCSC there was brief period in which the Pierce Cottage was used a behavior management unit and some youth reported to me that Pierce was "the new Confinement Unit". When I visited IYCSC the youth in Pierce reported that they had very limited programming and were also not receiving school. These youth spent many hours in their rooms or the day room. Since my visit to IYCSC, the Pierce Unit has been changed back to a regular living unit.

In June 2016 there were a total of 47 extended Behavioral Holds or 11.9 per 100 youth residents, 230 instances of Time Outs or 58.1 per 100 residents and 94 examples of Cool Downs or 23.7 per 100 residents. According to IDJJ, the average length of an Extended Behavioral Hold was 528 minutes; the average length of a Time Out was 87 minutes and the average duration of a Cool Down was 34 minutes. An Extended Behavior Hold involves placing the youth in secure setting when the youth's behavior poses a serious and immediate threat to safety or security. A Time Out also involves placing the youth in a secure location due to behavior that is perceived by staff to be out of control, violent or aggressive, During a Time Out the staff will engage in counseling and attempt to de-escalate the young person's behavior. By contrast, a Cool Down involves the temporary removal of a youth from regular programming that generally occurs in a non-secure setting and with constant staff supervision. Cool Down is also utilized to de-escalate the youth's disruptive behavior.

While there was general support for the new IDJJ Central Office instructions on the use of confinement by the facility top managers, there remains substantial criticism of this approach by a wide range of security staff and Youth and Family Specialists. Even some of the Mental Health staff questioned the wisdom of the reduced reliance on confinement. Many IDJJ security, counseling staff and mental health personnel perceived that there had been a major increase in institutional violence since the restrictions on confinement were implemented. They pejoratively referred to the alternatives as "assault a staff, go to your room". However, the data assembled by IDJJ does not sound an alarm in terms of decreased safety of staff or youth. The chronic and serious understaffing among security personnel at some IDJJ facilities is more pertinent to staff perceptions of danger.

Corrections staff may equate changes in behavior management techniques with increased threats to staff. There is the false perception that there are fewer consequences for serious misconduct and that being placed in confinement is a valuable deterrent to aggressive and assaultive youth. There continues to be a lack of clarity among staff as the proper role of confinement or temporary separation of very dangerous youth from the routine disciplinary

process that sanctions serious youth misconduct. Less confinement does not mean the absence of consequences for serious youth misbehavior.

The new confinement policies were begun without in-depth staff training on why the practices needed to change. CPI de-escalation training commenced in February 2015 and revamped use of force training began in the spring of 2016. Many staff expressed to the Safety &Welfare expert their desire for more training in evidence-based tools to help them better respond to youth. As I have noted previously, if the primary repertoire of control was based in restraints, lock-up and punitive disciplinary practices, it is frightening when these are seemingly removed without suitable replacements.

Many staff told me that violence in the facilities also may be a result of youth idleness and the lack of meaningful positive incentives for good conduct. Persistent understaffing at some facilities and the Illinois budget crisis has raised skepticism among some staff that there will be more funding for added security and treatment personnel or for more activities to keep the IDJJ young people productively engaged.

The important need for intensive and ongoing training for existing staff on managing troubled youth led IDJJ to hire a new Chief of Training and Professional Development to oversee this process. The Chief of Training and Professional Development was hired in the summer of 2014. Training has started but will intensify and expand during the latter months of 2016. I would urge IDJJ to develop a cadre of long term IDJJ staff who embrace the new departmental philosophy and who should be the primary trainers. IDJJ staff who have embraced the direction of the IDJJ reforms should be given coaching and curriculum materials by leading national figures in juvenile corrections.

This new approach to the restrictions on the use of confinement and limited programs must be integrated with other training on the new IDJJ rehabilitation model and increased awareness from all staff on research on adolescent development, the impact of childhood trauma, and the

18

value of utilizing the least restrictive option consistent with safety. Staff need to learn and practice the use of positive incentives and rewards as the most powerful ways to achieve behavioral compliance from young people. The IDJJ educators are already showing skill at implementing the Positive Behavioral Intervention System (PBIS) to reduce disruptive conduct in IDJJ classrooms.

The rift between facility managers and direct care staff at some facilities must be greatly reduced, otherwise some of the key new policy changes will be undercut. Long lasting reforms in juvenile corrections demand both strong advocacy by the top leadership, clear policies, reinforcement in daily implementation by middle managers and, ultimately strong buy-in by staff at every level of the organization. Staff need to live the reality that their work lives will get better as they reduce reliance on superficial tactics of control and isolation in favor of genuine rehabilitation and education behavior management strategies.

IDJJ has made an impressive start in reducing the use of confinement and limited programming. The process of implementation will improve as staff comprehend that these changes are mandated by the Remedial Plan and the Consent Decree, and are not subject to the whims of the current director. As IDJJ moves forward towards a real therapeutic approach, the use of isolation and segregation should continue to diminish.

IDJJ must further improve its documentation of the use of confinement and of limited programs. At present these data are collected monthly on spreadsheets. This information is discussed in monthly Superintendent meetings. IDJJ has launched a new data system but they understand that it does not capture all of the information that is needed in this area. IDJJ plans further enhancements to these data in the near future. The goal is to provide management with online real time knowledge of key information and allow staff to review this information for the past day, week, and month. These data must be automated and shared on a daily basis with Central Office managers.

The physical condition and sanitation of existing confinement units had not substantially improved since my round of site visits last year. While it is encouraging that fewer youth are now placed in these rooms, the conditions in some of the rooms and living areas in confinement units and other limited housing programs remain below professional standards. The ongoing problems of these rooms include inadequate lighting, poor ventilation, graffiti and gang signs that are scratched on the floors or written in permanent markers. Some of the rooms need upgrades in the water fixtures. During my site visits, I also observed occasional lapses in sanitation and cleanliness in confinement units and other limited program units at the larger IDJJ facilities. IYCSC is in the process of power-washing and painting the Taylor confinement unit.  In general, the restrictive living units were in better condition in IYCPM, IYCW and IYCC.

