**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-7289 |
| | ) | |
| JESSE MONTGOMERY, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT STATUS REPORT AS TO ISSUES IDENTIFIED IN 2016 MONITOR**
**REPORTS**

On November 10, 2016, this Court entered an order directing the parties to file a status report reviewing the deficiencies and areas for improvement noted in the 2016 reports of the Court-appointed monitors and describing what, if any, plans are in place or being put in place to remedy these issues. Dkt. 177. This report categorizes and summarizes the key issues identified in the monitors' reports, followed in each case by the Illinois Department of Juvenile Justice's (DJJ or Department) response and then Plaintiffs' response as to those issues.

Although the monitors' reports identified various areas of concerns, many of those concerns relate primarily to Illinois Youth Center (IYC) St. Charles, which remains a central focus of the Department's efforts to comply with the Remedial Plan. For that reason, IYC-St. Charles receives more specific treatment in the responses below.

**I.      Staffing Levels and Hiring Concerns**

The monitors' reports raised concerns with staffing levels—primarily for security staff and educator positions—and the hiring delays in filling those positions.

The Remedial Plan provides benchmarks for security staff ratios in compliance with the Prison Rape Elimination Act (PREA) Juvenile Facility Standards. Dkt. 73, Remedial Plan, Part V, § 4. It also requires certain student-to-teacher ratios (10:1 for general education; 6:1 for special education) and hiring of specific education-related positions (*e.g.,* library associate, school counselor, and special education resource coordinators). Dkt. 73, Remedial Plan, Part III, §§ 2-4; Dkt. 84, 7/17/14 Supplemental Order.

**1.   Security Staff**

**DJJ's Response**

1

DJJ has been meeting the security staffing ratios outlined in the Remedial Plan for over a year. These ratios are taken from the PREA ratios and are calculated based on the total number of security staff (Juvenile Justice Specialists, Juvenile Justice Interns, and Juvenile Justice Supervisors) reporting to work at the facility. In all facilities other than IYC-St. Charles, adequate security staff levels enable facilities to maintain regular operation on a daily basis.

As noted in the monitors' reports, IYC-St. Charles security staff absences have been impacting operations and programmatic opportunities for youth.[1] The discrepancy between PREA staffing ratios and operational staffing needs at IYC-St. Charles is due in part to the large layout of the IYC-St. Charles facility, which requires substantial movement of youth between cottages, school, dietary, etc.; additional posts to cover the facility due to its size and layout; and the mental health special treatment unit, which requires additional staff.

To address this issue, the Department began tracking security staffing levels at each facility this Fall. Facility administrators provide DJJ Executive Staff with daily reports at the outset of each day shift detailing the number of security staff members on duty, the number of security staff members who called in and the basis for their absence, and a report of the effect on the facility's operations for that day. *See* Ex. A (sample Operational Needs Report). This practice allows the Executive Staff to track facility needs, understand how staffing impacts youth programming, and to help identify solutions.

To limit disruptions due to security staffing shortages, first, DJJ has focused particular attention on IYC-St. Charles staff on leaves of absence and intervened with efforts to return them to work when possible. DJJ retained a former administrator on a contractual basis to review workers' compensation files from August to October 2016. On October 25, 2016, the facility held a workers' compensation claims review with staff from the Illinois Attorney General's Office and its claims adjustor to prioritize files and formulate strategies for returning employees to work. These efforts resulted in approximately 18 staff members returning to work from August through December. Progress has slowed recently due to turnover in the IYC-St. Charles Human Resources Department, but an individual is scheduled to start in that position soon, likely in January 2017.

Second, the Department recently hired 50 new security staff members who are currently receiving training at the DJJ Intern Academy. The Academy commenced on November 28, 2016, and the security staff interns will start working at their assigned facilities in early January 2017.

Each facility will receive the following new security staff members:

IYC-Chicago: 6
IYC-Harrisburg: 15

---

[1] Programmatic limitations are primarily recreational activities. Security staffing shortages are not impacting the delivery of mental health services.

IYC-Pere Marquette: 5
IYC-St. Charles: 18[2]
IYC-Warrenville: 5

Currently, the Department anticipates starting another Intern Class in late-Spring 2017.

Ensuring a full complement of security staff on a daily basis at IYC-St. Charles and maintaining staffing levels at the other facilities are priorities for DJJ leadership and remain primary areas of focus for improvement.

**Plaintiffs' Response**

The Court directed the parties to file this status report to "review[] the deficiencies and areas for improvement noted in the monitoring reports and describe[e] what, if any, plans are in place or being put in place to remedy them." Dkt. 177. Plaintiffs believe that, as to each of the plans laid out herein by Department, the Court-appointed monitors should be consulted as to whether these plans adequately address the deficiencies, and should inform the Court of their views.[3]

Plaintiffs believe that the monitors' views are especially important as to the security staffing issues at IYC St. Charles. While the other youth facilities have progressed, St. Charles continues to lag, although it currently holds almost one-third (about 120 youth out of a population of approximately 400) of the youth in DJJ custody. The Remedial Plan (Dkt. 73) has a general requirement that "DJJ shall increase the number of security staff posts to ensure **adequate staffing** at each facility." Dkt. 73 at 8 (§ V.4) (emphasis added). Unfortunately, throughout 2016, the effects of understaffing on "operations and programmatic opportunities for youth" at St. Charles have impacted DJJ's ability to comply with multiple critical requirements of the Consent Decree and Remedial Plan. *See, e.g.*, Dkt. 73 at § II.6 (coordination of mental health treatment), § III.1 (full-time, full-day instruction), § V.4 (security staffing levels), and § V.10 (minimum of eight hours of out-of-room time per day).

In his 2016 report, the Safety and Welfare Monitor, Dr. Barry Krisberg, characterized the problems at IYC St. Charles as "serious and severe." Dkt. 176-1 at 2-3. Similarly, Dr. Louis Kraus, the Mental Health Monitor, observed in his 2016 report that the "dearth of security staff at IYC St. Charles…continues to have a negative impact on transitioning youth to school, mental health treatment, and scheduled activities, as well as providing them appropriate breaks." Dkt. 178-1 at 3. As evidenced by the monitor's observations in previous years, the staffing problem

---

[2] Originally, 19 Interns were scheduled to begin at IYC-St. Charles. One intern dropped out on December 12, 2016.
[3] Shortly after the Court entered its order, the parties conferred as to a process and timetable for this report. On December 2, 2016, DJJ submitted a draft report to plaintiffs' counsel; plaintiffs' counsel supplied written comments on the report to DJJ on December 5, and the parties held an in-person meeting at the DJJ offices that day to discuss the report and comments. On December 8, DJJ provided a revised version of the report to plaintiffs' counsel, and plaintiffs provided their revised response on the morning of December 12. To date, the monitors have not seen or commented upon this report.

at St. Charles is long-standing. *See, e.g.*, Dkt. 154-1 (2015 Krisberg report) at 4-5, 40 (describing the biggest challenge facing IDJJ as the "continued problem of insufficient staffing").

