## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 12-cv-7289 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| HEIDI MUELLER, | ) | |
| | ) | |
| Defendant. | ) | |

### SEMIANNUAL JOINT STATUS REPORT (JUNE 2017)

This report is submitted pursuant to the Court's Order entered February 16, 2017 (Dkt. 188), which directed the parties to file a semiannual report on June 1 regarding those provisions of the Remedial Plan as to which Plaintiffs contend the Department of Juvenile Justice (the "Department" or "DJJ") is not currently in substantial compliance. On May 9, 2017, the parties met to discuss a document prepared by Plaintiffs' counsel which summarized Plaintiffs' preliminary positions as to areas in which the Department was currently not in compliance with the Remedial Plan and related Supplemental Orders. This report addresses the areas Plaintiffs' Counsel identified for status update, based upon the information available to Plaintiffs' counsel at the time of the May 9 meeting and as supplemented in certain areas by DJJ after that meeting.[1] This Joint Status Report explains the Department's efforts and progress in the identified areas since

---

[1] Certain requirements of the Remedial Plan cannot be assessed or fully assessed in this Report due to (i) the lack of current data enabling an assessment of compliance or non-compliance and/or (ii) the need for the expert monitors to make evaluative assessments as to whether the Department is in compliance with these requirements in their annual reports. These are Pt. I¶6 [individualized mental health treatment plans & coordination of treatment]; Pt. III ¶1 [NIA programming]; Pt. III ¶ 7 [literacy instruction]; Pt. IV ¶2 [confinement liaison]; Pt. V ¶1 [comprehensive treatment model]; Pt. V ¶2 [behavioral management system]; Pt. V ¶3 [youth case plans]; Pt. V ¶5 [youth and family specialist levels]; Pt. V ¶9 [limits on mechanical restraints]; Pt. V ¶10 [general programming]; Pt. VI ¶¶1-4 [community placement and discharge planning]; Pt. VII ¶1 [quality assurance].

the Compliance Report filed on January 20, 2017 ("Compliance Report," Dkt. 181-1), followed

by Plaintiffs' Responses as to same.

## REMEDIAL PLAN PART II:  MENTAL HEALTH SERVICES

**Paragraph 2: Board-Certified Child and Adolescent Psychiatrist:** DJJ shall enter into a contract with a board-certified child and adolescent psychiatrist to provide oversight of all psychiatric services in all DJJ facilities.

**DJJ Status:** DJJ advertised for the position in in the *Journal of the Academy of Child and Adolescent Psychiatry* and on the website for PracticeLink.  DJJ also sent a copy of the job description to the Mental Health Monitor to circulate to his contacts.

DJJ currently is finalizing a contract with a Child and Adolescent Psychiatrist and hopes to have her begin in June 2017.  The potential candidate recently lost her housing, which slowed the negotiations while she focused on locating a new residence.  As of May 22, she had located a new residence and was ready to resume contract negotiations once she completed her move after the Memorial Day weekend.  DJJ's Director has been in continuous communication with the candidate to keep the hiring process moving forward.

**Plaintiffs' Response:**  Plaintiffs were pleased to learn that the Department has made substantial progress towards hiring a Child & Adolescent Psychiatrist in recent months.  Plaintiffs recommend that the Department provide the Court with a brief update once contract negotiations with this candidate are complete and she begins her employment.  Alternatively, if this candidate's employment is not finalized within 30 days, Plaintiffs recommend that the Department update the Court on its efforts to find alternative ways to provide oversight of psychiatric services.

**Paragraph 4: Mental Health Staffing Levels and Qualifications**: DJJ shall establish appropriate staffing levels and qualifications of mental health professionals.

**DJJ Status:** On May 10, 2016, this Court entered an order outlining the required mental health staff to youth ratios for the Department's facilities and required qualifications for mental health staff. (Dkt. 165.)  The mental health staffing for each facility is specified in the table below. A few facilities (IYC-Chicago, St. Charles and Harrisburg) currently need additional staff to meet the required ratios, but the facilities are actively recruiting for those positions and using overtime as necessary to ensure that youth are receiving an appropriate level of mental health services.

| Facility | Mental Health Staffing Levels |
|---|---|
| IYC-Chicago | 1 Treatment Unit Administrator; 3 full-time mental health staff; 1 vacancy |
| IYC-Harrisburg | 1 Treatment Unit Administrator; 8 full-time mental health staff (5 for general population/2 for Juvenile Sex Offender (JSO) program/1 for Reception and Classification Unit); 2 vacancies (1 for general |

| | population/1 for JSO program). There will be an additional vacancy June 1, 2017, which will be posted. |
|---|---|
| IYC-Pere Marquette | 1 Treatment Unit Administrator; 2 full-time mental health staff; no vacancies |
| IYC-St. Charles | 1 Treatment Unit Administrator; 6 full-time mental health staff; 1 vacancy. |
| IYC-Warrenville | 1 Treatment Unit Administrator; 5 full-time mental health staff; no vacancies |

All mental health professionals have one of the licensures listed in the court's May 10, 2016 order, with the exception of two mental health professionals (1 at IYC-St. Charles and 1 at IYC-Pere Marquette) who are pursuing licensure.

**Plaintiffs' Response:** At the time of the parties' last compliance report in January 2017, the Department was meeting the required mental health staffing ratios at all facilities. Since then, mental health staffing vacancies have caused the Department to fall out of compliance with this provision at three facilities (IYC Chicago, IYC St. Charles, and IYC Harrisburg). Per the Consent Decree (Dkt. 33 ¶36), substantial compliance can be maintained if any violations are promptly identified and the facility develops and implements a timely and appropriate remedy that results in compliance. The Department has promptly identified the above mental health staffing vacancies and has been actively recruiting to fill these positions. In the meantime, the Department has been utilizing existing staff to cover necessary mental health treatment hours. The Mental Health Monitor, during his upcoming site visits, should opine on whether the Department's plan to fill vacancies is adequate, and examine whether DJJ's plan to use overtime as needed to cover mental health treatment hours is sufficient in the interim. Plaintiffs have also requested regular reports and updates on hiring to ensure that these vacancies are filled in a timely manner.

**Paragraph 6: Individualized Mental Health Treatment Plans and Coordination of Treatment**: DJJ shall ensure uniform policies and procedures for mental health treatment plans and coordination of treatment are in place in all facilities, including family therapy as appropriate.

