IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-7289 |
| | ) | |
| HEIDI MUELLER, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION TO ENFORCE**

**INTRODUCTION**

Plaintiffs are seeking relief against the wrong party and in the wrong forum. In the exercise of his independent prosecutorial discretion, the Saline County State's Attorney has elected to charge some youths from IYC-Harrisburg, many of whom are eighteen or older, with aggravated battery for assaulting staff at the facility. Plaintiffs do not claim that the prosecutions are malicious or without factual predicate, but they are concerned that the State's Attorney is pursuing offenses that they consider "trivial" or "slight." They are concerned that the sentences have been harsh, that the youths are represented by public defenders rather than private counsel, and that the proceedings in the Saline County Circuit Court "are not calculated to protect due process rights."

Of all the potential avenues for addressing these issues, plaintiffs have chosen one that cannot succeed. They have filed a motion in this Court, against the Illinois Department of Juvenile Justice ("DJJ"), arguing that when a DJJ employee independently decides to report an assault to the State's Attorney, he or she is "punishing" the youth who committed the assault in a way that violates the consent decree and remedial plan.

1

While DJJ has concerns about the prosecutions and has taken steps to address the issue, plaintiffs' motion is legally baseless and should be denied for multiple reasons. First, plaintiffs refused DJJ's request to meet and confer and consult with the court-appointed monitors prior to filing their motion, in violation of the consent decree. Second, plaintiffs' motion relates to matters outside the scope of the consent decree and remedial plan. Plaintiffs' unsupported inferences about the "overarching purposes" of the parties' carefully-negotiated agreements do not suffice. Case law holds that the agreements must be enforced "as written," and neither the consent decree nor the remedial plan includes *any* provision governing how, when, or whether staff may report assaults or other criminal misconduct to the State's Attorney. Third, plaintiffs' motion does not comport with the Prison Litigation Reform Act (PLRA), which bars relief unless there is a violation of federal law. Here, there is no violation of federal law—nothing in federal law immunizes youths at IYC-Harrisburg from prosecution for assaulting a staff member, and nothing in federal law prohibits a staff member from reporting such an assault to the State's Attorney. Fourth, the three court-appointed monitors have all opined that they do not support plaintiffs' request for an injunction barring DJJ from placing youths at IYC-Harrisburg at this time, and such relief would do more harm than good.

## BACKGROUND

**The Consent Decree and Remedial Plan**

Over the past five years, DJJ has agreed to and implemented comprehensive reforms for the benefit of the youths in its custody. To resolve a class action complaint filed by plaintiffs in 2012, DJJ entered into a consent decree (Dkt. No. 33) and, later, a remedial plan, which was negotiated with the input of three court-appointed experts and approved by the Court in April 2014 (Dkt. No. 73). These agreements address room confinement, education services, mental

health services, youth safety, and community placement. (*Id.*) Although some work remains to be done, plaintiffs agree that "DJJ has made notable progress in implementing the reforms required by the Decree and Plan." (Dkt. No. 202 at ¶2)

Some of most significant changes relate to the use of confinement. Under the remedial plan, confinement for discipline or punishment is prohibited, and other forms of confinement are strictly limited in accordance with court-approved departmental policies. (Dkt. No. 73 at 6-8) The court-appointed monitor responsible for confinement issues has endorsed the policies as "consistent with professional standards." (Dkt. No. 176-1 at 1) Plaintiffs have lauded DJJ's elimination of extended confinement as a "significant achievement," and they agree that the department is in substantial compliance with the key confinement provisions of the remedial plan. (Dkt. No. 183 at 22-24, Dkt. No. 190 at 12-13)

**The Harrisburg Prosecutions and DJJ's Response**

In their motion, plaintiffs do not allege that DJJ is violating any confinement provision in the remedial plan or consent decree. According to plaintiffs, some staff persons believe that as a result of the confinement reforms, IYC-Harrisburg is "without any effective discipline," and as a consequence, they have decided to report assaults against them to the Saline County State's Attorney. (Dkt. No. 202 at ¶5) As plaintiffs note, the data shows that IYC-Harrisburg is below average in youth-on-staff assaults. (*Id.* at ¶6)

