*R.J. v Mueller*
<u>*Case No. 12-cv-07289*</u>
General Juvenile Justice Issues
Kelly Dedel, Ph.D.

*Submitted December 7, 2017*

**Kelly Dedel, Ph.D.**
One in 37 Research, Inc.
16 Rock Street   Cody, WY  82414
(503) 799-0915   kelly.dedel@gmail.com
www.onein37.com

## TABLE OF CONTENTS

INTRODUCTION AND BACKGROUND............................................................................................3

CONFINEMENT ......................................................................................................................7
    IV.1 (a)-(k).  Confinement and Restricted Movement Policy...............................................7
    IV.2. Confinement Liaison. .............................................................................................13
    IV.3. Confinement Conditions ........................................................................................15

SAFETY AND GENERAL ISSUES .............................................................................................16
    V.1. Comprehensive Treatment Model. .........................................................................16
    V.2. Behavior Management System ...............................................................................18
    V.3. Individualized Youth Development Plans ................................................................21
    V.4. Security Staffing Levels .........................................................................................23
    V.5 Youth and Family Specialist Staffing Levels ............................................................24
    V.6. Training of Staff with Youth Contact ......................................................................25
    V.7. Youth Grievance Reporting ...................................................................................28
    V.8. Independent Juvenile Ombudsman ........................................................................30
    V.9. Limits on Mechanical Restraints. ...........................................................................31
    VII.4 Monitoring of Chemical Agents (out of order)........................................................34
    V.10. General Programming. .........................................................................................35
    V.11. Legal Assistance to Youth.....................................................................................38

COMMUNITY PLACEMENT ...................................................................................................38
    VI.1. Placement Coordinator ........................................................................................38
    VI.2. Discharge Planning Upon Intake. ..........................................................................39
    VI.3. Prepare Youth for Placement.................................................................................41
    VI.4. Placement. ..........................................................................................................42

QUALITY ASSURANCE ..........................................................................................................43
    VII. Deputy Director of Quality Assurance......................................................................43

COMPLIANCE STATUS CHART................................................................................................45

INTRODUCTION AND BACKGROUND

In December 2016, the Court approved a consent decree requiring three court-appointed experts to investigate conditions and services in Illinois Department of Juvenile Justice (DJJ) facilities and to file a report of their findings and recommendations. The Parties (the ACLU for the Plaintiffs and DJJ) collaboratively used these findings and recommendations to draft a Remedial Plan, which was filed on April 7, 2014. The DJJ's progress toward the reforms articulated in the Remedial Plan were to be monitored by the court-appointed experts, Dr. Kraus (mental health services), Dr. Krisberg (general juvenile justice issues) and Dr. Leone (education). In mid-2017, Dr. Krisberg took a leave of absence from his duties, and the Parties jointly agreed that Dr. Kelly Dedel would review the portions of the Remedial Plan pertaining to general juvenile justice issues. This is Dr. Dedel's first report describing the conditions of confinement observed during visits to the facilities in October 2017.

The Remedial plan addresses the conditions of confinement in five facilities: IYC-Chicago, IYC-Harrisburg, IYC-Pere Marquette, IYC-St. Charles and IYC-Warrenville. Together, these facilities hold just under 400 youth, and are staffed by approximately 550 security staff and 35 Youth and Family Specialists (YFSs; counselors). [This is in addition to mental health and education staff, whose duties are described in reports by Drs. Kraus and Leone.]

Although the Remedial Plan does not set specific targets for the reduction of youth violence, this data is helpful context for understanding the status of each of the required reforms. DJJ tracks data on the number of "reportable incidents" each month. These include youth-on-youth assaults (YOYA), fights, and youth-on-staff assaults (YOSA). The graph below shows the *rate* of reportable incidents per 100 youth for each month, July 2016 through September 2017. A *rate per 100 youth* is used to neutralize the impact of fluctuations in the number of youth being held in the facilities. It is calculated using the following formula: (# of incidents/ADP) x 100 = rate. The dotted trend line shows that the overall rate of violence increased throughout this period.



The bar graph below shows how the various types of violence (YOYA, fight, YOSA) are distributed each month. Each color in the bar represents a different type of violence (orange=YOYA, yellow=fight, green=YOSA), and the number within each segment is the number of each type of event for that month. By far, fights among youth are the most common type of violence, followed by YOYA and YOSA. YOYA is more common than YOSA. Recently, the proportion of YOYA has decreased, while the proportion of YOSA has increased.



Not surprisingly, the rates of youth violence differ across the five facilities. The table below shows the average rate of each type of violence from January 2017 through September 2017 for each facility, ranked highest to lowest. St. Charles is consistently ranked in the top two across the various types of violence, while Pere Marquette consistently has lower rates of each type of violence. The average rank of each facility is as follows: St. Charles has an average rank of 1.3, Warrenville and Harrisburg have an average rank of 2.6, Chicago has an average rank of 4.0 and Pere Marquette has an average rank of 4.3. These differences are partially explained by the different classifications of youth who reside in each facility (e.g., Pere Marquette houses minimum custody youth, whereas St. Charles houses medium and maximum custody youth; Warrenville houses girls of all custody levels, many of whom have mental health issues), but they are also likely to be influenced by the different levels of staffing, programming and the quality of behavior management strategies at each facility. These topics are the subject of the bulk of this report.

| Average rates of violence, January 2017 to September 2017 | | | | | |
|---|---|---|---|---|---|
| | YOYA | | Fights | | YOSA |
| Rank | Facility | Rate | Facility | Rate | Facility | Rate |
| 1. | St. Charles | 11.7 | St. Charles | 19.3 | Warrenville | 14.3 |
| 2. | Warrenville | 11.5 | Harrisburg | 14.8 | St. Charles | 10.8 |
| 3. | Harrisburg | 9.2 | Chicago | 14.5 | Harrisburg | 6.3 |
| 4. | Pere Marquette | 7.0 | Pere Marquette | 11.4 | Chicago | 5.6 |
| 5. | Chicago | 5.7 | Warrenville | 8.1 | Pere Marquette | 3.3 |

Some differences were noted among the facilities when examining the trends in specific types of violence over the previous 15 months (July 2016 through September 2017):

- At St. Charles, YOYA increased sharply, while Fights and YOSA increased at a more moderate pace.
- At Harrisburg, YOYA and YOSA increased slightly, while Fights decreased over time.
- At Chicago, YOYA, Fights and YOSA all increased sharply.
- At Warrenville, YOYA and Fights both decreased, but YOSA increased substantially.
- At Pere Marquette, YOYA and YOSA both decreased, but Fights increased substantially.

While all types of youth violence have some common underpinnings (e.g., excessive idle time, ineffective behavior management, lack of staff skill in de-escalation, gang-related issues), targeted strategies can be devised to address certain dynamics, such as the relationships among youth and staff that may contribute to YOSA, or gang dynamics that may contribute to assaults or fights involving multiple youth. In summary, these violence-related metrics are important outcomes to monitor, as they provide context and insight into the extent to which the various reforms in the Remedial Plan are achieving the outcome of safer facilities for youth and staff.

    As a general matter, DJJ is encouraged to continue its effort to update, revise and create policies that support the various reforms required by the Remedial Plan. Written policies formalize practice and create transparency that is necessary not only to demonstrate compliance with the Remedial Plan, but also to create a sense of predictability for both youth and staff. Youth need to understand how things are supposed to work, and thus information on protocols surrounding PBIS, disciplinary sanctions, Case Plans and Monthly Staffings, cut time and set time, confinement and grievances, etc. must be available to them in an accessible format. This could include information contained in Youth Handbooks, or graphic displays of various procedures on the housing units. Similarly, policies must be easily available to staff (e.g., in a policy manual located on each housing unit) to provide a source for quick reference and to ensure consistency across staff and facilities. Having clear, accessible policies may also help to combat some staff's concerns about arbitrariness or a lack of consistency and accountability among administrators. Toward this end, policies relevant to each provision of the Remedial Plan are discussed below, along with recommendations for how they might be streamlined or reformulated to better support the achievement of the Remedial Plan's goals.

    The remainder of this report is organized according to the 20 provisions of the Remedial Plan addressing general juvenile justice issues. For each provision, the following are presented: 1) the text of each provision; 2) the status of compliance as assessed by both Parties, extracted from the most recent status reports filed in court; 3) the sources of information used to form an opinion; 4) the findings; 5) a compliance rating; and 6) recommendations for reaching substantial compliance.

# CONFINEMENT

| IV.1 (a)-(k).  Confinement and Restricted Movement Policy. |
| --- |
| DJJ shall…rewrite its policy regarding use of confinement and restricted movement. "Confinement" refers to the removal of a youth from his or her assigned housing unit and placement of the youth into a confinement unit room, segregated from other youth and "Restricted Movement" refers to youth who are not held on a confinement unit in confinement status but nevertheless have restricted movement. The new policy…must include: (a) limits on use for behavior management; (b) limits on use for mental health crisis; (c) limits on investigative confinement; (d) limits on confinement for DOC transfer; (e) limits on medical confinement; (f) prohibitions on other confinement [prohibits use for discipline or punishment or for protective custody]; (g) provisions for periodic visual inspection and verbal communication; (h) provisions for appropriate services (medical, mental health, education, recreation, visiting, telephone contact and meals); (i) process for entry/continuation/exit; (j) documentation requirements; (k) restricted movement on other living units. |
| *Assessment by the Parties.*<br>In the recent status reports, the Parties agreed that the Department is in substantial compliance with this provision. |
| *Methodology.*<br>■ Reviewed Policy 05.01.303 "Behavior Management and De-Escalation" and "Confinement Rule Reference Chart"<br>■ Reviewed aggregate data on all forms of confinement<br>■ Analyzed data on the frequency and duration of Extended Behavior Hold (EBH), Time Out (TO) and Cool Down (CD)<br>■ Reviewed 92 records related to the use of EBH and TO to determine whether policy requirements surrounding the reason for placement, visual inspection, and continuation and exit were being met<br>■ Interviewed facility administrators and security staff about the use of confinement<br>■ Interviewed 23 youth regarding their experience of confinement |
| *Findings.*<br>　　DJJ Policy 05.01.303 "Behavior Management and De-Escalation" and the accompanying "Confinement Rule Reference Chart" guide the use of various types of confinement and address all of the requirements of the provision, (a) through (k). Confinement types related directly to behavior management include Cool Down (CD), Time Out (TO), and Extended Behavior Holds (EBH). Administrative forms of confinement include Investigative Status, Administrative Holds, Close Observation/Suicide Precautions and Medical Holds.<br><br>　　By policy, youth in any of these types of confinement may access medical care, daily showers/hygiene, daily recreation, visitation, reading materials, mental health services, and education services. Youth in any form of confinement for more than 24 hours must also receive 8 hours of out-of-room time for every 24-hour period (including one hour of large muscle exercise) and daily services by mental health staff. DJJ is currently contemplating changes to the confinement policy, including the services that may be accessed. The proposed changes will be reviewed during the subsequent monitoring period. |

Confinement decisions of all types are documented on the Confinement Decision Form. A Confinement Log documenting contacts with staff and behavioral assessments is required for all types except CD, since CD occurs in unsecured areas where youth are under constant observation by staff.

## Behavior Management-Related Confinement

Differences among the behavior management related confinement types are as follows:

- **Cool Down and Time Out**
  - used when a youth fails to follow instructions or otherwise behaves in a disruptive manner;
  - may not occur on the Confinement Unit—each facility has a list of approved CD (non-secure) and TO (secure) locations;
  - must include counseling with *uninvolved staff* within 30 minutes of placement, and every 30 minutes thereafter;
  - must include 15-minute verbal and visual checks; and
  - may last as long as needed for the youth to demonstrate an understanding of his/her behavior and the ability to return to programming with no further behavior issues, but may not last more than 4 hours.

- **Extended Behavior Hold**
  - used when a youth poses a legitimate safety threat;
  - may occur in the youth's room, Confinement Unit or other secure location;
  - must include an assessment of the youth's self-control by a *supervisor* within one hour and every hour thereafter;
  - must include 15-minute verbal and visual checks;
  - must include services by a *mental health professional* after 4 hours and every two hours thereafter; and
  - may last as long as needed for the youth to regain self-control, but not more than 24 hours.

The Department maintains data on the frequency and duration of confinement at all facilities. The graph below shows the overall trend in the use of confinement used for behavior management purposes (CD, TO and EBH) for July 2016 through September 2017. Conversations with facility administrators at some facilities indicated that the use of the terms EBH and TO remain in flux. While the practices have not changes substantially, the way in which episodes in confinement are categorized has. This may account for some of the changes witnessed toward the end of the 15-month time period.

In order to identify an overall trend, EBH/TO data were combined (the two categories that are not always distinct)—this combination is represented by the yellow line/data in the graph below. This metric provides a clearer overall view of the use of secure confinement. As shown by the dotted trend line, the overall use of secure confinement is trending upward and tracks the increases in youth violence discussed in the introduction to this report.