**Security and Youth and Family Specialist Staffing Levels**

The Remedial Plan calls for IDJJ to move towards compliance with PREA security staffing ratios of 12:1 during waking hours and 20:1 during sleeping hours by October 2015 and to achieve even better ratios of security staff to youth by October 2017. There has been substantial progress in the recruitment of new staff and there have been several new graduating classes. IDJJ has prioritized the assignment to these new security staff to IYCSC and IYCH, the larger facilities.  The agreed-upon security staffing ratios governing PREA have been met.

While additional security staffing on a daily basis is clearly needed at IYCSC, the IDJJ has not completed a comprehensive staffing analysis that would identify the greatest need for additional staff by specific posts and for living units. It makes sense that more staff should be allocated to crisis units, living units for high risk youth and in program areas that would increase the availability of programming for IDJJ young people.  The new staff are being assigned largely at the discretion of local chiefs of security and the superintendents. While Central Office must approve assignments to facilities, there are no clear criteria for the utilization of new staff.

Further, retirements, staff transfers and those on limited work assignments continue to reduce the full impact of the new staff on programming and safety issues.

I would urge that IDJJ complete a rigorous staffing analysis, preferably with the assistance of national juvenile corrections experts, that better defines the most efficient and productive assignment of new staff. IDJJ should also review the adequacy of supervision of new staff by mid-level managers and chiefs of security.

The infusion of new IDJJ staff also presents a great opportunity to train and orient these additional personnel towards the emerging new vision of IDJJ. There is an opportunity to equip them with tools and skills that are more consistent with the emerging treatment philosophy of IDJJ. Training for new staff is currently under revision. IDJJ recently implemented a supervisor training program where these supervisorial staff meet twice a month with security staff to review various topics. The supervisors also meet with the IDJJ Chief of Security for a similar review. This program was pilot tested at IYCH and is now being expanded to other facilities. IDJJ provided me with a copy of training forms for individual staff during these supervisor reviews.

While progress at IDJJ in adding more security staff (with the caveats mentioned above) has been impressive, there has also been good success in increasing the numbers of Family and Youth counselors. The case loads of counselors are roughly at the targeted levels. For example, the Remedial Plan calls for a ratio of 20:1 in youth to counselors in 2016, which constitute the staff ratios that are required to facilitate reaching out to families. However, the ability of current Family and Youth Specialists to provide intensive rehabilitative or reentry services remains minimal. Currently the Youth and Family counselors are most occupied handling very elementary tasks for youth such as arranging for visits and phone calls, checking on commissary balances, and helping youth get work assignments. Some of the Youth and Family Specialists are currently producing meaningful case plans for youth, but there are virtually no sustained case management services being provided. The counselors have not received much guidance on treatment interventions such as Motivational Interviewing and PBIS. IDJJ plans to commence

intensive training on these topics and the expanded Youth and Family Specialist responsibilities in 2016 and 2017.  IDJJ prioritized the increased training for security staff over that of the counselors. This year there will be more focus on training for the Youth and Family Specialists. Interviews that I conducted with IDJJ youth that are reported in latter sections of this report suggest that the young people value the support of the Youth and Family Specialists and see them often. When the youth mentioned the Youth and Family Specialists to me, these comments were generally positive.

In terms of information available to Youth and Family Specialists about their clients, IDJJ did begin an automated youth data system in December 2015, but substantial amounts of personal data still exist in a set of manual individual files that are not linked up.  Information sharing has improved within IDJJ, but it is currently not easy to share information within or between IDJJ facilities, especially if youth have been transferred among these institutions or living units. Data on parole and reentry are also kept in separate and unconnected files.

IDJJ has plans to expand its detailed computerized information system to handle client data. It is likely that more complete implementation of this new system will begin in 2016. The current information system contractor, Microsoft, is fixing bugs and trying to bring the system up to full functioning.  Some of these enhancements involve tracking new law changes and to more fully link up with the data system that is utilized by Aftercare.

More generally, the Youth and Family Specialist staff, especially at IYCSC and IYCH, professed very limited awareness of the components of the Remedial Plan that might directly impact their work.  Many of these Youth and Family Specialists are vocal critics of the reduction in the use of confinement and were concerned that the youth perceived that there were no consequences for misconduct.

While not absolutely opposed to increasing the amount and quality of treatment services for youth, the current counselors were not optimistic that anything would change as a result of the Remedial Plan. Many of these counselors were long term IDJJ employees and had been promoted from positions as security staff at the larger IDJJ facilities. The Youth and Family Specialists seemed to have limited prior exposure to ideas about the basics of evidence-based rehabilitation approaches, or trauma informed therapy. By contrast, the counselors at IYCW, IYCC and IYCPM seemed more excited about the opportunity to enhance high quality treatment services. There was general concern among the counselors and Mental Health staff that some of the currently operated, albeit limited, treatment programs would be abruptly ended by the reforms.

There was also concern expressed about the very short stays of some youth in IDJJ. Most of the Youth and Family Specialists and mental health staff felt that they hardly got to know these young clients before these youth are transferred elsewhere. Some of these young people would be better served in the community. Also, the counseling and mental health staff felt they spend a lot of their time preparing reports for youth who were being moved to other facilities or who were being considered for discharge. Some counselors also felt that they did not have enough access to their clients due to the requirements of the education and security staff. The Youth and Family Specialists are assigned to specific living units at IYCSC, IYCH and IYCPM, but the Youth and Family Specialists at IYCC and IYCW see clients in multiple living units.

While the Remedial Plan calls for increases in the ratio of these vital treatment staff to youth, and envisions a larger role for them in providing rehabilitation services, more and better educated staff in these positions will not entirely rectify the severe concerns that I have expressed above. These treatment staff now play a somewhat more passive role in daily operations compared to the traditional and strong influence of security staff. It is my view that the IDJJ needs to design a comprehensive strategy to retrain many of these staff towards to the new vision of the IDJJ reflected in the Remedial Plan. Without such a plan and a dedicated retooling of the counselors and mental health staff, IDJJ will struggle to move forward on many

23

aspects of the Remedial Plan. Mental Health and Youth and Family Specialists should play a larger and more meaningful role in the daily experiences of IDJJ residents.