At the end of 2015, plaintiffs' counsel were particularly concerned about the lagging state of educational programming at all the DJJ facilities – an issue they took up with the Department, and to which the Department responded.  Plaintiffs' counsel then visited St. Charles three times during 2016 (on February 10, May 3, and June 27).  During the February visit, plaintiffs' counsel learned that – although the facility had an almost full complement of teachers due to recent hiring efforts – school had been suspended for weeks because of fights which had broken out among youth at the school building.  Plaintiffs' counsel were subsequently assured that a plan to move youth to and from the school building in a manner that would minimize youth conflict had been developed and would be implemented by mid- to late March, enabling full-day school to resume on a regular basis.  *See* Dkt. 161 at 3. Unfortunately, as plaintiffs' counsel learned on subsequent visits, disruptions continued.  In July, in an effort to understand the ongoing security issues at St. Charles, plaintiffs' counsel, pursuant to the provisions of the Consent Decree (Dkt. 33 at ¶34(b), (c)) requested and ultimately received data for the period of May-July 2016 from the Department as to security staff numbers, the number of staff on any form of leave, and school cancellations, *inter alia*.  Plaintiffs subsequently requested an additional three months of data on October 17, which they received on November 1.  This data showed that, between July 1 and October 15, 56 out of 63 scheduled school days were partially cancelled due to teacher shortages and/or security concerns.  In addition, as of August, 43 out of 147 security staff were on some form of leave.

Plaintiffs are encouraged that the Department acknowledges that compliance with the PREA ratios has proved to be inadequate to provide sufficient security staffing at IYC St. Charles.  However, the only concrete plan for improvement the Department offers here is a modest increase in security staff (18 new recruits who will be coming to St. Charles as a result of DJJ's standard training and recruitment processes).  Although the efforts of DJJ to review and address the files of security staff on leave is commendable, there remains a considerable "on the books but not working" deficit even after these efforts. .

Finally, plaintiffs note that Dr. Krisberg suggested that DJJ needed to conduct a "rigorous staffing analysis" that would identify the greatest need for additional staff by specific posts and for living units, and "[t]he most important consideration of the youth to staff ratios should be whether there are denial of core services to young people." Dkt. 176-1 at 20-21. (Dr. Krisberg made the same recommendation in 2015. Dkt. 154-1 at 21-22.) This is not addressed in DJJ's response.  Dr. Krisberg's suggestions and observations concerning the problem of security staff at St. Charles who are not available for work assignments due to various employee work rules are likewise unaddressed: "I would recommend that the Court review these employee rules and recommend changes that will ensure that staff shortages do not harm the safety and programming opportunities for IDJJ residents." Dkt.154-1 at 12. "This same security staffing problem was less

4

pronounced at the other large IDJJ facility (IYCH) due to the liberal use of overtime to increase the ranks of the on-duty security staff." *Id.* at 15.

In summary, plaintiffs believe that, with deference to the monitors' views, the Department's response as to plans for security staffing at IYC St. Charles will not adequately address the ongoing problems at that facility.

### 2. Educators

**DJJ's Response**

DJJ is currently facing some educator shortages, primarily at IYC-St. Charles. That facility was meeting both its general education and special education ratios from January 2016 through July 2016, but teacher attrition led to the current shortage. *See* Ex. B (educator staffing data).

DJJ is taking steps to fill the educator positions at IYC-St. Charles. To help recruit qualified candidates, DJJ began posting the teacher positions on the Illinois State Board of Education website. DJJ has also asked the American Federation of State, County, and Municipal Employees (AFSCME) Union leadership to assist in recruiting for educator positions.

The State processes for hiring have presented barriers for filling vacant education positions, but DJJ has been instituting changes to eliminate unnecessary delays. Two Illinois Departments outside of DJJ play a role in the hiring process. The Department of Central Management Services (CMS) oversees hiring and personnel issues for the State and reviews DJJ education applications to determine whether applicants meet the requisite qualifications. The Public Safety Shared Services Department (Shared Services) is the liaison between DJJ and CMS. DJJ has been working closely with both Shared Services and CMS to reduce hiring delays for education positions.

First, DJJ began posting positions without waiting for Shared Services' approval. DJJ schools are now able to post for open teaching positions as soon as they become aware of a vacancy. Second, Shared Services has been eliminated as the "middle-man" between DJJ and CMS for transmitting educator candidates' applications to cut down on the time between receiving an application and moving forward with interviews. Third, DJJ has scheduled weekly meetings with Shared Services, certain DJJ Executive Staff (including the Chief of Staff, Chief Legal Counsel, and the School District leadership), and DJJ's facility Human Resources Representatives to review all vacant education positions and ensure that they are moving quickly through the hiring process. Similar meetings were held during Fall 2015 and Spring 2016 and were successful in improving educator hiring. The Department is hopeful that reinstating these meetings will help DJJ place qualified candidates in education positions more expeditiously. Finally, DJJ notified CMS of the importance of promptly filling these positions, and DJJ education applications now are flagged for priority review at CMS, with a general turnaround time of a few days.

5

IYC-St. Charles has interviews scheduled on December 12-13, 2016, for seven educator applicants, who have already gone through the CMS screening process. DJJ has also identified 2-3 teachers who will start on January 3, 2017, on a short-term contract to help alleviate the current educator shortage. In addition to filling open positions, and as noted in the Education Monitor Report, DJJ is seeking to hire full-time floater teachers to act as substitutes in the event of teacher absences.

The School District also continues to seek employees for the Special Education Resource Coordinator and School Counselor positions at each facility. However, it is making progress filling these positions and expects to see improvement in the next few weeks. The current status of these positions is as follows:

- IYC-Chicago
  - Special Education Resource Coordinator: Position was reposted until December 2, 2016.
  - School Counselor: Candidate selected and has started the backgrounds check process.
- IYC-Harrisburg:
  - Special Education Resource Coordinator: Hired on October 16, 2016.
  - School Counselor: Start date December 16, 2016.
- IYC-Pere Marquette:
  - School Counselor: Candidate has been selected and will be going through the backgrounds check process.
  - Special Education Resource Coordinator: Current DJJ educator is deciding whether to transfer into this position, anticipated start date will be in January/February 2017.
- IYC-St. Charles
  - School Counselor: One candidate is in the final stages of the hiring process.
  - Special Education Resource Coordinator: Internal candidate declined the position; District is moving forward with interviews of other candidates.
- IYC-Warrenville
  - School Counselor: Candidate selected and has started the backgrounds check process.
  - Special Education Resource Coordinator: Internal candidate declined the position; position will be reposted.

For several months, DJJ and Plaintiffs' counsel have been in communication about staffing and education issues at IYC-St. Charles, and DJJ has provided Plaintiffs' counsel with various data related to this issue. In the coming months, the parties plan to have on-going communication and in-person meetings to discuss DJJ's progress in this area.

**Plaintiffs' Response**

*See* plaintiffs' response, below, under "Educational Programming Concerns."

## II.    Educational Programming Concerns

The Education Monitor raised concerns about the availability of full-time/full-day school (primarily at IYC-St. Charles), career and technical and vocational education programs, and the provision of Special Education services, as required by the Remedial Plan.  *See* Dkt. 73, Remedial Plan, Part III, §§ 1, 7, 8.

### DJJ's Response

First, DJJ is working to fill staff positions for career and technical and vocational programs.  DJJ has extended an offer to a candidate for the Career and Technical Education (CTE) Director position, and his start date is December 13, 2016.  Positions for CTE teachers have been posted but are not yet filled.

DJJ also entered into a contract with Lakeland College to provide post-secondary programming for youth.  IYC-St. Charles will be offering horticulture, custodial maintenance, and building construction; IYC-Harrisburg will be offering horticulture, custodial maintenance, and culinary. The Lakeland College Associate Dean position at IYC-St. Charles has been filled and the individual started on December 7, 2016.  The candidate for the Associate Dean position at IYC-Harrisburg is in the background check process.  Interviews for the Lakeland teacher positions at IYC-St. Charles were held on December 7-8, 2016.  Because these teachers will be employees of Lakeland College, they will not be hired through the normal State hiring process.