**DJJ Status:** Between May and June, the Department's Compliance Coordinator is conducting internal reviews, which will assess compliance of Individualized Mental Health Plans with the Department's updated policies.

The Department is continuing to work on its family therapy and family engagement, which are being tracked monthly in the Mental Health Date Reports. These reports are being shared with Plaintiffs' Counsel. Mental health staff are also completing Monthly Family Therapy Checklists to document efforts and obstacles related to engaging youths and their family in family therapy. Samples of these checklists are available for Plaintiffs' counsel and the mental health monitor to review. Additional family therapy trainings with the Department's outside contractor have been put on hold due to delays in payment from the Illinois Comptroller's Office.

**Plaintiffs' Response:** Plaintiffs are unable to fully assess the Department's compliance with this provision of the Remedial Plan absent the results of the Department's internal audit, and the evaluative assessment of the Mental Health Monitor. The Department has provided Plaintiffs with

the schedules for Administrative Directive audits, which are expected to wrap up by the end of July. The Mental Health Monitor will also be conducting his annual site visits this summer. Plaintiffs will review the audit results and consult with the Mental Health Monitor regarding the Department's compliance with this provision.

As for the delays in payment resulting in the hold on Department family therapy trainings, Plaintiffs believe that the parties should discuss whether this is something that might be rectified by Court order.

**Paragraph 8: Medication Management**: DJJ shall review and revise, in consultation with the DJJ Medical Director and Child and Adolescent Psychiatrist, its policies and procedures relating to medication management.

**DJJ Status:** The mental health monitor agreed to assist DJJ in writing its medication management policies while the Department continued to recruit a Child and Adolescent Psychiatrist. DJJ has not yet received any draft policies from the monitor, but believes that this project will be more quickly advanced once the child and adolescent psychiatrist starts.

**Plaintiffs' Response:** Plaintiffs agree that once the Child & Adolescent Psychiatrist is hired, finalization of the medication management policy will proceed quickly.

## REMEDIAL PLAN PART III:  EDUCATION SERVICES

**Paragraph 1: Full-Time, Full-Day Instruction**: DJJ shall provide full-time, full-day instruction on all scheduled school days in each facility.

**DJJ Status:** Since January, the Department has continued to provide instruction on all scheduled school days for at least five hours per day at every facility except IYC-St. Charles. At IYC-St. Charles, DJJ hired three former educators on short-term contracts, which allowed the facility to achieve full-day school from February 27, 2017 through April 24, 2017 (March 14-17 were Not-In-Attendance (NIA) days). As those contracts have expired, IYC-St. Charles has been rotating cottages so youth get at least half day school every day.

The Department's January Compliance Report described a new joint procedure with the Public Safety Shared Services Department to reduce hiring delays. This procedure was finalized and has helped in reducing delays in the hiring process.

Unfortunately, the Department continues to struggle with its recruitment of qualified educator candidates, particularly at IYC-St. Charles. DJJ is exploring additional avenues for teacher recruitment. Specifically, DJJ is working with Teach for America's alumni coordinator to help increase awareness of DJJ job opportunities among Teach for America educators who are ending their two-year commitment and seeking other education job opportunities. DJJ has also reached out to the Chicago Teacher Education Pipeline at Illinois State University, whose program is geared toward educators interested in working in high-need, urban settings.  In addition, DJJ is

working with the Kane County Regional Office of Education to identify opportunities for partnership in recruitment and assistance with IYC-St. Charles school operation.

During spring break NIA days in March, the facilities submitted schedules for the Deputy Director of Programs outlining the alternative programming they would be providing that week.

**Plaintiffs' Response:** Plaintiffs are, needless to say, disappointed that struggles with teacher staffing continue to disable DJJ from complying at IYC St. Charles with the five-hour daily basic education requirement for youth who do not have a high school degree or GED. Given the history of this issue (*see* Dkt. 183, p. 12), Plaintiffs now believe that it is time for the Department to work with the education monitor, Dr. Leone, to develop a long-term plan, to be implemented by supplemental order, to create nine-month/three-month permanent teacher positions, and/or to provide youth who have not been able to attend full-day school while in DJJ custody with compensatory educational services thereafter. Dr. Leone has recommended both of these options previously.

Part III, paragraph 1 of the Remedial Plan also includes a requirement of 2 and ½ hours per day of educational programming for youth who have a high school degree or GED, as well as a requirement of alternative educational programming for youth in R&C (reception and classification) status. Plaintiffs currently believe that, as to the post-graduate education requirement, DJJ is not currently in compliance due to the issues relating to implementation of vocational/career and technical education discussed as to Part III, paragraph 7, below (pp. 9-11). Plaintiffs also believe that, due to the teacher staffing issues at IYC St. Charles discussed above, DJJ is not in compliance with the R&C education requirement at St. Charles.


**Paragraphs 2 and 3: Teacher Staffing Levels and Other Education Staffing Levels**: DJJ shall create and fill additional teacher positions, and DJJ shall hire additional education staff, as specified in the July 17, 2014 Supplemental Order.

**DJJ Status:** The Department seeks to maintain student to teacher ratios of 10:1 or lower for general education and 6:1 or lower for special education. The student-to-teacher ratios on the last day of each month since July 2016 are reflected in the tables below.

General Education Student to Teacher Ratio

| | 7/16 | 8/16 | 9/16 | 10/16 | 11/16 | 12/16 | 1/17 | 2/17 | 3/17 | 4/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Chicago* | 7.5 | 7.7 | 6.3 | 4.7 | 9.5 | 7.8 | 7 | 8.5 | 12.8 | 10 |
| *Harrisburg* | 5.8 | 5.6 | 5.6 | 4.4 | 4.3 | 5.7 | 6.9 | 5 | 5.2 | 5.6 |
| *Pere Marquette* | 5 | 4.3 | 5.3 | 4.7 | 5.3 | 4.7 | 9 | 6 | 7 | 4.5 |
| *St. Charles* | 9.7 | 11.8 | 12.5 | 12.3 | 11.5 | 14.2 | 10.3 | 6.7 | 6 | 8.7 |
| *Warrenville* | 5.2 | 5 | 3.8 | 3.4 | 3.2 | 4 | 3.6 | 3.6 | 4 | 2.8 |
| **IDJJ Average** | **6.9** | **6.9** | **6.8** | **5.9** | **6.6** | **7.4** | **7.2** | **5.7** | **6.4** | **6.4** |