Many of the issues identified in plaintiffs' motion are outside of DJJ's control. Plaintiffs are concerned that the Saline County State's Attorney has elected to prosecute some of the cases as "aggravated battery," a Class 2 felony, even though the offenses are sometimes "trivial" or "slight" (in plaintiffs' view), including spitting on staff, shoving them, or tossing "liquid" at

them.  (*Id.* at ¶¶4, 26)[1]  Plaintiffs' motion also includes an entire section arguing that the proceedings in the Circuit Court of Saline County are "not calculated to protect the youths' due process rights."  (*Id.* at ¶¶21-25)  Plaintiffs complain that the Saline County Court's docket has included up to twenty-five cases per day, that the youths are represented by a public defender rather than private counsel, and that conversations between the public defender and the youths can be overheard.  (*Id.*)

Plaintiffs acknowledge that the vast majority of the prosecutions were not at DJJ's initiative.  (Dkt. No. 202 at ¶17)  Plaintiffs' motion attaches a chart (Exhibit 1) identifying the incidents at Harrisburg that led to prosecutions of youths.  (Dkt. No. 202-1)  Of the 45 incidents identified in the chart, DJJ recommended prosecution in only three cases.  (*Id.*)[2]  In the other cases, staff independently sought out the Saline County State's Attorney to bring charges, generally without DJJ's knowledge.  (Dkt. No. 202 at ¶17)  DJJ did not recommend or support these prosecutions.

In mid-March, DJJ's Chief Legal Counsel traveled to Harrisburg and personally met with union leadership to express the department's concerns regarding the prosecutions.  While DJJ does not have a policy prohibiting its staff from independently reporting perceived instances of criminal misconduct occurring in its facilities to the State's Attorney or other law enforcement

---

[1] The Illinois Criminal Code defines aggravated battery to include certain conduct against correctional institution employees.  Specifically, it states that a person commits aggravated battery when he or she "[k]nowingly causes or attempts to cause a correctional institution employee . . . to come into contact with blood, seminal fluid, urine, or feces by throwing, tossing or expelling the fluid or material," and the person is an inmate of a penal institution.  720 ILCS 5/12-3.05(g)(3).  Such conduct is a Class 2 felony. 720 ILCS 5/12-3.05(h).

[2] The spreadsheet attached as Exhibit 1 to plaintiffs' motion lists 46 incidents, with the most recent incident occurring on April 21, 2017.  To DJJ's knowledge, this is not correct.  On June 28, 2017, DJJ's Chief Legal Counsel informed plaintiffs' counsel in writing that the last incident resulting in a prosecution happened on March 16, and that the April 21 incident was included in error.  Plaintiffs did not correct the spreadsheet before filing it.  Also, for the sake of completeness, DJJ just learned about an additional incident from September 13, 2016 that led to a prosecution.

authorities, union leadership agreed to encourage staff to go through DJJ's internal prosecution review process instead. In addition, the Office of the Independent Juvenile Ombudsman reached out to the Illinois Institute of Community Law in southern Illinois for assistance in addressing the criminal prosecutions. That group has now established a court-watching program where its members attend and observe the court hearings for DJJ youths facing prosecution. These measures appear to have been effective. As DJJ understands it, the last incident at IYC-Harrisburg that led to the prosecution of a youth happened on March 16, 2017, which is more than four months ago.

## **ARGUMENT**

### I.  **PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THEY REFUSED TO MEET AND CONFER WITH DJJ AND CONSULT WITH THE COURT-APPOINTED MONITORS PRIOR TO FILING, IN VIOLATION OF PARAGRAPHS 35 AND 40 OF THE CONSENT DECREE.**

Plaintiffs' motion fails at the outset because they did not comply with the meet and confer requirements of the consent decree. Under paragraph 35 of the consent decree, plaintiffs' counsel must notify DJJ and the monitors in writing if they believe that DJJ is out of compliance with any provision of the remedial plan, and then the parties must meet and confer regarding the alleged non-compliance. (Dkt. No. 33 at ¶35) More generally, paragraph 40 of the consent decree mandates that "[i]f any dispute arises under any aspect of this consent decree or the remedial plan, the parties shall attempt in good faith to resolve the dispute, prior to raising the matter with the Court." (*Id.* at ¶40)

Regrettably, plaintiffs did not comply with these requirements. On several occasions, plaintiffs orally expressed to DJJ their concerns about the prosecutions, and the parties discussed potential options for addressing the issue. But during these conversations, plaintiffs never accused DJJ of violating the consent decree or remedial plan. Nor did they mention the

5

prosecutions in the parties' recent joint status report. The Court directed the parties to file a joint status report identifying "the provisions of the remedial plan, if any, for which plaintiffs contend that the defendant is not in substantial compliance." (Dkt. No. 188) Plaintiffs learned of "at least a dozen of these prosecutions" in late May (Dkt. No. 202 at ¶18), but they did not mention the prosecutions in the parties' June 1, 2017 joint status report, much less claim that they have caused DJJ to violate the remedial plan.