Frequency of Confinement, July 2016 to September 2017

|  | Jul 16 | Au g 16 | Sep 16 | Oct 16 | Nov 16 | Dec 16 | Jan 17 | Feb 17 | Mar 17 | Apr 17 | May 17 | Jun 16 | Jul 17 | Aug 17 | Sep 17 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EBH | 64 | 18 | 15 | 5 | 25 | 6 | 16 | 5 | 22 | 11 | 23 | 93 | 81 | 81 | 30 |
| TO | 209 | 162 | 210 | 177 | 206 | 163 | 214 | 202 | 280 | 207 | 227 | 219 | 242 | 268 | 256 |
| CD | 144 | 66 | 128 | 90 | 86 | 73 | 160 | 189 | 239 | 176 | 211 | 96 | 48 | 108 | 154 |
| Combined | 273 | 180 | 225 | 182 | 231 | 169 | 230 | 207 | 302 | 218 | 250 | 312 | 323 | 349 | 286 |

When interpreting this data, it is important to recognize that facilities are no longer permitted to place youth in confinement as a form of punishment. Instead, confinement is to be utilized as an immediate response to an out-of-control youth, and its duration should be based on the length of time required for each youth to regain control. [Practices that appear to depart from this policy are discussed at the end of this section.] Dr. Dedel's experience suggests that most youth should be able to regain control and safely join the scheduled programming within 4 hours, which is compatible with DJJJ policy.

The Department's management information system, Youth 360, maintains data on each confinement episode, including the facility, type of confinement, location, duration, etc. Two monthly snapshots (July and September 2017) were analyzed in order to describe the typical duration of each type of confinement.

| Average Duration of Confinement, July and September 2017 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July 2017 N=371 | | | | | | September 2017 N=440 | | | | | |
| | Cool Down N=48 | | Time Out N=241 | | EBH N=82 | | Cool Down N=154 | | Time Out N=256 | | EBH N=30 | |
| Duration | # | % | # | % | # | % | # | % | # | % | # | % |
| < 1 hour | 42 | 88% | 156 | 65% | 25 | 30% | 142 | 92% | 167 | 65% | 6 | 20% |
| 1 to 4 hours | 6 | 13% | 79 | 33% | 37 | 45% | 12 | 8% | 85 | 33% | 8 | 27% |
| 4 to 18 hours | ~ | ~ | 3 | 1% | 14 | 17% | ~ | ~ | 4 | 2% | 12 | 40% |
| 18 to 24 hours | ~ | ~ | ~ | ~ | 6 | 7% | ~ | ~ | | | 3 | 10% |
| 24+ hours | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | | | 1 | 3% |

The total number of confinements in September 2017 was 19% higher than the number of confinements in July 2017 (440 versus 371, respectively). In both snapshots, the vast majority of confinements were short—100% of CD and 98% of TO lasted 4 hours or less. For EBH, a much larger proportion were longer than 4 hours in September than July (53% versus 24%), though they were far fewer in number (30 versus 82). It is likely that changes in the way confinement was categorized, as discussed above, is responsible for this shift. Overall, it is useful to know that only about 5% of all behavior management-related confinements (23 of 371 in July and 20 of 440 in September) lasted longer than 4 hours.

By policy, throughout the time in confinement, youth's safety should be monitored every 15 minutes, and youth should be periodically reassessed by either uninvolved staff or a supervisory staff, depending on the type of confinement. At the 4-hour mark, a mental health professional should be engaged.

A total of 92 Confinement Logs from September 2017 were assessed to determine the extent to which policy was being properly implemented for confinements related to behavior management. In general:

- The reasons youth were placed in TO and EBH were clearly described and appeared to be appropriate (e.g., just following an assault; aggressive and threatening with staff or another youth; disrupting group by refusing staff directives and lesser measures were ineffective).
  - At both St. Charles and Harrisburg, the need for confinement sometimes appeared to be triggered by youth's frustrations about being in their rooms, usually between 3p and 5p, when they should have been engaged in programming according to daily schedules. This is discussed in more detail in provision V.10, below.
- 15-minute visual/verbal checks were consistently implemented and a description of the youth's behavior accompanied each entry. However, in some cases, the descriptions were vague (discussed in more depth in provision IV.2, below).
- The vast majority of confinements were categorized appropriately (TO or EBH), but on occasion, a TO lasted longer than 1 hour without being converted to an EBH.

- Checks by uninvolved staff (TO) and supervisors (EBH) occur at the required intervals (TO—every 30 minutes; EBH—every hour) at most facilities, but not all. This is described in more detail in the next provision.
- Youth were generally released shortly after they regained control.
  - At Pere Marquette, in a few cases, the staff's assessment suggested that the youth was ready for release, but the youth did not exit TO until about 1 hour later.
  - At St. Charles, in a few cases, the log indicated non-compliant behavior by youth but the youth was still released.

When interviewed, both youth and staff confirmed that the periods of confinement were short, generally less than one or two hours, and that youth were released once they had processed the event with staff. In some places, facility administrators were concerned about confinements that ended at exactly 59 minutes, or other intervals that narrowly avoided the application of additional protections or notifications. What should drive the discussion about how long a youth is in confinement is whether the behavior assessments conducted at 15-minute intervals suggest that he/she is calm, whether the youth's interactions with staff indicate he/she has de-escalated and can safely return to programming, and whether youth released from confinement engage in subsequent misconduct (the implication being they were not actually de-escalated, and thus the release at 59 minutes was inappropriate). In Dr. Dedel's experience, other jurisdictions have found that collecting and reporting these outcome data help to ground the messaging about the de-escalation purpose of confinement.

<u>Administrative Forms of Confinement</u>

The monthly snapshots from July and September 2017 also captured each instance of confinements for administrative purposes and those related to medical hold and suicide prevention. Overall, these types of confinements occurred relatively infrequently (17 youth in July and 25 youth in September) but were significantly longer than confinements used for behavior management purposes.

- Administrative Hold—one in July (218 hours) and six in September (all were 69 hours);
- Close Supervision/Suicide Watch—11 in July (LOS ranged between 10 and 95 hours) and 15 in September (LOS ranged from 2 to 78 hours);
- Investigative Status—five in July (LOS ranged between 40 and 68 hours) and two in September (LOS ranged between 6 and 96 hours); and
- Medical Hold—none in July and two in September (LOS ranged between 61 and 134 hours)

The reasons for and conditions of these types of confinements will be further investigated during the next monitoring period to ensure all required services and notifications were made. Furthermore, the duration of placements will be examined along with the decision-making for youth on suicide precautions. The generally accepted practice suggests that to the extent possible, youth at risk of self-harm should continue to be engaged in regular programming whenever possible (perhaps with a 1x1 staff), as isolation can exacerbate their condition.

<u>Accumulation of Confinement</u>

For certain youth with particularly challenging behaviors, time in confinement can accumulate to the point that it interferes with the delivery of programming and creates a risk of self-harm, decompensation, increased frustration and aggression. DJJ policy guidelines require the Deputy Director of Operations to be notified any time a youth has been in confinement for 18 continuous hours or more than 10 times during a 30-day period.

- The 18-hour threshold was met 15 times in July and 23 times in September

- The 10-episode threshold was met by two youth in July and three youth in September.

DJJ administrators reported that specific protocols were not yet in place to identify the 10+ requirement automatically, but that this functionality could potentially be added to the Y360 software package. Notifications for longer lengths of stay occur in the moment, and are documented on the Confinement Form. The extent to which policy guidelines regarding notification are followed for youth with frequent/extended stays in confinement will be examined in more depth during the next monitoring period.

<u>Other Forms of Confinement</u>

While the use of confinement as a method for de-escalating an out-of-control youth appears largely to meet the requirements of this provision, three concerning practices were identified while on site at the facilities:

- **Alternative Behavior Unit (ABU).** Currently located on St. Charles' Taylor (Confinement) Unit, the ABU is a planned enhancement to the Behavior Unit previously located on the Pierce Unit. The ABU is designed as a 14-day program used as a sanction for violent behavior. The written program design envisions an intensive programming unit in which youth receive 3 hours of school and behavior modification interventions, groups facilitated by mental health clinicians, and recreation each day. The facility's Assistant Superintendent of Programs was candid in his assessment of the program's infancy but appeared committed to implementing the program as designed. However, the model has yet to be fully staffed and so currently, ABU youth have very limited time outside of their cells. Currently, the only programming component offered is 3-hours of school. Depending on the composition of the unit and whether all of the youth can co-exist peacefully, youth may be rotated in and out of their cells during the school period and thus may be locked-in for a portion of the 3-hour period. Because of the significant amount of time ABU youth spend in their cells, this unit appears to violate the requirements of this provision and DJJ's confinement policy. Harrisburg also operates an ABU, though the problem of excessive room time did not emerge during interviews. The program will be examined more closely on subsequent site visits.

- **Self-Confined.** Also located in St. Charles' Taylor Unit, "self-confined" youth are those whose history of aggressive behavior prevents their safe housing on one of the other general population units. Some of these youth may have participated in the ABU/Behavior Unit but then a safe housing location could not be identified upon their program completion. These youth spend nearly their entire day confined to their cells, except during recreation (which may be spent either outside in large muscle activity or inside in a variety of leisure activities; at a minimum 1 hour per day, possibly more if the unit population is low) and pull-out services from their YFS or mental health clinician (which appear to happen mostly upon request—otherwise the YFS/clinician simply conducts "rounds," speaking to the youth through his door). DJJ administrators indicated their intention to provide additional programming to these youth, but currently, the time self-confined youth are spending in their cells appear to violate the requirements of this provision.

- **Unscheduled Room Time.** Due to significant security and education staffing challenges at St. Charles, youth sometimes do not receive access to some of the programs listed on the daily schedule, such as school, leisure time and other structured programming. In addition, youth interviewed at Harrisburg expressed frustration that some staff—particularly relief staff—rotated groups of youth in and out of their rooms during the afternoon and evening hours.

While this may be an appropriate strategy on occasions when tensions on the unit run high, the youth indicated that this was a common and consistent practice. Their complaints fit with observations from the Confinement Forms indicating that TO and EBH were sometimes triggered by youth's escalating behavior when frustrated that they were in their rooms during the afternoon and evening. This practice interferes with DJJ's ability to meet the programming requirements of the Remedial Plan, and does not comport with this provision or DJJ's policy regarding the appropriate use and duration of confinement.

The evolution of these programs and practices will be reviewed during the subsequent monitoring period.

**Compliance Rating.** Partial Compliance

**Recommendations.**
1. Continue to ensure that youth are placed in confinement only as a temporary measure to manage significant disruptive behavior or to address a legitimate safety threat, ensure that the duration is based on the youth's readiness to return to programming, and ensure that staff consistently implement 15-minute visual checks to ensure the youth's safety.
2. Consider collecting and reporting data on youth's subsequent misconduct to fortify messaging about the de-escalation purpose of confinement.
3. Ensure that youth in the general population are out of their rooms and able to access school and other programming as the daily schedule requires.
4. Develop dependable procedures to identify youth who meet the 10+ episode and 18-hour requirements so that appropriate protections are in place for youth whose accumulation of time in confinement could present a risk of harm.
5. Increase the programming and out-of-cell time available to youth on the ABU and self-confinement units. The intensity of programming should be commensurate with the demonstrated high-level of need, and youth should have the same out-of-cell time as youth in the general population, save for times during which their behavior presents a legitimate safety threat to another person.
6. Other recommendations regarding administrative forms of confinement may be forthcoming after a more targeted review is conducted.

## IV.2. Confinement Liaison.

DJJ shall…develop and implement policies and procedures requiring a YFS or other non-security staff member to be present during the day shift at each confinement unit with at least one youth present. The YFS shall serve as liaison between youth and other facility staff, and shall help ensure that appropriate services (mental health, education, reading materials) are provided to the youth. This provision shall be subject to modification after implementation of the revised policy outlined [above] and the experts' assessment as to the need for and efficacy of the confinement liaison.

**Assessment by the Parties.**
While the Parties agreed that the Department is in substantial compliance with this provision in the most recent status reports filed with the Court, the Plaintiffs noted that DJJ's data was not sufficient to track compliance and were concerned about youth with longer lengths of stay when only security staff were present.

*Methodology*.
- Reviewed Policy 05.01.303 "Behavior Management and De-Escalation" and "Confinement Rule Reference Chart"
- Reviewed aggregate data on all forms of confinement
- Reviewed 92 records related to the use of EBH and TO to determine the frequency of staff contact while youth were on confinement. Confinement documents reviewed at all facilities except IYC-Chicago.
- Interviewed facility administrators and security staff about the use of confinement
- Interviewed 23 youth regarding their experience of confinement

*Findings.*

This provision requires a YFS to be present anytime a youth is confined in a facility's Confinement Unit. DJJ Policy 05.01.303 "Behavior Management and De-Escalation" and the accompanying chart do not quite mirror this provision, as DJJ policy requires contact between confined youth and a variety of staff (i.e., uninvolved staff, supervisors, and mental health staff). More specifically, youth on TO must be counseled by *uninvolved staff* every 30 minutes; youth on EBH must be counseled by a *supervisor* every hour, and by a *mental health staff* at the 4-hour mark and every 2 hours thereafter. Youth on Crisis Status must receive daily contacts by *medical or mental health staff*. Other types of confinement (Medical Hold, Administrative Hold and Investigative Status) do not have contact requirements in policy, though these statuses must be continually reviewed by the appropriate professional, which is assumed to include a conversation with the youth.