**Towards a New IDJJ Rehabilitative Model**

A core component of the Safety and Welfare Remedial Plan is the commitment by IDJJ to "develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitative model to be used by all youths in all DJJ facilities…" This model is to include substance abuse, educational, mental health and behavioral management and other programming for youth. There should also be high quality services for youth in special treatment units and sex offenders.

These reforms constitute an ambitious and multifaceted set of operational objectives for IDJJ top managers and for facility level managers as well. IDJJ has produced a very impressive description of the critical implementation steps and the projected timelines for achieving these goals. Some activities are already underway, but most of the major activities and staff participation in these efforts will occur in the last quarter of 2016 and early 2017. IDJJ has started offering briefing materials and "town hall meetings" for its staff and for IDJJ residents.

The IDJJ has very wisely decided to pilot test the key parts of the treatment and behavior management transformation. The Safety & Welfare expert has recommended the pilot testing approach that has worked well in other juvenile justice systems such as California, Massachusetts, and Missouri. The testing process will identify unanticipated implementation issues and allow for appropriate refinements. Moreover, the pilot sites will produce a cadre of internal advocates and mentors for other staff as they attempt the needed changes.

It is recommended that IDJJ quickly put in place a rudimentary quality assurance process to measure progress in the desired rehabilitation areas. IDJJ has been working since 2014 with the University of Chicago Urban Lab to evaluate its programming and examine length of stay. It is

anticipated that the Urban Lab will evaluate YASI and other programs.  It would be very valuable to have this outside research consultant study the implementation process of the new rehabilitation approach and provide key organizational feedback to IDJJ top managers. For example, it remains to be determined if IDJJ has sufficient numbers of the appropriate treatment and counseling staff to fully meet its ambitious treatment goals.

Many of the IDJJ polices in the rehabilitation arena are aspirational at this point.
As noted above, the capacity of the Youth and Family Specialists to develop and administer quality youth development plans is still at a very rudimentary level.  There are some resource groups that are delivered episodically by the mental health practitioners, but these are of unknown value. Youth in the Wells Program are getting regular hours of substance abuse and other rehabilitative programs. There is an evidence-based gender-responsive curriculum offered at IYCW. However, most IDJJ youth spend varying amounts of their time in school, with some recreation services and lots of unstructured time in the day rooms of living units playing board games or watching television.  The program for sex offenders will be moved to IYCH and the JSO youth with developmental disabilities will be placed in the Indian Oaks School that will be reviewed by Dr. Kraus. None of the existing treatment programs has been subject of careful evaluation by IDJJ and their fidelity to other evidence-informed programs and the value to youth is unknown.

Young people at every IDJJ facility that I visited asked for more treatment and rehabilitation services. Many of youth residents were especially interested in improving their life skills via Anger Management, Cognitive Behavioral Therapy and Substance Abuse groups.  Other youth requested basic help in coping with life after release including advancing their educational levels, increasing vocational skills and job readiness, obtaining health care insurance, and getting a driver's license or other form of ID.  Almost all youth with whom I met wanted more structured programming in preparation for release and returning home.

Almost all of the IDJJ youth that I interviewed complained that there was lots of "dead time" in daily schedules when they were sitting in their rooms or in day rooms, and they wanted much more contact with counselors and mental health clinicians. The IDJJ young people wanted more structured recreational opportunities such as intramural sports as well as exposure to music and art. I have recommended that IDJJ provide all of its youth a minimum of 8 hours per day of highly structured pro social activities.

**Effective Behavioral Management - the Use of Restraints**

IDJJ has committed to utilizing more positive incentives with its youthful residents and to reduce the use of chemical and mechanical restraints. New policies have been drafted that reflect this change in philosophy. Balancing positive rewards with sanctions at IDJJ facilities is consistent with the best research on juvenile justice and will help reduce the exposure of the agency under a number of federal laws such as PREA and the Americans with Disability Act. Based on an August 2016 PREA audit, all IDJJ facilities were found in compliance with the law's requirements. In July 2016, IDJJ hired a full time Compliance Coordinator to monitor ongoing PREA-related issues.

PREA and the ADA seek to protect vulnerable youth from excessive, capricious and arbitrary punishments. IDJJ has made steady progress in defining appropriate policy statements in these areas, however, implementation of the behavioral management approach will take intensive staff training and very careful monitoring of how staff respond to the most challenging youngsters in IDJJ facilities. I plan on devoting close attention to monitoring the implementation of the new techniques in current and future monitoring efforts.

Research is clear that the utilization of mechanical restraints can be very harmful for youth who possess histories of severe trauma. In effect, the mechanical restraints can re-traumatize these vulnerable youngsters. Moreover, the use of mechanical restraints is inconsistent with an agency that is focused on promoting treatment and rehabilitation. Several youth corrections

agencies do not use mechanical restraints except under emergency situations. Mechanical restraints should not be used with youth with severe disabilities except in emergencies. Staffing should be augmented so that staff conduct can be managed by personal interactions with young people. It is almost unheard of to witness the use of mechanical restraints in those youth corrections systems such as the Missouri Division of Youth Services that are committed to a humane and treatment-oriented approach to juvenile justice.

To prevent and minimize the use of mechanical or chemical policy goals demands the delivery of high quality training to all staff who are involved in the direct care of young people. In addition to giving staff insights into adolescent social and intellectual development, the staff must receive high quality training in conflict de-escalation techniques. Further, security staff and Youth and Family Specialists should have timely access to Mental Health workers to assist them in resolving crisis situations.

Staff should be given practical guidance in how best to safely defuse potentially volatile situations without resort to restraints through the use of appropriate progressive behavior management techniques. As noted earlier, all IDJJ staff have received some CPI training and follow-up coaching. All instances in which restraints are employed must be thoroughly documented in timely and well written reports that include the time, location and reasons for the use of restraints as well as whether less restrictive techniques were tried. Whenever possible, the use of mechanical restraints should be video recorded. Top managers at each facility must review each instance of the use of restraints for compliance with IDJJ policy and with sound juvenile correctional practice. The facility managers must seek the advice and counsel of security staff, treatment supervisors, educators and mental health clinicians, who have worked with the youth in question, to determine if there were less intrusive ways to protect the safety of all those involved.