Second, with respect to full-time, full day instruction, DJJ is in compliance with this requirement at every facility except IYC-St. Charles.  IYC-St. Charles has not been able to provide full-time, full-day instruction due primarily to the educator shortages.[4]  To address this issue, the IYC-St. Charles principal has developed a schedule to rotate cottages throughout the day so each youth receives at minimum school in either the morning or afternoon every day.  Traditionally, youth from multiple cottages have not been combined into a single classroom because mixing youth can create conflicts, potentially leading to fights or other misconduct.  The Department's Compliance Coordinator is working closely with the IYC-St. Charles Principal and other facility staff to develop creative solutions for more youth to receive full day school.  Other efforts detailed above (*see supra* pp. 4-5) demonstrate DJJ's work to find a long-term solution and fill the education vacancies.

Third, the Remedial Plan requires DJJ to update its policies and procedures for special education and provide for timely obtaining youths' records from prior schools, identifying and assessing

---

[4] Although security staffing absences at IYC-St. Charles previously had been impacting the Department's ability to provide full-day school, currently the primary impediment is educator shortages.

youth with disabilities, developing and implementing Individualized Education Programs (IEP), and monitoring to ensure that youth are receiving the services specified in their IEPs. *See* Dkt. 73, Remedial Plan, Part III, § 8. DJJ made substantial progress to meet these requirements when it hired a new Director of Special Education in August of 2016.

The Special Education Director immediately began working to improve school procedures using the Illinois State Board of Education computerized IEP program, I-STAR. The I-STAR program allows for centralized tracking of IEP compliance with procedural requirements to help the Special Education Director provide timely feedback to faculty and staff on supporting students' needs. In addition, school staff are updating special education monitoring logs on a daily basis so all special education faculty and staff promptly receive case management information. DJJ school district data reflects marked improvement in the timeframe for ensuring IEPs are current and updated appropriately. In October 2016, 97% of youth who qualified for an IEP had a current IEP in place within 30 days of admission.[5] Even without Special Education Resource Coordinators and School Counselors hired at every facility, DJJ is diligently requesting and obtaining student records upon the youths' enrollment because of a district-wide process implemented at the beginning of this school year.

Additionally, DJJ entered into a cooperative agreement with Mid-Valley Special Education Cooperative for support with special education compliance and services, specifically at IYC-St. Charles. The IYC-St. Charles school administration and the Special Education Director have been working closely with Mid-Valley staff to improve the practices and procedures for special education at this facility. A Mid-Valley educational consultant works directly with the IYC-St. Charles special education teachers and staff to provide on-site, continuing professional development.

District-wide, the Special Education Director provided professional development on utilizing I-STAR to all special education faculty and staff, with assistance from Illinois State Board of Education and Mid-Valley personnel. IYC-St. Charles, IYC-Warrenville, and IYC-Chicago staff participated in this training on October 13, IYC-Harrisburg staff participated on November 10, and IYC-Pere Marquette staff are scheduled for training on December 22. Additional professional development sessions on special education topics are scheduled for January 12, January 24, and March 31.

Fourth, DJJ enhanced youth educational programming by entering into a partnership with Literacy Volunteers of Illinois (LVI), which provides volunteer tutoring and literacy programming for youth at IYC-St. Charles, IYC-Warrenville, IYC-Harrisburg, and IYC-Chicago. Efforts are underway to implement the program at IYC-Pere Marquette as well. LVI tutors are trained in learner-centered tutoring methods and visit the facilities on a weekly basis to

---

[5] DJJ either received the IEP from the youth's home school district or developed its own interim IEP for the youth.

8

provide individual tutoring to youth. Youth in the program receive individualized reading help where they can direct the pace and goals for their own learning. Particularly at IYC-St. Charles, LVI has provided enriching programming for youth to supplement their educational services.

Fifth, the Remedial Plan requires DJJ to implement blended instruction to provide both traditional classroom and web-based instruction for youth. The Education Monitor Report noted that students receiving special education services may benefit from more direct instruction as they work on GradPoint—DJJ's web-based instructional program. Youth with special education needs are able to receive a continuum of special education services within a variety of educational environments in all five facilities. Each school provides youth with additional individualized support as they interact with GradPoint and blended learning. To enhance the teachers' roles in curriculum support, the school Superintendent engaged the University of Chicago in the Spring of 2016 to provide blended learning and web-based professional development for both general and special educators at all DJJ facilities.

Sixth, the Education Monitor Report questions whether youth receive educational services in the Reception and Classification (R&C) Units during their first days after admission to the facility. DJJ has three R&C facilities: IYC-Harrisburg (Southern boys), IYC-St. Charles (Northern boys), and IYC-Warrenville (all girls). At IYC-Harrisburg, a teacher is currently stationed in the R&C Unit and is following a specific curriculum, which includes orientation of the facility and the rules, testing (TerraNova Test and Basi Test), and finally placement in a class based on their educational needs until they are moved to a different unit. At IYC-Warrenville, girls remain in R&C for only about three days. During that time, they work with either the Principal or an available teacher, who reviews the school manual with youth and may bring them to school to get started on GradPoint or use tablets. Education currently is not offered during R&C at IYC-St. Charles, but DJJ will expand these services once school counselors or additional educators are hired.

Finally, from December 2016 to May 2017, the School District is providing a professional development training series featuring Dr. Anthony Muhammad, author of *Overcoming the Achievement Gap: Liberating Mindsets to Effect Change*. Dr. Muhammad's on-going trainings are focusing on how educators and other staff can change their mindset in working with justice-involved youths and achieve better outcomes for students.

**Plaintiffs' Response**

As reported to the Court in the March joint status report, in November 2015, plaintiffs opened a dialogue with the Department as to shortages in educational staffing within DJJ. Dkt. 161 at 2-3. Plaintiffs acknowledge and commend the Department's concerted efforts detailed in this report to increase and expedite the hiring of educational staff. Plaintiffs are also encouraged by the

Department's efforts to implement vocational and post-graduate education, and to secure and implement IEPs for students with learning challenges.

However, plaintiffs believe that the Department's comments about IYC St. Charles do not adequately acknowledge the role of security staff shortages in school disruptions. In addition, the problem of teacher attrition which has caused new shortages at St. Charles highlights the pressing need for substitute teachers, which are a requirement of the Remedial Plan (Dkt. 73 at 8 (§ III.4)), but as to which DJJ still does not yet have a definite timetable (it is "seeking to hire full-time floater teachers").

As with each section of this report, plaintiffs defer to the Court-appointed monitors as to whether they believe the plans and steps detailed in this section are adequate to meet the monitors' concerns.

## III.    **Mental Health**

With respect to mental health treatment, the monitors observed deficiencies including the lack of a board-certified child and adolescent psychiatrist, inadequate use of informed consents, and family therapy.

### **DJJ's Response**

First, the Remedial Plan requires DJJ to engage a board-certified child and adolescent psychiatrist to oversee all psychiatric services in facilities. DJJ has struggled to fill this position and is looking to alternative solutions. This summer, DJJ hired a child and adolescent psychiatrist but the candidate was unable to receive background clearance. DJJ extended an offer to another child and adolescent psychiatrist to work on a contractual basis, but at this point the offer has not been accepted. To date, recruitment efforts for this position have included DJJ's Medical Director reaching out to every hospital and university in the Midwest with a psychiatric training program, and postings with Adler University, Northern Illinois University, a national mental health and juvenile justice committee, and psychiatric and psychological associations.