Special Education Student to Teacher Ratio

| | 7/16 | 8/16 | 9/16 | 10/16 | 11/16 | 12/16 | 1/17 | 2/17 | 3/17 | 4/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Chicago* | 6.5 | 7.7 | 8.3 | 9.7 | 10 | 10 | 9 | 9 | 7.3 | 7 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *Harrisburg* | 6.8 | 8.8 | 8.5 | 7.3 | 7 | 6 | 6.3 | 9.5 | 7.3 | 6.5 |
| *Pere Marquette* | 4.7 | 3.0 | 2.0 | 3 | 5 | 5 | 4 | 4.5 | 4.3 | 4 |
| *St. Charles* | 3.7 | 6.3 | 5.5 | 7 | 6 | 4.5 | 7 | 4.2 | 5.2 | 10.3 |
| *Warrenville* | 3.7 | 3.0 | 4.0 | 4.7 | 4.3 | 3 | 3.7 | 6.3 | 4.0 | 5.3 |
| **IDJJ Average** | **5.2** | **6.5** | **6.3** | **6.7** | **6.6** | **5.7** | **6.1** | **6.9** | **6.0** | **6.6** |

As of June 1, 2017, the School District has the following vacancies at each facility (as indicated by the symbol √):

| IYC | General Educator | Special Educator | Career and Technical Educator | Educator Substitute | School Counselor | School Psychologist | SpEd Resource Coordinator | Library Associate | Principal |
|---|---|---|---|---|---|---|---|---|---|
| CHI | | | √ | √ | | | | √ | |
| HB | √ Pending | | | | | | | | |
| PM | √ Pending | √ | √ Start Date:7-1-17 | | √ | √ | Special Ed teacher will fill this position | √ Pending | |
| STC | √ | √ Pending | √ | | √ | | √ | | |
| WRV | √ Pending | | √ | √ | | √ Pending | √ | | √ |

All facilities with the exception of IYC-Pere Marquette have a School Counselor. IYC-St. Charles is authorized to have two School Counselors and interviews for the second School Counselor are scheduled for June 6-7, 2017. Although IYC-Harrisburg initially was authorized to have two School Counselors, based on the decrease in youth population, the education monitor has agreed that one school counselor currently is sufficient, but he may recommend that another School Counselor be hired depending on his observations during his upcoming facility visit at the end of June.

Currently IYC-Chicago is nearly fully staffed. The candidate for the Library Associate position tentatively accepted an offer but then declined the position. IYC-Chicago's new Physical Education teacher started on Tuesday, May 16, 2017. No candidates were selected for the substitute teacher position, and it has been reposted.

IYC-Harrisburg currently has a special education educator vacancy, and the candidate is in the background-check process.

At IYC-Pere Marquette, there have been candidates for the School Counselor and School Psychologist positions but they have declined offers or not passed the background-check. The Special Education Resource Coordinator will be filled by the current Special Education Teacher once another special education teacher is hired. The positing for the special educator position ended on May 30, 2017 and there are 4 applications to fill the position. The library associate candidate selected a conditional offer and currently is in the background check process. A general education teacher resigned on May 31, 2017, and a candidate to fill this vacancy was selected on May 25, 2017, and is completing the hiring process. A career and technical educator has been hired and will start on July 1, 2017.

6

IYC-St. Charles continues to be the Department's greatest challenge. Three school staff members are currently on leaves of absence. Since February 2017, three new teachers have been hired. An additional special education teacher has accepted an offer for the positon and is currently in the background-check process. DJJ has re-posted the educator positions and is working to hire additional staff. As previously noted, the short-term contracts for three temporary educators have now expired and the Department is working to fill those vacancies either through permanent or temporary teachers. The substitute teacher started June 1, 2017. Interviews for the Special Education Resource Coordinator are scheduled for June 6-7, 2017.

IYC-Warrenville has a Principal vacancy, and the former principal is temporarily serving in this position. Interviews for the Principal position are scheduled for June 6-7, 2017. The School Psychologist Language Arts teachers are in the background-check process. A Physical Education teacher was interviewed on May 26, 2017, and Shared Services is preparing a conditional offer for the selected candidate.

As mentioned above, DJJ continues to explore additional avenues for teacher recruitment, including working with Teach for America's alumni coordinator to help increase awareness of DJJ job opportunities among Teach for America educators and the Chicago Teacher Education Pipeline at Illinois State University, whose program is geared toward educators interested in working in high-need, urban settings. DJJ also is working with the Kane County Regional Office of Education to identify opportunities for partnership in recruitment and assistance with IYC-St. Charles school operation.

The School District Superintendent, Gloria Davis, resigned from her position effective May 31, 2017. The Assistant Superintendent, Dr. Sophia Jones-Redmond, has been selected to be the new Superintendent, effective June 1, 2017.

**Plaintiffs' Response:** Part III, paragraph 2 of the Remedial Plan requires 10:1 student-to-teacher ratios in general education and 6:1 student-to-teacher ratios in special education. As to these requirements, the data speaks for itself, indicating that the DJJ has not achieved substantial compliance as to general education ratios at IYC St. Charles, and has not achieved substantial compliance as to special education ratios at IYC Chicago and IYC Harrisburg (it remains to be seen whether the deviation from ratio at IYC St. Charles is temporary or not).[2]

Part III, paragraph 2 also requires that DJJ "work to streamline the teacher hiring process." As stated above, the difficulties in teacher hiring at IYC St. Charles call for the implementation of a formal reform as advised by Dr. Leone.

Part III, paragraph 3 of the Remedial Plan incorporates the requirements of the Supplemental Order dated July 17, 2014 for other educational staffing (librarians, school counsellors, etc.). Dkt. 64, ¶¶3-4. As to the positions required by the July 2014 Supplemental Order, DJJ's data (*above*) indicates that there is non-compliance as to different positions at different facilities.

---

[2] "Substantial compliance" is defined in the Consent Decree as a status in which "any violations of the relevant remedial plan(s) are minor or occasional, and are neither systemic nor serious." However, even a "serious" violation of the remedial plan does not automatically create a status of non-compliance if the violation is promptly identified and timely remedied. Dkt. 33, ¶ 36.

**Paragraph 4: Substitute Teacher Policy**:  DJJ shall create and implement a plan to provide for certified substitute teachers.