On June 9, 2017, plaintiffs sent a letter to defense counsel requesting certain information and documentation relating to the prosecutions, which DJJ provided. The letter asserted that the prosecutions interfere with the "fundamental goals" of the consent decree, but again, plaintiffs did not accuse DJJ of non-compliance, nor did they advise DJJ that they intended to seek a court order that would bar DJJ from placing additional youths at IYC-Harrisburg. Although plaintiffs had previously indicated that they might file some sort of motion, it was not until late in the afternoon on Friday, July 14, when defense counsel was out of the office (as plaintiffs knew), that plaintiffs provided DJJ with notice that they would be alleging non-compliance and requesting such drastic relief.

Defense counsel promptly requested that the parties meet and confer and consult with the court-appointed monitors. On Monday, July 17, defense counsel wrote: "I strongly believe that the parties should meet and confer before you file, including a joint call with the court-appointed monitors to get their input." Plaintiffs refused this request, filed their motion the same day without seeking the monitors' input, and immediately began a media blitz, including a radio interview that was played early the next morning. In declining to meet and confer, plaintiffs' counsel cited timing concerns, claiming that "the prosecutions have continued without respite." But to the best of DJJ's knowledge, the latest staff-assault incident being prosecuted by the

6

Saline County State's Attorney occurred on March 16, 2017—more than four months ago—confirming that there was no reason why the parties could not have had a call with the monitors prior to plaintiffs' filing.

Plaintiffs' failure to seek the court-appointed monitors' input before filing their motion is particularly unfortunate. Had plaintiffs consulted with the monitors prior to filing, they would have learned that the monitors do not support their misplaced request for an injunction prohibiting DJJ from sending youths to IYC-Harrisburg at this time. While DJJ shares some of plaintiffs' concerns regarding the Harrisburg prosecutions and remains open to discussing ways to address the issue with plaintiffs and the monitors, plaintiffs' motion to enforce is premature and should be denied.

## II. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT RELATES TO MATTERS OUTSIDE THE SCOPE OF THE CONSENT DECREE AND REMEDIAL PLAN.

On the merits, plaintiffs' motion should be denied because it relates to matters outside the terms of the consent decree and remedial plan. Plaintiffs' class action complaint addresses five discrete topics: room confinement, education services, mental health services, youth safety, and community placement. (Dkt. No. 1) The consent decree and remedial plan that resolved plaintiffs' claims are limited to these topics, and say nothing at all about criminal prosecutions of youths. (Dkt. No. 33 at ¶43 (stating that the consent decree and remedial plan resolve "only those claims . . . actually set forth in the plaintiffs' complaint")) Neither the consent decree nor the remedial plan, nor any of the Court's supplemental orders, reflect *any* agreement between the parties regarding prosecutions of youths in DJJ custody. In particular, no provision in either agreement governs how, when, or whether staff may report instances of criminal conduct to the

7

State's Attorney or others. Thus, plaintiffs did not claim non-compliance based on the prosecutions in the parties' recent joint status report.

In their present motion, plaintiffs invoke the purported "overarching purposes" of the consent decree and remedial plan rather than claiming that DJJ has violated any specific provision of either agreement. (Dkt. No. 202 at ¶20) Plaintiffs note that the agreements forbid "punitive confinement." (*Id.* at ¶2) From this starting point, they broadly infer that under the agreements, any action by DJJ or its staff—whether related to confinement or not—must be "directed at rehabilitative goals rather than punishment." (*Id.* at ¶10) They next infer that staff reporting of criminal misconduct to the State's Attorney amounts to "punishment" contrary to the agreements. (*Id.* at ¶¶10, 29) It is on the basis of these unsupported inferences that plaintiffs seek enforcement. Plaintiffs do not cite to any legal authority supporting such an expansion of the consent decree and remedial plan, nor can they.

Binding precedent makes clear that plaintiffs' inferences about the "overarching purposes" of the parties' agreements provide no basis for enforcement. "[T]he scope of a consent decree must be discerned within its four corners, and not by what might satisfy the purposes of one of the parties to it." *See, e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971). *In Armour*, the federal government cited a consent decree in an attempt to block a corporation from acquiring the Armour meatpacking company. *Id.* at 663-664. The decree prohibited Armour from dealing directly or indirectly in certain commodities, and the government argued that the decree's "purported purpose" of separating meatpackers from the retail food business would be "circumvented" or "frustrated" by the acquisition. *Id.* at 667-681. The Supreme Court rejected this argument, noting although such a structural separation may have been the government's "overall aim," the decree itself prohibited only "particular actions

8

and relationships not including the one here in question." *Id.* at 677-78. As the Court explained, a consent decree is a carefully negotiated compromise between the parties that must be construed "as it is written," not as it "might have been written," and where a party is seeking to enforce (rather than modify) a consent decree, an argument that "unforeseen circumstances" now make additional relief desirable is "out of place." *Id.* at 681-82.