While many episodes of confinement take place in the youth's own room, Chicago, St. Charles and Harrisburg use their Confinement Units to some extent. Given the broad range of places where confinement can occur and the broad range of staff who are required to meet with and counsel youth, confinement records were reviewed to determine the overall level of staff contact and the frequency with which it occurred, regardless of the location of confinement. Confinement forms were not reviewed at IYC-Chicago due to the short time on site, but were reviewed at the other four facilities.

For the most part, across the 92 confinement records reviewed, checks by uninvolved staff (TO) and supervisors (EBH) occurred at the required intervals (TO—every 30 minutes; EBH—every hour).

- Checks were completed as required at Warrenville (7 of 7 reviewed), Pere Marquette (30 of 38 reviewed), and Harrisburg (20 of 20 reviewed). This includes the initial contacts by uninvolved/supervisory staff, as well as contacts by mental health staff for the small number of confinements that reached the 4-hour mark. Most of the time, the log entries included a description of the youth's attitude/behavior/verbalizations, though some staff gave only noted the youth's location, such as "at door," "at window," or "on bed."
- Checks at the required intervals were not consistently documented at St. Charles. Occasionally, the chronological log included entries indicating the youth was "talking to staff," but staff did not describe the substance of the conversation as required on the bottom portion of the form.

When interviewed, all of the youth who had experienced some form of confinement (including youth at IYC-Chicago) confirmed that a staff member/supervisor spoke to them about the circumstances of the situation. YFS at most facilities indicated they visited youth on their caseload who were in confinement, but many indicated the youth "was not in there long enough."

Dr. Dedel is of the opinion that the title of the staff who counsels the youth is less important than the dependability and substance of the contacts. Many of the confinement records—particularly

those at Warrenville and Pere Marquette—evidenced obvious efforts to process the event and attempts to de-escalate youth in confinement by a broad range of staff. However, some of the entries at other facilities were overly vague (e.g., "talked to youth"), giving no sense of the substance of the conversation or whether the youth was ready to return to programming. Staff and supervisors need to provide short statements of the nature of the conversations with youth, providing either justification for continuing confinement or authorization to return the youth to programming.

Similar contacts are also required for youth in administrative forms of confinement (Investigative Status and Administrative Hold) and for those on Close Observation as a result of suicide risk. The type and frequency of staff contacts with youth in these forms of confinement will be examined in the subsequent monitoring period.

**Compliance Rating.** Partial Compliance

**Recommendations.**
1. Consider streamlining the confinement policy by merging EBH and TO into a single category, along with the requirements for staff contact and notification. Comments on the proposed policy changes will be offered during the subsequent monitoring period.
2. Ensure the visual and verbal contacts prescribed by policy are delivered at the appropriate intervals and that staff use descriptive language to document the youth's attitude/behavior/statements.
3. Ensure that staff contacting youth in confinement sign the bottom of the Confinement Log and include information about the substance of their conversations with youth and their assessment of youth's readiness for release.
4. Other recommendations regarding the administrative forms of confinement may be forthcoming once a more targeted review is conducted.

## IV.3. Confinement Conditions

DJJ shall develop and implement policies and procedures ensuring adequate and thorough cleaning and sanitation of all confinement rooms after they are vacated before the room is used for another youth...ensure rooms remain free of food, human waste or graffiti...rooms must be well-lit, functional plumbing, appropriately heated/cooled, adequate bedding and blankets.

**Assessment by the Parties.**
In the most recent status reports, the Parties agreed the Department is in substantial compliance with this provision.

**Methodology.**
▪ Visual inspection of confinement units and youth rooms

**Findings.**

Visual inspections of spaces used for EBH and TO were conducted at each facility. By far, most confinements occur in the youth's own room. While the facilities varied a bit in terms of the deterioration of the physical plant, for the most part, youth's rooms were found to be in acceptable condition, with operational toilets/sinks/lighting/HVAC, no graffiti, and varying levels of organization depending on the youth's personal habits.

Visual inspection of confinement units at St. Charles, Chicago and Harrisburg (the three places that continue to use their Confinement Units) revealed the following:

- <u>Chicago</u>. While the confinement unit was dimly lit, rooms were clean and functional.
- <u>Harrisburg</u>. Rooms in the A-Wing were covered in graffiti. (One of the youth interviewed reported that when youth are involved in incidents at school, they sometimes take their pencils with them as they leave the classroom and are not properly searched prior to being placed in confinement). Lighting, plumbing, HVAC, all appeared to be adequate. Mattresses were present in the rooms, but not sheets, blankets or pillows.
- <u>St. Charles</u>. Rooms in the holding cell area appeared to be clean and functional. However, rooms on both hallways (containing the ABU and Self-Confinement programs) were covered in graffiti. Lighting, plumbing, HVAC all appeared to be adequate. Mattresses were present in the rooms, but not sheets, blankets or pillows.

*Compliance Rating.*
- IYC Chicago: Substantial Compliance
- IYC Harrisburg: Partial Compliance
- IYC Pere Marquette: Substantial Compliance
- IYC St. Charles: Partial Compliance
- IYC Warrenville: Substantial Compliance

*Recommendations.*
1. Ensure that graffiti covering the walls in the Confinement Units at St. Charles and Harrisburg are routinely cleaned off or painted over. Ensure that youth with longer lengths of stay in confinement are provided with appropriate bedding.

## SAFETY AND GENERAL ISSUES

### V.1. Comprehensive Treatment Model.

DJJ shall...develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitation model to be used for all youth in all DJJ facilities, including youth in special treatment units and juvenile sex offenders. The model shall ensure general uniformity and cohesive programming in all DJJ facilities, across educational, mental health, substance use, behavior management and other programming for youth.

*Assessment by the Parties.*
In the most recent status reports, DJJ asserted it is in substantial compliance with this provision, though the Plaintiffs contended that not all services are fully functional (including mental health and education services), nor have they been reviewed to determine effectiveness, and thus believes DJJ to be in partial compliance.

*Methodology.*
- Reviewed DJJ's "Comprehensive Youth Development and Reentry Planning Model," dated May 2017
- Reviewed a variety of policies related to the provisions of the Remedial Plan (policies listed below with each relevant provision)

16.

- Interviewed 23 youth regarding their experiences at DJJ facilities
- Observed 9 Monthly Staffings
- Interviewed 16 facility administrators, 34 YFSs and approximately 10 security staff regarding their experiences working with DJJ youth
- Reviewed 15 case plans, 3 from each facility

*Findings.*

DJJ's Rehabilitative Program Model involves assessment, case planning, and services to meet identified needs. This 3-step process is initiated when the youth is admitted to custody, and continues as the youth returns to the community. The underlying focus on criminogenic needs (i.e., focusing on the factors that contributed to the youth's delinquency) is a very strong approach. The focus on progress toward case plan goals in the facility's behavior management approach has elevated the role of rehabilitation to a central position in the facility.

Assessment. The assessment part of the model appears to be fully implemented with regard to the administration of the YASI screening and full assessment by the YFSs. The YASI is a well-respected assessment instrument that has been normed and validated on a juvenile justice population. [The reader is referred to reports by Dr. Leone and Dr. Kraus for an assessment of the screening and assessment process for education and behavioral health.]

Case Planning. The YASI Case Plan template creates an important link between assessment results and the youth's behavioral targets and goals. The YASI Case Plan format requires counselors to break down each goal into component parts (i.e., Action Steps). Action Steps should reflect the various tasks related to insight and understanding, skill development, and practice and demonstration—the essential components of behavior change. While DJJ's case plan format is solid, as discussed in more detail in V.3, below, the content is not yet up to par. [The reader is again referred to Dr. Leone's and Dr. Kraus' reports for an assessment of case planning/treatment planning in the education and behavioral health domains.]

Services. A variety of modalities have been established to deliver required services (e.g., individual counseling from YFSs; group and individual counseling from mental health clinicians; informal interactions with security staff, YFS, and other staff; leisure time activities led by facility staff and volunteers; large muscle activity), but without effective case planning, these services are unlikely to be effectively targeted. As discussed in more detail in V.3, below, DJJ still needs to determine exactly how the case plans will be implemented and how the youth's progress toward goals will be supported by the full range of staff (particularly security staff) with whom the youth have contact. Further, as discussed in more detail in V.10, below, some youth appear to have an excess of leisure time on their housing units and thus the opportunities to deliver services that are responsive to the needs described in the case plan are not being maximized. [The reader is again referred to Dr. Leone's and Dr. Kraus' reports for an assessment of education and behavioral health services.]

In addition to services delivered to address criminogenic needs, an equally essential component of rehabilitating youth in custody is the behavior management program. In terms of incentives, behavioral expectations are clearly articulated via the PBIS program, and all youth and staff appear to see it as a central component of the facility's operation and find the ability to earn rewards to be compelling. That said, as discussed in more detail in V.2, below, additional work is needed to incentivize sustained achievement and to ensure that the levels are consistently and meaningfully differentiated. Sustained achievement at the highest levels brings an opportunity for "cut time," or reductions to the youth's Targeted Release Date, as does the completion of YASI goals. As discussed in V.2, below, the availability of cut time is a relatively new feature of the behavior management

program, and the facilities are currently working to ensure its integrity. The opportunity to reduce a youth's time in custody is one of the more powerful motivators for influencing behavior change, and thus DJJ's efforts "to get it right" are both necessary and applauded.

A drop in PBIS level is one of several ways that DJJ can respond to negative behavior. Other sanctions include early bed time, commissary restrictions, privilege or activity restrictions, and time added to the youth's Targeted Release Date (i.e., "set time"). Most of these are imposed via the Adjustment Committee as the core of the youth disciplinary system. While an exhaustive review of the Adjustment Committee's functioning and outcomes has not yet been conducted, feedback from youth and staff suggest that more could be done to enhance the credibility and visibility of the sanctioning process. This is discussed in more depth in V.2, below.

Thus, DJJ has a clearly conceptualized program model that reflects many of the elements of best-practice for rehabilitation and behavior change among youth in custody. However, not all of the components have been fully implemented at this point. Additional opportunities for family engagement may also be prudent, given the known positive effects on behavior and school achievement in the facility and the ability to reduce recidivism upon release. DJJ appears to be fully committed to ensuring that each component is implemented with fidelity. Once fully implemented, DJJ is encouraged to develop metrics and an internal monitoring strategy to assess whether the desired outcomes are being achieved.

*Compliance Rating.* Partial Compliance

*Recommendations.*
1. Shore up the substance of case plans, and develop an implementation plan that includes both YFS and security staff. Ensure that case plan goals are of the appropriate scope to warrant "cut time" when achieved. This is discussed in more detail in V.3, below.
2. Maximize the ability to provide services relevant to case plan goals by increasing the volume of structured rehabilitative programming and decreasing the volume of leisure time. This is discussed in more detail in V.10, below.
3. Ensure that PBIS levels are appropriately incentivized, distinct from one another, and consistently implemented by staff. This is discussed in more detail in V.2, below.
4. Additional recommendations regarding the disciplinary process/Adjustment Committee may be forthcoming after a more thorough review is conducted.

## V.2. Behavior Management System

DJJ shall…adopt and implement a comprehensive, department-wide, evidence-based or evidence-informed behavior management system to provide a consistent model for youth behavior throughout the facilities.

*Assessment by the Parties.*
In the most recent status reports, DJJ reported it is in substantial compliance with this provision, though additional improvements are planned. Plaintiffs assessed partial compliance due to inconsistent implementation, which they found was a frequent complaint of youth.

*Methodology.*
- Reviewed DJJ Policy 04.01.305 "Positive Behavior Interventions and Support" and Policy 04.01.135 "Youth Interventions"

- Reviewed sample of youth's point cards
- Interviewed facility administrative staff, security staff, and YFS about their impressions of the PBIS system, Levels, and Disciplinary System
- Observed 6 Staffings for youth on Intensive Intervention
- Interviewed 23 youth about PBIS, Levels and the Disciplinary System

**Findings.**

All of the facilities are in the process of implementing PBIS throughout the youth's waking hours. By design, PBIS utilizes a daily point card with behavior ratings for various time segments throughout the day. Sustained achievement at certain point totals allows youth to promote to higher levels (C, B, A and Honors/Gold), with successively more incentives and rewards at each level. Youth are able to earn reductions to their Targeted Release Date ("cut time") by remaining infraction free for a period of time, and by maintaining A-level status or higher for a period of time. Additional cut time is available through program completion (e.g., substance abuse, sex offender, or education) and by achieving case plan goals each month. PBIS points are entered into a spreadsheet each evening and level promotions occur each week. DJJ is working to automate this process so that level promotions can occur daily, which may improve the effectiveness of the system as the reward will occur closer in time to the behavioral accomplishment.