Currently, Reportable incidents involving restraints are sent to the Executive Team for their review. Periodically, Central Office staff should also conduct an in-depth and multi-disciplinary

27

examination of a sample of the incidents for suggestions for improved training or policy refinements. Systematic data on the use of restraints should be disseminated and discussed at regular staff meetings at the facility and Central Office level.

**Youth Grievances, Youth Rights and the Complaint Process**

The Remedial Plan called for IDJJ to maintain the hotline for PREA reporting, and to upgrade and improve the grievance process within 180 days of the Court's approval of the plan. IDJJ has made progress in ensuring that locked grievances boxes are placed in every living unit and that there is an adequate supply of forms available to IDJJ youth. I recommend that IDJJ also post clear and easy to read instructions in every living unit about the process by which young people may express potential grievances.

IDJJ has come close to meeting this standard about access to grievances. They have trained their staff in the basic grievance process. Youth have received some information about the complaint process. IDJJ supported the legislation to create an independent Juvenile Ombudsman, and, as noted earlier, the office of the Ombudsman is occupied by Kathleen Bankhead. The Ombudsman reports directly to the Governor and has been assured the requisite staffing resources to professionally meet their responsibilities. She has already debriefed with each of the court experts about areas of focus and priority in terms of protecting youth rights. The Ombudsman has her own system of receiving and tracking youth grievances. This year the Ombudsman will produce an annual report that will document facility visits, youth contacts and basic data on the accomplishments of this Office.

My interviews with both youth and staff suggested that most of the troubling and egregious staff behavior in terms of verbal abuse and inappropriate contact has been independently and professionally investigated. The current top management at IDJJ has expressed a "zero tolerance" standard for staff misconduct. Managers at the various IDJJ institutions have reinforced the agency-wide view. Some staff that were subject to these inquiries chose to retire

from IDJJ, while others received warranted sanctions. I did hear accounts by youth of staff misconduct and verbal abuse at one living unit at IYCH. I reported these anecdotes to top managers at IYCH and Central Office and I was assured that there would be a thorough review of these stories.

It is important to observe that only a few IDJJ youth reported to me that they were being physically or verbally harassed by staff. The overall youth assessment of IYCW staff was that, with few exceptions, the young people felt that they could report any problems with staff without fear of retaliation. One exception was during this year's S&W audit of IYCW when some of the girls repeated their concerns expressed in earlier audits that some of the staff were too rough with them.  As noted above, I did hear youth complaints about some staff engaging in verbal abuse and some excessive physical force at IYCH.

Several of the IDJJ youthful residents explained that the lack of sufficient staff, particularly at IYCSC, and the problem of single shifts put added pressure on security staff and Family and Youth Specialists, who did not have enough time to verbally engage the youngsters to result potential conflict situations. Shortages of staff when they occur have eroded the amount of patience that security staff can invest with very needy youth. Indeed, some youth confided in me that there was a perceived sense by youth that they need escalate their misconduct to get sufficient attention by staff.

Virtually all of the youth that I interviewed know how to file grievances but they were doubtful that anything positive would result from filing grievances or complaints. Many of the youth perceive that the staff do not believe youth accounts of their problems and many youth were more comfortable with handling their concerns informally with individual staff rather than utilizing the formal grievance process. Other IDJJ residents seek out facility top managers or Central Office staff in attempts to redress their complaints. For the young residents of IDJJ, the current grievance process is not credible and should be revamped. Very few grievances are ever

filed by the youth and, consequently, grievance data are not routinely utilized by managers to improve operations at the facility level.

Based on a sampling of filed grievances that I conducted at each of the IDJJ facilities, it was interesting that most of the youth issues involved their failure to receive basic services such as showers, adequate recreation time, adequate clothing not in disrepair, access to commissary, and the extremely poor quality of the food. Youth were also concerned about their sense of inconsistency of some staff relative to institutional rules, especially when staff give disciplinary charges for relatively minor misconduct. Staff that are perceived as giving out "too many tickets" anger youth because the youngsters think that these sanctions led to increases in "set time" that extend youth incarceration in IDJJ facilities or some loss of privileges.

IDJJ youth are given a manual on their rights at intake, but these were often misplaced and this description of youth rights and responsibilities should be easily accessible to youth and staff in each living unit. The established grievance and complaint process should be periodically clarified for youth and staff. Continuous training of staff and youth should be used to increase youth confidence in the integrity of the grievance and complaint process. The role of fair and open communication among staff and youth should be an integral part of the IDJJ rehabilitation model.

**IDJJ's Response to LGBT Youth**

The Remedial Plan requires IDJJ to create and implement a training program and to promulgate policies that would address the needs of LGBT youth. IDJJ has made substantial progress in the area. The training for staff on LGBT issues has been conducted. There are a new set of policies covering LGBT youth, including those with Gender Dysphoria. This includes an agency-wide protocol and review committee that considers the special needs of Transgender youth. These IDJJ policies are in keeping with current professional thinking in this field and draw upon excellent models from other jurisdictions. The key issue for ongoing monitoring is how these

formal policy steps are being reflected in actual practices in IDJJ facilities. Deputy Director Heidi Mueller has been monitoring the implementation of these policies. It appears that IDJJ staff are following the approved policy guidance.

**Performance-based Data (PbS)**

The IDJJ has contracted with the Performance-based Standards (PbS) project to assist in a facility audit that occur every six months. These operational standards cover a wide range of topics and allows each of the facilities to be compared with others. Further, PbS provides data on how IDJJ facilities differ from a national group of similar juvenile institutions that also participate in the PbS process. The PbS provides a "field average" for each of its key elements. These data can supplement ongoing quality assurances processes conducted by the IDJJ Central Office.