As a State agency, DJJ has a disadvantage in recruiting potential candidates. Child and adolescent psychiatrists are in high demand and can command considerable salaries in the private sector. DJJ has increased the compensation package for this position as much as possible, but still may not be able to attract a qualified candidate for this role in the short term.

Alternatively, the Deputy Director of Programs and her staff have engaged universities and hospitals to pursue other avenues to seek consultative services for DJJ policies and for specific, challenging youth psychiatric cases. Currently, one promising opportunity exists to partner with a Chicago-area hospital. Resident physicians from the hospital would do a rotation in DJJ's

facilities, under the supervision of a hospital attending psychiatrist. Deputy Mueller will be meeting with the hospital administration in the coming weeks to discuss next steps. DJJ is also asking an Illinois university with an accredited psychiatric program to mirror this program for its Southern facilities.

Second, with respect to the use of informed consents, the Remedial Plan requires DJJ to develop revised procedures and forms to ensure that appropriate informed consents are obtained for administration of psychotropic medications. Dkt. 73, Remedial Plan, Part II, §7. DJJ has been obtaining youth consent and documenting it on consent forms, but in recent discussions with the Mental Health Monitor learned that those consent forms should be more thorough and include additional information. DJJ is revising the forms and will be implementing new consent forms and procedures by February 1, 2017, to ensure compliance with this requirement.

Third, the Mental Health Monitor expressed concern about implementation of family therapy. Under the Remedial Plan, DJJ is required to provide "family therapy as appropriate" in connection with individualized mental health treatment plans for youth. Dkt. 73, Remedial Plan, Part II, § 6. Although DJJ has taken significant steps to prepare staff to conduct family therapy sessions, it still needs additional time to fully implement it as part of the mental health treatment program.

DJJ's Chief of Mental Health Services has trained all mental health professionals on family therapy through the use of a consultant who has provided intensive training and coaching to mental health staff members for the past year. The consultant conducted eight family therapy workshops (four in the Northern Region and four in the Southern Region), and DJJ currently is exploring extending her contract for additional workshops in 2017. DJJ's Chief of Mental Health Services and the consultant have been conducting phone conversations with facilities each month to assist with implementation.

Despite this support, some DJJ mental health staff members are struggling to implement family therapy effectively. Therapists encounter inherent challenges, including difficulty connecting with other members of the family over the phone when their main responsibility is to serve the individual needs of the youth at the facility. Additionally, family members are often distrustful of DJJ therapists, seeing them as law enforcement agents, further limiting the efficacy of the service. In January 2017, DJJ's mental health department will begin tracking the specific obstacles to family therapy to better assess what changes need to be made to enhance implementation. Currently, every facility's mental health department has been making family contacts and they all have provided at least some family therapy sessions; IYC-Warrenville and Pere Marquette have had the most success in implementing family therapy to date.[6]

---

[6] In 2016, IYC-Warrenville reported 137 family therapy sessions; IYC-Pere Marquette reported 20.

In addition, DJJ's Chief of Mental Health has invited an individual who worked in Indiana's juvenile justice system, which has been successful in using family therapy in its programming, to give a presentation to DJJ Executive Staff on implementing family engagement in early 2017.

Finally, with respect to staffing levels for Mental Health Professionals, DJJ is currently meeting the required staffing ratios outlined in the May 10, 2016 Supplemental Order at all facilities. Because DJJ has experienced a population decline over the past year, facilities require fewer mental health professionals to provide the same level of services. For example, on November 1, 2015, IYC-St. Charles' youth population was 219; as of December 6, 2016, it was 122. Thus, although IYC-St. Charles technically has three vacancies in mental health positions, the facility's mental health staffing ratios are still being met. DJJ is actively working to fill one of those positions, and the other vacant positions will remain open and may be filled if population levels increase. With respect to tele-psychiatry, DJJ has used it in the past, but now has sufficient mental health staff available on-grounds to provide services in person, with the exception of IYC-Pere Marquette, which occasionally still relies on tele-psychiatry.

**Plaintiffs' Response**

Plaintiffs defer to the Mental Health Monitor, Dr. Kraus, as to whether the additional steps detailed by DJJ to make up for the lack of the Child and Adolescent Psychiatrist called for by the Remedial Plan (Dkt. 73 at 2-3 [§II.3]) are sufficient. The same is true as to DJJ's response to the concerns about informed consent and family therapy expressed by Dr. Kraus.

Plaintiffs note, however, that DJJ's response as to mental health omits a fact of great concern to the Mental Health monitor, namely, that security staff deficiencies at IYC St. Charles have interfered with the delivery of mental health services at that facility. *See* Dkt. 178-1 at 3, 10-11; *see also* Dkt. 176-1 at 13-15 (general impact of security staff deficiencies on all "core services" to youth).

## IV.    Other Programmatic & Treatment Concerns

The monitors' reports addressed DJJ's other programmatic and treatment offerings, such as recreational and community programs.

**DJJ's Response**

The Remedial Plan requires DJJ to implement an evidence-based comprehensive treatment and rehabilitation model for all youth in its care. Dkt. 73, Remedial Plan, Part V, § 1. DJJ's first step in this process was its adoption of the Youth Assessment Screening Instrument (YASI), a criminogenic risk assessment administered to youth when they enter the facility and used to inform programmatic decision-making. The roll-out and implementation of the YASI began in 2015 and training remains ongoing. Specifically:

- February-April 2015: YASI rollout and training on the YASI Assessment
- May 2015: YASI Pre-Screen started at DJJ Reception Centers
- May-August 2015: Practice-period on the YASI Assessment
- August-October 2015: YASI Case Planning Training
- November 2015: YASI Assessments and Case Planning implemented
- 2016: Case Planning Coaching and Support

The quality of the case plans has been and remains an ongoing area of focus for DJJ. From August – October 2015, DJJ began training staff on how to develop case plans. DJJ counselors, called Youth and Family Specialists (YFS), received training on rehabilitative services, risk needs, responsivity principles, case planning, and case management. DJJ administrators visited every facility to provide booster training for supervisors, met with each YFS, and determined areas for continued support and training. The Deputy Director of Programs personally met with every YFS, supervisor, assistant superintendent of programs and clinical services supervisor, and she continues to conduct audits on case plans and assessments to provide coaching.

As part of this effort, starting in February 2016, DJJ also hired three coaches to provide on-going coaching and technical assistance to all DJJ facilities and Aftercare Specialists (juvenile parole officers) on assessments and case planning. For 2017, DJJ will be concentrating its ongoing YFS training on the quality of its case management.

Second, upcoming legislative changes are providing the Department with a unique opportunity to revisit its policies, enhance coordination among staff from multiple disciplines to improve its rehabilitative offerings, and further align all practices with the comprehensive treatment and rehabilitation model. Under Public Act 99-0628 (effective January 1, 2017), DJJ will be assuming the release decision authority for delinquent juveniles with indeterminate sentences. Prior to this legislation, the Illinois Prisoner Review Board made these decisions about youth release.

In preparation for these legislative changes, DJJ has taken a more comprehensive look at how it assesses youth eligibility for release, taking into account PBIS (Positive Behavioral Interventions and Supports) principles of incentivizing positive behaviors.[7] For example, the Department is providing youth with more opportunities to receive time reductions by achieving treatment goals, completing treatment groups and programs, obtaining diplomas, GEDs, and post-secondary course credit, and maintaining "Grade A" behavior for periods of time.