**DJJ Status:**  DJJ is hiring permanent substitute teachers (*i.e.*, floater teachers) for all five facilities who will be able to fill in for educators during absences. Full-time floater teachers have been hired at IYC-Harrisburg, St. Charles, and Chicago. The substitute teacher applicant at IYC-Warrenville declined the position on May 22, 2017 and it has been reposted. No candidates were selected from the May 24, 2017 interviews for the IYC-Chicago position.

**Plaintiffs' Response:**  Plaintiffs acknowledge progress towards compliance with this requirement. At the time of the January 2017 party reports, there were no substitute teachers in place (*see* Dkt. 183, p. 17); now three of the Department's five facilities reportedly have substitute teachers.  Full compliance with this need is overdue, however.

**Paragraph 5: Modified School Calendar:** DJJ shall implement a modified school calendar.

**DJJ Status:**  With respect to NIA days (the area identified by Plaintiffs' counsel as requiring an update), during spring break NIA days in March, the facilities submitted schedules for the Deputy Director of Programs outlining the alternative programming they would be providing that week.

**Plaintiffs' Response:** *See* footnote 1, above.  There is insufficient information to date to assess whether DJJ is in compliance with the requirement to provide alternative educational programing for youth on "NIA" (not in attendance) days; this requirement also needs monitor assessment.

**Paragraph 6: Blended Instruction**: DJJ shall ensure that it provides both traditional classroom instruction and web-based instruction, individually tailored to students' needs.

**DJJ Status:**  DJJ is providing blended learning at all five facilities and the Department is moving forward with an expansive Technology Enhancement Plan.  Last year the School District secured additional funding through its Title 1 Federal Grant to purchase 100 internet-based Hot Spots, 36 multi-media projectors and headphones for each youth. The additional funding also allowed the administration to purchase each educator a laptop, 80 total, that will assist with providing internet-based instruction through a secured process and provides immediate access to data during meetings, especially the IEP and re-evaluation meetings. The next phase of the Technology Plan is to install Smartboards in all of the School District classrooms.

Work is currently under way to install access points at every youth center, distribute the laptops to educators, and conduct professional development on how to use the technology in the blended learning model.  The educators at IYC-Pere Marquette have received their laptops and are currently using them for instructional purposes. The principal started "No Computer Wednesday," an initiative requiring teachers to deliver instructing using only their laptops and not using GradPoint for that day. The school district plans to implement this initiative at all facilities.  On May 22, 2017, the staff at IYC Chicago will receive their laptops.

The District also launched a Project Based Learning program in January 2017 using a thematic unit approach. A thematic unit is the organization of a curriculum around a central theme with a series of lessons that integrate subjects across the curriculum, including math, reading, social studies, science, and language arts. Templates were distributed to all principals to help them create a schedule of monthly themes for the year and to identify the activities and projects for each subject relating back to the monthly theme.

**Plaintiffs' Response:** Plaintiffs commend the Department's plans; however, whether the Department is adequately implementing "blended instruction" (a combination of computer-based and teacher interaction) so as to achieve substantial compliance is uniquely within the education monitor's province to assess.

**Paragraph 7: Curriculum**: DJJ shall provide an academic curriculum sufficient for required instruction for every youth without a high school diploma or GED.

- DJJ is working towards implementing curriculum with career and technical education programs for which high school credit can be earned.
- DJJ is working to offer at least two vocational programs at each facility with 50 or more youth, and at least one vocational program at each facility with fewer than 50 youth.
- DJJ is working to offer at least one vocational program leading to certification at each facility.
- DJJ is able to provide intensive literary instruction to youth through the Reading Horizons reading curriculum.

**DJJ Status:** DJJ's curriculum includes instruction in all subjects required by state law in order to earn a high school diploma and in all subjects required for preparation to take the GED exam.

The Lake Land College program provides post-secondary and dual credit vocational credit to youth at IYC-Harrisburg and IYC-St. Charles. Associate Deans at both IYC-St. Charles and Harrisburg were hired February 2017. Updates on the available classes are as follows:

**IYC Harrisburg:**
- Custodial Maintenance: This course covers machine and electrical safety, the detergency process and chemical usage, handling and mixing. Youth have an opportunity to earn 3 college credit hours. **Lake Land College is in the process of hiring a teacher.**

- Culinary Arts: This course prepares students to take and pass the Illinois Sanitation Exam. Youth have an opportunity to receive a sanitation certificate and up to 3 college credit hours. **The class officially started May 8, 2017 with four youth.**

- Horticulture: The Horticulture certificate is designed for youth seeking educational training and employment in the industries of landscaping, greenhouse management, plant propagation, nursery management, golf course management and turf grass. Youth have an

opportunity to receive their first certificate within 4 weeks. **The class officially started April 24, 2017 with three youth.**

**IYC St. Charles:**
- Custodial Maintenance: This course covers machine and electrical safety, the detergency process and chemical usage, handling and mixing. Youth have an opportunity to earn 3 college credit hours. **The class started on April 3, 2017 with three youth.**

- Horticulture: The Horticulture certificate is designed for youth seeking educational training and employment in the industries of landscaping, greenhouse management, plant propagation, nursery management, golf course management and turf grass. Youth have an opportunity to receive their first certificate within 4 weeks. The class started April 3, 2017, but stopped on April 17, 2017 to ensure comprehensive tool control procedures were in place. **The class resumed on May 4, 2017 and currently has five youth.**

- Building Construction: This course covers basic safety principles fundamental to construction, including the correct use of power tools, emergency and first aid procedures. Youth would have an opportunity to earn 4 college credit hours. **Lake Land is currently searching for a teacher.**

The YouthBuild program continues at IYC-Pere Marquette and is now up and running at IYC-Chicago. At IYC-Pere Marquette, four youth are in the program this summer. At IYC-Chicago, three youth have competed the first semester and youth are interviewing for the summer session. The program for IYC-Chicago is located in an alternative high school and youth are working toward their OSHA-10 certification for workplace safety. Five youth from IYC-Pere Marquette are taking eight week college courses at Lewis & Clark Community College this summer.

IYC-Warrenville is working with a local community college to explore the possibility of two community college educators teaching dual-credit courses starting in September.

DJJ is also continuing it partnership with Literacy Volunteers of Illinois who provides literacy tutoring for youth at IYC-Chicago, Warrenville, St. Charles and Harrisburg. During April 2017, 79 youth were provided one-to-one tutoring through the services of 33 volunteers who contributed 250 tutoring hours. The literacy tutoring is in addition to, and separate from, DJJ's intensive literacy instruction curriculum, Reading Horizons.