The Supreme Court applied the same principles in *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 565 (1984), where it reversed an injunction entered by the Sixth Circuit to enforce a consent decree. The Sixth Circuit had enjoined the City of Memphis from following a seniority system for layoffs, reasoning that such relief was necessary to effectuate the broad purposes of a consent decree that resolved charges of race discrimination in the promotion and hiring of Fire Department employees (the layoffs would adversely impact African-Americans). *Id.* at 573-574. Citing *Armour*, the Supreme Court reversed the injunction, noting that the "four corners" of the consent decree included "no mention of layoffs or demotions." *Id.* at 574. The Court added that if there were any intention to depart from the seniority system, which was adopted by the City and Union and permitted under Title VII, there would have been an "express provision to that effect." *Id.* at 574-75.

Other courts including the Seventh Circuit and Northern District of Illinois have similarly held that consent decrees must be enforced as written. *See, e.g.*, *White v. Roughton*, 689 F.2d 118, 119-121 (7th Cir. 1982) (finding no violation of consent decree); *Autotech Tech. Ltd. P'ship v. Automationdirect.com, Inc.*, 2006 WL 1304949, at *9 (N.D. Ill. May 10, 2006) ("If, with the benefit of the illumination hindsight always provides, ADC neglected to insist upon language in the Consent Order that would clearly prohibit the conduct about which it now complains, it must look for succor elsewhere. Courts will no more rewrite a consent decree than they will any other

contract. When dealing with consent orders—reflecting as they inevitably do a compromise between competing and discordant aspirations—the language the parties agreed upon should be enforced as written.").[3]

Based on this case law, plaintiffs' motion should be denied. Plaintiffs do not and cannot identify any provision of the consent decree or remedial plan addressing prosecutions of youths. They are not seeking to enforce the parties' agreements as written, but rather to rewrite them to address an issue that was not raised in their complaint and that was not contemplated by the parties when they settled this case.

### III. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THE PRISON LITIGATION REFORM ACT PRECLUDES RELIEF THAT IS NOT NECESSARY TO CORRECT A VIOLATION OF FEDERAL LAW.

Because the provisions of the consent decree and remedial plan do not address the conduct at issue here, plaintiffs' motion fails and can be denied without further analysis. But the Prison Litigation Reform Act (PLRA) poses an additional hurdle that plaintiffs cannot surmount. The parties agree that the PLRA applies in this case. (Dkt. Nos. 33 at ¶3, 73 at I-2) Under the PLRA, prospective relief in civil actions with respect to prison conditions "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). Such relief must be "narrowly drawn" and extend "no further than necessary to correct the violation of the Federal right." *Id.* In addition, the court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

---

[3] This is a report and recommendation of the magistrate judge, which the District Court adopted in toto without any objection. (Case No. 05-cv-5488, Dkt. No. 224)

Here, the PLRA forecloses any relief because plaintiffs have not identified any violation of federal law.[4] In their motion, plaintiffs point to the confinement provisions of the remedial plan. Some courts have held that subjecting juvenile delinquents who have not been convicted of crimes to conditions of confinement (such as isolation) that "amount to punishment" violates their fourteenth amendment due process rights. *See, e.g.*, *R.G. v. Koller*, 415 F. Supp. 2d 1129, 1152-56 (D. Haw. 2006), citing *Bell v. Wolfish*, 441 U.S. 520 (1979) (pretrial detainees), *Youngberg v. Romeo*, 457 U.S. 307 (1982) (involuntarily committed mentally disabled persons). But obviously, this principle cannot be extended so far as to exempt juveniles who *do* commit crimes while in DJJ custody from prosecution, conviction, and sentencing for those crimes, even if plaintiffs consider this to be "punishment." No federal law immunizes youths in DJJ custody from prosecution for criminal misconduct.