All of the facilities have implemented point cards to track youth's behavior throughout the day and the mechanics of the system are well understood by youth, security staff, counselors and administrators. However, both staff and youth at all facilities noted that some staff do not appear to rate youth's behavior accurately, choosing to award 2-points to youth instead of providing feedback to youth about their behavior and why fewer points were awarded. As a result, some youth receive rewards that they have not earned. Other complaints from youth ("staff won't fill out cards") and staff ("youth won't give up their point cards" or "youth forge their point cards") are typical of systems implementing point-based systems and did not appear to occur frequently enough to compromise the integrity of the PBIS system.

At all facilities, youth are promoted to Levels C, B, A, and Honors/Gold after achieving at certain levels for a sustained period. At some facilities (Warrenville and Pere Marquette), the privileges appeared to be meaningful to youth and they valued the opportunity to earn things they wanted. At other facilities (Chicago, St. Charles and Harrisburg), many youth complained that there were no significant differences among the levels (e.g., bedtimes were the same, activities for higher level youth were few and far between and thus were not compelling). The main thing motivating youth at these facilities was the opportunity to earn cut time for A-level performance. The facilities are encouraged to implement a robust array of rewards and incentives and to ensure that distinctions between levels are meaningful and compelling. Forming a Youth Council may be helpful toward this end (some facilities may already have done so). While DJJ often seeks input from youth and staff as it develops new programs and policies, creating a standing body with specific duties to provide input, offer feedback on the quality of implementation and to voice concerns is an important way to empower youth and to further their positive development. It may also alert DJJ to issues that are not immediately apparent via the regular supervision of staff.

A frequent complaint of counselors at some facilities was that some security staff were not skilled in communicating about youth's points and levels, and that youth who lost points or whose level dropped often spiraled out of control once they learned of the demotion, leading to additional point losses, misconduct and confinement episodes. Training to increase staff skill in communicating about the youth's level of achievement is recommended.

When youth commit a rule violation, they receive a "ticket" (Youth Disciplinary Report, or YDR). DJJ has an array of accountability options available: level drops, early bedtime, commissary restriction, rec restriction (i.e., loss of leisure time programming), and set time (i.e., adding time to the youth's Targeted Release Date). At many facilities, youth, security staff and counselors also spoke of "BARJ" contracts, which prescribe a variety of restorative activities, such as apology letters, community service work on the unit or around the facility grounds, etc. An in-depth review of the frequency with which the various sanctions are applied was not conducted, but will be undertaken in the subsequent monitoring period.

Security staff and counselors both complained that "youth have no consequences" or "there is no discipline." Staff complaints about a lack of youth consequences are common following a change in the way confinement is used. Whether the perceptions are accurate or not is to be determined, but statements like these reveal a lack of buy-in by staff and suggest that the sanctions may not be sufficiently visible to staff, that the consequences may not be properly imposed or that follow-up to ensure youth actually complete the sanctions may lack integrity. Starting in late 2015 and continuing into 2017, some staff at IYC-Harrisburg took matters into their own hands by bringing charges against youth who assaulted them. Staff at the facility reported that this occurred because they did not have confidence in the DJJ system, feeling that disciplinary cases were not handled appropriately. Strategies for increasing the visibility and credibility of accountability measures have been discussed with DJJ, and their implementation is encouraged.

In order to improve the effectiveness of accountability measures in addressing youth behavior and to enhance their credibility among staff, systems for ensuring proper follow-through and tracking implementation are needed. Ensuring that sanctions imposed on one shift are carried through to subsequent shifts can be challenging and, if poorly done, threaten the integrity of the behavior management program.

While the addition of "set time" appeared to be a compelling disincentive for misconduct among the youth interviewed, some of the staff interviewed were concerned about the lack of a graduated scale for imposing it, feeling that the time imposed was not always proportional or did not increase in a logical manner for subsequent similar misconduct. Although they supported the concept of BARJ contracts, some of the counselors objected to being asked to craft them at some point *after* sanctions were imposed by the Adjustment Committee, as a way for youth to earn some of the set time back. These staff felt they were being asked to "discount" the youth's behavior, which at times included assaultive behavior toward a colleague. Offering the BARJ contract as a way to suspend some portion of the set time *during* the Adjustment Committee meeting may alleviate this concern (DJJ reports it is already considering this change).

In addition to these accountability measures, the PBIS model includes a treatment-oriented response to youth with chronic behavior problems. "Intensive Interventions" are prescribed for these youth, designed by the youth's YFS. Progress toward more behavior-focused goals and objectives is then discussed at Weekly Staffings. Several such staffings were observed while on site; they were both youth-focused and goal-directed. While staff are still developing skills to craft the interventions and training is ongoing, it appears to be a promising approach to responding to youth with chronic behavior problems and those with more significant mental health concerns. For this latter subset of youth, additional modifications to the incentive program (or, conversely, the disciplinary process) may be prudent to ensure that behavior targets are realistic and attainable and that the youth fully understands the requirements and proceedings.

***Compliance Rating.*** Partial Compliance

*Recommendations.*
1. Activate the Y360 component for PBIS so that level promotions can occur as they are earned.
2. Expand the array of incentives and rewards available to youth of different PBIS levels, and ensure their consistent implementation by all staff.
3. Encourage accuracy when rating behavior/awarding points, and coach security staff on how to communicate with youth about point reductions or level drops in an effort to prevent significant negative reactions.
4. Devise systems to ensure that disciplinary sanctions are communicated across shifts and are fully implemented. Publicize this information to staff to make the imposition of accountability measures more visible.
5. Continue professional development efforts to increase staff skill in drafting and implementing Intensive Interventions.
6. Additional recommendations may be forthcoming once the YDRs, Adjustment Committee proceedings and sanctions have been assessed.

## V.3. Individualized Youth Development Plans

DJJ shall implement policies and procedures requiring preparation and implementation of a youth development plan (YDP) for each youth committed to DJJ. Within 14 days of a youth's arrival at his or her assigned facility, DJJ facility and aftercare staff will begin collaborating to develop the YDP. Through the use of screening and assessment, the YPD will identify needed services based on the youth's strengths and needs and will serve as a plan for the youth carrying through to the youth's release on aftercare.

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that DJJ is in partial compliance with this provision, and noted that Dr. Krisberg recommended supervisory oversight of the content of case plans.

*Methodology.*
- Review DJJ Policy 05.05.101 "Youth Reception and Classification Process" and Policy 04.01.120 "YASI Assessment and Case Planning"
- Reviewed 15 Case Plans (3 from each of 5 facilities), drafted in July/August 2017
- Interviewed Deputy Director of Programming regarding Case Plans
- Interviewed 34 YFS staff regarding their duties surrounding case planning
- Interviewed 23 youth about their YASI goals
- Observed 9 Monthly Staffings

*Findings.*
        The YASI Case Plan has several component parts. It includes a Behavior Analysis designed to identify target behaviors, triggers, motivations and incentives for change; a list of the youth's Protective Factors; and the Goals and Action steps designed to support the youth's behavior change. Within 30 days of admission, using the three priority domains identified by the YASI assessment, the counselor and youth collaboratively identify the Case Plan's goals, along with a set of Action Steps intended to identify the various interventions that will support the youth's behavior change. Ideally, a case plan should identify the target behaviors, identify skills that the youth needs to respond differently to triggering events, identify how those skills will be taught and opportunities for the youth to practice and demonstrate that these skills are being used to respond differently in a variety of situation. These tasks (understanding triggers, developing new skills, opportunities for practice) should

be articulated in the Action Steps. Youth's progress in achieving case plan goals are assessed at each Monthly Staffing, and cut time is awarded when youth meet their goals.

A sample of 15 Case Plans (3 from each facility, most written in July or August 2017) were reviewed to assess the quality of case planning and the activities undertaken to support youth's behavior change. While the content of the case plans could provide some helpful information for identifying youth's individual behavior targets and some of the steps toward behavior change, the substance of most of the case plans was subpar. Most of the staff did not seem to understand the Behavior Analysis, often confusing "triggers" with "motivation," and the Goals and Action steps often did not reflect the target behavior when it was identified. The Protective Factors usually included a solid list of assets that could be used to motivate behavior change, but they were rarely integrated into the Goals and Action Steps. While all of the case plans identified 3 priority YASI domains, a significant number failed to include a full set of Action Steps. One case plan didn't have any goals. These deficiencies resulted in most of the Case Plans being disconnected, without a clear behavior target or pathway for achieving the goals. Because achieving YASI goals has been incorporated into the behavior management system, they will need to be of the appropriate scope to be attainable in a single month. That said, all of the tasks described above (insight, skill development, and opportunities for practice) cannot be accomplished in such a short period of time. This suggests that Action Steps will need to be sequential and will need to build upon tasks completed in previous months. Subsequent case plans reviews will assess the extent to which Goals have achieved this balance.

Conversations with YFS' at each facility revealed their struggles to identify Goals and Action Steps of the appropriate scope. Some felt that the goals were too broad, too ambitious for completion in a given month. Others felt that the goals were too narrow, and that cut time was being awarded for rather inconsequential achievements. These appear to be reasonable struggles given the relatively short tenure of the cut time policy. Along with more practice and experience with the YASI format, some of the YFS' frustrations may be alleviated if they utilize the option to customize the Goals and Action Steps that is part of the software package.

That said, all of the youth interviewed knew their YASI goals and appeared to be motivated by the fact that they could shorten their length of stay by achieving them. Furthermore, at each of the 9 Monthly Staffings observed while on site in October 2017, YASI goals and the youth's progress toward them were a central point of focus for the team's discussion. In a few of the meetings, family members were engaged by telephone. DJJs efforts to include families in case planning meetings is aligned with best practice and should be amplified whenever possible. Particularly as a youth's release date approaches, family support and involvement with the youth's goals will be critical to the youth's success upon release.

In many facilities across the country, implementing the case plan is a shared responsibility among all of the adults working with youth, including counselors, security staff, educators, and mental health clinicians, in addition to the youth's family. The youth's problem behaviors are likely present throughout the day, and thus all those working with the youth need to understand each youth's case plan and the change it is designed to bring about. They also need to identify the ways in which they can contribute to the achievement of the goals, using specific strategies and cues that are identified in the Monthly Staffings. This type of cross-disciplinary implementation is not yet evident in most of the facilities (Warrenville being an exception), and as a result, the YFSs appeared to feel that implementing the case plan was entirely their responsibility. An exception to this theme was when youth had mental health or substance abuse goals, both of which were "owned" by the relevant treating clinician.

DJJ has implemented a case plan review form which is completed by the YFS Supervisor who reviews one case plan per YFS per month. DJJ also continues to offer facility-based training to improve the quality of case plans, which hopefully will reflect areas of weakness identified by the supervisory reviews. These efforts, along with additional time for the YFS' to become more facile with the software package, should result in case plan content that is more coherent and integrated.

**Compliance Rating.** Partial Compliance

**Recommendations.**
1. Improve the content of case plans by continuing to support skill development among YFSs with supervisory coaching and formal training. Use the results of the case plan reviews to inform the content of training, and to offer support to individual YFSs in the specific areas in which they are struggling.
2. Develop YASI goals that strike the appropriate balance of being achievable within a month (for "cut time" purposes) and building upon tasks completed in previous months to address key facets of behavior change (e.g., insight, skill development and opportunities for practice).
3. Clarify the role of other staff (security, mental health, substance abuse, education) in implementing the case plans' action steps that are designed to support behavior change.

## V.4. Security Staffing Levels

DJJ shall increase the number of security staff posts to ensure adequate staffing at each facility. Specifically, DJJ shall comply with the PREA standards by achieving and maintaining youth to security staff ratios of… 8:1 for waking hours and 16:1 for sleeping hours by October 2017.

**Assessment of the Parties.**
In the most recent status reports, the Parties agreed that DJJ is in partial compliance with this provision. They agreed that while PREA ratios have been achieved at all 5 facilities, the 8:1 ratio is insufficient to provide dependable access to programming and adequate security at St. Charles.

**Methodology.**
- Reviewed aggregate staffing data
- Reviewed Staffing Plan for St. Charles
- Interviewed Chiefs of Security at each facility
- Interviewed Deputy Director for Operations and Chief of Security Operations regarding staffing levels at St. Charles
- Observed facility operations, noting the number of staff and youth present

**Findings**
Aggregate data provided by DJJ for July 2016 through September 2017 showed that each facility exceeded the PREA staffing ratios (8:1 during waking hours and 16:1 during sleeping hours) each month. While on site, a variety of activities in the dayrooms of the living units, school, programming spaces, and movement between areas were observed. The 8:1 ratio was met at all facilities except St. Charles, where several living units were observed operating with only 1 staff present for 12-15 youth.