This "field average" is informative although it does not necessarily mean that IDJJ is meeting or falling below some established professional standards of service delivery and programming. The PbS audit allows helps juvenile correctional administrators to identify priority areas for reform and to develop internal plans to improve the quality of its services. The most recent PbS audit was completed in April of 2016 and offers an excellent snapshot of the Illinois juvenile corrections system. The next scheduled audit will be completed in October 2016 and will be publically available in November 2016. Once these later audit data are available, the S&W expert can further update this analysis.

It is important to note that the PbS data measures various factors at a point in time. To compile trends requires assembling the various PbS measures for each facility over time. In some cases the very low incident rates may mean that one or two events can greatly effect these trends. IDJJ uses the PbS national field average as a guidepost, but also computes an agency average as well. The different sizes of the facilities and the differing mission of particular facilities might

exert an impact on these comparisons. IDJJ publishes trends in the PbS data in its annual report.

The Ratio of Direct Care Staff to Youth

The April 2016 PbS audit assessed the ratio of direct care staff to youth during the collection month. Both the male and female units at IYCW (3.32 and 2. 25 respectively) had staff to youth ratios that were above the PbS field average (0.94). The staff to youth ratio was lowest at IYCK, but was closer to the PbS field average at IYCH (0.96), IYCPM (1.10) and IYCSC (1.06). In general, a higher ratio of staff to youth is a positive finding. It is worth noting that IDJJ counts all direct care staff, not just security staff, in its PbS calculations. Thus IDJJ staff to youth ratios may appear somewhat higher that other jurisdictions in the PbS national field average.

The Use of Restraints

The April 2016 audit showed that all IDJJ facilities except IYCSC utilized Physical Restraints at a rate that was less than the national field average. Physical Restraints mean that a staff will hold the youth using their physical strength as opposed to Chemical or Mechanical methods. For example, the PbS field average was 0.66 per 100 person days of youth confinement. The calculation of a rate per 100 person-days allows comparisons of facilities with differing average daily populations. This rate of Physical Restraints at IYCSC was 0.851 and 0.498 for the male living unit at IYCW. Rates for IYCCC and IYCH were 0.189 and 0.127, respectively. PbS found no youth subject to Physical Restraints at IYCPM, IYCW Female units, or IYCK in April 2016.

With respect to the use of Mechanical Restraints, the frequency in the use of mechanical restraints exceeded the PbS field average of 0.80 per 100 youth days in the General Population and Sex Offender Units at IYCK (2.846 and 1.310, respectively). IYCSC had a rate of Mechanical Restraints of 2.724 per 100 youth days and the female unit at IYCW had a rate of 1.689. The rate in the Male Unit at IYCW was 0.746 and 0.603 at IYCH, slightly below the PBS national field

average. The rate of using Mechanical Restraints at IYCC was 0.315 and IYCPM had no reports of Mechanical Restraints in April 2016.

The use of Chemical Restraints of IYCSC of 0.511 per 100 youth residents can be compared with the PbS field average of 0.08. There were no reports of using Chemicals Restraints in any other IDJJ facilities based on the April 2016 PBS audit. Three were no reports of the use of Restraint Chairs and any IDJJ facilities during this audit. In general, the use of Restraint Chairs is an aspect of prisons but is almost never observed in juvenile facilities. The utilization of room confinement, isolation or special management units was the highest at IYCSC and the IYCK General Population units at 4.086 and 3.795, respectively. By contrast the PbS field average was 2.03 per 100 youth residents. The Sex Offender (2.262) and Mental Health Unit Living Units at IYCK (0.200) were similar to the PbS field average.

These PbS data on the use of restraints illustrates the significant issues at IYCK which is now closed. These data also suggest that the Court should very closely monitor the utilization of restraints at IYCSC. When the next round of PbS data is available in mid-November 2016, it will be important to assess if the use of restraints at IYCSC is being reduced.

The use of isolation, confinement or special management units was 2.027 per 100 residents at the Female unit at IYCW and 2.488 at the Male unit at IYCW. The rate was 1.935 per 100 residents at IYCH. The lowest utilization rates were observed at IYCK Mental Health unit (0,200) and IYCC (0.504). The use of isolation, room confinement and special management units at IYCPM was 0.864 per 100 residents.

Isolation and Confinement Practices and Idleness

The average duration of isolation, room confinement or special management units was 5.19 hours at IYCSC and 2.40 hours at IYCH. The duration was less than 2 hours at all other IDJJ facilities. This compares very favorably with the PbS field average of 16.89 hours. This finding is

very consistent with overall IDJJ policies to sharply limit the time that youth stay in any restricted housing settings. In the PbS field average approximately 65% of confinement or isolation are ended within 4 hours. For IDJJ facilities virtually all these temporary restrictions are ended in under 4 hours. The one exception is at IYCSC where less than 25% of these restrictions extend past 4 hours.

The April 2016 PbS audit revealed that most IDJJ residents spend almost no idle time in their rooms or dormitories during waking hours over an average 24 hour period. The exception to this finding was at IYCSC and IYCC where youth spent an average of 2.00 hours of idle time in rooms or dormitories. The PbS field average for idle waking time was 0.81 hours. The Court should continue to monitor trends in youth idleness at IYCSC and IYCC because this indicator is often related to other facility safety concerns. I was told that IYCC are working hard to increase youth activities and the idleness issues at IYCSC are connected to staffing shortages and the inconsistent offering of school hours.

Youth Injuries and Safety Concerns

The rate of injuries per 100 youth residents is generally below the PbS field average of 0.63. In April 2016, IYCSC (1.396), the male living unit at IYCW (1.990) and IYCK Mental Health (1.071) were above this PbS field average. There were no reported youth injuries at the IYCW female living units. Youth injury rates were substantially below the PbS field average at IYCC (0.378) and IYCH (0.349). The injury rate at IYCPM was 0.605.

Injuries to youth caused by other youth per 100 days of confinement were highest at IYCSC (0.511) and the youth to youth injury rate was 0.308 and 0.238I at the IYCK General Population and IYCK Sex Offender living units, respectively. The youth to youth injury rate at IYCH was lowest at IYCH (0.159) and there were no such injuries at IYCW or IYCK Mental Health.