For greater consistency, the Department has also been working on revisions to its disciplinary sanctions to further integrate the PBIS approach in addressing youth behavior. This summer a work group developed a graduated sanctions and incentives grid, which is currently being circulated for review and input. It outlines three tiers of various behaviors and gives guidelines

---

[7] PBIS is DJJ's Department-wide behavior management program.

13

for the type of sanction that can be imposed. DJJ will begin training on these new guidelines in January 2017. In addition, the Department is incorporating Balanced and Restorative Justice (BARJ) principles into its disciplinary process by letting youth enter into a BARJ contract to reduce disciplinary sanctions. DJJ plans to create a BARJ committee to oversee the early implementation of these contracts.

The Department is also empowering its direct care staff to play a greater role in the release decision process and hopes that this will improve the quality of monthly youth staffings as well as staff engagement in the rehabilitative process. During these staffings, DJJ staff will assess youth behavior and achievement of programmatic goals to determine their eligibility for release. *See* Ex. C (draft Monthly Staffing Form). Staffings will include educators, security staff, counselors (Youth and Family Specialists), mental health, Aftercare, the youth and his/her parents if available. Ultimately that committee will make a recommendation for the facility superintendent and then the Director for review and approval. DJJ is optimistic these new procedures will further invest DJJ in a programmatic orientation at all levels and move it closer to full implementation of a comprehensive treatment and rehabilitative model. Two Department-wide trainings were conducted in November, and throughout December members of the release-decision work group will be visiting all DJJ facilities to provide support and guidance for implementing these procedures in the monthly staffings.

With respect to specific programming, the monitors' reports expressed concern about the amount of recreational, rehabilitative, and enrichment opportunities for youth in the facilities. This summer, each facility was required to develop a weekly schedule for all of their cottages/housing units and submit the schedule to Executive Staff. Facility Duty Administrative Officers (DAOs) and the Department's Compliance Coordinator are periodically checking to evaluate whether the schedules are being followed. *See* Ex. D (sample housing unit schedules). Specifically for Pierce Cottage, the Behavioral Unit at IYC-St. Charles, the Compliance Coordinator is making unexpected visits at the cottage to observe programming and make sure that it is consistent with the cottage's schedule, in addition to reviewing youth files and video footage. *See* Ex. E (Pierce Cottage schedule). The files for youth on Pierce Cottage are available for inspection and review by the monitors and Plaintiffs' counsel upon their request.

Youth residing at DJJ facilities can participate in a number of supplemental programs, such as Youth Build (job-training program), Chicago Symphony Orchestra residency (music programs), Safe Humane (dog therapy program), School of Art Institute of Chicago (art program), Bible studies and other religious ministry programs, knitting class, and art therapy. *See* Ex. F (sample programmatic and community trip schedules). Recently a former Blackhawks player and team staff have visited IYC-St Charles, Warrenville and Chicago to conduct hockey clinics and provide motivational speaking. DJJ plans to continue this relationship in 2017. All five facilities also offer the Liberation Library program, a partnership with a volunteer organization that

14

collects books for youth to request and enables youth to write letters to volunteers about the books they have received.

Storycatchers is another DJJ partner, and its program is currently available at IYC-Warrenville and IYC-Chicago. Participating youth write and share personal stories about challenging situations, which are then combined into an original musical play. The performances are open to friends, family, and other DJJ community supporters. Storycatchers recently was awarded a grant from Chicago Beyond, and it has also applied for a MacArthur Grant, which, if awarded, will allow it to expand the program to DJJ's other three facilities.

Currently IYC-St. Charles has the least rich offering of these supplemental programs, and this facility will be of primary focus for DJJ in 2017. Staff members at that facility recently have scheduled basketball tournaments with the youth and on-site volunteers, and work is underway to coordinate an intramural basketball league between youth residing in the three Northern facilities.

DJJ is also expanding its treatment offerings. Currently, treatment offerings include substance abuse treatment, DBT (Dialectical Behavioral Therapy), CBT (Cognitive Behavior Therapy), and SPARCS (trauma-treatment group). Two group treatment models have been identified for future implementation in 2017: Thinking for a Change and ART (Aggression Replacement Therapy).

The monitors' reports also recommend increasing family engagement, primarily at IYC-Harrisburg. Given its location—over five hours south of Chicago—youth placed at this facility whose families live in Chicago and other Northern areas struggle to visit in person. Although DJJ takes family location into account when determining youth placement, it may need to place youth from Northern Illinois at IYC-Harrisburg for safety, security, or programming reasons. For example, DJJ's juvenile sex offender treatment program is based at IYC-Harrisburg. A youth's gang affiliation or behavioral history also may require separation from other youth in the Northern DJJ facilities due to safety concerns. IYC-Harrisburg, however, does have scheduled visitation days and frequently works with families to schedule visits at other times to accommodate their travel schedule.

DJJ is also taking other efforts to better engage families across the Department. It plans to invite parents to participate in the monthly staffings discussed above (*see supra* p. 11) so they can play a larger role in the rehabilitative process.

Additionally, Aftercare (juvenile parole) is also working to better engage the parents of DJJ youth. First, it is creating parent boards at various Aftercare offices and plans to hold Parent Cafés to provide support and training. Supervisors and one Aftercare Specialist from each

Aftercare office[8] attended a two-day Parent Café Training in June 2016 provided by Be Strong Families. In July 2016, all Aftercare Specialists were trained on expectations for family engagement. Recruitment for the Parent Cafés began immediately among existing parents of youth on Aftercare and of those in facility. The first official Parent Café is scheduled for December 2016. Aftercare will have guest speakers based on parents' expressed interests and hold restorative justice hubs. Staff from Be Strong Families are available to work with Aftercare staff from a coaching prospective to ensure ongoing training needs are met to maintain the Parent Cafés.

Second, the Cabrini Green Organization is working with Aftercare to provide services for Family Law at the Chicago Day Reporting Center.

Finally, the Chicago Day Reporting Center staff and Aftercare Specialists work with parents of youth who are sanctioned to attend the Day Reporting Center. Staffings are held with parents to discuss youth expectations and they are encouraged to be present and take an active role. From this initiative, a couple of parents volunteered at the Chicago Day Reporting Center. One of them received a certificate of appreciation at her son's completion recognition service. She participated in the promotional ceremony and took a picture with her son, each holding their certificate.

**Plaintiffs' Response**

Plaintiffs once again defer to the Court-appointed monitors as to whether the plans detailed by DJJ as to the timetable and implementation of the Comprehensive Treatment Model required by the Remedial Plan are adequate to address any concerns of the monitors. The Remedial Plan required that the Model be implemented no later than April 2015 (Dkt. 73 at 8 [§V.1]), but plaintiffs' counsel understand that Dr. Krisberg has been apprised of the progress towards developing and implementing the Model and is not concerned about any delay.

Plaintiffs commend the Department's ongoing efforts to increase supplemental programming and family involvement. The acknowledged lack of programming for youth at IYC St. Charles remains a concern, and one which plaintiffs believe cannot be remedied absent solutions to the staffing problems at the facility, since any youth movement or outings require security staff supervision. To promote family engagement at IYC Harrisburg, plaintiffs suggest that the Department consider ways to facilitate better transportation options for families, perhaps by providing a bus that makes pre-scheduled trips from Chicago and other distant areas.