This Spring, DJJ teachers are receiving professional development in the use of the Reading Horizon's curriculum as an intensive reading intervention. Teachers, special education faculty, and principals from IYC-Pere Marquette and IYC-Harrisburg met with DJJ's Director of Special Education and a Reading Horizons presenter on May 18. Training for the northern region is currently scheduled for June 26. Although the Department has used the Reading Horizons curriculum in previous years, DJJ now is focusing on incorporating it more routinely to provide additional support to students whose reading fluency and comprehension are below grade level, additional research-based data points to demonstrate student growth, and extra support to students whose assessment scores place them in the bottom quartile for reading.

IYC-St. Charles had been using ACT KeyTrain on teachers' computers to test the youths to see what career cluster they were interested in and what level they needed to obtain for the entry level job in that category. This program rolled out on youth computers on May 22, 2017. There was a firewall issue that first needed to be resolved before youth could access it on their own computers.

Unfortunately, DJJ Director of Career and Technical Education resigned in April 2017, which has been a setback to the Department's vocational programming. The position has been posted.

As noted above, all facilities with the exception of IYC-Pere Marquette have a School Counselor. IYC-St. Charles is authorized to have two School Counselors and is in the process of hiring the additional Counselor. The School District has developed a School Counseling log and job expectations document that will greatly assist the work of the School Counselor. The School Counselors meet as a group, once a month with the Assistant Superintendent of Schools to discuss the progress of counseling related projects and student needs.

**Plaintiffs' Response:** Part III, paragraph 7 of the Remedial Plan includes three requirements with which the Department is still not in substantial compliance.

Two of these requirements pertain to vocational, career and technical education. These are (i) the requirement that career and technical education programs for which high school credit can be earned be available to "all youth" who do not yet have a high school degree or GED, and (ii) the requirement that DJJ offer vocational programming in which "youths who already have a high school diploma or GED, or who are not on a diploma track, can earn vocational certification." As to the second requirement, there is a further provision requiring facilities with more than 50 youth to offer at least two such programs (at least one of which must lead to vocational certification). Additionally, the requirement of vocational programming for youth who already have a high school degree or GED overlaps with the requirement of Part III, paragraph 1 that all youths who have a degree or GED must be provided 2 and ½ hours of educational programming per school day.

Although it is evident from DJJ's statement that progress towards meeting these requirements is being made, it is also evident that it has not yet been achieved. DJJ has a population of some 400 youth currently; historically, approximately 75% of them do not yet have a high school degree or GED, so there are some 300 students to whom pre-graduate career and technical education programs need to be offered, and some 100 to whom vocational programming needs to be offered. For the career and technical or vocational programs currently available, DJJ's statement acknowledges enrollments of three youth or four youth only, in some cases with two youth scheduled to be added (*see above*).

The third requirement of paragraph 7 as to which compliance has not been achieved is the requirement that "DJJ shall provide intensive literacy instruction to all youths who score below the 25th percentile on standardized reading tests upon DJJ admission." DJJ does not indicate the coverage provided by the "Reading Horizons" program to date, and the other literacy tutoring

described is provided at four of the five facilities by volunteers, and amounts to a bit over three hours per youth (250 hours for 79 youth) over an unspecified period of time.[3]

**Paragraph 8: Special Education Policies and Procedures**: DJJ shall revise and update its policies and procedures relating to special education.

**DJJ Status:**  Since January, the District has improved in its ability to obtain students' school records from former school districts better enabling it to meet student needs.  With the employment of five School Counselors, two Special Education Resource Coordinators, and a Mid-Valley Special Education Consultant, student records from previous school districts are being received within two to seven days of student entering the school district.

A database of school district contacts throughout the State continues to increase as DJJ staff reach out to obtain student records from the key contact point person for each district.  The Illinois State Board of Education's Student Information System (SIS) has also been a valuable resource to access previous school information.  If, for any reason, a delay occurs in receiving the records and it is known that a particular student was receiving Special Education support services prior to incarceration, DJJ is creating a 30-day interim Individual Education Program (IEP) to ensure uninterrupted services. As any IEP is received, it is reviewed to determine how DJJ can provide services comparable to those provided by the former school district, and the educational environment identified by the former school district is maintained.  All IEPs are being entered into the I-STAR IEP Program and I-STAR Statewide Data Base so information can be expedited to the youth's Case Manager in order to share with appropriate staff.

During the 2016-2017 school year, 98% of students with IEPs exiting IDJJ School District have been in compliance with special education laws and regulations with current IEPs in place.

**Plaintiffs' Response:**  Part III, paragraph 8 of the Remedial Plan requires not just that DJJ update special education policies and procedures, but that they be updated with the aim of timely obtaining youth IEPs from previous schools, identifying and assessing youth learning disabilities, developing and implementing IEPs, and ensuring that youth are receiving the services specified in their IEPs.  Plaintiffs believe that DJJ has made progress towards compliance with these requirements, especially as to obtaining previous school records and tracking students with special learning needs.  As to the qualitative aspects of these requirements, assessment by the education monitor will be the only way to determine compliance; however, Plaintiffs note that the absence of a full complement of special education staff at each facility (*see above*, p. 6) by itself suggests that youth needs are not currently being met.

## REMEDIAL PLAN PART IV:  USE OF CONFINEMENT

---

[3] This is a requirement that needs both better data collection and monitor assessment in order to determine compliance (there is no indication that the 79 students mentioned constitute "all youth who score below the 25th percentile," and whether the instruction provided might satisfy the "intensive literacy instruction" requirement cannot be determined without monitor assessment).  *See* n. 1, *above*.

**Paragraph 2: Confinement Liaison**: DJJ shall develop and implement policies and procedures requiring a youth and family specialist or other non-security staff member to be present during the day shift at each confinement unit that has at least one youth in confinement.

**DJJ Status**:  With the exception of IYC-St. Charles, DJJ facilities are rarely using their confinement units, even though those units can still be used under the Department's revised confinement policies.  Generally, youth are placed in their rooms on the living unit when they need to be removed from programming, and Youth and Family Specialists (YFS) have offices on the living units. At IYC-St. Charles, YFS and Mental Health Professionals make rounds on the confinement unit when youth are placed there.  At all IDJJ facilities, within the first hour during a youth's confinement and regularly thereafter, non-security staff such as Duty Administrative Officers, Youth and Family Specialists, or Mental Health Professionals meet with the youth regardless of where they are placed.  Because the confinement units at all facilities but St. Charles are being used so rarely, because youth remain in those units for a short period of time when they are used, and due to program schedule needs, the Department has required non-security staff to check in with the youth regularly, rather than creating a post for non-security staff in the confinement units.  IDJJ would like to revisit the confinement liaison requirement in light of the significantly diminished use of confinement units and need to align staff and resources toward ensuring the best possible program services.