Likewise, no federal law prohibits DJJ staff from reporting incidents of perceived criminal misconduct to the State's Attorney. Quite the opposite: there is at least a colorable argument that under the facts presented in plaintiffs' motion, staff had a protected First Amendment right to report instances of criminal misconduct to the State's Attorney. *See Gschwind v. Heiden*, 692 F.3d 844, 847 (7th Cir. 2012) (reversing grant of summary judgment against First Amendment retaliation claim brought by teacher forced to resign after reporting student's threat to police and filing criminal complaint); *see also Meyer v. Bd. of County Commissioners of Harper County*, 482 F.3d 1232, 1243 (10th Cir. 2007) ("[F]iling a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to

---

[4] This Court previously determined that the consent decree and remedial plan comport with the PLRA, but a new analysis is necessary here because plaintiffs' motion does not seek "simple" enforcement of the agreements, which do not include any provisions addressing prosecutions of youths in DJJ custody. *See Doe v. Cook County, Ill.*, 798 F.3d 558, 564-65 (7th Cir. 2015).

11

petition the government for redress of grievances."), citing *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) (collecting cases).

Plaintiffs' motion should be denied. Plaintiffs have not identified a violation of a federal right by DJJ that could support the relief they request here. Moreover, plaintiffs' request that this Court bar DJJ from placing any additional youths at IYC-Harrisburg is not "narrowly tailored" to any violation of federal law.

### IV. PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE THEIR REQUESTED RELIEF IS NOT SUPPORTED BY THE COURT-APPOINTED MONITORS, WOULD DO MORE HARM THAN GOOD, AND WOULD VIOLATE PRINCIPLES OF COMITY AND FEDERALISM.

Finally, plaintiffs' request for an injunction barring DJJ from placing youths at IYC-Harrisburg should be denied because it would do more harm than good. Although plaintiffs have consistently, and quite properly, sought the court-appointed monitors' input prior to taking positions in this case, they did not do so in connection with their present motion, which is notably silent regarding the monitors' opinions. DJJ has consulted with the three monitors, and they are unanimous: at this time, *none* of them supports plaintiffs' request for a moratorium on placing youths at IYC-Harrisburg.

Consistent with the court-appointed monitors' assessments, this Court should decline to issue such drastic relief, which would cause disruption and impede DJJ's ability to comply with the consent decree. IYC-Harrisburg is DJJ's second largest facility in terms of population, with 120 youths in residence (IYC-St. Charles has 126 youths), and it is currently meeting the required staffing ratios and the requirements regarding mental health and full-day school. It also is providing post-secondary vocational programming. In recent months, about 18 youths have been placed at IYC-Harrisburg each month.

Under plaintiffs' requested relief, youths that would otherwise go to IYC-Harrisburg would have to go to IYC-St. Charles for reception and classification, where they would be much further from their families, and where teacher shortages have compromised the facility's ability to provide full-time, full-day education. Youths in other facilities would be adversely impacted too, as their facilities could fall out of compliance with staffing ratios.[5] Further, requiring DJJ to place youths in other facilities without regard to gang affiliation, youth safety, or staff safety could result in a more dangerous environment at these facilities.

Plaintiffs' requested relief also runs afoul of principles of comity and federalism, including the "fundamental policy against federal interference with state criminal prosecutions." *Younger v. Harris*, 401 U.S. 37, 46 (1971). Although plaintiffs here do not expressly seek to enjoin the Saline County State's Attorney from prosecuting youths, their requested relief is intended to have such an effect, despite the "longstanding public policy against federal court interference with state court proceedings." *Id.* at 43 (reversing lower court's injunction prohibiting district attorney from prosecuting individual for violation of allegedly unconstitutional state law).

## **CONCLUSION**

For the reasons stated above, plaintiffs' motion to enforce should be denied. Plaintiffs' motion, which ultimately seeks to hold DJJ responsible for the independent actions of the Saline County State's Attorney, violates the "meet and confer" requirements of the consent decree, has no legal merit, and seeks counterproductive relief that the monitors do not support and that is not in the best interests of the class members.

---

[5] Plaintiffs assert that "the remaining youth centers have enough bed capacity to accommodate population increases." (Dkt. No. 202 at ¶32) But plaintiffs' analysis is overly simplistic. The capacity numbers on DJJ's website on which plaintiffs rely assume double-bunking, which DJJ tries to avoid. Also, IYC-Pere Marquette is at capacity; IYC-Warrenville houses girls and younger, lower-risk boys; and the current IYC-Chicago population exceeds the facility's single-bunked capacity.

Dated: August 1, 2017

LISA MADIGAN
Attorney General of Illinois

Respectfully submitted,

*/s/ Michael T. Dierkes*

Michael T. Dierkes
Office of the Illinois Attorney General
100 West Randolph Street, 13th Floor
Chicago, Illinois 60601
(312) 814-3672

Counsel for Defendant