Interviews with the Chief of Security at St. Charles, Deputy Director for Operations, and Chief of Security Operations indicated that required ratios were occasionally not met during September and

October 2017, and other days required the extensive use of overtime to meet ratios and provide youth access to some programming. Shortages in security staff were compounded by shortages in education staff, which compromised youth's ability to attend a full day of school on a daily basis. For the security staff, Friday/Saturday/Sunday were most problematic.

Several things have been put into place which should improve the staffing situation at St. Charles:

- Beginning in mid-November, staff deployment will be improved by realigning days off and reassigning staff from 3rd shift to 2nd shift.
- A class of 13 interns graduated from the Academy on 11/17/17 and an additional class of 15 interns will matriculate on 11/27/17. By the 2nd week of January, the total number of security specialists will be 207, minus those out on leave. In early December 2017, approximately 64 staff at St. Charles were out on some type of leave, which significantly compromises the ability to cover posts necessary for maximizing both safety and programming.
- St. Charles staff are being re-trained on the mechanics of the Operational Needs Reports that include a staffing component. Once accurately completed, these reports will provide consistent access to reliable staffing information.

While the staffing situation at St. Charles is serious, some of the other facilities would also benefit from efforts to improve staff morale and staff retention. Staff at nearly all facilities reported concerns related to safety and their perception that the youth behavior management system is ineffective. These concerns can trigger staff turnover and low morale, and in turn, DJJ's investments in recruiting and training staff could be caught in a never-ending cycle. Staff reported that support and guidance from their supervisors isn't as constructive as desired, particularly following incidents in which staff are assaulted by youth. Communicating the agency's support for staff involved in such incidents is an essential contributor to improving morale and staff retention.

*Compliance Rating.*
- IYC Chicago: Substantial Compliance
- IYC Harrisburg: Substantial Compliance
- IYC Pere Marquette: Substantial Compliance
- IYC St. Charles: Partial Compliance
- IYC Warrenville: Substantial Compliance

*Recommendations.*
1. Continue to recruit, hire and train qualified security staff and properly deploy staff to ensure youth's access to programming and to provide adequate safety for both youth and staff.
2. Address staff retention issues, particularly those related to safety and staff wellness following incidents in which staff are assaulted.

## V.5 Youth and Family Specialist Staffing Levels

In consultation with the court-appointed general juvenile justice expert and Plaintiff's counsel, DJJ shall establish appropriate staff-to-youth ratios for YFSs. [This ratio was adopted in a supplemental order—established at 20:1, and also noted that YFSs need to have frequent, meaningful interactions with youth to facilitate effective rehabilitation.]

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that the ratio has been met, but Plaintiffs raised concerns about the quality of YFSs' services given competing responsibilities.

*Methodology.*
- Reviewed YFS job responsibilities.
- Interviewed 34 YFSs about caseload size, case planning, counseling and other duties
- Interviewed 23 youth about YFS interactions

*Findings.*
      Each facility meets the required ratio of one YFS per 20 youth. Except at Warrenville, where YFSs reported caseloads of less than 10 youth, the YFSs at the other four facilities reported caseloads between 15 and 17 youth. The YFSs interviewed at four facilities reported that in addition to frequent daily contact with youth as they spent time on the living units, they provided one-on-one counseling for between 30 to 60 minutes per week. The one exception was at IYC-Chicago, where YFSs reported they provided individual counseling to each youth for only about 15 minutes per week.

      All of the youth interviewed reported frequent contact with their YFS and knew their YASI goals. They reported both informal contact on the unit as well as private, one-on-one sessions. Most of the youth reported that their sessions were 30-60 minutes in duration, but also noted that if they needed more time, their YFS was willing to have longer sessions. Youth interviewed at IYC-Chicago were an exception, reporting shorter individual sessions and counselors who seemed "really busy."

      All of the YFSs reported competing responsibilities that were difficult to juggle. Some of these are scheduled (e.g., Monthly Staffings, Case Plan development, Court Reports) but compete with daily crisis intervention and other unplanned events. These pressures on their time and the learning curve associated with case planning/cut time, described in V.3 above, sometimes appeared to limit the ability to provide structured rehabilitative counseling. That said, it is premature to assert that caseloads are too large, as the quality of rehabilitative counseling is likely to change as YFSs become more adept at case planning and the responsibilities for implementing the case plan are shared more broadly among the other staff (security, education, mental health) involved with each youth. In subsequent monitoring periods, case notes will be reviewed to develop a better sense of the content of individual sessions between YFSs and youth.

*Compliance Rating.* Partial Compliance

*Recommendations.*
1. Monitor the YFSs ability to provide interventions as prescribed in the Case Plans, in order to ensure that sufficient time is available for the rehabilitative counseling that is necessary to facilitate behavior change.

## V.6. Training of Staff with Youth Contact

DJJ shall provide training to ensure that all staff who have direct contact with youth are adequately trained in: (a) adolescent social and intellectual development; (b) gender responsive and culturally competent interaction with youth; (c) mental health and trauma needs of justice-involved youth; (d) conflict resolution and de-escalation; (e) participation of mental health staff in resolving conflicts; (f) effective behavior management, including alternatives to use of confinement; (g) report writing for use of force incidents, including time, location and reasons for force; (h) alternatives to the use of force

when appropriate; (i) the basic principles of the ADA and PREA; (j) zero tolerance for verbal and sexual abuse and harassment.

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that DJJ is in substantial compliance with this provision.

*Methodology.*
- Reviewed DJJ Policy 03.03.102 "Employee Training"
- Reviewed Academy's course schedule for April 2017
- Reviewed training spreadsheets created by each facility

*Findings.*
   DJJ staff receive their core training at two separate venues: at the Academy when they first come on the job, and at the facility for annual training thereafter. Staff may also receive more informal, targeted training on specific topics or newly developed agency policy. The chart below lists the various requirements of this provision and indicates the relevant course from the April 2017 Academy schedule. Some of the Academy courses addressed multiple requirements of the Remedial Plan.

| Remedial Plan Requirement | Relevant Courses from the Academy |
|---|---|
| Adolescent social and intellectual development | Adolescent Brain Development (3 hours) |
| Gender/cultural competence | Cultural Competency (3 hours) |
| MH/Trauma of JJ youth | Mental Health (6.5 hours) |
| Conflict resolution | CPI (13 hours) + Practicum (3 hours) |
| MH role in resolving conflict | Mental Health (6.5 hours) |
| Behavior management and alternatives to confinement | PBIS (6.5 hours); CPI (13 hours); Practicum (3 hours) |
| Report writing for use of force | Report Writing (3 hours) |
| Alternatives to using force | CPI (13 hours) + Practicum (3 hours) |
| PREA/ADA | LGBT (5 hours); PREA (2.5 hours) |
| Zero tolerance for verbal and sexual abuse and harassment | Sexual Harassment (1 hour) |

   This chart indicates that all of the topics required by this provision are included in Academy training for new DJJ staff. However, "adequate training" also requires on-going refreshers to keep staff's skills honed, to adapt to emerging conditions at the facilities, and to incorporate new knowledge from the field. Assessing the extent to which veteran staff receive training in the topics required by this provision proved to be more challenging.

   Each facility provided a spreadsheet containing individual-level training data for juvenile justice interns, specialists and supervisors (i.e., security staff). While these data were requested for the purpose of assessing compliance with this provision, individual-level training data are also essential for sustaining compliance absent external oversight. Unfortunately, the current facility records make both assessing compliance and ongoing monitoring difficult. A standardized template is recommended so that both individual (e.g., what annual refresher courses does a given employee need) and aggregate-data (e.g., how many staff have completed/need a particular course) can be extracted.

   The facilities' spreadsheets offered some useful information, but the lack of uniformity makes cross-facility comparisons and agency-wide conclusions difficult. Many included training courses that

are not required by this provision, and that information was omitted from this analysis. Key findings are as follows:

- **Chicago**. A roster containing information on 16 interns, 60 specialists, and 7 supervisors was reviewed. Of the 60 specialists, 8 were on a Leave of Absence and 1 was a facility Trainer, so training data were evaluated for the remaining 51 specialists. Of these:
  - All of the specialists and supervisors had completed 2 days of <u>facility-based refresher training</u> in 2017. All of the interns had completed 1 day (they had just completed the academy). The topics covered in this training were not indicated.
  - 65% of the specialists and 14% of supervisors had completed <u>CPI training</u>. Further, 90% of specialists and 100% of supervisors had completed <u>OC training</u>.
  - All specialists and supervisors had completed <u>Sexual Harassment and PREA training</u>, and 41% of specialists and 57% of supervisors had also completed <u>LGBTQ training</u>.
  - 80% of specialists and 100% of supervisors had completed <u>mental health training</u>.
  - Only 4% of specialists and none of the supervisors had completed <u>PBIS training</u>.
  - *Note that some of these topics may have also been covered in the refresher training mentioned in the first bullet. Training completion dates ranged from 2015 to 2017, so it is unclear what time period this spreadsheet was intended to capture.*

- **Warrenville**. A roster containing information on 11 interns, 10 supervisors, and 50 specialists was reviewed. Of the 50 specialists, 1 was on a Leave of Absence, so training data were evaluated for the remaining 49 specialists. Of these:
  - A variety of annual, bi-monthly and quarterly trainings were noted, but the topics were not always provided.
  - 55% of specialists and 30% of supervisors had completed <u>CPI Review training</u>. Further, 20% of specialists and 90% of supervisors had received training in the <u>Physical Intervention policy.</u>
  - 92% of specialists and 90% of supervisors had completed <u>PREA training</u>, 98% of specialists and 80% of supervisors had completed <u>PREA Response training</u>, and 88% of specialists and 90% of supervisors had completed <u>LGBT training</u>.
  - 86% of specialists and 90% of supervisors had completed <u>mental health training</u>.
  - 39% of specialists and 90% of supervisors had completed <u>crisis intervention training</u>.
  - *Note that the training roster was dated FY17 and FY18, so presumably, some of the training is forthcoming. Some training may also be operating on a bi-annual refresher schedule rather than an annual refresher schedule.*

- **Harrisburg**. A roster including 35 interns, 109 specialists and 16 supervisors was provided. However, the roster did not include specific training courses completed or dates for any of the staff. Instead, a list of annual training topics was provided. Of the topics required by this provision, only <u>mental health</u>, <u>use of force/restraints</u> and <u>sexual harassment</u> were included.

- **St. Charles**. A roster of 175 security staff (interns, specialists and supervisors) was provided. Course completion data indicated that:
  - 61% of staff completed <u>CPI training</u>. However, 39 of these 107 staff (36%) last completed CPI in 2014 or 2015, indicating that St. Charles has not kept up with CPI annual training. Three CPI Instructors were trained in 2017, however, which may help to remedy this problem.
  - 27% of staff completed <u>LGBT training</u> and 83% completed <u>PREA training</u>.

- o   83% completed <u>mental health training</u> as part of FY18 Annual Training.

- **Pere Marquette**. A roster including information on 10 interns, 32 specialists and 7 supervisors was provided. Course completion data did not distinguish the staff's position but the following general information could be gleaned. During 2017:
  - o   98% of all staff completed <u>CPI training</u> and 86% of all staff completed <u>CPI Physical Skills training</u>.
  - o   All staff completed <u>PREA training</u> and 80% completed <u>LGBT training</u>.
  - o   All staff completed both <u>Sexual Harassment training</u> and <u>Discrimination training</u>.
  - o   All staff completed <u>PBIS training</u>.
  - o   All staff completed <u>use of force</u> and <u>security restraints training</u>.
  - o   All staff completed <u>incident report writing training</u>.
  - o   All staff completed <u>ADA training</u>.

     In summary, the training data were difficult to decipher and thus certainty about the level of compliance with this provision is challenging. Pere Marquette appears to be providing annual refresher training in most of the topics required by this provision, as does Warrenville though a significant proportion of Warrenville staff appear to need annual refresher training in core courses such as CPI and the new physical intervention policy. Chicago's and Harrisburg's data raised more questions than it answered. St. Charles' data indicated a need to cover all of the topics required by this provision, as well as a need to ensure staff's annual CPI training is up-to-date.

     During the subsequent monitoring period, Dr. Dedel will work with DJJ to identify a structure for maintaining training data that is more amenable to monitoring and more useful for internal efforts to determine which staff need which annual refresher courses. In the future, training curricula will be reviewed and a sample of training courses will be observed.

---

***Compliance Rating.*** Partial Compliance

---

***Recommendations.***
1.   Develop standard record-keeping procedures to track the completion of annual refresher training in the topics required by this provision for juvenile justice interns, specialists and supervisors.
2.   Ensure that staff receive both initial (i.e., Academy) and annual refresher training in all of the topics required by this provision, (a) through (j) above.
3.   Additional recommendations may be forthcoming once the curricula and delivery of the various training courses have been assessed.