34

There were almost no injuries to youth caused by staff at most IDJJ facilities; and the staff to youth injury rate was well below the PbS field average of 0.006 at IYCH (0.032) , but it was slightly above the PbS field average at IYCSC (0.068).

The data on youth injuries during the application of force by staff was highest at IYCH (0.032) and IYCSC (0.34), as compared with a PbS field average of 0.05. There were no reported injuries of youth due to staff application of mechanical or physical restraints at other IDJJ facilities

In April 2016 there were no injuries per youth due to suicidal behavior per 100 person days at any IDJJ facilities with the exception of IYCSC with a rate of 0.068 as compared to the PbS field average of 0.03. The rate of suicidal behavior without injuries to youth was highest at IYCSC (02.04) compared to the PbS field average of (0.04). Other facilities with some reported youth suicidal behavior were the IYCK Sex Offender Program (0.119), IYCPM (0.086) and IYCH.

The April PbS data collection showed rates of assaults and flights involving youth per 100 person days that were higher than the PbS field average of 0.45 at many IDJJ facilities. For example, the rate of assaults and fights was highest at IYCK General Population units (1.708) and at the IYCK Sex Offender units (1.190).  The assault and fighting rate was also above the PbS field average at IYCSC (0.124), IYCC (0.882) and IYCW female units (1.014). Lower rates of violence were found at IYCPM (0.173) and IYCH (0.603). In April 2016, the PbS data reported no youth assaults or fights at the IYCW male units.

The number of youth who said that they were being forced to engage in any sexual conduct in the last six months was virtually zero based on the April PbS 2016 audit. On a national basis the PbS field average is 2.71%.  There are two facilities that report percentages that are higher than the field average – these were IYCW female (5.2 %) and IYCK general population (5.26%).

As part of the PbS April 2016 audit, samples of youth residents were queried if they feared for their safety during the past six months. On a national basis, approximately 19.25% of

35

incarcerated youth expressed safety fears. No youth agreed with this statement at the IYCK Sex Offender program and the IYCW male units. By contrast the highest percentage of fearful youth were at the IYCK Mental Health unit and the IYCW female units, at 36.36% and 30.77%, respectively.  Fear levels of youth were lower at IYCSC (24.14%), IYCK General Population (21.05%) and IYCPM (20.00%).  The percentage of youth who were fearful was lowest at IYCH (7.69%) and IYCC (11.52%).

<u>Staff Injuries and Safety Concerns</u>

Looking at other safety issues for IDJJ revealed that assaults on staff by youth were above the PbS field average of 0.12 at the IYCK General Population (0.759) and the IYCK Mental Health units (0.200). Other IDJJ facilities with higher than PbS rates were the IYCW female units (0.676) and IYCW male unit (02.49)  The youth on staff assault rate at IYCSC was 0.40O.  The rate of assaults on staff at IYCH was below the PbS field average at 0.063. There were no reported assaults on staff at IYCC and IYCPM.

By comparison, the rate of injuries per 100 staff-days of employment showed IYCK General Population living units with a very high rate of 1.080 as compared with the PbS field average of 0.11. The next highest staff injury rate was found at IYCSC (0.516).  The staff injury rate at the IYCK Sex Offender unit was 0.212.    The staff injury rate at IYCC was 0.176. There were no reported staff injuries at IYCW, IYCPM and IYCK Mental Health.  IYCH also reported a very low staff injury rate of (0.033).

The percentage of staff who said that they feared for their safety was especially high at IYCSC (61.29%), IYCK general population (66.67%) and IYCC (50%). The lowest levels of staff fear were at IYCPM (6.25%) and IYCH (6.67%).  Staff fear was above the PbS field average of 26.94% at the IYCK Mental Health (45.8%) and the IYCW male unit (37.04%). The percentage of staff that expressed fear for their safety in the past six months was 26.67 at IYCW female units and 21.43% at the IYCK Sex Offender unit.

36

Other Facility Security Concerns

The April 2016 PbS audit reported no examples of completed Walk-Aways and AWOLs per 100 person days of residence. Incidents involving weapons as contraband were likewise rare. The rate of weapons found were reported at the IYCK general population unit which had a rate of 0.380 per 100 person days. There were no reported instances of contraband involving drugs. Some other forms of contraband were reported at IYCH (0.349), IYCPM (0.086) and IYCSC (0.034).

**Youth Viewpoints**

As part of this comprehensive review of Safety and Welfare issues, I conducted private and confidential interviews with youngsters residing in each of the IDJJ facilities.  In all, I spoke with more than 30 youth. While it was not possible for me to verify specific claims from youth who complained about maltreatment during the time that I was onsite, in every instance I followed up with IDJJ managers and requested official documentation in terms of incident reports, some medical records, disciplinary actions, and housing units changes. IDJJ top managers were very cooperative in researching these cases and sharing with me the requested information For this report, I have selected a few youth whose stories are illustrative of the range of experiences by these young people and by their peers in IDJJ facilities. I offer these brief accounts to humanize some of the statistical data that were presented earlier.

It is important to stress that there are often many sides or perspectives on events that occur in IDJJ facilities. Investigating potential harm is a complex and time consuming process. Still, youth and staff perceptions are important. A central premise of Social Psychology is "What people define as real is real in its consequences". Further, humans form their self-perceptions from how others in their environment respond to them as well as the physical settings that they experience on a daily basis. It is also worth noting that rumors of staff misconduct are often

pervasive in secure juvenile facilities. These stories, whether true or exaggerated are repeated. Thus, the misconduct of a few staff can have a very deleterious impact on the institutional milieu.

Here are some anecdotes gathered from IDJJ young people that deserve closer policy and programmatic scrutiny. I have attempted to keep the youth's identities confidential whenever possible.