**V.    Training Needs**

---

[8] The Department currently has eight Aftercare offices across the state: Chicago, Chicago Heights, Aurora, East St. Louis, Champaign, Peoria, Rockford, and Springfield.

The monitors' reports recommended additional trainings and enhanced support from supervisory staff to line staff to better integrate the Department's updated policies and procedures into practice throughout the Department.

**DJJ's Response**

Updated trainings have been a critical component of DJJ efforts to comply with the Remedial Plan. Trainings and work to integrate the substance of the trainings into DJJ daily procedures remains ongoing.

### 1. PBIS (Positive Behavioral Interventions and Support) Training

DJJ is focusing its training efforts on PBIS as it works to integrate the behavioral-management program into all aspects of facility operations. DJJ hired a PBIS coach on a year-long contract to provide training and support in PBIS at all DJJ facilities. In addition, this Summer and Fall DJJ's Deputy Director of Programs, Chief of Training and Professional Development, and Chief of Mental Health visited each DJJ facility and spoke to staff at all levels, including front line supervisors, middle management, and facility administrators. They received feedback from staff about what is working with PBIS, where there are gaps, and they will have follow-up meetings in early 2017 to further implement staff suggestions. Again, PBIS is also a key driver behind the Department's revised release procedures.

The complete timeline of PBIS training is as follows:

- o July of 2013-June of 2014: Initial round of training commenced. It was a full week at each facility with all staff, conducted by a PBIS consultant.

- o July 2014: DJJ instituted a weekly PBIS check-in calls with DJJ facilities. The calls became monthly calls in the fall of 2014 and continued through July 2015.

- o October 2014 & 2015: Key PBIS leadership staff (at least 2 per facility) were all sent to a PBIS training conference in Rosemont, IL.

- o November 2015: DJJ recognized the need for additional support and contracted with a PBIS coach to assist the facilities in their PBIS implementation.

- o January-March of 2016: The PBIS coach spent time at each facility going over initial assessments and creating action plans.

- o April-July of 2016: The PBIS coach spent several days at each facility checking in on action plans, meeting with administrators and coaching line staff in real time on each shift in applying PBIS practices.

17

o May 2016-August 2016: DJJ held Department-wide video conferences every three weeks to discuss PBIS program implementation progress and troubleshoot issues. During these videoconferences, a number of implementation questions and logistical issues arose that needed to be solved.

o July 2016-September 2016: DJJ Executive Staff (Chief of Mental Health, Chief of Training and Professional Development, and Deputy Director Programs) followed up at every facility with roundtable discussions for Administrative teams, supervisors, and direct care staff to gather feedback about what was working and where staff experienced challenges.

o October-November 2016: The PBIS coach synthesized the implementation status at each facility and created a toolkit for DJJ to use to continue to enhance implementation going forward.

o September-December 2016: DJJ Chief of Mental Health, Chief of Training and Professional Development, and Deputy Director of Programs compiled feedback into a set of standards and guidelines for staff to enhance implementation of PBIS.

o January-February 2017: DJJ will roll out the revised standards and guidelines.

**2. CPI (Crisis Prevention Institute) De-Escalation Training**

Facility staff have received the following Crisis Prevention Institute de-escalation training (CPI training).

o January 2015: Facility trainers attended CPI training.

o 2015-2016

▪ Facility CPI trainers conducted their own CPI trainings at facilities. Initially, these trainings were taking place on average once a month at each facility to get the majority of staff trained. These trainings continue to take place at the Intern Academy and on an ongoing basis at the facilities.

▪ CPI continues to be a part of informal trainings, through roll-call reviews and the supervisor/specialist bi-monthly training meetings.

**3. LGBTQI Training**

DJJ has invested significant time and resources into training around its LGBTQI policies. All new staff members at facilities, including JJS Interns at the Academy, and new Aftercare staff members receive training on the Department's LGBTQI policies when they join the Department. A LGBTQI mental health group meets on a regular basis, which includes two therapists at each facility acting as the point of contact for any policy or programmatic questions. DJJ is also in the

process of rolling out a facility-based supplemental training. The DJJ Chief of Professional Development and Training has worked closely with a consultant from the Health and Medicine Policy Research Group to create training materials, develop a training plan, and support implementation. As a result, support for LGBTQI youth has become embedded in facility curriculum, policy, and practice. DJJ is becoming a national leader in this work; staff members spoke at the Coalition for Juvenile Justice annual conference in Washington, D.C. in April and at the Coalition for Juvenile Justice National DMC Conference in Baltimore in December. In 2017, DJJ plans to identify LGBTQI coordinators for each facility, who will help ensure that the needs of LGBTQI youth are being addressed throughout the Department. They will advocate for youth, ensure that their facility is cultural competent with respect to this population, and will be educators and support for staff in working with these youth.

The specific timeline for implementation of LGBTQI training is as follows:

- o February 2015: DJJ's LGBTQI consultant had an initial meeting with DJJ Executive Staff and commenced training at the DJJ Intern Training Academy. Intern class trainings remain ongoing for each new intern class.

- o January 2016-present: The LGBTQI consultant began training in the facilities. To date, Aftercare, IYC-Harrisburg, IYC-Chicago, and IYC-Warrenville have received training. IYC-Pere Marquette will receive the training in December 2016. Currently, it is anticipated that IYC-St. Charles staff will receive this training by the Spring of 2017.

### 4. YASI (Youth Assessment Screening Instrument) Training

- o *See Training Schedule outlined at supra* p. 10.

### 5. PREA (Prison Rape Elimination Act) Training

The Prison Rape Elimination Act (PREA) has been another area of focus for the Department over the past year. All department heads receive training on a yearly basis, and training is provided to all new staff members upon hire, including at the JJS Intern Academy. Interactive training materials are provided to department heads for use with their staff, and PREA procedures and requirements were reviewed with staff during roll calls. DJJ hired a full-time Compliance Coordinator in July who reviewed all of the Department's policies for PREA compliance. He also assists staff in responding to PREA-related incidents to ensure that they are handled appropriately. In August, the Department had its first round of PREA audits, and all five facilities passed the audit with 100% compliance.

### 6. Training Implementation

The next step is implementing these trainings and better embedding them with staff, including increasing accountability measures.

First, DJJ has developed a training strategy to address a particular concern in the monitors' reports by building security supervisors' competency in managing the newer, less experienced Juvenile Justice Specialist (JJS) staff.  In the summer, DJJ piloted a new supervisor training at IYC-Harrisburg. Supervisors meet with their assigned specialists twice a month to review and give feedback on a variety of topics, such as CPI, PBIS, PREA, line movements, count procedures, and restraints.  These training sessions are documented and become part of the specialist's training file.  *See* Ex. G (Juvenile Justice Specialist Supervisor Training Form). Facility supervisors in turn meet monthly with their Chief of Security for similar review and feedback.  After piloting this program at IYC-Harrisburg this Summer, it was rolled out to all facilities in the Fall.  DJJ plans to expand this training program to the counselor (YFS) staff in 2017.

Second, DJJ will be providing refresher training for new JJS staff within their first year of employment.  IYC-Chicago recently piloted this eight-hour training course, which reviewed various policies and procedures such as such as conducting "shake-downs" of youth living units, PBIS, facility counts and other general procedures. The training provides JJS staff with on-site instruction on the topics they learned in the Intern Academy along with an informal learning opportunity to receive coaching on topics in which they may be struggling.  DJJ leadership has developed guidelines for this course and will be expanding it to other facilities in February 2017.