**Plaintiffs' Response:**  This information is not currently being tracked in a way that allows Plaintiffs or the Monitors to assess compliance.  While it is true that most youth who were sent to the confinement unit in the past few months were there for short periods of time, there were dozens of instances of youth being held in facility confinement units (for crisis confinement, administrative hold, and otherwise) for 24 hours or more.  While these occurrences were mostly in accordance with existing policies, Plaintiffs have concerns about youth being held on the confinement unit for extended periods of time with only security staff present.

If DJJ would like to revisit the necessity of the Remedial Plan's confinement liaison requirement, this must be done in consultation with the court-appointed Safety & Welfare Expert.  Plaintiffs further recommend that DJJ establish a fixed protocol for documenting non-security staff visits and interactions with youth on the confinement unit, to ensure that youth are receiving sufficient meaningful contact with non-security staff, and to ensure that the Department is complying with existing confinement policies.

## REMEDIAL PLAN PART V:  SAFETY AND GENERAL ISSUES

**Paragraph 1: Comprehensive Treatment Model:**  DJJ shall develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitation model to be used for youth in all DJJ facilities, including but not limited to youth in special treatment units and for juvenile sex offenders.

**DJJ Status:** DJJ's new release procedures and additional incentives for youth to receive sentence reductions (*i.e.*, "cut time") are helping enhance the Department's comprehensive treatment model. As previously discussed, on January 1, 2017, the Department became the releasing authority for

juvenile delinquents and rolled out a new release procedure and updated sentence calculations at the same time. The new procedure emphasizes the importance of the monthly youth staffings and encourages inter-disciplinary participation from those involved with the youth, including educators, mental health staff, youth counselor/YFS, and Aftercare.

The new cut time opportunities incentivize youth to maintain positive behavior and engage in programming opportunities. For example, if youth do not receive any major tickets (*e.g.*, fights and assaults) for 28 days, they receive 7 days of cut time; if, in addition, youth maintain A-level behavior for 28 days, they receive another 7 days of cut time. Youth also receive cut time for reaching programmatic goals, such as obtaining a high school diploma or GED, meeting certain behavioral goals, completing substance abuse treatment, and/or completing a YouthBuild program or vocational course, among others.

Based on conversations with youth, many of them are taking advantage of the new procedures to maximize their ability to reduce their sentence. As the new procedures continue to take hold, the Department hopes that it will continue to improve youth engagement and behavior, leading to positive youth outcomes and safer facilities for both staff and youth.

The Deputy Director of Programs also met with program leaders from all facilities to identify and begin work on four program-related priorities for the year. First, improving release staffing processes. Second, enhancing the use of targeted and intensive behavioral interventions following the PBIS model. Third, implementing additional evidence-informed cognitive behavioral therapy interventions for youth in all facilities. All facilities will be adding additional facilitators for trauma-informed therapy (*i.e.*, SPARCS therapy) so it can be offered to more youth. Fourth, improving the system for awarding sentence reductions for program participation.

**Plaintiffs' Response:** Plaintiffs acknowledge the Department's ongoing efforts to create and implement a comprehensive treatment model; however, based upon the Department's own description, this is still a work in progress. This Remedial Plan requirement will need comprehensive monitor assessment to determine substantial compliance.

**Paragraph 2: Department-Wide Behavioral Management System** DJJ shall adopt and implement a comprehensive, department-wide, evidence-based or evidence-informed behavioral management system to provide a consistent model for youth behavior throughout the facilities.

**DJJ Status:** The Department utilizes the Positive Behavior Interventions and Supports (PBIS) model as its behavioral management system. PBIS is an evidence-based model used across the country in residential hospitals, mental health facilities, juvenile corrections, and schools to improve youth behavior by employing a proactive approach to interrupt patterns of negative or aggressive behavior using a balance of positive reinforcements and age-appropriate behavior corrections.

The Department is currently working to better integrate PBIS principles in all aspects of facility operations and programming. A draft set of comprehensive incident and behavior management policies has been developed. The policies include a revised PBIS system reflecting a uniform point card for all youth centers, clear instructions for staff awarding youth points, and daily level

14

calculations so youth receive more immediate incentives and consequences reflective of their behavior.

From late March through mid-April, the Chief of Professional Development and Training and Assistant Chief Legal Counsel met with the superintendent teams at each youth center to solicit feedback on the revised PBIS system and other policies, and to discuss the requirements for successful implementation.  In late April through mid-May, the policies were introduced to work groups at each youth center, composed of staff selected by both the superintendent and union leadership. The work groups were the result of feedback from union leadership that its members wanted an opportunity to provide greater input into Department initiatives.

Work group feedback is currently being incorporated into final versions of the policies, expected to be issued along with Department-wide training at the beginning of July.  The work groups have also been given specific tasks for implementation, including development of the enhanced incentive structure for all PBIS levels and a youth center list of immediate rewards for positive behavior. Through this process, the Department is striving to enhance staff investment in the PBIS system and create thoughtful implementation plans that will improve the fidelity of PBIS implementation at all youth centers.

PBIS is also driving the Department's new release process and sentence calculations described above with respect to the Comprehensive Treatment Model.

**Plaintiffs' Response:**  Plaintiffs acknowledge the Department's ongoing efforts to create and implement its chosen behavioral management system (PBIS); however, based upon the Department's own description, this is still a work in progress. This Remedial Plan requirement will need comprehensive monitor assessment to determine substantial compliance.

**Paragraph 3: Individualized Youth Development Plans** DJJ shall implement policies and procedures requiring preparation of a youth development plan (YDP) for each youth committed to DJJ custody.

**DJJ Status:**  In March 2017, the Department's Deputy Director of Programs created a case plan review form to review the quality of youth case plans.  The Clinical Services Supervisors and Youth and Family Specialist Supervisors are completing the forms and going over them with their staff to provide feedback and discuss how case plans can be improved. Copies of the forms are also sent to Deputy Director of Programs for his review.