---

<u>V.7. Youth Grievance Reporting</u>

DJJ shall ensure that all youth have adequate means to report allegations of abuse and submit grievances. DJJ shall maintain a hotline which youth can use any time for reporting sexual abuse or harassment. In addition, DJJ shall ensure a grievance box and grievance forms are available on each unit, provide education to youth and staff about the grievance process, and require each facility to submit a monthly report to the Director of the DJJ describing all grievances and their resolutions.

***Methodology.***

In the most recent status reports, the Parties agreed that DJJ is in partial compliance with this provision, noting that Dr. Krisberg found that youth did not perceive the system to be dependable.

*Methodology.*
- Reviewed DJJ Policy 04.01.114 "Local Youth Grievance Procedures" and revision dated 10/1/17.
- Interviewed Grievance Coordinators at Warrenville, St. Charles, Pere Marquette and Harrisburg.
- Reviewed approximately 60 grievances across the five facilities
- Reviewed grievance logs from all five facilities
- Interviewed 23 youth about their use of and concerns about the grievance system
- Visual inspection of grievance boxes at all five facilities

*Findings.*

Based on technical assistance provided by the John Howard Association, DJJ revised its grievance policy and signed it into effect on 10/1/17. The new policy comports with the generally accepted practice in the field and includes the following features:

- An assigned Grievance Officer and backup at every facility to ensure constant coverage;
- Daily grievance pick-up when working and when feasible, no less than 3 times per week;
- Protections for youth's confidentiality; and
- Timely resolution (5 days for non-emergency) and timely appeal (within 5-10 days, depending on level).

The new procedure for assessing and resolving grievances is a significant change from the previous policy. Previously, grievances were first distributed to the youth's YFS for consideration. This practice subverts the goal of having an objective, neutral party review the youth's complaint. With the new policy, the Grievance Officer is now the first step toward resolution. Furthermore, the previous policy had unusually long timelines (2 weeks for the YFS and then another 2 weeks for the Grievance Officer), which may have contributed to the youth's perception that the process was ineffective.

The site visit coincided with the issuing of the new policy, so its impact could not be assessed. Instead, the review of grievances (n=60) and grievance logs and interviews with Grievance Officers (n=4) and youth (n=23) confirmed previous findings—that the process took an extraordinary amount of time, such that many of the youth's issues were resolved or they no longer wanted to pursue them. About half of the youth interviewed had used the grievance process and felt it was a viable way to have their concerns addressed; those who had not utilized the grievance process confirmed that they knew *how* to access it if they chose to do so. In most cases, these youth simply preferred other methods for solving problems (e.g., talking to staff, calling the Ombudsman). A review of resolved grievances revealed that while some of the "resolutions" appeared to be non-responsive or did not seem to fully address the stated issue, the vast majority evidenced a serious effort to address youth's concerns by various entities (e.g., counselors, dietary staff, Treatment Unit staff, Intelligence Officers).

In 2018, grievances will be reviewed to assess the effectiveness of the new policy and procedures. That said, a number of improvements to the grievance logs and other documentation are recommended to assist in the effort to track the timeliness and reasonableness of the resolutions:

- Utilize a consistent Grievance Tracking Log format across sites. At a minimum, track the youth's name, date the grievance was written, the date it was picked up, whether it was an emergency, the substance of the youth's concern, the date on which it was resolved by the Grievance Officer, date approved by the Superintendent, whether the grievance was

substantiated, whether an appeal was filed, whether the appeal was substantiated and the date the appeal was resolved.

- Encourage Grievance Officers to compile a packet that shows the way in which each grievance was resolved including summaries of initial interviews with youth about their concerns, emails requesting information from facility staff (e.g., dietary, medical/MH staff, disciplinary committee members), the information provided by those staff, and summaries of how the grievance was resolved or that it was forwarded on to the Superintendent for resolution.
- Ensure that the youth signs or otherwise notes on the grievance form that he accepts the resolution offered by the Grievance Officer or Superintendent, or chooses to appeal it.

At the time of the site visit, Grievance Officers reported that they had not yet been trained on the new policy. Based on experience in other jurisdictions, training that includes timeline requirements, expectations regarding documentation and procedures for tracking helps jurisdictions to come into substantial compliance more quickly. Furthermore, information on the new process, along with relevant timelines, should be easily accessible to youth, perhaps in the form of a graphic display of the information on each housing unit.

---

**Compliance Rating.** Partial Compliance

---

**Recommendations.**

1. Develop clear expectations for documentation and tracking grievances and train all Grievance Officers, back-ups and Superintendents on these requirements.
2. Ensure that the supporting protocols are in place, such as locked grievance boxes on each unit, easy availability of grievance forms, descriptions of how to use the grievance system in the Youth Handbook and on the housing unit. These things will be observed/verified on subsequent site visits.
3. Utilize tracking forms to determine whether required timelines are being met, and develop corrective action plans to rectify any identified deficiencies.
4. Utilize Quality Assurance staff to routinely audit the substance of grievances and their resolutions to ensure that each grievance has a proper inquiry and reasonable conclusion.

---

## V.8. Independent Juvenile Ombudsman

DJJ has proposed legislation (SB 2352) that would create within DJJ an Independent Juvenile Ombudsman for the purpose of securing the rights of youth committed to DJJ. The Ombudsman will be appointed by the Governor for a term of four years and shall be responsible for reviewing and monitoring the implementation of rules and standards established by the DJJ and the delivery of services to youth to ensure that the rights of youth are fully observed; provide assistance to youth or family; investigate and attempt to resolve complaints; periodic inspections of facilities and procedures to ensure that the rights of youth are fully observed; being accessible to and meeting with youth, informing youth of their rights.

---

**Assessment by the Parties.**
In the most recent status reports, the Parties agreed that DJJ is in substantial compliance with this provision.

---

**Methodology.**
- Interviewed Ombudsman and Deputy Ombudsman

| |
|---|
| ▪ Reviewed Ombudsman's 2016 Annual Report |

***Findings.***
      The Ombudsman was appointed by, and reports to, the Governor's Office, but is "embedded" within DJJ and has access to all DJJ facilities and youth. Now in the second year of operation, the Ombudsman hired a Deputy in August 2017, and the office's structure and operating budget continue to evolve. Both the 2016 Annual Report and more recent conversations between Dr. Dedel and Ombudsman revealed a high degree of immersion in the facilities and on-going and frequent contact with DJJ youth. In FY 2016, she made 98 visits to six IYCs, nearly 1,500 in-person contacts with youth in custody, and 80 contacts with DJJ youth's family members. In FY17, the Ombudsman and Deputy made 102 visits to the IYCs, over 1,000 in-person contacts with youth in custody, and received over 350 phone calls from DJJ youth and their families.
      Not only does the Ombudsman identify themes and patterns within and across facilities, but also advocates for individual youth as needed. She reported that she and the DJJ executive staff appear to be philosophically aligned and that DJJ takes the Ombudsman's concerns seriously. The facility Superintendents are also receptive and, at most facilities, successfully resolve the issues that the Ombudsman presents. The Ombudsman's knowledge of best practices for youth in custody, insight into the problems DJJ is facing and the ways in which DJJ is working to resolve them are particularly impressive.

***Compliance Rating.*** Substantial Compliance

***Recommendations.*** None

 

| V.9. Limits on Mechanical Restraints. |
|---|
| DJJ shall adopt and implement a policy that limits the use of mechanical restraints. |

*Assessment by the Parties.*
In the most recent status reports, DJJ reported substantial compliance with this provision, while Plaintiffs assessed partial compliance given the frequency of mechanical restraint use at St. Charles and a lack of information about the surrounding circumstances.

*Methodology*
- Reviewed Policy 05.01.305 "Use of Physical Intervention" and DJJ Policy 05.01.126 "Security Restraints"
- Reviewed aggregate data on the use of mechanical restraints
- Reviewed a sample of 10 incident reports involving the use of mechanical restraints at Harrisburg

***Findings.***
      As an initial matter, it is unusual in Dr. Dedel's experience, for a consent judgment to include a provision solely about the use of mechanical restraints, leaving the use of physical restraints uncontested. Conversations with both Parties suggested that at one time, mechanical restraints may have been over-used and applied in situations that did not warrant an escalation in the level of restrictiveness of the restraint. It is with this history in mind that the following analysis is offered.

      DJJ Policy 05.01.305 "Use of Physical Intervention," effective date 08/01/17, permits the use of mechanical restraints when a youth's behavior escalates to the point that a physical hold is impossible

or is insufficient to diminish the immediate safety threat. This connection to the level of resistance and continued threat is aligned with the generally accepted practice in the field. The policy also requires an after-action staff debriefing in which facility administrators review the incident and address with staff any issues related to their handling of the event and/or technique for using physical intervention or mechanical restraints. This is a terrific practice, and one that has effectively identified and corrected the improper use of force in other jurisdictions.

The line graph below shows the use of mechanical restraints (blue) as compared to the number of reportable incidents (orange) each month, July 2016 through September 2017. The dotted trend lines show that the use of mechanical restraints has increased at approximately the same rate as the number of reportable incidents. This comparison is useful, though imperfect because incidents that do not involve youth violence (and thus are not included in "reportables") may also require staff to use physical force and mechanical restraints.



The facilities differ significantly in their uses of mechanical restraints. As shown in the chart below, St. Charles (orange) and Harrisburg (yellow) account for between 75%-90% of mechanical restraint use. The numbers inside the colored bars are the actual number of mechanical restraint uses for the two facilities. These two facilities account for about 64% of DJJ's population and about 74% of all reportable incidents in FY17, which suggests that they are contributing a somewhat disproportionate number of incidents involving mechanical restraints.



The number of uses of mechanical restraints is not particularly meaningful without an assessment of whether they are used in situations authorized by policy, and whether they are applied and removed safely. DJJ recently implemented Form 434(a) that captures, among other things, whether mechanical restraints were used, the start and end times, the physical intervention techniques used, the reasons that less restrictive alternatives were impossible or insufficient.

A sample of 10 recent incidents involving the use of mechanical restraints was reviewed while on site at IYC-Harrisburg. While it appeared that mechanical restraints were applied only in situations in which youth continued to resist a physical hold, the staff's language was not sufficiently descriptive to be certain. When describing their physical techniques, staff used vague language such as "separated the youth," "restrained the youth," "secured the youth," or "used CPI." This phrasing is not sufficient to understand how the staff attempted to restrain the youth or how the youth was able to continue to resist. In other words, it does not address the issue of *proportionality* which is key to understanding whether physical force is being used appropriately. Furthermore, staff used similarly vague language to indicate that the physical hold was insufficient, by remarking that the youth was "resisting" or "still combative." More descriptive language when reporting the use of physical force and the youth's response to it would be helpful in assessing the appropriateness of the use of mechanical restraints. That said, even the vague language does indicate that staff attempted to control the youth via physical holds and when those failed, mechanical restraints were applied, which is in compliance with DJJ policy. This finding matches the internal assessment by DJJ leadership and facility administrators, who all reported their assessment that mechanical restraints are consistently used within policy guidelines.

Furthermore, most of the time, youth spent a very short period of time in mechanical restraints—most were removed within 5 minutes. Longer durations were sometimes observed when the youth refused to let staff remove the handcuffs. Current DJJ policy does not specify that youth must be under constant observation when in mechanical restraints, but DJJ administrators reported that this is the practice.

Thus, the review of incidents at Harrisburg suggested that mechanical restraint use conforms to policy requirements, although more specific language would be helpful to determine whether the failure to control the situation using physical force was technique-related (and thus, reductions in the use of mechanical restraints could be achieved as staff improve their skills in the use of physical holds), and the nature of the youth's resistance (to confirm that mechanical restraints were necessary to control the situation, rather than, perhaps, adjusting the hold or transitioning to a more restrictive physical restraint technique). Incident reports involving mechanical restraints from all facilities will be reviewed during the subsequent monitoring period.

*Compliance Rating.* Substantial Compliance

*Recommendations.*
1. Ensure that staff utilize descriptive language when documenting their use of physical restraints, including descriptions of the technique used and descriptions of the type of resistance encountered, so that the appropriateness of the use of mechanical restraints can be better assessed.
2. Additional recommendations may be forthcoming once incidents at other facilities are reviewed.

## VII.4 Monitoring of Chemical Agents (out of order)

Court-appointed experts and the plaintiff's counsel may monitor DJJ's use of chemical agents.

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that DJJ is in substantial compliance with this provision.

*Methodology.*
- Reviewed DJJ Policy 05.01.305 "Use of Physical Intervention"
- Aggregate data on the use of chemical restraints

*Findings.*

DJJ Policy 05.01.305 "Use of Physical Intervention," effective date 08/01/17, permits the use of OC spray when a youth's behavior escalates to the point that physical holds and mechanical restraints are impossible to apply or insufficient to diminish the immediate safety threat. This connection to the level of resistance and continued threat and the placement of OC spray at the end of the use of force continuum (meaning, it is a last resort) is aligned with the generally accepted practice in the field. While DJJ is one of only 6 state juvenile justice agencies in which staff (supervisors) are authorized to carry OC spray on their person[1], OC spray is utilized relatively infrequently, and only by certain facilities.