A 19 year old young women at IYCW reported that she was generally treated nicely by the staff. She did say that there was lots of fights and "drama" among the girls. This young women never received visits and she expressed concern that staff should treat everyone consistently.  She rated the treatment groups as good, but felt that the youth needed more opportunities to practice what they had learned. She complained that the medical care was uneven and sometimes it took too long to see a nurse. She sees a psychiatrist periodically to check on her medications. She is a high school graduate and spends a good portion of day working on tablet computer in the library.  There were 1-2 hours of recreation every day. Her opinion was that the grievance system doesn't work well for the youth.  She feels that the males at IYCW got more attention from the staff than the girls. This youth account illustrates the significant challenges faced by IDJJ youth people who have limited contact with family members.

A 16 year old from Northern Illinois had spent over a year at IYCW. She needs 7 more credits to graduate.  She admits to having serious anger issues and receives regular weekly counseling sessions with a therapist, as well as being enrolled in weekly SPARCS and DBT classes. She sees an Aftercare specialist once a month. She does get regular visits from her family. This young women has a variety of institutional jobs and receives at least one hour of recreation a day. In general, the staff treat the young women respectfully. She did file one grievance against a staff person and this matter was successfully resolved.

Another 16 year old female needed 16 more credits to graduate. She complained about very bad headaches and believes that she needs her braces to be tightened. She did spend some time in the confinement unit after staff were concerned that she was potentially suicidal. She was temporarily placed on suicide watch and was strip searched. While in D-Wing for 2 day, she was allegedly assaulted by another girl. She has been assaulted several times by other residents and sustained some injuries. This young women complains about being bullied by other girls and does not feel safe. She receives visits from her mother on a weekly basis. Even with her family support, this youngster shows the compounded issues of mental health needs that require staff attention and expertise.

I spoke to a 16 year old male at IYCW who had been transferred from IYCSC and preferred being at IYCW, describing the residential environment as "much more mellow". He proudly reported that he had completed 4 credits at IYCW despite a less than successful school history in the past. He had several job assignments and was enrolled in weekly treatment groups dealing with anger issues, substance abuse problems and parenting. He had not received any visits since being at IYCW. He possessed many psychological challenges and was getting mental health services on a regular basis. The smaller male living unit size at IYCW can be a definite benefit to those young people who do not thrive in the large facilities.

Another 16 year old male resident at IYCW had previously been at IYCC. He expressed his concerns that there were some fights at IYCW, but that he felt much safer than when he was at IYCC. He attends school, has a work assignment, and receives family visits 3-4 times a month. This young man sees a therapist twice a week and participates in groups dealing with Anger Management and the effects of PTSD. He has been assigned an Aftercare specialist. The more enriched mental health offerings at IYCW were a clear value to this youth.

An 18 year old at IYCC has been there for 7 months. This is his second commitment to IYCC. He has earned a GED and has a number of work assignments. One concern is the unchanging daily routine and insufficient recreation time. Those youth in school get physical education classes

which means more recreation time. He felt that not being enrolled in school meant less opportunities for cut time. He is taking many counseling classes, especially through the Wells Center but he feels that there are very few incentives for youth who want to succeed. He has no defined plans for returning home and his parole officer has not visited him. He feels safe although there is some fighting among the youth. There are a few staff that engage in verbal abuse of youth and these staff sometimes show favoritism towards certain young people.

An 18 year old at IYCSC from Chicago has resided there for about 12 months. He is a high school graduate and takes computer-based classes to prepare for college admissions tests. He would prefer more personal mentoring to prepare for the ACT and SAT tests. He has a work assignment and sees his Youth and Family Specialist almost daily. While most of the staff treat him well, there are a few security staff that are verbally abusive or who arbitrarily take away his incentive points. A grievance that he filed against one staff person was resolved and he believes that the staff person was under investigation by his supervisors. This young person receives visits every week but he claims that he has not had any formal contacts with his parole officer or an Aftercare specialist. According to IDJJ policy, these youth should have been assigned one or the other. If this youth was a juvenile felon, he should have DOC parole agent. This youth echoed a concern of other residents of IYCSC that many well behaved youth are punished via lock downs, denial of regular showers, or denial of recreation time if the staff are responding to living unit conflicts that are created by other youth. Youth have not been permitted to use the IYCSC gym due to safety issues. This further shows how the staffing shortages at IYCSC can adversely impact the youth who reside there.

Another IYCSC resident had been there for about three months after a stay at IYCC. He expressed concern that fights break out almost every day. He doesn't feel safe and has to watch his back constantly. He wishes that there was more order in the facility. While he finds the education program at IYCSC helpful, there had been no school for almost a week due to staffing shortages. He complained that many youth spend large amounts of time in their rooms and were receiving limited recreation. When not in their rooms, the youth spend time watching

television and playing card games. Daily routines are pretty unchanging. This young person does see a mental health therapist and a mental health student intern on a weekly basis.

One of the younger IYCSC residents was 14 years old. He generally feels safe and a thinks that his medical and mental health care is fine. He receives no visits currently, but gets two family phone calls each week. He hopes to be paroled to another state upon his release. This youth enjoys the school but classes have met only twice a week in the past, and for the most recent 2-3 weeks there was no school at all at the facility. He receives recreation daily but rarely has an opportunity for any large muscle exercise. Recreation consists of television, board games and playing chess or checkers. He talks with his mental health therapist about the challenges on returning back into the community. The youth spends many hours in the rooms on weekends when staff is even further depleted.

I spoke to two other IYCSC youngsters that had spent short periods of time in the Taylor and Pierce cottages due to disciplinary problems. As of June 2016, Pierce was a general population cottage and Taylor was used for Time Out. Prior to June 2016, Pierce was operated as a restrictive housing unit and these youth may have been in Pierce at various times. Both youth described being transported to Taylor and Pierce in mechanical restraints. These young people described being fed in their rooms and received virtually no recreation. They were receiving some mental health services while in restrictive housing. They got to go to the gym once in a while. As with other IYCSC residents, these youngsters had no education services in the past two weeks. They received no commissary privileges and both received additional time added to their expected release dates.