Finally, to further support its ongoing training efforts, DJJ is also planning on hiring a Department-wide training coordinator to assist the Chief of Training and Professional Development in developing training programs and working with each facility to support training implementation and accountability.

**Plaintiffs' Response**

Plaintiffs defer to the Court-appointed monitors as to the adequacy of DJJ's steps and plans for training detailed in this report.  Plaintiffs do acknowledge that there appears to have been significant improvement in DJJ for LGBTQI youth.

## VI.    Use of Mechanical Restraints

The monitors' reports raised concerns about the Department's use of mechanical restraints, including training for staff on the proper use of restraints, and Executive Staff oversight of when such restraints are used.  Under the Remedial Plan, DJJ was to "adopt and implement a policy that limits the use of mechanical restraints."  Dkt. 73, Remedial Plan, Part V, § 9.

**DJJ's Response**

The Department's mechanical restraint policy, which was approved by the monitors and the Court, provides that DJJ "shall use security restraints to protect property or persons, or to ensure the custody of youth." Under current policy, "Security restraints shall not be applied for more time than is absolutely necessary or used for the purpose of punishment." Administrative Directive 05.01.126 (eff. 6-1-15) (Ex. H).

DJJ continues to cover this policy with staff and review incidents to ensure that it is being followed. For example, anytime an "unusual incident," such as a youth fight or assault, occurs at a DJJ facility, the Compliance Coordinator (or designated Executive Staff member) is notified by phone to review the incident with the facility. In addition, an "Unusual Incident Report" detailing the incident is emailed to all Executive Staff for their review. *See infra* p. 19; Ex. I (sample Unusual Incident Reports). In the Unusual Incident Report, staff document whether mechanical restraints are used, the justification for the use of mechanical restraints, and when restraints are removed. Both facility administrators and Executive Staff frequently review video footage of these incidents to assess how they were handled, including whether the use mechanical restraints was appropriate and consistent with the Department's policies. Depending on the circumstances, the review may prompt an investigation and possible counseling or discipline of involved employees.

DJJ's Director recently reviewed the mechanical restraint policy with facility administrators on the weekly Monday-morning call, and the facilities have been addressing the policy with security staff during roll-calls. For example, at IYC-Harrisburg, facility administrators ask staff members to complete a questionnaire following an incident where restraints were used and then debrief with the staff members involved. *See* Ex. J (sample questionnaire). The questionnaire guides staff through analyzing the event to determine whether other interventions could have been used earlier to prevent the incident, or whether alternative interventions could have been used to manage the incident more effectively.

As noted above, *supra* p. 15, facility staff have also received the Crisis Prevention Institute's de-escalation training (CPI training). Fully implementing this training and building staff investment will be an on-going process, and is part of the supervisor/specialist training described above. DJJ leadership began a series of meetings focused on this topic in October, and is developing a comprehensive implementation strategy for 2017 focused on improving staff buy-in and compliance with its policies.

**Plaintiffs' Response**

Plaintiffs defer to the Court-appointed monitors as to the adequacy of DJJ's steps and plans as to the use of mechanical restraints. Plaintiffs note that Dr. Krisberg expressed the view that "The[]

data also suggest that the Court should very closely monitor the utilization of restraints at [IYC St. Charles]." Dkt. 176-1 at 34.

## VII.    Confinement

The monitors recommended additional oversight on the use of confinement and better training for staff on the rationales for changing the confinement policies.

### DJJ's Response

At the start of the Remedial Plan in 2014, use of confinement was the primary focus of the monitors and Plaintiffs' counsel.  DJJ believes that it has made significant progress in this area in the past year.  DJJ implemented its new confinement policies in July 2015, and has seen a notable reduction in the use of confinement in its facilities. With the exception of IYC-St. Charles, the Department's facilities have generally eliminated the use of their confinement units,[9] even though those units can still be used under the Department's revised confinement policies. Executive staff periodically audit confinement paperwork and review video footage to determine whether use of confinement comports with DJJ's new policies.  The Department also works closely with the Juvenile Ombudsman to investigate any complaints related to the use of confinement.

To ensure that staff better appreciate the provisions of the Remedial Plan and how it is driving changes throughout the Department, including the new confinement rules, the Remedial Plan has been reviewed, and will continue to be addressed, at the Intern Academy, pre-service orientation training for non-security staff, roll calls, and other Department-wide trainings.

*See also supra* p. 2 (addressing oversight on programmatic limitations and out-of-room time).

### Plaintiffs' Response

Plaintiffs acknowledge that there appears to have been a considerable improvement in diminishing and limiting confinement throughout DJJ.  This is an important achievement. Nevertheless, as with each section of this report, plaintiffs defer to the Court-appointed monitors as to whether they believe the plans and steps detailed in this section are adequate to meet the monitors' concerns.

---

[9] IYC-Harrisburg still uses its confinement unit for timeouts during the day due to that unit's location near the school, but otherwise generally uses the youth's room if he needs to be removed from programming for behavioral reasons.

## VIII.   Quality Assurance

The monitors' reports recommended improved data collection and tracking in such areas as confinement, mechanical restraints, and limitations on programs, as well as increased assessments of the effectiveness of DJJ's rehabilitative programs.

### DJJ's Response

In compliance with the Remedial Plan, DJJ has a Quality Assurance and Research Manager who manages the Department's data collection. *See* Dkt. 73, Remedial Plan, Part VII, § 1. DJJ posts data on its external website on a monthly basis, reporting facility population and security staff levels; information about youth diagnoses, psychotropic medication, rates of self-harm attempts, and substance abuse treatment; school information, including student enrollment, teacher staffing levels, percent of special education students, and diplomas awarded; reportable incident rates, including use of chemical restraints, mechanical restraints, and confinement by facility; and Aftercare caseloads.  This data is used for public transparency, and is also reviewed with facility superintendents at monthly meetings with Executive Staff.  The Department's data reports are available at https://www.illinois.gov/DJJ/Pages/default.aspx.

The monitors' reports expressed concern about Executive Staff receiving timely reports and data about programmatic restrictions, use of mechanical restraints, confinement, and serious incidents.  Again, Executive Staff currently receive daily "Operational Needs" reports on staffing levels at each facility and the impact on youth programming and movement. *See supra* p. 2. Facilities provide these reports daily for each day-time security shift.

Executive Staff also receive email reports on "Unusual Incidents," such as youth fights or assaults, immediately following an incident, and provide consistent follow-up depending on the nature of the incident.  Ex. I.  These reports include the youth and staff involved, the nature of the incident, whether restraints were used and why, any injuries to youth or staff, the disposition, and whether any follow-up such as mediation between the youth involved will occur.  Executive Staff review these reports and may initiate further review—such as viewing any available video footage, opening an investigation, or providing feedback to staff about better responses—on a case-by-case basis.  The facilities also contact the Department's Compliance Coordinator (or other Executive Staff designee) by phone to discuss incidents and receive real-time support on how to properly respond.  Every Monday morning, certain Executive Staff host a call with the facilities' Duty Administrative Officers (DAOs)[10] to review any issues that arose over the weekend and identify any procedures that need to be reviewed and reiterated with staff.

DAOs are also required to conduct unscheduled inspections of their facility and email a report of that inspection to the Executive Staff.  These inspections may include meeting with staff and

---

[10] DAOs include Senior facility management, such as Superintendents, Assistant Superintendents of Programs and Operations, Chiefs of Security, Clinical Services Supervisors, and Principals.

youth, conducting systems checks (*i.e.*, drills for staff to review procedures, such as escape drills), checking conditions of housing and confinement units, and identifying any maintenance needs. Ex. K (sample Unscheduled Inspection Reports).