**Plaintiffs' Response:**  Plaintiffs acknowledge that the Department is creating youth development plans (but note that the Department's own description indicates that the quality of these plans is an ongoing project).  Part V, paragraph 3 of the Remedial Plan requires not just that the plans be created, but that they identify services needed by youth and "serve as a plan for the youth carrying through to the youth's release on aftercare."  Whether the youth case plans currently being created successfully meet these requirements will need monitor assessment to determine substantial compliance.

**Paragraph 4: Security Staffing Levels** DJJ shall increase the number of security staff posts to ensure adequate staffing at each facility.

**DJJ Status:** DJJ is meeting its required youth to security staff ratios of 8:1 (waking hours) and 16:1 (sleeping hours) at each facility:

Youth to Security Staff Ratio

|  | 1st Shift | 2nd Shift | 3rd Shift |
|---|---|---|---|
| *Chicago* | 5.4 | 5.6 | 8.7 |
| *Harrisburg* | 3.4 | 3.8 | 7.7 |
| *Pere Marquette* | 3.8 | 4.3 | 6.8 |
| *St. Charles* | 2.9 | 3.3 | 6.7 |
| *Warrenville* | 2.3 | 2.1 | 4.2 |
| **IDJJ Overall** | **3.4** | **3.6** | **6.9** |

*Data provided for month of April*

Because security staffing at IYC-St. Charles has historically been a focus, DJJ is continuing to add to its security staff headcount at that facility. In January 2017, when the facility assessed its staffing needs, it had 137 active security staff. Due to increased hiring and efforts at returning staff from leaves of absence, IYC-St. Charles has increased its staffing levels to 183 active security staff (including 12 interns currently in the training academy who started working at the facility on May 29, 2017). Security absences/shortages at IYC-St. Charles generally have not been impeding operations or restricting youth movement throughout the facility, and the facility uses overtime as necessary to reduce staffing-related disruptions. The current staffing levels were able to support full-time/full-day school from the end of February through April once the school had adequate educators. Based on a recent assessment, the facility estimates that it still needs approximately 17 additional security staff to account for upcoming retirements and anticipated attrition.

DJJ recently held intern screenings and currently has approximately 60 applicants in the northern region who passed the initial screening process and will be eligible for hire assuming they pass the backgrounds process. Based on the availability of the Department of Corrections Backgrounds Investigations Unit to run background checks on these individuals, the Department anticipates beginning to hire interns in early July and starting the next Academy training on August 7, 2017. DJJ is also planning on holding another screening in July and can run another intern class in early fall if necessary based on staffing needs. The Department is also exploring hiring a retired administrator to work with IYC-St. Charles to assess the facility's post assignments and maximize the current staffing level based on operational needs.

All facilities are continuing to send executive staff operational needs reports for the 1st and 2nd shifts which detail the daily staffing levels and any restrictions on youth movement due to staffing shortages or other security issues.

**Plaintiffs' Response:** Plaintiffs acknowledge that DJJ is in compliance with the security staffing ratios, but note that, at IYC St. Charles, those ratios had not been sufficient to ensure "adequate staffing," necessitating the plan for hiring an additional 38 security staff at that facility. Plaintiffs

are encouraged that progress towards hiring additional staff for that facility continues and that the Department is anticipating future needs based on retirement and attrition.

**Paragraph 5: Youth and Family Specialist Staffing Levels**: DJJ shall achieve and maintain a staff-to-youth ratio for Youth and Family Specialists of an average of 20:1 as specified in the July 17, 2014 Supplemental Order.

**DJJ Status:** DJJ has been meeting the 20:1 youth to Youth and Family Specialist ratio at all facilities:

Youth to YFS Ratios

|  | **Ratio** |
|---:|:---:|
| *Chicago* | 19 to 1 |
| *Harrisburg* | 11 to 1 |
| *Pere Marquette* | 10 to 1 |
| *St. Charles* | 11 to 1 |
| *Warrenville* | 10 to 1 |
| **IDJJ Overall** | **11 to 1** |

Data for May 15th, 2017

Dr. Krisberg has previously raised concerns about the value of YFS interactions with youth. As described above, the recent changes to the staffing and release decision process and integration of PBIS principles into the youth's target release date are creating opportunities for improved and enhanced interactions.

**Plaintiffs' Response:** Plaintiffs acknowledge that DJJ is in compliance with the YFS staff ratios initially set in the Supplemental Order required by Part V, paragraph 5 of the Remedial Plan. Dkt. 84, ¶4. That Order also requires assessment by the safety and welfare monitor, Dr. Krisberg, as to whether the YFS "are engaging in frequent, meaningful interactions with youths and facilitating effective rehabilitative services based on youths' individual needs," and anticipates the possibility of further adjustment to the ratios based upon the monitor's assessment. This requirement thus needs further monitor assessment to determine substantial compliance.

**Paragraph 7: Youth Grievance Reporting** DJJ shall ensure that all youth have adequate means to report allegations of abuse and/or submit grievances.

**DJJ Status:** DJJ has been working with Plaintiffs' Counsel to revise its grievance policies to address the issues raised regarding the lack of integrity and confidentiality in the process. On January 30, 2017, DJJ sent a revised grievance policy (which was reviewed and approved by the

Department's Independent Juvenile Ombudsman) to the court monitor and Plaintiffs' Counsel. Plaintiffs' Counsel has been working with the John Howard Association to get feedback on the draft policy and is scheduling a call to discuss John Howard's proposed revisions.

**Plaintiffs' Response:** Plaintiffs have reviewed DJJ's proposed grievance policy and have shared it with the John Howard Association for their review. The John Howard Association has prepared comments and suggestions for improving the policy, and Plaintiffs are in the process of scheduling a phone call between JHA and the parties to discuss the proposed revisions.

**Paragraph 9: Limits on Mechanical Restraints** DJJ shall adopt and implement a policy limiting the use of mechanical restraints.

**DJJ Status:** DJJ continues to track the use of mechanical restraints, and facilities are required to provide information about mechanical restraint usage in incident reports. DJJ also plans on implementing a form staff will be required to fill out whenever force is used, including mechanical restraints, to explain why force was necessary. These forms will be available for monitors and Plaintiffs' counsel review once they are implemented.

**Plaintiffs' Response:** DJJ currently collects raw numbers that reflect when mechanical restraints are used, but these raw numbers do not reflect which specific restraints were used or the circumstances under which they were used. In order to ensure that DJJ is limiting the use of mechanical restraints to only those situations where it is absolutely necessary, Plaintiffs believe DJJ must collect better and more specific data on the usage of mechanical restraints. Plaintiffs look forward to reviewing the Department's proposed form documenting mechanical restraint usage, and will monitor this data along with the Safety & Welfare Monitor.