The line graph below shows the number of uses of chemical restraints (i.e., OC spray) each month, July 2016 through September 2017. Of the 94 uses in the 15-month period shown below, St. Charles accounted for 66 of them (70%), with Harrisburg (n=19; 20%), Chicago (n=6; 6%) and Warrenville (n=3; 3%) contributing the remainder. Pere Marquette did not use OC spray in the previous 15-month period.

---

[1] Council of Juvenile Correctional Administrators. (2011). *Issue Brief: Pepper Spray in Juvenile Facilities*. Boston, MA: CJCA.



During subsequent monitoring periods, written documentation and videotaped footage of incidents involving OC spray will be reviewed to ensure OC is being utilized only when necessary and in a manner commensurate with the generally accepted practice.

***Compliance Rating.*** Substantial Compliance

***Recommendations.***
1. Continue to track data on the use of chemical restraints, along with written documentation and videotaped footage of each incident. Provide this information upon request.

## V.10. General Programming.

DJJ shall create and implement a policy to provide opportunities, subject to reasonable security concerns, for all DJJ youth to spend at least 8 hours per day outside of their rooms engaged in supervised activities (not including meals or showers), so that during hours when they are not participating in school or treatment, they have opportunities to participate in an appropriate mix of physical exercise, recreational activities and work details.

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that DJJ is in partial compliance with this provision and needs to ensure an appropriate mix of activities, particularly in the evening and on weekends. Staff shortages reportedly contributed to the challenges in this area.

*Methodology.*
- Reviewed DJJ Policy 04.01.130 "Programs and Case Management"
- Reviewed Unit Schedules for each facility
- Reviewed Consultant Reports addressing this issue
- Observed facility operations
- Interviewed 23 youth regarding their daily schedule

*Findings.*

DJJ Policy 04.01.130 "Programs and Case Management" requires that youth must receive 12 hours/weekdays and 8 hours/weekends of "program services and/or out-of-room activity." The policy goes on to define these services and activities as being "either structured or unstructured" and "on- or off-grounds" including "leisure time, crafts, institution sponsored clubs and organizations, academic and vocational programming, counseling, work, religion, cultural and social events, athletics and special activities."

Program schedules for each unit in each facility were reviewed to ascertain the volume and type of programming available. On weekdays, youth who are still in school have 5.5 hours of school and, on some days, have other activities scheduled in the evenings. Across the system, a mix of programs are offered including religious ministry; creative arts (e.g., StoryCatchers); social/leisure time (e.g., "recreation," movie nights, ice cream socials); athletics (e.g., time in the gym; running; basketball; weight room; soccer club) and rehabilitative (e.g., Forward Thinking, mental health groups, individual counseling). While all of the facilities have scheduled family visitation, some of the facilities also spoke of family events.  In the aggregate, a variety of programs are available to youth. However, this diversity of activities is rarely available to an individual youth at certain facilities, as the programs are spread widely across facilities and housing units.

While most youth appear to be *out of their room*s for the required 12-hours on weekdays and 8 hours on weekends (wake up at 6a and bedtime at 8p or 9p), at St. Charles, Harrisburg and Chicago, most of the non-school hours are consumed by unstructured leisure time (i.e., "recreation" where youth may socialize, watch TV, play games, etc.). While some leisure time is certainly developmentally appropriate and can help youth learn to make better choices about how to spend their free time once in the community, an excess of it (i.e., more than one hour on weekdays and two hours on weekends) is not beneficial to facility safety or to positive youth outcomes.

When interviewed, youth at Chicago, St. Charles and Harrisburg indicated that they spent most of their days on the unit, watching TV or playing cards. While most reported that they went to school (aside from youth who had graduated, discussed below, and youth at St. Charles due to teacher shortages), and reported that they went to the gym/outside to engage in large muscle activity every day (sometimes multiple times per day), they said they were frequently bored and wished there was more to do. Exceptions to this theme were notable at Warrenville and Pere Marquette, where all youth reported that they were "busy" and had a range of activities that they enjoyed. They appeared to appreciate the opportunity to try new things and to identify skills they didn't know they had. Most youth also rated their work with mental health clinicians and counselors positively.

Youth who have graduated or earned their GED do not continue to attend the regular school program. [Some jurisdictions permit, others encourage, youth to continue to attend school, functioning either as peer tutors, teacher's aides, or strengthening their skills in certain areas. Not only does this continue to reinforce the value of learning, it also structures and occupies these youth's otherwise free time.] Some of the facilities—Harrisburg in particular—have a nice array of vocational and post-secondary opportunities for youth which clearly helps to advance their engagement in learning and contributes to positive youth outcomes post-release. According to DJJ's data, in September 2017, of the 399 youth in custody, 297 youth were enrolled in school, leaving approximately 100 youth who had graduated or had a GED. System-wide, only 45 youth were engaged in post-secondary or collegiate courses. When interviewed, youth engaged in these programs gave them outstanding reviews, but noted that they occupied only a couple hours each weekday. Warrenville and Chicago did not have any youth engaged in such programs.

A considerable strength of the DJJ system is that facility jobs are plentiful and that youth at Pere Marquette have off-campus jobs. All of the youth interviewed reported that they had, or wanted, a job and found the opportunity to earn some money to be very compelling. Facility administrators reported that they were largely successful in meeting the demand for jobs, and were open to creating additional positions to meet the needs of youth. In contrast to many places in which jobs are reserved for youth who are performing well in the behavior management program, the facilities all seemed to recognize the value of employment, of filling the youth's time with a compelling structured activity, as a key behavior management tool. Hopefully, this attitude can be leveraged to fill the blank spots in the daily schedules, and to increase the amount of time that youth are engaged in meaningful activities other than leisure time. Opportunities for youth to participate in off-campus outings received rave reviews at Pere Marquette and Warrenville—similar opportunities should be available to youth at other facilities to enrich the incentive program and to further youth's exposure to new activities and interests.

As noted in Provision IV.1, above, due to staffing challenges (both security and education) at St. Charles, youth sometimes do not receive access to the programs listed on the daily schedule, including school, leisure time and other structured programming. Youth in St. Charles' ABU and Self-Confinement units do not receive anywhere near the required amount of programming. Furthermore, youth interviewed at Harrisburg expressed frustration that some staff—particularly relief staff—rotated groups of youth in and out of their rooms during the afternoon and evening hours. While this may be an appropriate strategy on occasions when tensions on the unit run high, the youth indicated that this was a common and consistent practice. Their complaints fit with observations from the Confinement Forms indicating that TO and EBH were sometimes triggered by youth's escalating behavior when frustrated that they were in their rooms during the afternoon and evening. This practice of locking youth in their rooms during scheduled programming hours interferes with DJJ's ability to meet the programming requirements of this provision, and does not comport with the Remedial Plan or DJJ's policy regarding the appropriate use and duration of confinement.

Even when this practice of locking youth in their rooms during scheduled programming hours has been addressed, the fact that so many of the youths' waking hours are consumed by unstructured leisure time at certain facilities is of concern. The goals of facility safety and positive youth outcomes are unlikely to be achieved without an infusion of structured activities led by an adult throughout the youth's waking hours.

***Compliance Rating.*** Partial Compliance

***Recommendations.***
1. Ensure that youth are not locked in their rooms during scheduled programming hours, except to address serious operational issues. When unit lock-in is deemed necessary, ensure that staff seek approval from a supervisor and that the duration is logged into the unit log.
2. Limit the amount of unstructured leisure time (i.e., "recreation") to one hour on weekdays and two hours on weekends. Fill the remaining non-school hours with a variety of structured programs led by an adult (either staff or volunteer). Target specific facilities and units for an infusion of resources to reduce the amount of leisure time.
3. Ensure that youth who have graduated/earned a GED have full-day schedules. This could include a combination of academic and vocational programming (either post-secondary or within the existing school program) or full-time employment.
4. Ensure that youth ABU and Self-Confinement units have full-day schedules of structured programming. The behavior of these youth indicates they are among those *most in need* of

structure and rehabilitative services, and yet, ironically, they receive the least amount of programing of any youth at DJJ.

5. Develop and implement a quality assurance strategy to quantify the amount and type of programming that the average youth participates in at each facility.

---

### V.11. Legal Assistance to Youth.

Plaintiff's counsel shall prepare a list of non-profit legal organizations that might assist youths who believe their rights have been violated by DJJ conditions or services and DJJ shall review and post list in a prominent location in dayroom and visitation rooms at DJJ youth centers. DJJ shall reasonably facilitate confidential communication between youth and such attorneys by means of meetings, and telephone calls.

*Assessment by the Parties.*
In the most recent status reports, the Parties agreed that DJJ is in substantial compliance with this provision.

*Methodology.*
- Observations while on tour
- Interviewed 23 youth regarding their contact with their lawyers
- Reviewed DJJ Consultant's Analysis

*Findings.*
   While an exhaustive audit was not conducted, information about legal resources was observed in many of the housing units visited. When interviewed, youth knew how to contact their lawyers and said they were able to do so by phone or mail upon request.

   DJJ implemented an internal quality assurance mechanism to ensure that information is posted as required. A consultant to DJJ conducted an exhaustive audit in April 2017, visiting every housing unit at each facility. Of the 36 housing units open at the time of the tour, the required postings (John Howard, Ombudsman, PREA) were present in about 85% of them. Facility administrators were notified about the missing information and in many cases, had taken steps to rectify the problems before the consultant concluded the site visit.

*Compliance Rating.* Substantial Compliance

*Recommendations.* None.

## COMMUNITY PLACEMENT

### VI.1. Placement Coordinator

DJJ shall assign a Placement Coordinator to oversee and monitor implementation of this part of the Remedial Plan. The Placement Coordinator shall be a full time DJJ staff members whose primary job responsibility is to coordinate and monitor activities of facility and aftercare staff responsible for overseeing and planning for community placement and identifying and resolving barriers. DJJ shall

provide the Placement Coordinator with monthly reports that identify all youths with placement barriers and provide details as to the barriers, placement plans and status of each youth's placement.

*Assessment by the Parties.*

In the most recent status reports, DJJ asserted it was in substantial compliance. Plaintiffs agreed that staff had been hired, but did not have enough data to confirm compliance.

*Methodology.*
- Interviewed Deputy Director of Aftercare, Placement Unit Manager, Placement Specialists and Contract Manager
- Reviewed Placement Barrier Reports for September and October 2017
- Reviewed 13 Alternative Placement referral packets

*Findings.*

Rather than the single "Placement Coordinator" required by this provision, DJJ enriched the staffing complement and built a Placement Unit consisting of a Manager and three Placement Supervisors who are regionally assigned. The Placement Supervisors are responsible for preparing placement packets and identifying appropriate placements for youth who are not returning to a parent, guardian or extended family member. Placement Supervisors supervise the Aftercare Specialists who are assigned to each facility and function as traditional parole/aftercare officers once the youth is released from the IYC.

Each month, a Placement Barrier report is constructed from Youth-360 that includes youth with assigned placement levels of 3 (alternative placement with return to family), 4 (alternative placement to be followed by independent living), and 6 (DCFS dual-custody youth). In October and September 2017, there were 37 and 25 such youth, respectively. While arranging placement begins upon the youth's admission to DJJ, planning is intensified when youth are within 4 months of their Targeted Release Date (TRD).

Each of the Placement Barrier reports contained detailed information about each youth, including the reason they are being placed outside the home, any barriers to placement, the type of placement that is recommended, dates of all contacts with DCFS caseworkers (for dual-status youth), and detailed case notes of all the actions taken to facilitate placement (e.g., consent forms, medical and mental health packets, packets being sent, dates of interviews, dates of acceptance, etc.) along with the relevant dates. The reports are thorough and comprehensive. In some ways, the title "Placement Barrier Report" is a misnomer, as the reports detail the steps taken on behalf of all youth to anticipate barriers and prevent them from interfering with timely placement.

*Compliance Rating.* Substantial Compliance

*Recommendations.* None.

## VI.2. Discharge Planning Upon Intake.

In conjunction with the statewide implementation of Aftercare Specialists for all youth in DJJ, DJJ shall engage in initial placement planning within 14 days of a youth's commitment to DJJ and arrival at a DJJ facility, incorporating concurrent planning to minimize the number of youth who could otherwise be released on aftercare but for lack of a placement.

*Assessment by the Parties.*

In the most recent status reports, DJJ asserted it is in substantial compliance, though Plaintiffs reported they needed additional information to determine the timing of the initial planning.