I believe that these multiple restrictions should be more carefully assessed in terms of the value of these sanctions within the overall treatment plans for these young people. It is worth reviewing whether appropriate due process procedures were followed and if these youth given the needed mental health services to help resolve their anger problems. The research is clear that punishments per se are not very effective in producing durable positive behavior change

and contribute to escalating bad conduct. One youth explained that he tried to contact the Ombudsman to complain about his treatment but the call went directly to voicemail. Neither of these youth felt that the current grievance process was effective in resolving their concerns. Both of these young people understood the reasons for being placed in restrictive housing, but neither of them had clear picture of what they needed to do to return to their original living units.

Youth at IYCPM were much more content with their experience in IDJJ. Many of these youth were out in the community, either attending Youth Build programs or in other outside activities. The school program was generally rated very positively and they liked the youth incentive program.  Youth were rewarded with off-campus trips and went fishing with staff supervision. There was a Family Day once a month with special activities. Staff were very focused on helping IYCPM young people to prepare for reentry by helping the youth get signed up for social security benefits and obtaining state IDs. There was also aggressive outreach to local churches to launch a youth mentoring program. Treatment and mental health services for youth were readily available. There were only two adverse transfers of IYCPM residents to other IDJJ facilities. Most youth leave IYCPM to go into Aftercare services in their home communities.

I spoke to several youth who had spent time at IYCH and at other IDJJ facilities. Many of these youth complained about a few staff that had threatened youth, were often physically rough and expressed racially abusive language.  I listened to multiple IYCH youth recount versions of these examples of alleged staff misconduct. While I did not require these youth to divulge the names of the allegedly offending staff, these young people freely give me their names. In cases where I could review the serious incidents reports, these security and supervisory staff had been present at these events. Few of these youth ever filed formal grievances since they felt that the security supervisors would not really listen to their concerns. Some youth claimed to have written letters complaining about certain staff but did not feel that they received adequate responses.  None of these young people reported that they had spoken with the Ombudsman

and did not know how to contact this person. IDJJ has been working with the Ombudsman whenever concerns have been raised by individual young people. They have established a toll free number for youth to confer with the Ombudsman.

By contrast most of these IYCH youth liked the school program and found that their Family and Youth Specialists were very helpful to them. There were many opportunities for youth to get jobs in the institution, but they requested more chances to acquire marketable job skills. Many of these youth expressed their concerns to the top IYCH managers who they regarded as both sympathetic to them but not always aware of some staff misconduct. These youth generally liked residing at IYCH compared to their prior experiences at IYCSC and IYCSC. They asserted that IYCH had generally lower levels of violence than other facilities and the facility was pretty well organized. The use of confinement or other forms of restrictive programming at IYCH was rare.

The youth at IYCH wanted more access to treatment and mental health services, particularly in the area of controlling their anger issues. Several of the youth participated in drug treatment and SPARCS groups. There were some youth getting regular visits, but other young people at IYCH rarely saw their parents or guardians. IYCH did not have regular Family Days and there was no designated staff assigned to increase the engagement of families in the lives of the incarcerated youth. The Mental Health Department has the primary responsibility for increasing family engagement. Since March of 2016, Mental Health Department have conducted three workshops on this topic and do make monthly calls about family engagement to the facility managers. These young people wanted to have more recreational opportunities, especially large muscle exercise, and more chances to participate in off grounds activities. There are several current efforts to take youth into the local community, but only about 10 youth are participating in these community visits. While there was one Aftercare specialist who spent 2-3 days a week at IYCH, many of the youth expressed their interest in more contact with Aftercare staff and better preparation for upcoming parole hearings.

**Key Implementation Considerations**

With all of the profound changes that have occurred at IDJJ, there is a need to revisit and slightly update the R.J. vs Montgomery Remedial Plan. I would suggest that this revision strengthen areas that include the provision of services to youth who qualify under the federal Americans with Disabilities Act (ADA) and Individuals with Disabilities Education Act (IDEA) legislation. The current efforts to meet the requirements of the Prison Rape Elimination Act (PREA) as well as to appropriately respond to the needs of LBGT youth should be continued and expanded.

Major management changes at IDJJ in the Central Office and at some facilities suggests the need for increasing on-going efforts at team building. The current effort to share positive experiences and ideas among various facilities should be expanded.

Staffing shortages, especially at IYCSC must be solved immediately. Insufficient on-duty security staff must not lead to excessive room restrictions, denial of schooling and limitations on other basic youth services including recreation and personal sanitation. IDJJ is planning a fall 2016 Academy for new IYCSC staff and hopes to add an additional 25 security staff interns.

While substantial progress has been achieved to limit the use of confinement and other forms of restricted programs, there is need to increase the understanding and training of security and counseling staff as to the rationale for these reforms. These discussions should be led by existing IDJJ staff who have fully embraced these reforms. IDJJ must continue to improve its data collection on serious incidents and tract trends in safety and security issues for all of its facilities and for specific living units at each facility. Access of young people to youth advocacy groups should be encouraged by IDJJ.

Staff at IDJJ facilities need refresher training on de-escalating conflicts among youth, as well as resolving disputes between staff and youth. The use of mechanical restraints should be further

reduced. Staff should also receive additional training and mentoring in the use of incentives for youth to promote good behavior. Further, staff and youth need regular and repeated training in making the existing grievance system a more effective way for protect youth rights.

With the declining youth caseloads in institutions and in Aftercare, the IDJJ should carefully assess its efforts to consolidate programs and resources. The ongoing efforts to create new mental health and sex offender programming at existing IDJJ facilities should be reviewed and evaluated at least semi-annually.

IDJJ should expand its efforts to more fully implement an evidence-based treatment and rehabilitation model that should include improved case management skills. Staff should expand their training in active listening techniques and in delivering group and individual counseling services. These improvements should include the active leadership of mental health staff in all aspects of facility operations.

IDJJ should explore cost effective strategies to improve the safety, maintenance and physical facility issues at all facilities. This should include upgrading gyms and other outside recreational areas. IDJJ must continue to create more home like versus prison environments in all of its facilities.

IDJJ should examine ways to expand family contacts and visiting for all of its youth. Visiting and family activities should be expanded and encouraged. Aftercare services should be expanded for youth still in IDJJ facilities, including preparation for community reentry.

Respectfully Submitted,

Barry Krish