All facilities also report data on Performance Based Standards (PBS)[11] every six months. April and October are the data-collection months. DJJ's PBS consultant reviews the data with every facility and Executive Staff, and supports the facility as they create a facility improvement plan.

The monitors' reports also recommended measuring progress in implementing a comprehensive treatment and rehabilitative model, and measuring value of treatment programs for youth. DJJ has an established relationship with the University of Chicago Urban Labs, and the next phase of its research will focus on these topics. DJJ's Deputy Director of Programs and Quality Assurance and Research Manager are meeting with researchers at Urban Labs in the next couple of weeks to set research questions, and baseline data is ready to be provided to them.

The DJJ Quality Assurance and Research Manager has worked closely with the monitors to discuss their data needs and provides data to the monitors and Plaintiffs' counsel on request. DJJ is committed to transparency and will continue providing useful and informative data to monitor its progress improving operations and youth programming.

**Plaintiffs' Response**

Plaintiffs defer to the Court-appointed monitors as to whether they believe the plans and steps detailed in this section are adequate to meet the monitors' concerns. However, plaintiffs believe that DJJ should be charged with developing, in consultation with the monitors, topics and parameters for additional data collection to track compliance with the Consent Decree and Remedial Plan, and such data should be distributed on an ongoing basis to the monitors and plaintiffs' counsel.

## IX.    Youth Grievances

The monitors' reports recommended improvements to the youth grievance process to make it easier for youth to understand and give it more credibility.

**DJJ's Response**

Under the Remedial Plan, DJJ shall ensure that youth have an adequate means to report allegations of abuse and submit grievances. Dkt. 73, Remedial Plan, Part V, § 7. DJJ has a current grievance process but is working to revamp it to increase youths' awareness of the process and overall trust in the system. Currently, youth receive instructions on the grievance

---

[11] PBS collects data from agencies, facilities and programs in over 30 states, and allows DJJ to compare its data with others participating in PBS. *See* www.pbsstandards.org.

process in their youth orientation manual. Ex. L (IYC-Harrisburg Youth Orientation Manual at 25). Locked boxes are located in facility housing units or dietary for youth to submit grievances.

DJJ's Independent Juvenile Ombudsman also maintains an active presence at DJJ facilities and works closely with the Executive Staff to resolve a range of youth complaints as they arise. DJJ believes that in some instances youth may be bypassing the normal grievance process and working directly with the Ombudsman to resolve their issues. For example, from August 2015 to June 2016, she had over 1,400 in-person contacts with DJJ youths.

This coming year, the Department will focus on making the youth's counselor (YFS) more engaged in the grievance process so that DJJ staff are the first step in addressing easily-resolved issues rather than engaging the Ombudsman at the outset. DJJ also will provide additional training on the grievance process for all new staff members, including at the Intern Academy, and in the orientation it provides to youth upon entering the facility. DJJ is also working closely with the Ombudsman to revise the DJJ grievance policy and procedures to address youths' concerns that grievances do not remain confidential and are not timely resolved. A draft grievance policy will be provided to the monitors and Plaintiffs' counsel for feedback by February 1, 2017.

DJJ also provides youth with access to information about legal organizations and other outside support groups. For example, the facility day rooms and visitation rooms include a list of non-profit legal organizations able to assist youth who believe their rights have been violated. DJJ also posts contact information for the John Howard Association, the PREA Hotline, and the Ombudsman.

### Plaintiffs' Response

Plaintiffs are pleased that the DJJ grievance process is being reworked, and look forward to seeing the new draft policy in February 2017.

### X.     Aftercare & Residential Placements

The monitors' reports observed that Aftercare Specialists (juvenile parole officers) are consumed with finding placements for youth. They also recommended increased contacts between Aftercare and youth prior to release and expanded preparation for community reentry.

### DJJ's Response

DJJ's Aftercare Division started as a pilot program in Cook County and was rolled-out Department-wide in January 2015. Prior to Aftercare's creation, youth released from DJJ custody were supervised by Illinois Department of Corrections Parole Agents.

Under the Remedial Plan, DJJ is required to hire a Placement Coordinator and improve youth access to placement in residential facilities. *See* Dkt. 73, Remedial Plan, Part VI. DJJ hired a

placement team in February 2016. This team is composed of a Manager, Placement Coordinator, and three Placement Supervisors, who focus specifically on the placement of youth who are in facility and in need of an alternative placement and those in community in need of placement. DJJ also has two Resource Coordinators whose primary responsibility is to find quality resources for youth as needed. This team has reduced the burden on regular Aftercare Specialists in securing residential placements for youth. Aftercare has expanded services to include increased residential treatment programs for behavioral health needs, transitional housing and independent living for older youth, and family-based services including MST (Multi-Systemic Therapy) services (to sustain home placements). The Placement Unit compiles monthly reports on youth needing residential placement, and these reports will be provided to Plaintiffs' counsel and the monitors upon request.

The Department is also increasing Aftercare involvement with youth prior to their release. In connection with the changes to the Department's release decision procedures, Aftercare Supervisors will be expected to participate in the revamped monthly staffings for youth, *see supra* pp. 11-12, and the current plan is for the supervisors to spend one-assigned day per week at a DJJ facility. Aftercare is also developing an Aftercare Transition Program, where an Aftercare Specialist will lead a monthly two-hour group to address common problems youth face on Aftercare and better prepare youth for release. DJJ expects to launch this program in early 2017.

To further support community transition, Aftercare also has been working on opening Day Reporting Centers in areas with high DJJ youth populations. Day Reporting Centers have opened in Chicago and East St. Louis, and additional reporting centers will be located in Champaign and Peoria. Day Reporting is a program of community supervision, incorporating a Cognitive-Behavioral treatment approach, aimed at impacting the compliance behavior of youth deemed to be at high risk for recidivism. Day Reporting is intended for youth who present with community adjustment problems. Youth are referred based on the sanction and/or intervention intent of Aftercare.

## Plaintiffs' Response

Plaintiffs defer to the Court-appointed monitors as to whether they believe the plans and steps detailed in this section are adequate to meet the monitors' concerns. However, plaintiffs acknowledge progress in this area, and also acknowledge that the availability of community resources is not generally within the Department's control.

## XI.     Management/Facilities

The monitors' reports expressed concerns about the condition of DJJ's facilities and recommended improvements, noting recreation areas and confinement units in particular.

## DJJ's Response

DJJ's facility improvements depend on the Capital Development Board's (CDB) priorities. DJJ created a five-year plan, submitted to CDB, listing facility improvement projects at all facilities except IYC-Chicago, which is a leased property. This five-year plan includes efforts to improve recreation areas at IYC-St. Charles and IYC- Warrenville, replace roofing at IYC-Harrisburg, IYC-Warrenville, and IYC-St. Charles, and to update restrooms, provide central air, and replace windows at IYC-Pere Marquette.

With respect to concerns about the conditions in the confinement unit at IYC-St. Charles (Taylor Cottage), the unit has been scrubbed and mopped. The facility has ordered power-washers and expects to have power-washing completed at the end of December. The unit will also be re-painted and that project should be completed by the end of February.

**Plaintiffs' Response**

Plaintiffs defer to the Court-appointed monitors as to whether they have additional suggestions for improvement which are achievable during ongoing state budget problems in the State of Illinois.