**Paragraph 10: General Programming** DJJ shall create and implement a policy to provide opportunities, subject to reasonable security concerns, for all DJJ youth to spend at least eight hours per day outside of their rooms engaged in supervised activities.

**DJJ Status:** All facilities were required to create schedules for all housing units, and those schedules have been posted on the Department's intranet site. Executive staff are doing spot checks when they visit facilities to ensure compliance with the schedules. The Department hired a retired administrator on a short-term contract to audit areas of compliance, including whether youth are receiving the appropriate amount of out-of-room time. She has reported general compliance during weekdays and has started moving her inspections to weeknights and weekends.

In February, the three northern facilities started an intramural basketball league. Games are held every other week and allow youth to visit and meet youth from other youth centers. A similar soccer league is planned for later in the year. IYC-Pere Marquette continues to field a team of youth in a community recreational soccer league. The youth wear uniforms and play weekly at a community indoor sports arena in Alton.

**Plaintiffs' Response:** Plaintiffs recently received housing unit schedules from all Department facilities. On their face, the schedules appear to comply with Remedial Plan program

requirements, though the Safety & Welfare Monitor should opine on whether the schedules contain an appropriate mix of physical exercise, recreational activities, and work details. Whether the facilities are consistently abiding by the housing schedules will need to be monitored further. Spot checks conducted by executive staff and administrators have indicated compliance, however these checks have only been occurring sporadically for a couple of months. Plaintiffs and the Safety & Welfare Monitor will need to review a larger sample of data before concluding that the Department has achieved compliance here.

## REMEDIAL PLAN PART VI: COMMUNITY PLACEMENT

**Paragraph 2: Discharge Planning Upon Intake** DJJ shall engage in initial placement planning upon intake.

**DJJ Status:** Aftercare specialists are assigned to youth at intake and are helping coordinate placement upon release. If youth will have a host site issue or likely will need a residential placement, the placement unit is notified promptly to reduce placement-related delays for youth release. Legislation also went into effect January 1, 2017, which requires DJJ to notify the committing court whenever a youth's release is delayed solely due to a lack of a placement. *See* 705 ILCS 405/5-745(4).

**Plaintiffs' Response:** Part VI, paragraph 2 of the Remedial Plan requires DJJ specifically to "engage in initial placement planning within fourteen days of a youth's commitment to DJJ and arrival at a DJJ facility . . . to minimize the number of youths who, but for a lack of placement, could be released on aftercare status." Since the January 2017 reports of the parties, DJJ has provided Plaintiffs with "placement barrier reports" showing youth placements, impediments to placements, length of time (if any) youth remain in DJJ custody due to placement barriers, and other information. These reports do not enable Plaintiffs to assess whether DJJ is complying specifically with the 14-day planning deadline, but Plaintiffs are satisfied that the Department is engaging in well-organized and documented placement efforts; only monitor assessment is needed here to corroborate that DJJ is in compliance with this paragraph.

**Paragraph 3: Preparation of Youth for Placement:** DJJ shall collaborate with placement providers to prepare youth for placement in residential facilities and enhance their prospects for success at those facilities.

**DJJ Status:** The Aftercare Specialists are educating the youth on their potential placements. When DJJ is working with a provider who is considering taking a DJJ youth, typically DJJ schedules a phone interview between the provider and the youth, followed by an in-person interview, to determine whether the youth will be a good fit for the placement.

The Placement Unit also is working with the Deputy Director of Programs to revamp and enhance "Parole School" so that it is more focused on successful preparation for release. Part of this revamp

is specific programming related to success in residential placement for those youth who will be attending a placement upon release.

**Plaintiffs' Response**:  *See* Plaintiffs' Response to paragraph 2, *above*.

## REMEDIAL PLAN PART VII:  IMPLEMENTATION AND MONITORING

**Paragraph 1:  Deputy Director of Quality Assurance**: DJJ shall appoint a Deputy Director of Quality Assurance to monitor the delivery of services and programs to youth, ensuring implementation of programs and operations are consistent with the agency's objectives and assisting with development and implementation of statewide policies, procedures, guidelines, and performance standards.

**DJJ Status:** DJJ's Compliance Coordinator is currently conducting facility reviews, which are addressing various areas including confinement policy compliance and documentation.  DJJ also hired a former superintendent to conduct audits of the facilities' compliance with their general programming schedules. The Department's Data Manager recently returned from maternity leave and has resumed data collection and review related to areas tied to the consent decree and remedial plan.

**Plaintiffs' Response:**  The Department has provided Plaintiffs with the schedules for Administrative Directive audits, which are expected to be finished by the end of July.  The Safety & Welfare Monitor will need to review the results of these audits to determine whether they are sufficient to satisfy this requirement of the Remedial plan.

Last year, the Safety & Welfare Monitor expressed concern that the Department did not have an adequate quality assurance process in place to measure youth progress in rehabilitation areas, and to provide regular feedback to Department managers.  Compliance with this provision, then, will require close collaboration between the Department and the Safety & Welfare Monitor.  Plaintiffs understand that the Department's ability to work with the Safety & Welfare Monitor has been limited in recent months, thus this will need to be an area of continuing review.

DATED:  June 1, 2017

Respectfully submitted,

**For the plaintiffs:**                                          **For the defendant:**

By: /s/ Lindsay S. Miller _____            By: /s/ Michael T. Dierkes _____

Benjamin S. Wolf                                          Michael T. Dierkes
Camille Bennett                                            Office of the Illinois Attorney General
Lindsay S. Miller                                           General Law Bureau
Roger Baldwin Foundation of ACLU, Inc.      100 West Randolph Street, 13th Floor
180 North Michigan Avenue, Suite 2300        Chicago, IL  60601
Chicago, IL 60601                                        (312) 814-3672
(312) 201-9740

Maja C. Eaton
Kevin M. Fee, Jr.
Joseph R. Dosch
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

## <u>CERTIFICATE OF SERVICE</u>

I, **Lindsay S. Miller**, an attorney, hereby certify that I have caused a true and correct copy of the foregoing SEMIANNUAL JOINT STATUS REPORT (JUNE 2017) to be served on June 1, 2017 upon all counsel in this case via the Court's electronic filing system.

/s/ <u>Lindsay S. Miller</u>