*Methodology.*
- Interviewed Deputy Director of Aftercare, Placement Unit Manager, Placement Specialists and Contract Manager
- Interviewed Intake staff at IYC-Harrisburg
- Reviewed aggregate data on Placement Levels and date of initial entry
- Reviewed 13 Alternative Placement referral packets

*Findings.*

When youth are committed to DJJ, they spend approximately 2 weeks in Reception & Classification undergoing a variety of assessments to identify the appropriate facility and constellation of services. One of the many things that occurs during the intake period is an assessment of the likely placement for a youth once released from secure custody. A review of the youth's case file and interviews with youth and family are used to identify the youth's "Placement Level": (1) parent/guardian, (2) extended family member, (3) alternative placement with return to family; (4) alternative placement with transition to independent living; (5) interstate compact; and (6) DCFS dual-status youth. Of the 464 youth admitted to DJJ between April and September 2017:

- 85% (n=393) were placed with parent or guardian
- 3% (n=12) were placed with extended family
- 6% (n=27) were placed in an alternative placement with a return to family
- 2% (n=11) were placed in an alternative placement with a transition to independent living
- 1% (n=3) were interstate compact
- 4% were missing data

Thus, alternative placements are required for a relatively small proportion of DJJ youth (less than 10%). That said, these youth generally have complicated histories and thus initiating planning upon admission to a facility is prudent.

Using a one-day snapshot from November 2017, of the 416 youth in DJJ custody, 91% had an initial placement level identified within 14 days of their admission. Another 4% had an initial placement level identified within 21-days. As expected, there are a small number of youth whose post-custody placement is complicated, and thus the placement cannot be quickly or easily determined. Thus, DJJ's current process effectively identifies those youth who will require an alternative placement shortly after their commitment, which allows Placement Specialists to promptly begin the process of developing youth's placement packets and identifying an appropriate provider.

Data from the Placement Barrier reports reveals DJJ's success in arranging alternative placements in advance of youth's release date. DJJ reported that in 2014, 88 youth were on the first "barrier list," some of whom were well past their TRDs. By reassessing host sites, collaborating closely with DCFS and expanding the number of providers, service areas and beds allocated for DJJ youth, DJJ has been able to significantly reduce the number of youth who languish in the facilities while awaiting placement. The review of documents showed that barriers impacting the youth's release date appear to be the exception rather than the norm.

In September 2017, only 6 youth going to placement were past their TRD: 2 had been accepted and were simply awaiting an intake date from the provider, 2 were awaiting provider approval, and 2 others were awaiting DCFS placements. Similarly, in October 2017, only 4 youth going

to placement were past their TRD: 1 had been accepted and was awaiting an intake date and 3 were awaiting DCFS placements.

The combination of early planning at intake and intensified planning as the TRD approaches, documented on the Placement Barriers Report, appears to successfully minimize the number of youth who could be released but for lack of a placement.

*Compliance Rating.* Substantial Compliance

*Recommendations.*
1. Routinely assess the reason that initial placement levels are not identified/entered within 14 days to understand the reasons for delay and whether any are actionable at the facility level.

## VI.3. Prepare Youth for Placement.

DJJ shall collaborate with providers to prepare youth for placement in residential facilities and enhance their prospects for success at those facilities.

*Assessment by the Parties.*
In the most recent status reports, DJJ asserted that it is in substantial compliance with this provision, and Plaintiffs agree that DJJ is engaging in well-organized and documented placement efforts.

*Methodology.*
- Review Policy 04.50.101 "Aftercare Release Planning Program," effective 8/1/2017
- Interviewed Deputy Director, Placement Unit Manager, Placement Specialists and Contract Manager
- Observed 9 Monthly Staffings
- Interviews with 23 youth about their release plans

*Findings.*
When an appropriate provider has been identified for a youth going to alternative placement, DJJ arranges a phone interview between the provider and the youth, followed by an in-person interview and an in-person visit by the youth to see the program, meet staff, etc. This helps youth to make more informed decisions about their placement and allows providers to get a better understanding of the youth's strengths and needs. A few of the youth whose Monthly Staffings were observed talked about what they had learned about a provider they'd spoken to over the phone. Another youth with a long history of violent behavior discussed his frustrations with not being accepted, though was receptive to staff's encouragement that they would try another provider. Most of the youth interviewed planned to return to a parent or guardian, but two had visited a placement and felt optimistic they would be accepted.

In the late summer 2017, DJJ implemented a "Parole School," described in Policy 04.50.101 "Aftercare Release Planning Program." Groups of approximately 10 youth who are within 90 days of their TRD are assembled for 3 sessions of a group that is co-led by a Placement Specialist and facility staff (usually a YFS). The group helps youth to develop skills needed for success in the community (e.g., dealing with authority, dealing with criticism and frustration, how to ask for help) and provides detailed information on the 16 standard aftercare conditions and reporting requirements. This type of preparation is aligned with best practices in transitioning youth from secure custody to the community.

Given the short tenure of the program, the impact of the program is not yet known. In subsequent monitoring periods, a sample youth records will be reviewed to assess completion rates.

*Compliance Rating.* Substantial Compliance

*Recommendations.*
1. Identify metrics to assess process- and outcome-related measures to ensure Parole School has been implemented according to design and to assess its impact on parole success. These could include the proportion of released youth who completed all 3 sessions, and aggregate rates of violations of aftercare conditions as well as positive outcomes like engagement in employment or school.

## VI.4. Placement.

DJJ shall establish a sufficient number of available beds in appropriate community facilities for juvenile sex offenders and other youths who require residential placement upon release.

*Assessment by the Parties.*
In the most recent status reports, DJJ asserted that it is in substantial compliance with this provision, while Plaintiffs assessed partial compliance due to a lack of information about youth who aren't able to be placed.

*Methodology.*
- Interviewed Deputy Director, Placement Unit Manager, Placement Specialists and Contract Manager
- Reviewed aggregate data on number of youth in placement and number of placement slots
- Reviewed Placement Barrier Reports for September and October 2017
- Reviewed 13 Alternative Placement referral packets

*Findings.*
    A review of 13 Alternative Placement packets clearly illustrated the variety of reasons that youth require alternative placement, usually because a suitable host site with a parent, guardian or extended family member simply cannot be found. The packets clearly illustrated the challenging relationships these youth had with their families and the various reasons that family placements were not viable. From this review and interviews with DJJ staff, it is clear that alternative placement is not taken lightly, and is truly a last resort.

    Barriers to placement may include non-responsive parents/guardians who do not return consent forms timely, delays in DCFS' efforts to identify a child welfare placement, and offense-related factors (e.g., youth with sex offenses, violent histories, arson charges). These latter factors are related to bed space in so much as there are fewer providers who are licensed to care for such youth. That said, the dramatic reductions in DJJ's population and concurrent efforts to increase the number of providers available to provide alternative placements have reduced the scope of this problem since the time the Remedial Plan was crafted. In November 2017, a total of 19 youth with sex offender charges were in alternative placement. Currently, four providers offer specialized treatment to this group of youth, one of which offers a dedicated 6-bed unit to DJJ youth.

*Compliance Rating.* Substantial Compliance

*Recommendations.* None.

## QUALITY ASSURANCE

| VII. Deputy Director of Quality Assurance. |
| --- |
| DJJ shall appoint a Deputy Director of Quality Assurance whose responsibilities include monitoring the delivery of services and programs to youth; ensuring that the implementation of agency programs and operations are consistent with the agency's objectives and mandates; and assisting with development and implementation of policies, procedures, guidelines and performance standards. |

*Assessment by the Parties.*
In the most recent status report, DJJ asserted it is in substantial compliance with this provision although Plaintiffs needed additional information about the Quality Assurance reviews to assess compliance.

*Methodology.*
- Reviewed Policy 01.11.103 "Facility and Performance Based Review Process"
- Interviewed Compliance Manager and Data Manager about duties related to quality assurance
- Reviewed FY2017 QA Review priorities and relevant QA Review Instruments

*Findings.*

Compared to other juvenile justice agencies across the country, DJJ has a sophisticated quality assurance plan and data management capacity. DJJ policy 01.11.103 "Facility and Performance Review Process" describes the procedure for both internal and external audits of facility performance. The goal of the review process is to ensure that facilities follow the requirements of the agency's many Administrative Directives (ADs). The Compliance Manager has been with DJJ for 20 years, and began in this role in July 2016. Late 2016 and early 2017 were dedicated to preparing facilities for PREA audits.

As required by policy, each facility conducts an internal review of its performance on each AD. The process is directed by a Facility Review Control Officer, appointed by the facility's Superintendent. The FRCO schedules and coordinates the review, convenes the Facility Review Team and compiles results. The results of internal reviews relevant to this section of the Remedial Plan will be reviewed during subsequent monitoring periods.

For the external review, each year, a set of 30 ADs are selected, prioritizing those related to the Remedial Plan. Reviews of each facility are conducted annually by the Compliance Manager and between 6 and 8 staff from other DJJ facilities with expertise in the relevant subject matters (e.g., security, counseling, behavioral health services, medical, education, etc.). Structured review instruments have been designed to guide a comprehensive audit of each AD by each subject matter expert. Review instruments related to key areas of the Remedial Plan (Behavior Management, Sexual Harassment and Abuse, and Reception and Classification, among others) were reviewed. Each included a methodology for each policy requirement, such as staff to be interviewed, documents to be reviewed, or files to be audited. Several also included matrices to guide the file audits. Although the Compliance Manager reported that the reviewers routinely interact with youth, youth interviews are not specifically required by the policy nor were they evident in the review instruments. DJJ is encouraged to include youth in the required protocols for reviewing ADs that have a direct impact on a

Case: 1:12-cv-07289 Document #: 225-1 Filed: 12/07/17 Page 44 of 45 PageID #:2742

youth's experience in the facility (e.g., their experience in confinement, information delivered during orientation, whether they know how to report sexual harassment or abuse, etc.).

Following an exit conference with facility administrators where initial findings are discussed, the Compliance manager and team draft a comprehensive written report that discusses the facility's performance. Areas identified as being out of compliance are the subject of a corrective action plan (CAP) crafted by facility administrators.

The external reviews began with IYC-Chicago in October 2017 and will continue throughout 2018. The report/CAP for IYC-Chicago's review was not yet complete at the time this report was drafted, but all reports and CAPs will be reviewed as they become available in subsequent monitoring periods. Once QA reports that accurately identify areas in which facility performance does/does not meet the requirements of the various ADs are routinely generated, along with CAPs that are used to drive performance improvements, DJJ will have met its obligations under this provision.

On the data side, the Research/Data Manager extracts data from Youth-360 to compile reports for various external stakeholders—*R.J.* monitors, the public, Legislature and Governor's Office. Internally, facility administrators receive aggregate data on various performance measures each month (e.g., number of reportable incidents, uses of force, confinement usage and duration, etc.). All metrics have standardized definitions and the accuracy of data entry is emphasized. This capacity to produce reliable, aggregate data will greatly assist DJJ in its internal capacity to monitor performance and outcomes, as required by this provision.

***Compliance Rating.*** Partial Compliance

***Recommendations.***
1. Consider amending policy to require interviews with youth when auditing procedures that directly impact their experience in the facility.
2. Implement the external reviews as planned, and craft written Quality Assurance reports that identify facility performance issues. Ensure that Corrective Action Plans are utilized to drive improved performance in areas of identified weakness.
3. Continue to utilize data to monitor facility performance related to the topics covered by the Remedial Plan.

44.

COMPLIANCE STATUS CHART

Of the 20 provisions in the Safety & Welfare portion of the Remedial Plan, DJJ is in substantial compliance with 8 provisions (40%) and in partial compliance with 12 provisions (60%). DJJ is not in non-compliance with any of the provisions.

| DJJ's Compliance with Safety & Welfare Portion of the Remedial Plan | | | |
|---|---|---|---|
| Provision | | 2017 | 2018 |
| IV.1 | Confinement and Restricted Movement Policy | PC | |
| IV.2 | Confinement Liaison | PC | |
| IV.3 | Confinement Conditions | PC | |
| V.1 | Comprehensive Treatment Model | PC | |
| V.2 | Behavior Management System | PC | |
| V.3 | Individual Youth Development Plans | PC | |
| V.4 | Security Staffing Levels | PC | |
| V.5 | Youth and Family Specialist Staffing Levels | PC | |
| V.6 | Training of Staff with Youth Contact | PC | |
| V.7 | Youth Grievance Reporting | PC | |
| V.8 | Independent Juvenile Ombudsman | ✓ SC | |
| V.9 | Limits on Mechanical Restraints | ✓ SC | |
| VII.4 | Monitoring of Chemical Agents | ✓ SC | |
| V.10 | General Programming | PC | |
| V.11 | Legal Assistance to Youth | ✓ SC | |
| VI.1 | Placement Coordinator | ✓ SC | |
| VI.2 | Discharge Planning Upon Intake | ✓ SC | |
| VI.3 | Prepare Youth for Placement | ✓ SC | |
| VI.4 | Placement | ✓ SC | |
| VII. | Deputy Director of Quality Assurance | PC | |