**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 12-cv-7289 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| HEIDI MUELLER, | ) | |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT STATUS REPORT AS TO ISSUES IDENTIFIED
IN 2017 MONITOR REPORTS**

On February 16, 2017, this Court entered an order directing the parties to file end-of-year status reports reviewing the deficiencies and areas for improvement noted in the annual reports of the Court-appointed Monitors and describing what, if any, plans are in place or being put in place to remedy them. Dkt. 188. The Illinois Department of Juvenile Justice's ("DJJ" or "Department") and Plaintiffs' responses to those issues are provided below for each provision of the Remedial Plan.[1]

## II. MENTAL HEALTH SERVICES

1. <u>Licensed Physical Medical Director</u>. DJJ shall enter into a contract with a licensed physician to serve as DJJ medical director to provide oversight of all facility health care operations, oversight and monitoring of all vendor-provided health care services, and development of protocols and procedures for delivery of health care services. The contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

***DJJ Report: Substantial Compliance***

The Department concurs with the Mental Health Monitor's[2] finding of compliance with this requirement. Dr. Justin Kwak is DJJ's Medical Director.

***Plaintiffs' Response: Substantial Compliance***

---

[1] For the Court's convenience, Plaintiffs have prepared a summary chart listing each Remedial Plan provision and noting the respective compliance assessments of the parties and Court-appointed Monitors. (attached as Exhibit A)

[2] The Mental Health Monitor has provided his draft 2017 report to the parties; both Plaintiffs' counsel and DJJ have reviewed and commented on the draft and returned it to the Monitor for final review before filing. The parties do not expect any substantial changes to the report before filing.

Plaintiffs agree that DJJ is in substantial compliance with this requirement of the Remedial Plan. Dr. Justin Kwak has been the Department's Medical Director since the summer of 2015.

2. <u>Board-Certified Child and Adolescent Psychiatrist</u>. DJJ shall enter into a contract with a board-certified child and adolescent psychiatrist. The child and adolescent psychiatrist shall provide oversight of all psychiatric services in all DJJ facilities, including monitoring all vendor-provided psychiatric services; ensure coordination of all psychiatric services with other health care and mental health services; consult with staff; assist with the development and implementation of protocols and procedures for delivery of psychiatric and mental health services; and assess and evaluate youth in appropriate cases. The child and adolescent psychiatrist shall ensure that psychiatric staffing hours in DJJ facilities are sufficient to ensure that psychiatric services to youth comply with established professional standards, including (a) initial psychiatric evaluations of at least 90 minutes per patient and (b) medication follow-up and assessments of at least 30 minutes per patient. The contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

*DJJ Report: Substantial Compliance*

The Department concurs with the Monitor's finding of compliance with this requirement. Dr. Lynn Maskel is DJJ's Child and Adolescent Psychiatrist.

*Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree that DJJ is now in substantial compliance with this requirement of the Remedial Plan. Dr. Lynn Maskel has been the Department's Child and Adolescent Psychiatrist since September 2017.

3. <u>Treatment Unit Administrator Positions</u>. DJJ shall have qualified full-time treatment unit administrators ("TUAs") to oversee delivery of mental health services at each of its facilities. The minimum qualifications for these positions shall include a doctoral degree (Ph.D. or Psy.D.) and appropriate licensure by the State of Illinois.

*DJJ Report: Substantial Compliance*

The Department believes it is in substantial compliance with this provision of the Remedial Plan despite some current vacancies.

Under the Consent Decree, a facility can be in "substantial compliance in a subject area if any of the violations of the relevant remedial plan(s) are minor or occasional, and are neither systemic nor serious." (Dkt. 227, Amended Consent Decree, ¶ 36. ) For over a year and half, the Department had a Treatment Unit Administrator (TUA) at each facility:

| Facility | Name | Dates as TUA |
|---|---|---|
| IYC-Chicago | Cara Murphy | 5/16/14 to 10/14/17 |
| IYC-Harrisburg | Jonathon Warshawsky | 9/16/15 to present |
| IYC-Pere Marquette | Cherie Motley | 2/1/15 to 7/16/17 |
| IYC-St. Charles | Kevin Whitson | 5/1/13 to present |

| IYC-Warrenville | Jolene Harbaugh | 6/16/11 to present |

Currently, the Department has qualified TUA's in place at IYC-St. Charles, IYC-Warrenville, and IYC-Harrisburg.

The former TUA at IYC-Pere Marquette promoted to the Assistant Superintendent of Programs at that facility and is continuing to assist in performing TUA functions along with a licensed clinical social worker who is temporarily assigned into the position. The social worker is working closely with the former TUA and DJJ's Chief of Mental Health to ensure that she is supported in this role. We have posted the position multiple times but have not received any qualified applicants to date.

The TUA at IYC-Chicago resigned from the Department in October 2017. The position was posted prior to the former TUA resigning, and a candidate has been selected and is moving through the hiring process. In the interim, the Assistant Superintendent of Programs for IYC-Chicago is assisting the mental health team by meeting with them weekly, reviewing and discussing treatment plans with new hires, and sitting in on staff meetings. Additionally, DJJ's Chief of Mental Health currently goes to IYC-Chicago one day each week to provide additional coverage until the position is filled. She is also covering after hours crisis calls.

***Plaintiffs' Response: Substantial Compliance as to Warrenville, Harrisburg, St. Charles, and Chicago. Non-compliance as to Pere Marquette.***

Plaintiffs agree that the Department is in substantial compliance with this provision at IYCs Warrenville, Harrisburg, St. Charles, and Chicago. While the TUA position at IYC Chicago is not currently filled, the position has only been vacant for three months, and based on the Department's representations, a replacement candidate has been selected and is moving through the hiring process. If this position remains unfilled by the parties' next status report, Plaintiffs will need to reconsider whether this vacancy constitutes a serious violation of the Remedial Plan.

However, Plaintiffs cannot yet agree that the Department is in substantial compliance with this Remedial Plan provision at IYC Pere Marquette. While it is true that a facility can be in "substantial compliance" if a Remedial Plan violation is minor or occasional, and is neither systemic nor serious, the TUA position at Pere Marquette has been vacant for six months, and there is no indication that a replacement candidate will be identified or hired in the near term. The Mental Health Monitor agrees that, at this time, there is non-compliance with this provision at IYC Pere Marquette. While Pere Marquette's former TUA continues to assist in this role, Plaintiffs believe the Mental Health Monitor should evaluate in 2018 whether this is an appropriate interim remedy warranting a future finding of compliance.

4. <u>Mental Health Staffing Levels and Qualifications</u>. DJJ shall, in consultation with the court-appointed mental health expert and Plaintiffs' counsel, establish appropriate staffing levels and qualifications of mental health professionals to deliver individual and group therapy based on youths' diagnostic needs and services called for in each youth's individualized mental health treatment plan. Pursuant to the May 10, 2016 supplemental order, DJJ shall achieve and maintain the following average staffing ratios for mental health professionals: at least one mental health professional per 35 youths at MHL 0; at least one mental health professional per 20 youths at mental health acuity level MHL 1;

3

at least one mental health professional per 10 youths at MHL 2; at least one mental health professional per 8 youths at MHL 3; and at least one mental health professional per 5 youths at MHL 4. *See* Dkt. No. 165.

### *DJJ Report: Partial Compliance*

The Department concurs with the Monitor's finding of compliance with mental health staffing levels and qualifications at IYC-Harrisburg, IYC-Pere Marquette, and IYC-Warrenville.

IYC-Chicago had some mental health staff vacancies last year but has been meeting the staffing ratios set forth in the May 10, 2016 Supplemental Order since October 2017. Based on the youth population and their mental health needs, IYC-Chicago needs 3.80 full-time mental health professionals. The facility currently has 4 full-time mental health professionals.

With respect to IYC-St. Charles, as of December 2017, the facility needs 9 full-time mental health professionals to meet the ratios; the facility needs three staff to meet those ratios. The Department's medical provider is actively working to fill these positions and a social worker is currently in the backgrounds process. DJJ has also posted state positions fill these vacancies. When vacancies occur, other mental health staff increase their caseloads to provide additional coverage as needed.

### *Plaintiffs' Response: Partial Compliance*

Plaintiffs agree with DJJ's assessment of "Partial Compliance" based upon the requirements as to the qualifications and staffing ratios set forth in the May 10, 2016 Supplemental Order (Dkt. 165).

However, Plaintiffs note that the Mental Health Monitor, in recent conversations with the parties and in his draft 2017 Report, has expressed increasing concern as to whether the existing staffing ratios meet the needs of the DJJ population. This is in accordance with the provisions of the Supplemental Order, which required ongoing monitoring, assessment, and reporting as to this issue by the Monitor, in anticipation of the possibility that the ratios might not meet the needs of the evolving DJJ population and might need to be adjusted in the future. *See* Dkt. 165, ¶ 7. Now that the mental health monitoring report has been finalized and filed, Plaintiffs anticipate opening the discussions as to this issue contemplated by paragraph 7 of the Supplemental Order within the next 30-60 days, depending on the availability of the parties and the Monitor.[3]

5. <u>Mental Health Records and Hospitalization</u>. DJJ shall implement uniform policies in all facilities to ensure (a) that the DJJ timely requests hospital and other outside mental

---

[3] Paragraph 7 provides:

<u>Monitoring</u>. The court-appointed mental health expert shall monitor and assess whether the foregoing staffing ratios and qualifications for mental health professionals are sufficient to ensure delivery of individual and group therapy to DJJ youths based on their diagnostic needs and services called for in their individualized mental health treatment plan (*see* Dkt. 73 at II(4)), and shall report his findings as part of his annual monitoring report. *See* Dkt. 33 ¶¶ 29, 32. Based upon these findings, the court-appointed mental health expert and the parties shall discuss whether to move this Court to adjust the foregoing mental health staffing ratios and qualifications, and either party may so move.

health records for youth and (b) adequate identification and assessment of youth with significant mental health needs potentially in need of outside hospitalization, and as appropriate facilitation of such hospitalization.

### DJJ Report: Substantial Compliance

The Department concurs with the Monitor's finding of substantial compliance for all youth centers as it relates to requests for mental health records.

The Monitor expressed concern about the Department's compliance with adequate identification and assessment of youth with significant mental health needs potentially requiring outside hospitalization, and as appropriate, facilitation of such hospitalization. The Monitor pointed to two examples of youth at IYC-St. Charles needing hospitalization.

With respect to youth hospitalization, the Department believes that all facilities are in substantial compliance with this provision. The Remedial Plan requires DJJ to "implement uniform policies in all facilities to ensure . . . (b) adequate identification and assessment of youth with significant mental health needs potentially in need of outside hospitalization, and as appropriate facilitation of such hospitalization." That policy (A.D. 04.04.102 – Emergency Mental Health Services) is in place and is being implemented. DJJ's mental health department tracks all youth experiencing a mental health crisis on a monthly crisis log. That log documents (1) the type of watch the youth was placed on; (2) the dates for that watch; (3) the description of the youth's behavior; (4) the total time on crisis; (5) whether a review for hospitalization occurred if the youth was on a watch for 72 hours; and (6) whether the youth was hospitalized.

With respect to the two youths the Monitor identified, the Department has been in extensive and consistent communication with the Illinois Department of Children and Family Services (DCFS) and the Illinois Department of Human Services (DHS) to secure hospitalization for these youths. Although hospitalization has not been secured due to obstacles outside of the Department's control, the Department has worked to facilitate hospitalization consistent with the requirements of the Remedial Plan.

For these reasons, the Department believes that is substantially complying with the Remedial Plan's requirements regarding facilitating hospitalization for youth with significant mental health needs.

### Plaintiffs' Response: Partial Compliance

The Mental Health Monitor has assessed DJJ as in "Partial Compliance" as to these provisions and Plaintiffs agree with that assessment. As described at some length in the Monitor's draft report, DJJ has been unable to find hospital placements for two youth with acute mental health needs who had been assessed as needing hospitalization (one of whom also has additional disabilities). Since becoming aware of these youth in the latter part of 2017, Plaintiffs' counsel have requested and received more than one update on DJJ's efforts to place these youth, and these efforts were also discussed in a meeting of the parties and the Monitor on November 21, 2017.

Based on these updates, Plaintiffs do not fault DJJ's efforts – a very large number of hospitals, both in-state and out-of-state, were reportedly contacted but refused both youth. However,

Plaintiffs agree with the Monitor that what these events reveal is that some additional steps – whether securing additional funding or the creation of a DJJ-controlled placement hospital unit – need to be taken in order to ensure that youth such as these receive the mental health services they need.  The Consent Decree contains a broad mandate that "The remedial plan shall ensure the provision of adequate mental health services to all IDJJ youth, including but not limited to … *appropriate and prompt hospitalization of youth when required* …."  Dkt. 33, ¶ 17 (emphasis added).  In the meantime, as of Plaintiffs' counsel's site visit to IYC St. Charles on January 11, the two youth in question unfortunately remain at IYC St. Charles.

6. <u>Individualized Mental Health Treatment Plans and Coordination of Treatment</u>.  DJJ shall ensure uniform policies and procedures are in place in all facilities requiring: (a) the development and implementation of an individualized mental health treatment plan for each youth, including the type and amount of mental health services each youth needs, (b) coordination by mental health staff with each other, and with other staff, in planning treatment, providing treatment, and planning community reentry (including integration with community mental health services), and (c) family therapy as appropriate.

### DJJ Report: Substantial Compliance

The Department concurs with the Monitor's finding of compliance in the development and implementation of individualized mental health treatment plans and coordination by mental health staff in planning and providing treatment and community reentry services.

The Monitor noted that there are not enough Special Treatment Units for youth in need of services and also expressed some concerns about the ability of IYC-Harrisburg to treat higher needs mental health youth.  During the next monitoring period, DJJ will discuss with the Monitor different strategies for ensuring that all DJJ youth receive the proper level of mental health services.

The Monitor recognized that the Department has made progress with family engagement and family therapy but found that more efforts for tele-therapy and therapy during family visits need to be enhanced.  The Department continues to track family engagement in its monthly mental health data reports, including number of family therapy, family engagement sessions, family contacts sessions, and missed sessions.  In 2018, the Department is also returning a consultant on a contract to provide additional coaching to staff to better engage families.

### Plaintiffs' Response: Substantial Compliance as to 6(a) and 6(b), Partial Compliance as to 6(c)

Plaintiffs agree that the Department is in substantial compliance with Remedial Plan requirement 6(a), which requires development and implementation of an individualized mental health treatment plan for each youth.

Plaintiffs also agree that the Department is in substantial compliance with Remedial Plan requirement 6(b), which requires treatment and reentry planning and coordination by mental health staff.  That said, Plaintiffs share the Mental Health Monitor's concern that, as a result of the recently lowered population in DJJ, there is a higher percentage of youth with more significant mental health needs, and there are not enough Special Treatment Units available to

properly accommodate all of these youth. Serious consideration must be given to whether additional Special Treatment Units are needed to remedy this problem.

Plaintiffs believe the Department is only in partial compliance with Remedial Plan requirement 6(c), which requires the provision of family therapy as appropriate. The Mental Health Monitor acknowledged that there have been significant improvements to family therapy at some facilities, but overall this is still an area that needs improvement. According to the Department's data, the number of executed family therapy, family engagement, and family contact sessions increased from 2016 to 2017 at Chicago, Harrisburg, and Pere Marquette. The total number of family therapy sessions at Warrenville decreased from 2016 to 2017, but the number of family engagement and family contact sessions increased. At St. Charles, the total number of family therapy, engagement, and contact sessions decreased from 2016 to 2017. To improve the frequency and effectiveness of family therapy in 2018 and beyond, Plaintiffs agree with the Mental Health Monitor's recommended use of tele-therapy, and his suggestion that family therapy sessions be conducted during family visits when feasible.

7. <u>Medication Consent</u>. DJJ shall develop revised procedures and forms to ensure that appropriate informed consents are obtained for administration of psychotropic medications. The consent forms shall (a) communicate the diagnosis; (b) identify the specific goals and potential side effects of the treatment; (c) provide for documentation of parental, guardian, or youth consent as legally required; and (d) provide for an assent signature for minor youth where consent is provided by a parent or guardian.

### DJJ Report: Substantial Compliance

The Monitor stated that the Department is not in compliance as it relates to medication consent. The Monitor noted that there are some verbal consents but a process for full implementation of verbal consent is not in place.

The Department maintains that it is in substantial compliance with this provision of the Remedial Plan. On January 31, 2017, the Department's Medical Director issued a memo to the Department's Heath Care Unit Administrators instructing them to use the medication consent form (approved by the Monitor) and the relevant medication information sheet and to ensure that a copy of both documents is placed in the youth's medical file. The Health Care Unit Administrators for each facility have been reviewing the forms and providing the Department's Medical Director with quarterly reports on compliance. During the next round of Monitor visits, the Department will direct the Monitor to location of these consents in the youth medical file and will review the documentation with him.

### Plaintiffs' Response: Non-Compliance

Plaintiffs are aware that the Department and Mental Health Monitor reviewed and revised the Department's informed consent form in winter 2017. Plaintiffs further reviewed a sample of the Department's medication consent forms in spring 2017, but are not in a position to evaluate whether the consent forms are being properly and consistently utilized and charted at each DJJ facility. Plaintiffs therefore defer to the Mental Health Monitor, who found the Department's use of medication consent forms to be fragmented and incomplete during his on-site observations and assessments. In 2018, Plaintiffs will pay particular attention to the Monitor's review of

informed consents in an effort to identify any deficiencies and call for corrective action if needed.

8. <u>Medication Management</u>.  DJJ shall review and revise, in consultation with the DJJ Medical Director and Child and Adolescent Psychiatrist, its policies and procedures relating to medication management. The policies and procedures shall address the use of stimulant medications for youths with polysubstance abuse and shall ensure adequate monitoring of the consequence of medication.

### *DJJ Report: Non-Compliance*

The Monitor noted that DJJ's new child and adolescent psychiatrist, Dr. Maskel, recently joined the Department and has begun reviewing its policies and procedures relating to medication management.  The policies were also discussed with the parties and the Monitor during a meeting on November 21, 2017.  DJJ will complete a draft medication management policy by January 31, 2018, and will circulate it to the ACLU and the Monitor for their review.

### *Plaintiffs' Response: Non-Compliance*

Plaintiffs agree with the Mental Health Monitor and the Department that DJJ is not yet in compliance with this provision of the Remedial Plan.  The Remedial Plan requires that medication management policies be reviewed and revised in consultation with the Department's Child and Adolescent Psychiatrist, who was just hired in September 2017.  Now that the position is filled, the Department is making progress towards revising these policies, and Plaintiffs look forward to reviewing these policies in the coming weeks.

9. <u>Youths in Reception and Classification Units</u>.  DJJ shall create and implement policies and procedures to ensure appropriate group therapy is available to youths in Reception and Classification Units subject to reasonable safety and security considerations.

### *DJJ Report: Substantial Compliance*

The Department concurs with the Monitor's finding of compliance with this requirement.  The Monitor recommended either shortening the amount of time youth spend in the Reception & Classification Unit or providing more activities for youth in the Unit.  This recommendation relates specifically to IYC-St. Charles and IYC-Harrisburg; youth in Reception & Classification at IYC-Warrenville spend considerably less time.  On January 16, 2018, the former Reception Unit Administrator at IYC-St. Charles will be returning to the Department to assist the reception units in reviewing reception procedures and making the process shorter and more efficient.

### *Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree that the Department is in substantial compliance with this provision of the Remedial Plan.  Appropriate policies and procedures are in place to ensure appropriate group therapy is available to youths in Reception and Classification.  Given the limited programming and education options available to youths in Reception & Classification, Plaintiffs agree with the Mental Health Monitor that resources should be directed towards either reducing the amount of time that youth spend in this Unit, or providing more programming to reduce idleness.

10. <u>Youths Seeking Immediate Mental Health Care</u>.  DJJ shall promptly fulfill, to the extent reasonably possible, requests by youths who ask to immediately speak with a mental health professional, without any presumption that such youths need crisis confinement.

### *DJJ Report: Substantial Compliance*

Under this provision in the Remedial Plan, DJJ is required to "fulfill requests by youth to immediately speak with a mental health professional, without any presumption that such youths need crisis confinement."  DJJ does not have a practice of placing youth on crisis confinement merely because they request to speak with a mental health professional, nor did the Monitor report that he had concerns that this practice was happening.

The Department's Chief of Mental Health Services tracks data on the number of mental health requests by youth and referrals by staff, and the number of requests/referrals responded to on the same day, within 24 hours, and within five business days of the request/referral.  This data will be sent to the Mental Health Monitor on a monthly basis in 2018.

Department-wide, the mental health teams at each youth center provide training to other staff members every year.  At least one hour of training on mental health issues is included in the annual training required for all staff.  The facilities' Youth and Family Specialists (YFS) receive an additional hour of training, and each facility provides two additional training sessions on a topic of their choice based on the needs of the facility.  Through these efforts, the Department seeks to build the capacity of all staff to better assess youths' mental health needs and to seek assistance on behalf of youth when needed.

To the extent the Monitor expressed concern about the adequacy of psychiatric/mental health services, DJJ believes those concerns fall under Part II.6 covering Individualized Mental Health Treatment Plans and Coordination of Treatment rather than this provision.  That issue is addressed above.

### *Plaintiffs' Response: Partial Compliance*

The Mental Health Monitor has assessed DJJ as in "Partial Compliance" with this provision and Plaintiffs agree with that assessment.  Compliance with this provision is challenging to evaluate, since the evidence is anecdotal and to some extent subjective.  However, like the Monitor, Plaintiffs believe, based upon youth interviews at IYC Chicago and IYC Harrisburg, that compliance with this provision is imperfect at those sites; in addition, the current failure to meet what the Monitor refers to as "staffing levels at [even] the minimal requirements" at IYC Chicago and IYC St. Charles make it unlikely that this provision is fully complied with at those sites.

11. <u>LGBTQ Youths</u>.  DJJ shall create and implement a training program and promulgate and implement revised policies addressing needs and potential treatment of LGBTQ youth and youth diagnosed with Gender Dysphoria. The revised policies shall include (a) protection of LGBTQ youths from violence, threats, and harassment from staff and others; (b) individualized decisionmaking, which includes the input of DJJ mental health staff, regarding the classification and housing of transgender youths, including whether to house them with male or female youths; (c) individualized decision-making, which includes the input of DJJ mental health staff, regarding whether to continue or begin

hormone or hormone-blocker therapy for transgender youths; and (d) when body searches of transgender youths are necessary, allowing such youths to choose the gender of the staff who will search them.

### DJJ Report: Substantial Compliance

The Department concurs with the Monitor's finding of compliance with this requirement.

### Plaintiffs' Response: Substantial Compliance

Plaintiffs agree that the Department is in substantial compliance with this provision of the Remedial Plan. The Department has made substantial improvements in its treatment of LGBTQ youth and youth diagnosed with Gender Dysphoria, which have been corroborated by Plaintiffs' own monitoring of the Department's data and by Plaintiffs' counsel's interviews with youth. Additionally, although previously filed policies concerning the treatment of LGBTQ youth and the evaluation of youth with Gender Dysphoria were reviewed by the parties and Monitors, and were approved by the Court, the parties have discussed potential revisions to these policies that may further improve protections for these youth.

## III. EDUCATION SERVICES

1. <u>Full-Time, Full-Day Instruction</u>. DJJ shall provide full-time, full-day instruction on all scheduled school days in each facility. Specifically, DJJ shall make available at least five hours of instruction per day, on all scheduled school days, to all youths committed to the DJJ, regardless of their status or security classification, except that: (a) DJJ shall offer at least two and one-half hours of educational programming per scheduled school day to youths who have a high school diploma or GED; and (b) within 120 days of the entry of this plan, and in consultation with the court-appointed education expert and Plaintiffs' counsel, DJJ shall develop and implement a policy regarding the kind and minimum amount of alternative educational programming for youth in reception and classification units. During scheduled non-school days, DJJ shall offer alternative educational programming and online coursework.

### DJJ Report: Partial Compliance

The Education Monitor's report noted that most youth receive the five hours of daily instruction required by the Remedial Plan except for those at IYC-St. Charles. Unfortunately, youth at IYC-Chicago also are not receiving full-time and full-day instruction due to a teacher shortage.

The Department continues working to address systemic hiring barriers in obtaining staff for key positions. At IYC-Chicago the full-time floater teacher begins on January 16, 2018, and a teacher who has been out on a leave of absence is anticipated to return at the end of February 2018. Interviews for a Physical Education teacher are scheduled for January 17, 2018, and a social studies teacher has accepted a conditional offer and is going through the backgrounds process.

At IYC-St. Charles, a contractual educator started on December 4, 2017, Language Arts teacher started on December 18, 2017, a second Language Arts teacher starts on January 16, 2018.

Interviews for math teachers are scheduled for January 26, 2018. Two additional educators have accepted conditional offers are moving through the background process.

The Education Monitor's report also noted that very few youths with high school diplomas or GEDs receive 2.5 hours of educational programming per day. The Department's partnership with Lakeland College allows youth at IYC-Harrisburg and IYC-St. Charles to participate in post-secondary vocational programming, and youth at IYC-Pere Marquette also receive post-secondary opportunities. As of the end of November 2017, 13 post-secondary youth at IYC-Harrisburg were participating in the Lakeland College culinary arts and horticulture programs, 10 post-secondary youth at IYC-St. Charles were participating in the Lakeland College custodial maintenance program and one post-secondary youth at IYC-Pere Marquette was participating in the Lewis & Clark Community College and Youth Build construction program. Providing post-secondary opportunities at IYC-Warrenville and IYC-Chicago is a key area of focus for 2018.

### Plaintiffs' Response: Partial Compliance

Plaintiffs agree that the Department is in partial compliance with this provision of the Remedial Plan. With respect to full-time instruction, youths at IYCs Warrenville, Harrisburg, and Pere Marquette consistently received five hours of daily instruction throughout 2017. School interruptions at IYCs St. Charles and Chicago, however, prevent the Department from achieving full compliance with this component.

According to the Department's data, 100% of scheduled school days have been disrupted or cancelled at IYC St. Charles since at least March 2017. This data is corroborated by the accounts of youths, who have reported to Plaintiffs' counsel as recently as January 2018 that they typically attend school for 1-2 hours per day a few times per week. These disruptions and cancellations are due to persisting security and educator shortages. Unfortunately, teacher shortages at IYC Chicago since October 2017 have also resulted in regular school disruptions. During Plaintiffs' counsel's last visit to IYC Chicago in January 2018, youths reported having attended only half-day school since October 2017.

The Education Monitor expressed his concerns about these education deficiencies to the Department via letter on October 23, 2017. The Department responded to the Monitor's letter on November 22, 2017, and reported on several steps that the Department planned to take to address chronic staffing shortages and hiring delays. The parties and the Education Monitor have conferred twice about these issues, and are scheduled to confer again in February and April, at which point the Education Monitor will assess whether the Department's corrective measures have proven effective.

At IYC St. Charles, Plaintiffs have additional concerns about the education of youth on the Alternative Behavior Unit (ABU). The ABU has been in operation since August 2017, and youth on the ABU have consistently reported to Plaintiffs' counsel that they receive either no education, or at most one hour of school a couple of days per week. Plaintiffs have requested and received some information about education and programming on the ABU, and have raised these concerns with the Department and Education Monitor. The provision of services to youths housed on the ABU will be an area of intense focus for Plaintiffs in the upcoming review period.

11

This Remedial Plan provision also requires that the Department implement a policy regarding the kind and minimum amount of alternative educational programming for youth in Reception and Classification Units.  In his report, the Education Monitor indicated that he was not able to assess the adequacy of education services for students in R&C during this round of monitoring, and will address this particular requirement during the next reporting period.  (Dkt. 225-2, p. 6).

Finally, this requirement calls for the provision of 2.5 hours of educational programming per day to youths with high school diplomas or GEDs, and alternative education programming and online coursework during scheduled non-school days.  As the Education Monitor noted, very few graduates receive additional educational programming.  (Dkt. 225-2, pp. 9-10).  As of November 2017, there were about 24 total students enrolled in post-secondary programs, but there are dozens more graduates or GED recipients across facilities.  Plaintiffs are also not aware of any alternative education programming being provided to students on scheduled non-school days. Improvements in these areas are additional areas of significant focus for Plaintiffs during the upcoming review period.

   2.  <u>Teacher Staffing Levels</u>.  DJJ shall ensure student to teacher rations of 10:1 or lower for a general classroom setting and 6:1 or lower for students with intensive needs. DJJ shall also work to streamline the teacher hiring process to eliminate any barriers to timely hiring of teachers and duplicative efforts or other inefficiencies in the hiring process.

**_DJJ Report: Partial Compliance_**

As described in Section III.1., the Department continues its constant effort to hire and retain a full complement of teachers at each facility.  The Education Monitor noted that staffing levels at most facilities are consistent with the 1:10 general education and 1:6 special education ratios in the Remedial Plan.  In recent months, the Department has struggled to maintain the 1:6 special education ratio at every facility except IYC-Warrenville.  The most recent monthly data is as follows:

General Education Student to Teacher Ratio

|  | 1/17 | 2/17 | 3/17 | 4/17 | 5/17 | 6/17 | 7/17 | 8/17 | 9/17 | 10/17 | 11/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Chicago* | 7 | 8.5 | 12.8 | 10 | 7.7 | 6.7 | 7.8 | 7.7 | 5.4 | 10 | 10.3 |
| *Harrisburg* | 6.9 | 5 | 5.2 | 5.6 | 4.8 | 4.2 | 4.4 | 5.4 | 4.7 | 6.3 | 6.8 |
| *Pere Marquette* | 9 | 6 | 7 | 4.5 | 5 | 3.7 | 4.3 | 4.3 | 2 | 1.6 | 2 |
| *St. Charles* | 10.3 | 6.7 | 6 | 8.7 | 10.3 | 11.2 | 16.6 | 17.6 | 13.2 | 11.6 | 6.6 |
| *Warrenville* | 3.6 | 3.6 | 4 | 2.8 | 2.5 | 2.8 | 3.3 | 3.3 | 3.8 | 4.5 | 5.8 |
| **IDJJ Average** | **7.2** | **5.7** | **6.4** | **6.4** | **6.2** | **5.8** | **7.1** | **7.7** | **5.7** | **6.3** | **6.1** |

Special Education Student to Teacher Ratio

|  | 1/17 | 2/17 | 3/17 | 4/17 | 5/17 | 6/17 | 7/17 | 8/17 | 9/17 | 10/17 | 11/17 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Chicago* | 9 | 9 | 7.3 | 7 | 6.8 | 5.8 | 5.0 | 7.3 | 6 | 6.3 | 7.7 |
| *Harrisburg* | 6.3 | 9.5 | 7.3 | 6.5 | 7.3 | 7.2 | 8.0 | 9.8 | 9.6 | 8.6 | 9.2 |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *Pere Marquette* | 4 | 4.5 | 4.3 | 4 | 2.3 | 3.3 | 4.3 | 4.3 | 7 | 8 | 8.5 |
| *St. Charles* | 7 | 4.2 | 5.2 | 10.3 | 10.7 | 10.7 | 8.7 | 9 | 22 | 22 | 28 |
| *Warrenville* | 3.7 | 6.3 | 4.0 | 5.3 | 5.7 | 6 | 4.3 | 4.3 | 4.3 | 4 | 5.5 |
| **IDJJ Average** | **6.1** | **6.9** | **6.0** | **6.6** | **6.7** | **6.6** | **6.3** | **7.3** | **9.1** | **8.9** | **10.9** |

As the Department continues to hire, it is also working to provide teachers with professional development aimed at improving the culture and climate of their schools. The Department contracted with Quo/Vadimus to conduct training sessions for principals and teachers on understanding how trauma impacts school experience and providing support for addressing trauma, building classroom management skills, and enhancing youth engagement in learning. Additionally, the Department is evaluating teacher salaries and seeking to offer salaries competitive with the youth center's geographic region. Through these efforts, the Department seeks not only to onboard new teachers but to retain teaching staff by building competencies for the unique correctional environment and offering competitive compensation.

The Department is exploring partnerships with Illinois universities and the possibility of hosting student teachers. Additionally, the District 428 Superintendent is partnering with Governor's State University to allow education students to conduct a portion of their required observation hours at DJJ schools and will be presenting at a forum for education students this spring. The Superintendent helps to continue forging partnerships with universities to recruit new teachers by building awareness of and interest in DJJ schools.

These challenges in filling educator vacancies are not unique to DJJ. According to the Illinois State Board of Education, school districts in Illinois reported over 2000 unfilled positions for teachers, administrative staff, and support staff in 2017. A recent survey from the Illinois Association of Regional Superintendents of Schools (covering the 2015 to 2016 school year) showed that 75 percent of school districts in Illinois received fewer qualified candidates than in previous years. The shortages also impacted classes, with 16 percent of schools reporting canceled classes or programs due to teacher shortages. In this context, DJJ struggles to attract high-quality teacher candidates who are in demand at better-resourced school districts serving less-challenging student populations.

*Plaintiffs' Response: Partial Compliance*

Plaintiffs agree with DJJ's (and the Education Monitor's) assessment of "Partial Compliance" with this provision.

It is no secret that teacher hiring and retention, especially (but not exclusively) at IYC St. Charles, has been an ongoing problem with the implementation of the Consent Decree and Remedial Plan. On October 23, 2017, as described in his annual Report, the Education Monitor sent a letter to Director Mueller concerning this long-term issue and describing additional steps DJJ could take to address it. *See* Dkt. 225-2, p. 3 and Appendix C. As required by paragraph 35 of the Consent Decree, the parties and the monitor had a meet-and-confer shortly thereafter to discuss DJJ's non-compliance and how it could be addressed. This resulted (as also described in the Report) in an agreement to re-examine the status of DJJ's compliance with this provision in

early April, since DJJ was in the process of developing and/or implementing several initiatives that it hoped would address its chronic teaching shortages. *See* Dkt. 225-2, p. 3. Since then, the parties and the Monitor have had two calls (on November 28 and January 17) during which DJJ reported to the Monitor on the status of their initiatives, and a further call is scheduled for February 26.

Until April, Plaintiffs await the results of those efforts.

3.  <u>Other Education Staffing Levels</u>.  DJJ shall hire the following additional education staff, as specified in the July 17, 2014 Supplemental Order: (a) On or before March 7, 2015, a full-time Library Associate at IYC Chicago, IYC Harrisburg, and IYC St. Charles, and a half-time Library Associate at IYC Pere Marquette and IYC Warrenville; (b) On or before July 7, 2015, two full-time school counselors at IYC Harrisburg and IYC St. Charles; one full-time school counselor at IYC Chicago and IYC Warrenville; and a half-time school counselor at IYC Pere Marquette; (c) On or before March 7, 2015, a full-time Office Associate at IYC Chicago, IYC Harrisburg, and IYC St. Charles, and a half-time Office Associate at IYC Pere Marquette and IYC Warrenville; (d) On or before April 7, 2015, a full-time special education instructional specialist at IYC Chicago, IYC Harrisburg, and IYC St. Charles, and a half-time special education instructional specialist at IYC Pere Marquette and IYC Warrenville.

### *DJJ Report: Substantial Compliance*

The Monitor noted that DJJ still has vacancies in other authorized positions.  Below is chart summarizing the status of each youth center's staffing levels for school positions other than educators as of early January 2018.  Recent hires have improved the Department's staff levels since the Monitor's visit to the schools.

| IYC-Chicago | Office Coordinator | Hiring in process |
|---|---|---|
| | Special Education Resource Coordinator | Filled but recent resignation; rehire in progress |
| | School Counselor | Filled |
| | Library Associate | Hiring in process |
| IYC-Harrisburg | Office Coordinator | Filled |
| | Special Education Resource Coordinator | Filled |
| | School Counselor | Filled |
| | Library Associate | Filled |
| IYC-Pere Marquette | Office Coordinator | Filled |
| | Special Education Resource Coordinator | Current special education teacher accepted position; will be filled when replacement hired |
| | School Counselor | Filled |
| | Library Associate | Filled |
| IYC-St. Charles | Office Coordinator | Filled |
| | Special Education Resource Coordinator | Filled |

| | School Counselor (2 positions) | Filled (both positions) |
|---|---|---|
| | Library Associate | Filled |
| IYC-Warrenville | Office Coordinator | Filled |
| | Special Education Resource Coordinator | Filled (started 12/18/17) |
| | School Counselor | Hiring in process, candidate accepted conditional offer |
| | Library Associate | Filled |

***Plaintiffs' Response: Partial Compliance***

The Education Monitor's Report assessed DJJ as in "Partial Compliance" with this provision, noting that as of September 2017 "DJJ continues to have nearly 1/3 of authorized positions vacant." Dkt. 225-2, p. 10. Plaintiffs agree with the assessment of Partial Compliance. Although DJJ has apparently made progress towards compliance since the Monitor's assessment, sporadic (rather than sustained) compliance with any provision of the Remedial Plan does not constitute compliance as defined in the Consent Decree (*see* Dkt. 227, ¶ 36).

4. <u>Substitute Teacher Policy</u>.  DJJ shall create and implement a plan to provide for certified substitute teachers in its facilities to minimize the impact of teacher absences on instruction in its schools.

***DJJ Report: Substantial Compliance***

The Department created a permanent floater teacher position at each youth center to cover classes during teacher absences.  All five schools have filled this position, and currently all but St. Charles have a teacher in the position (IYC-Chicago's teacher starts January 16, 2018).  At St. Charles, the floater teacher resigned six months after being hired but the position is in the process of being filled again and interviews will be held on January 19, 2018.

***Plaintiffs' Response: Partial Compliance***

The Education Monitor's Report assessed DJJ as in "Partial Compliance" with this provision, noting that, as of the dates of his site visits, there were no substitute teachers in place, although as of the date of his report DJJ was "in the process of employing" them.  Dkt. 225-2, p. 10. Again, only sustained compliance with a provision constitutes compliance under the terms of the Consent Decree.  Dkt. 227, ¶ 36.  In addition, even now, DJJ does not have a substitute/floater teacher in place at IYC St. Charles.

5. <u>Modified School Calendar</u>.  DJJ shall reduce teacher absences and ensure continuity of instruction by implementing a modified school calendar. The modified school calendar shall have defined vacation times for teachers, and minimize the use of vacation time by teachers during school instruction periods.

***DJJ Report: Substantial Compliance***

The Education Monitor noted DJJ's compliance with this provision in the Remedial Plan but expressed concern with teachers' ability to work on non-instructional days and take vacation during times of the year where school is in session.  DJJ educators' benefit time is outlined in the

AFSCME union agreement. However, DJJ does not believe instruction is disrupted by educators' ability to take benefit time during the instructional year and has not seen it become a problem. DJJ also has hired full-time floater teachers to act as substitutes and cover classes for any educators utilizing benefit time.

***Plaintiffs' Response: Substantial Compliance***

As noted by DJJ, the Education Monitor assessed compliance with this provision but expressed continued concern over the provision of the union contract that permits DJJ teaching staff to take vacation during periods when school is in session. Dkt. 225-2, pp. 10-11 and n. 9. In the coming year, Plaintiffs believe that both Plaintiffs and the Monitor should request data from DJJ by which they may try to assess whether this provision of the contract does in fact interfere with the delivery of education services at DJJ sites, since this has been a concern of the Monitor over a number of reporting periods.

6. <u>Blended Instruction Model</u>. DJJ shall ensure that it provides both traditional classroom instruction and web-based instruction, individually tailored to students' needs.

***DJJ Report: Partial Compliance***

The Education Monitor acknowledged DJJ's efforts to conduct professional development for teachers on implementing the blended learning model in classrooms but noted concern that not all teachers have embraced this approach. Specifically, teachers at IYC-Warrenville reported reluctance to provide small-group instruction because of student complaints. A new principal started at IYC-Warrenville in October, filling a position that was vacant for more than 10 months. The IYC-Warrenville principal is focused on enhancing blended learning at the school by implementing the following:

- Offering youth more choices about their learning experiences;
- Focusing whole group instruction on thematic units and skills, offering one-on-one instruction, and providing opportunities for independent work and technology engagement;
- Providing differentiated instruction to satisfy students' diverse learning needs;
- Designating Wednesdays as a day for traditional teaching not utilizing GradPoint;
- Offering Music Appreciation, Life Skills, and Vocational Education courses in addition to core classes;
- Providing daily support from therapists during instructional time to support positive youth behavior in school.

All principals are submitting a yearly calendar with monthly thematic units to the District 428 Superintendent reflecting each month's focus for the project-based learning at the school. In the coming year, each school will be expected to set aside structured time for traditional teaching methods each week, and most facilities have already begun doing so. Through these efforts, the District hopes to continue building its blended learning instructional methods to better serve students.

***Plaintiffs' Response: Partial Compliance***

Plaintiffs agree with DJJ's (and the Education Monitor's) assessment of "Partial Compliance" with this provision. Dkt. 225-2 p. 11. Plaintiffs' counsel continue to hear complaints from certain youth that the computer-based learning program does not work for them without teacher interaction. This remains a problem at sites other than IYC Warrenville; for instance, at a recent (January 12) site visit to IYC Chicago, counsel heard complaints about this very issue.

7. <u>Curriculum</u>. DJJ shall provide an academic curriculum sufficient to make available, to every youth without a high school diploma or GED, instruction in: (a) all subjects in which they must earn credit under state law in order to earn a high school diploma; (b) all subjects they need in order to prepare to take the GED exam; and (c) career and technical education programs for which high school credit can be earned. DJJ shall also offer vocational programming in which youths who already have a high school diploma or GED, or who are not on a diploma track, can earn vocational certification. Within one year of entry of this remedial plan, DJJ shall offer at least two vocational programs at each facility (except that facilities with fewer than 50 youths need only have one), and the DJJ shall ensure that at least one vocational program at each facility leads to certification. DJJ shall provide intensive literacy instruction to all youths who score below the 25th percentile on standardized reading tests upon DJJ admission.

### DJJ Report: Partial Compliance

The Education Monitor stated that the Department's GradPoint web-based instructional system meets the needs of many youth. The Department is migrating to a new version, Pearson Connexus, which will include additional instructional tools along with tutoring and teaching support through the online courses. The Department is focused on providing high-quality curriculum supplementing its core course offerings, including reading intervention for youth with low levels of literacy, Career and Technical Education courses, and vocational programming. The Department has taken strides to enhance its curriculum in 2017 and remains focused on continued expansion in 2018.

As noted by the Education Monitor, youth with low levels of literacy and those needing special education services receive additional support through the Reading Horizons program. Teachers at each youth center were trained in the program during 2017. In addition, as noted by the Monitor, volunteer tutors with Literacy Volunteers of Illinois work with youth at every DJJ facility, except IYC-Pere Marquette, and provide literacy interventions for youth. Finally, a newly formed Special Education Curriculum Council will be meeting in 2018 to review additional reading and math intervention programs for Department-wide implementation during the upcoming school year. The Department will be considering providing credit for student work in these intervention programs so youth with low levels of literacy are incentivized in the same way as youth working on GradPoint.

Regarding Career and Technical Education (CTE) programming, IYC-Pere Marquette offers a course in AutoCAD software and 16 high school students participated in November. Through a partnership with Lewis & Clark University and Youth Build, IYC-Pere Marquette also offers a construction program in which students are transported to an off-campus construction site where they are engaged in real-world construction projects. In November, three students participated in the construction program. IYC-Pere Marquette also offers a highway construction program through its partnership with Lewis & Clark and Youth Build with one youth participating in

November.  At IYC-Harrisburg, youth have the opportunity to participate in culinary arts, building maintenance, and horticulture programs.  In November, six high schoolers participated in the culinary arts course and 10 participated in the building maintenance course.

The Department hired a new CTE Director in the fall of 2017 and continues to improve its CTE programming at each facility.  The CTE Director is working to launch a Business Applications program, using Microsoft Office, to provide youth with computer literacy and technical skills.  At IYC-Chicago and IYC-Warrenville, the District will be offering an entrepreneurship program featuring real-world concepts, financial education and life skills utilizing the Network for Teaching Entrepreneurship (NFTE) workbooks and a financial education program that was donated to IYC-Chicago by the University of Chicago.  The CTE Director anticipates implementation of this program by early summer 2018.

Finally, the Department experienced a delay in implementation of the ACT KeyTrain, a software curriculum providing interactive courses focused on workplace skills for success, due to transition in the CTE Director position.  The Department's new CTE Director is working with school principals to launch the curriculum and anticipates Department-wide utilization in Spring 2018.

IYC-St. Charles continues to lack educational programming in the Reception and Classification Unit (R&C) for youth coming into the Department due to the educator staffing shortage.  Youth in the IYC-Harrisburg R&C receive educational programming and youth in the IYC-Warrenville R&C transfer into the general population and receive full-day school within a few days of admission.

Finally, the District 428 Superintendent is working to provide a richer curriculum for youth.  First, the Superintendent is exploring ways to infuse multi-cultural art and poetry into the District's History and Language Arts courses.  Second, the Department is finalizing an intergovernmental agreement with the Kane County Regional Office of Education to provide enrichment programs, including art and music, to youth at IYC-St. Charles.  Finally, the District's new Assistant Superintendent began on January 2, 2018 and brings with her a strong curriculum background, which the Department anticipates will enhance each school's educational program.

***Plaintiffs' Response: Partial Compliance***

Plaintiffs agree with DJJ's (and the Education Monitor's) assessment of "Partial Compliance" with the requirements of the "Curriculum" paragraph of the Remedial Plan (Part III ¶ 7).  *See* Dkt. 25-2, p. 11.  Plaintiffs acknowledge that 2017 saw the launch of a number of vocational and CTE programs within DJJ; however, these programs still fall short of the wide availability of CTE, or, for graduates, vocational programs leading to vocational certification, contemplated by paragraph 7.  The available programs so far have small enrollments.[4]

---

[4] Plaintiffs' counsel have heard this from youth interviews throughout the year; *see also* Dkt. 225-2, p. 9, reporting on youth enrolled in post-secondary education and community college.  DJJ's November 2017 data, however, does show a near-doubling of youth enrolled in post-secondary education over the July 2017 data reported by the Monitor – 32 youth rather than 17.

In addition, Plaintiffs remain concerned about the full implementation of the requirement that intensive literacy instruction be provided to all youths scoring below the 25th percentile on standardized reading tests. The Education Monitor apparently believes that compliance with this requirement is largely – though not exclusively – addressed by youth IEPs (individualized education plans); *see* Dkt. 225-2, p. 6. Thus, the ongoing problems with hiring special education teachers at multiple sites mean that, to the extent it depends on IEP services, this requirement is also not being met. In addition, the Monitor's evidence for compliance is, as reported, anecdotal ("[i]nterviews with youth and discussions with teachers and administrative staff," *see id.*). Plaintiffs believe that, in the coming year, a more reliable means of tracking compliance with this requirement should be found. Youth with learning difficulties have repeatedly complained to Plaintiffs' counsel about the lack of tutoring to help them with language arts.

8. <u>Special Education Policies and Procedures</u>. DJJ shall revise and update its policies and procedures relating to special education. The policies and procedures shall provide for (a) timely obtaining youths' IEPs and related materials from their prior schools, (b) identification and assessment of youths with learning disabilities, (c) development and implementation of IEPs, and (d) monitoring to ensure that youths are receiving the services specified in their IEPs.

### *DJJ Report: Substantial Compliance*

The Department concurs with the Education Monitor's finding that special education policies and procedures are in place at DJJ schools and services have improved considerably. DJJ's Director of Special Education has worked to make significant progress in the Department's legal compliance by implementing processes to ensure that DJJ youth have up-to-date Individualized Education Programs (IEPs).

The Director of Special Education has built collaborative relationships with other DJJ departments to better serve youth with disabilities. In 2017, Aftercare Specialists began participating in IEP meetings to help develop transition goals for youth spanning from their time in facility through their return to the community. This partnership has not only helped develop more robust IEPs, but also has helped build collaboration between School District 428 and the Aftercare team. Additionally, School District 428 coordinated training for DJJ nurses to conduct vision and hearing testing, a collaboration that has enhanced service delivery for youth.

The focus for the Department moving forward, in addition to filling all vacant special education-related staff positions, is to improve the services delivered to youth and implementation of their IEPs. The District 428 Superintendent's goal is for each DJJ school to implement a co-teaching model with general and special education teachers in the same classroom supporting students with disabilities while continuing to provide a Resource Room for more intensive services separately.

### *Plaintiffs' Response: Partial Compliance*

The Education Monitor assessed DJJ as in "Compliance" with this provision, although he acknowledged that staff vacancies, especially at IYC St. Charles, "result in some students . . . not receiving required services." Dkt. 225-2, p. 11. Since subsection (c) requires not just "development" but also "implementation of IEPs," Plaintiffs assess DJJ as in only "Partial

Compliance" with this paragraph, while acknowledging that there has been significant progress in this area during the past year. However, more recent staffing data as to special education vacancies than that on which the Monitor reported means that DJJ is likely out of compliance with the "implementation" requirement at more sites than IYC St. Charles (*see* pp. 12-13, *above*; only Warrenville was meeting the special education staffing ratios as of November 2017).

## IV. USE OF CONFINEMENT

1. <u>Confinement and Restricted Movement Policy</u>. DJJ shall rewrite its policy regarding use of confinement and restricted movement. The new policy regarding the use of confinement and restricted movement shall include the following features: (a) Limits on confinement for behavior management; (b) Limits on mental health crisis confinement; (c) Limits on investigative confinement; (d) Limits on confinement for transfer to DOC; (e) Limits on medical confinement; (f) Other confinement prohibited; (g) Periodic visual inspections; (h) Appropriate Services; (i) Process for entering, continuing, and exiting confinement or restricted movement; (j) Documentation; (k) Restricted movement on other living units.

*DJJ Report: Substantial Compliance*

The Safety & Welfare Monitor recommended that the Department collect data on youth committing misconduct shortly after being released from confinement to help ground the messaging about de-escalation being the purpose of confinement. On January 17, the Deputy Director of Operations issued a procedural bulletin for staff requiring the number of confinements, and the number of youth placed in confinement engaging in additional misconduct the same day, to be shared with security staff at roll call and with department heads at regular meetings.

The Monitor also noted that the descriptions of 15-minute visual and verbal checks when youth are in confinement need to be more detailed. The Deputy Director of Operations addressed this issue with all youth center superintendents on December 13, 2017 and instructed them to work with staff on improving the descriptions. The Deputy Director of Operations and his staff will be reviewing these forms quarterly to ensure the descriptions have improved.

The Monitor noted that the Department should ensure all youth are receiving the required out-of-room time in accordance with program schedules. The Department distributed on January 12 a Policy Bulletin for daily programming schedules at each youth center. The Policy Bulletin includes the expectations for daily programs, services, and out-of-room activities, requires a monthly program schedule to be submitted to the Deputy Director of Programs for approval and posted on the first work day of the month, and requires any deviations from the schedule to be approved by the shift supervisor, recorded, and tracked. The Department is seeking to collect accurate data about facilities' program offerings and adherence to schedules. This data will provide the Executive Staff with an accurate picture of program deficiencies and inconsistent implementation of schedules, which will inform decisions about infusing resources and support to correct any deficiencies.

The Monitor also noted that youth in confinement should receive intense programming commensurate with their high-level of need. IYC-St. Charles has developed a plan for youth in

confinement and on the Alternative Behavioral Unit (ABU) to receive more time out of their rooms, daily educational programming, and more structured programs. The facility struggles to implement this plan because of the consistent shortage of security staff. The Department's efforts to address this issue begin with recruiting, hiring, training, and retaining security staff, discussed in more detail in part V.4.

The Monitor recommended that the Department develop reliable procedures to identify youth in confinement for 18 continuous hours or more than 10 times during a 30-day period, noting that accumulated confinement interferes with the delivery of programming and creates a risk of self-harm, decompensation, increased frustration and aggression. The Department has determined that its Y360 system is able to track confinements over 30 day periods, and will update the Monitor on its progress in using the database as a tracking system in the next monitoring period.

### Plaintiffs' Response: Partial Compliance

Plaintiffs' agree with the Safety & Welfare Monitor that the Department is only in partial compliance with this provision of the Remedial Plan. (Dkt. 225-1, p. 13).

The Department has improved its recordkeeping when it comes to tracking various forms of confinement and, according to this data, the duration of youth confinement appears to be consistent with approved Department policies. There do appear to be some lingering problems related to the location of behavioral holds which, according to approved Department policies, should not occur on confinement units. In 2017, however, approximately one third of behavioral holds at St. Charles and half of behavioral holds at IYC Chicago occurred on the confinement unit. This is an easily fixable problem and should be corrected to ensure that staff and youth are distinguishing the concept of behavioral holds, which occur when a youth is disruptive or violates a youth center rule, from punitive confinement.

While many of the Department's confinement practices have improved, there are some extremely troubling practices that, in Plaintiffs' view, prevent the Department from achieving substantial compliance. Since August 2017, IYC St. Charles has been operating an Alternative Behavior Unit ("ABU"), which was designed as a 14-day program used as a sanction for violent behavior. (Dkt. 225-1, p. 12). While the program was envisioned as an "intensive" unit with programmatic and behavioral interventions for violent youth, staffing shortages from the outset turned the ABU into a de facto punitive confinement unit. Since the unit's opening, Plaintiffs' counsel have not spoken to a single youth on the ABU who has received the regular services to which they are entitled. Instead, youths report that they spend at least 23 hours per day in their rooms, receive no large muscle exercise or outside time, and receive at most one hour of on-unit education a couple of days per week, if at all. When youths are permitted to leave their ABU rooms for hour-long recreation, they report that this time is spent watching a muted television in another room with, at most, one additional youth. Youths on the ABU complain that they do not have access to regular showers, nor are they permitted to clean their rooms on a daily basis. Other youths complain that it is difficult to get staff to respond timely to youth who may be in mental health crisis or engaging in self-harming behavior.

In addition to youths who are assigned to the two-week ABU "program," there are other youths housed on the unit more permanently. Some of these youth are "self-confined," meaning they've chosen to stay on the ABU because they do not feel that there is another safe housing option for

them at IYC St. Charles. Self-confined youth on the ABU have reported that, because they have not been "assigned" to the ABU for behavioral intervention reasons, they are not entitled to the already minimal amount of programming provided to other ABU youth. One self-confined youth reported to Plaintiff's counsel in January 2018 that he had not set foot outside the ABU for any reason since September 2017.

The conditions on the ABU are the precise conditions that this Remedial Plan and the Court-approved confinement policies were designed to eliminate. It is not clear, however, that the Department is tracking the time youth spend on the ABU as a form of confinement, despite the fact that there appears to be very little difference between current conditions on the ABU and punitive confinement. The Safety and Welfare Monitor has expressed her concerns about the ABU and self-confined youth, and will continue examining the practice. (Dkt. 225-1, p. 12). The conditions of the ABU have and will continue to be an intense focus of Plaintiffs' counsel in the coming months. The Department must develop a plan to remedy this problem.

Lastly, Plaintiffs agree with the Safety & Welfare Monitor that unscheduled room time due to significant security and education staffing challenges at IYC St. Charles run afoul of this provision of the Remedial Plan. Youths at IYC Harrisburg have expressed similar complaints to Plaintiffs' counsel. This is another area that Plaintiffs and the Safety & Welfare Monitor believe needs to be tracked, and the Department must develop a plan to ensure that prohibited confinement conditions are not being created in youths' own housing units.

2. <u>Confinement Liaison</u>. DJJ shall develop and implement policies and procedures requiring a youth and family specialist or other non-security staff member to be present during the day shift at each confinement unit that has at least one youth in confinement. The youth and family specialist shall serve as a liaison between the youth and other facility staff, and shall help ensure that appropriate services (including mental health services, education services, and reading materials) are provided to the youth.

### *DJJ Report: Substantial Compliance*

The Monitor recommended streamlining the confinement policy to merge Extended Behavioral Holds and Time-Outs into a single category with the same requirements for staff contact and notification. A draft revision to Administrative Directive 05.01.303 regarding Behavior Management and De-Escalation will be shared with Plaintiffs' Counsel and the Monitor for review and input during the first quarter of 2018.

The Monitor also recommended that the Department ensure visual and verbal contacts are being delivered at the intervals and by the staff required under the confinement policy, that staff use descriptive language to document the youth's attitude, behavior and statements, and that staff sign the confinement log and include the substance of their contacts with the youth. As noted above, the Department's Deputy Director of Operations addressed this issue with facility superintendents on December 13, 2017, and will be reviewing the forms quarterly for compliance.

### *Plaintiffs' Response: Partial Compliance*

The Safety & Welfare Monitor found the Department to be only in partial compliance with this provision of the Remedial Plan. (Dkt. 225-1, pp. 14-15). Accordingly, Plaintiffs' defer to the opinion and expertise of the Monitor.

Although this provision requires a youth and family specialist to be present anytime a youth is confined in a facility's confinement unit, the Safety & Welfare Monitor has expressed her opinion that the title of the staff who is present and counsels the youth is "less important than the dependability and substance of the contacts." (Dkt. 225-1, p. 14). The Safety & Welfare Monitor found that the required checks by uninvolved staff or supervisors on youth in confinement occurred regularly and at the intervals required by Department policies at most facilities. Additionally, most log entries were filled out and included substantive descriptions of the conversations held and the youth's attitude and behavior. These checks, however, were not consistently documented at IYC St. Charles, and staff did not describe the substance of the conversations held on the bottom of the form. Thus, based on the current records, it is not possible to tell whether staff performing checks on youth in confinement at IYC St. Charles are engaged in efforts to help de-escalate youth, help youth process the event that resulted in their confinement, or ensure that appropriate services are provided. The Safety & Welfare Monitor has noted that this will be a continued area of examination during the next reporting period. (Dkt. 225-1, p. 15).

    3. <u>Confinement Conditions</u>. DJJ shall develop and implement policies and procedures ensuring adequate thorough cleaning and sanitation of all confinement rooms after they are vacated before the room is used for another youth, and as needed during any period of use with an individual youth to ensure rooms remain free of food or human waste and/or graffiti. DJJ shall also ensure that all confinement rooms are well lit with functional plumbing, are appropriately heated or cooled, and contain adequate bedding and blankets.

***DJJ Report: Substantial Compliance***

The Monitor recommended that graffiti covering the walls in the confinement units at IYC-St. Charles and IYC-Harrisburg be routinely cleaned and painted over. The Department's Deputy Director of Operations is working with youth center superintendents to make sure safety and sanitation inspections are performed properly and that issues are promptly resolved. IYC-St. Charles and IYC-Harrisburg maintain a schedule for regular safety and sanitation inspections, with daily inspections conducted by Juvenile Justice Specialists, weekly inspections conducted by Juvenile Justice Specialist Supervisors, and monthly inspections completed by Health Care Unit staff. The youth centers' Assistant Superintendents of Operations and Chiefs of Security review the inspections and conduct any follow-ups needed to resolve issues.

The Monitor also recommended that youth with longer lengths of stay in confinement be provided with appropriate bedding. The Department's current practice is to provide bedding for youth if they are in confinement for extended periods of time or during sleeping hours.

During their regular facility site visits, the Deputy Director of Operations and his staff will be checking on the condition of the confinement units and verifying that youth housed on them have bedding.

***Plaintiffs' Response: Substantial Compliance as to Chicago, Warrenville, and Pere Marquette; Partial Compliance as to Harrisburg and St. Charles***

Plaintiffs agree with the Safety & Welfare Monitor, who found the Department to be in substantial compliance with this provision of the Remedial Plan at IYCs Chicago, Warrenville, and Pere Marquette, and partial compliance at IYCs Harrisburg and St. Charles. (Dkt. 225-1, pp. 15-16). Most significantly, the Safety & Welfare Monitor observed graffiti covering the walls of the confinement units at Harrisburg and St. Charles, and recommended that these walls be routinely cleaned or painted over. Youth reports to Plaintiffs' counsel corroborate the Monitor's findings. Youth at St. Charles have further reported to Plaintiffs' counsel that youth housed on the Alternative Behavior Unit are not permitted to clean their rooms on a daily basis, as they are on general housing units, which results in trash accumulation and unpleasant odors.

## V.     SAFETY AND GENERAL ISSUES

1. <u>Comprehensive Treatment Model</u>. DJJ shall develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitation model to be used for youth in all DJJ facilities, including but not limited to youths in special treatment units and for juvenile sex offenders. Such a model shall ensure general uniformity and cohesive programming in all DJJ facilities, across educational, mental health, substance abuse, behavioral management, and other programming for youths.

***DJJ Report: Partial Compliance***

The Monitor recommended improving the substance of youth case plans and creating action steps reflective of the components of behavior change. The Department has engaged YASI coaches from Orbis Partners, Inc., the creators of the YASI, to provide support from January through June of 2018. The YASI coaches will work with Youth and Family Specialist Supervisors (YFSS) on creating higher-quality case plans, and the YFSS will train the Youth and Family Specialists (YFS) they supervise.

The Monitor also noted that security staff should be trained to implement case plans in addition to YFS. The Department is exploring mechanisms for building JJSs' skills in this area. First, the Department remains focused on enhancing the role of staffing teams. The Department's goal is for JJS staff to regularly participate in the staffing team meetings for the youth they supervise and to take a more active role in developing the case plans and monitoring progress. Second, the Department is working on processes for sharing case plan information with JJS staff supervising the youth so they are aware of the goals the youths are working towards. Finally, the Department is identifying training opportunities to better prepare JJS to implement case plans. An introduction to the YASI is already provided during Intern Training Academy and the Deputy Director of Programs is working to provide an enhanced training for security staff. This will remain an area of focus for the Department in 2018.

The Monitor also noted the need to increase the volume of structured rehabilitative programming and decrease youth unstructured leisure time. As discussed in part IV.1, on January 12, the Department issued a Policy Bulletin related to program schedules with the goal of collecting accurate data and making improvements to youth programming at each facility.

*Plaintiffs' Response: Partial Compliance*

Plaintiffs agree with the assessment of "Partial Compliance" with this provision by DJJ and in the Safety & Welfare Monitor's report (Dkt. 225-1, p. 18). As recent events at IYC Harrisburg have shown, the full and consistent implementation of this model and the behavior management system (*below*) are crucial steps in ensuring that DJJ completes a successful transformation to a rehabilitative model. *See* Dkt. 223 (DJJ's Updated Plan to Address Youth Prosecutions in Saline County), pp. 1-6 (describing additional training and policies addressed at comprehensive behavior management); *see also* Dkt. 226 ¶ 3 (order providing that the Safety & Welfare Monitor shall perform an assessment on DJJ's progress in implementing the Plan and report to the Court within six months).

2. <u>Behavior Management System</u>. DJJ shall adopt and implement a comprehensive, department-wide, evidence-based or evidence-informed behavioral management system to provide a consistent model for youth behavior throughout the facilities.

*DJJ Report: Partial Compliance*

The Monitor recommended activating the Y360 component for Positive Behavior Interventions and Supports (PBIS) daily levels. The Department anticipates that this functionally will be added to the Y360 system in March 2018, along with a revised PBIS Administrative Directive.

The Monitor also recommended expanding the array of incentives and rewards for PBIS levels and ensuring consistent implementation. The Department continues to look to expand incentives and find additional resources to assist youth centers in purchasing incentives for youth. The Deputy Director of Programs has asked the facility superintendents to provide him a list of potential incentives by the end of January 2018 so the Department can develop a coordinate strategy for purchasing or obtaining incentives Department-wide.

The Monitor recommended encouraging accuracy when rating behavior and awarding PBIS points to youth, and coaching security on how to communicate point reduction and level drops to youth. The Department's Deputy Director of Programs and Chief of Professional Development and Training are partnering to create training for Duty Administrative Officers (DAOs) and JJSSs to build staff members' skills communicating PBIS points to youth.

The Monitor recommended ensuring that disciplinary sanctions are communicated across shifts and fully implemented, and publicizing information to staff to make the imposition of accountability measures more visible. At IYC-Harrisburg, the administration is posting a spreadsheet in roll call of youth sanctions, including commissary restriction, PBIS level reduction, and curfew, to keep staff informed of disciplinary sanctions and to help ensure the sanction is implemented. During their visits to roll call, DAOs will be checking to make sure the postings are present and to take corrective action whenever they are missing.

The Monitor also recommended continuing professional development efforts to increase staff skills in drafting and implementing intensive interventions. The Department's Deputy Director of Programs issued a Procedural Bulletin for Intensive Interventions and a template Behavior Intervention Plan. At the end of 2017, the Deputy Director of Programs and Chief of Professional Development and Training visited IYC-Harrisburg, IYC-St. Charles, and IYC-Chicago to conduct training for YFSs and Mental Health Professionals and trained YFSs, Mental

Health Professionals, and Educators at IYC-Pere Marquette. Training for IYC-Warrenville is scheduled for February 1, 2018.

***Plaintiffs' Response: Partial Compliance***

Plaintiffs agree with the assessment of "Partial Compliance" with this provision by DJJ and in the Safety & Welfare Monitor's report (Dkt. 225-1, p. 21). As with the comprehensive behavior management model, consistent implementation of the PBIS system is essential to youth rehabilitation and staff acceptance of the Department's reforms. *See* Dkt. 223, pp. 6-7 (re: PBIS). Plaintiffs look forward to the Safety & Welfare Monitor's six-month assessment of DJJ's progress as to these provisions.

3. <u>Individualized Youth Development Plans</u>. DJJ shall implement policies and procedures requiring preparation of a youth development plan (YDP) for each youth committed to DJJ custody. Within fourteen days of a youth's arrival at his or her assigned facility, DJJ facility and Aftercare staff will begin collaborating to develop the youth's YDP. The YDP will, through the use of screening and assessment, identify needed services based on the youth's strengths and needs, and will serve as a plan for the youth carrying through to the youth's release on aftercare.

***DJJ Report: Partial Compliance***

The Monitor recommended improving the content of case plans and supporting YFS skill development with supervisory coaching and formal training, and developing high-quality YASI goals that are achievable within one month and sequenced with the goals the previous month. As described in part V.1, Orbis Partners, Inc. will be providing coaching to YFSSs on case plan development. The Deputy Director of Programs will be meeting with Orbis Partners, Inc. to develop the training and will ensure these objectives are included in their work.

The Monitor also recommended clarifying the roles of other staff (security, mental health, substance abuse, education) in implementing the case plans' action steps that are designed to support behavior change. As discussed in part V.1, the Department is working to strengthen the functionality of staffing teams so all staff members working with a particular youth are involved in the development and implementation of the case plan.

***Plaintiffs' Response: Partial Compliance***

Plaintiffs agree with the assessment of "Partial Compliance" with this provision by DJJ and in the Safety & Welfare Monitor's report (Dkt. 225-1, p. 23). During the course of 2017, prompted by Dr. Krisberg's concerns about prior year case plans, Plaintiffs requested and reviewed a sample of case plans; while Plaintiffs' counsel's assessment of those plans was far from expert, a number of them seemed wanting in substance (as the Safety & Welfare Monitor's report addresses; *see id.*, p. 22).

4. <u>Security Staffing Levels</u>. DJJ shall increase the number of security staff posts to ensure adequate staffing at each facility. Specifically, DJJ shall comply with the Prison Rape Elimination ("PREA") Juvenile Facility Standards (28 CFR 115.313(c)) by achieving and maintaining youth to security staff ratios of . . . 8:1 for waking hours and 16:1 for sleeping hours by October 2017.

*DJJ Report: Partial Compliance*

The Department believes it is in compliance with this requirement at every facility except IYC-St. Charles.  The Monitor recommended continuing to recruit, hire, and train qualified security staff and properly deploy staff to ensure youth's access to programming and to provide adequate safety for youth and staff.  Regarding recruitment, the Department's Deputy Director of Operations will begin visiting Southern Illinois University in the first quarter of 2018 to provide students with information about pursuing future employment with the Department.  Additionally, the Department's Chief of Professional Development and Training is working to build relationships with the University of Illinois at Chicago and Bradley University and plans to make presentations for students to solicit interest among potential applicants in February/March 2018.

Regarding hiring and training, the Department is conducting additional screenings to identify qualified staff and scheduling additional Juvenile Justice Specialist Academies to onboard as many as possible.  The Department held an Intern Training Academy in October/November 2017, bringing on approximately 40 new security staff.  Additionally, the Department scheduled a special Intern Training Academy just for IYC-St. Charles.  That class graduated on January 5, 2018 with 13 interns.  Another Agency-wide class is scheduled for mid-February 2018.

The Monitor also recommended addressing staff retention issues, particularly those related to safety and staff wellness following incidents in which staff are assaulted.  At IYC-Harrisburg, the Department developed a communication plan as part of its plan to address youth prosecutions and help staff feel more supported by the administration.  Also, the Department has created a Staff Wellness Committee in an effort to boost morale and get staff thinking about mental and physical health and well-being. The Director's goal is for the Committee to be driven by staff at each youth center and in the Agency offices, and currently about 23 members are participating. The Committee recently launched with an introductory meeting and discussion of the action items participants would like to see come from the meetings.  The Committee's initial requests include the desire to receive information from administration about youth success stories, a staff response team to be deployed to support staff in need, designated time for physical wellness activities on-site, and staff discounts at local vendors.

Finally, the Department is working to return staff from leaves of absences as soon as possible. The Department held a claims review at IYC-St. Charles on December 8, 2017 with Tri-Star, the Department's workers compensation claims administrator, and attorneys from the Workers Compensation Bureau in the Illinois Attorney General's Office.  Additionally, the Department created a second Human Resources position at IYC-St. Charles; once hired, that employee will focus on workers compensation claims.

*Plaintiffs' Response: Partial Compliance*

Plaintiffs agree that the Department is in partial compliance with this provision of the Remedial Plan.  While the Department typically meets PREA ratios at each facility, these staffing ratios have not been sufficient to provide adequate security staffing at IYC St. Charles.

In January 2017, based on an Operational Needs Assessment, the Department determined that it needed to hire an additional 38 security staff to address the staffing deficit at IYC St. Charles. DJJ planned to reach this goal through two rounds of intern hiring beginning in March 2017 and

April 2017 respectively. By June 2017, however, DJJ reported to the Court that it had conducted another needs assessment and determined that St. Charles still needed an additional 17 security staff to account for upcoming retirements and anticipated attrition. DJJ anticipated beginning to hire interns to fill this updated void in early July, and to start the next Academy training in August 2017.

Now, DJJ reports that they still do not have sufficient security staff at IYC St. Charles, and they are planning to address this problem through recently completed and upcoming training academy classes. This is a serious and persistent problem affecting IYC St. Charles, and Plaintiffs will push for the Department to engage the Safety & Welfare Monitor and Plaintiffs' counsel in more frequent conversations to strategize about alternative solutions.

> 5. <u>Youth and Family Specialist Staffing Levels</u>. DJJ shall achieve and maintain a staff-to-youth ratio for Youth and Family Specialists of an average of 20:1 as specified in the July 17, 2014 Supplemental Order.

### DJJ Report: Substantial Compliance

The Monitor recommended monitoring the YFSs' ability to provide interventions as prescribed in the case plans in order to ensure that sufficient time is available for the rehabilitative counseling that is necessary to facilitate behavior change. As described in part V.1, YFSS will receive coaching and training conducted by Orbis Partners, Inc. The Deputy Director of Programs will reassess after this training is completed to determine whether YFS need additional support building their individual capacity to handle daily tasks while also providing rehabilitative counseling for youth.

### Plaintiffs' Response: Substantial Compliance

Plaintiffs agree with DJJ's assessment of "Substantial Compliance" with the YFS staff-to-youth ratios as provided in the July 2014 Supplemental Order (Dkt. 84). Plaintiffs note, however, that the Safety & Welfare Monitor assessed DJJ's compliance with this provision as "Partial Compliance" due to her reservations about the YFS staff's ability to provide interventions as required in youth case plans, noting that "[a]ll of the YFSs reported competing responsibilities that were difficult to juggle." Dkt. 225-1, p. 25. If future monitoring reports continue to reflect these substantive problems, it may be necessary for the parties to revisit the staffing ratios provided in the Supplemental Order.

> 6. <u>Training of Staff with Youth Contact</u>. DJJ shall provide training to ensure that all staff that have direct contact with juveniles are adequately trained in the following areas: (a) adolescent social and intellectual development; (b) gender responsive and cultural competent interaction with youth; (c) the mental health and trauma needs of justice involved youth; (d) conflict resolution techniques (including conflict de-escalation); (e) the participation of mental health staff in resolving conflicts; (f) effective behavioral management including alternatives to use of confinement; (g) report writing on use of force incidents, including the time, location, and reasons for force; (h) alternatives to the use of force when appropriate; (i) the basic principles of the Americans with Disabilities Act ("ADA") and the Prison Rape Elimination Act ("PREA"); and (j) zero tolerance for verbal and sexual abuse and harassment.

*DJJ Report: Substantial Compliance*

The Monitor recommended ensuring that all staff receive the training required by the Remedial Plan and developing standard record-keeping procedures to track the completion of annual refresher training in the topics required for Juvenile Justice Interns, Specialists, and Supervisors. The Department's Chief of Professional Development and Training has been working with the Monitor to create a spreadsheet tracker that will be required to be utilized by the Training Coordinators at each facility. Through the use of a standard record-keeping procedure, the Training Coordinators will be able to monitor staff members' training participation and ensure all staff receive the training required, and the Department's Chief of Professional Development and Training will be able to monitor compliance Department-wide.

*Plaintiffs' Response: Partial Compliance*

For this provision of the Remedial Plan, Plaintiffs' defer to the expertise of the Safety & Welfare Monitor, who found the Department to only be in partial compliance.

The Safety & Welfare Monitor acknowledged that the Department provides core Academy training in each of the areas required by the Remedial Plan. This provision further requires "adequate training," which "requires on-going refreshers to keep staff's skills honed, to adapt to emerging conditions at the facilities, and to incorporate new knowledge from the field." (Dkt. 225-1, p. 26). The Safety & Welfare Monitor explained, however, that the Department's current facility records make assessing compliance and ongoing monitoring difficult. For example, at Harrisburg, facility data did not include lists of specific training courses completed or dated for any of the staff, nor were all of the required training topics included in the list of annual training topics. (Dkt. 225-1, p. 27). As facility data was not comprehensive or uniformly maintained, the Safety & Welfare Monitor was unable to express certainty about the level of compliance with this provision.

The Safety & Welfare Monitor will make recommendations to the Department on how to standardize recordkeeping procedures, which will enable her to better evaluate the Department's compliance. Plaintiffs are also pleased that the Safety & Welfare Monitor plans to directly review and observe training courses and curricula for adequacy in the coming year. Until the Monitor has sufficient information to conduct an adequate review, Plaintiffs cannot agree that the Department is in substantial compliance with this provision.

7. <u>Youth Grievance Reporting</u>. DJJ shall ensure that all youths have adequate means to report allegations of abuse and/or submit grievances. DJJ has instituted and shall maintain a hotline which youth can use at any time to report sexual abuse or harassment. In addition DJJ shall ensure a grievance box and grievance forms are available on each unit, provide enhanced education to youths and staff about the grievance process, and require each facility to submit a monthly report to the Director of the DJJ describing all grievances and their resolutions. DJJ shall provide these monthly reports to the court-appointed experts and Plaintiffs' counsel.

*DJJ Report: Partial Compliance*

The Monitor recommended developing clear expectations for documenting and tracking grievances and training all Grievance Officers, back-ups and Superintendents on these

requirements. Training for all Grievance Officers and back-ups is scheduled for January 17, 2018 and will be conducted by the Deputy Director of Programs. At the training, Grievance Officers will be informed of the new process and the requirements for ensuring supporting protocols are in place, and will be provided with a template tracker for documenting grievances that will be required for use at all facilities.

Through implementation of the new youth grievance process, the Deputy Director of Program's staff will be monitoring for quality assurance to make sure that timelines are met, supporting protocols are in place, and that youth grievances are resolved appropriately and reasonably. Corrective action plans will be developed to rectify any deficiencies identified.

### *Plaintiffs' Response: Partial Compliance*

Plaintiffs agree with the assessment of "Partial Compliance" with this provision by DJJ and in the Safety & Welfare Monitor's report (Dkt. 225-1, p. 30). Once implemented, Plaintiffs believe that the new grievance policy should represent a significant improvement over the past policy and procedure; however, the policy is in its early stages. On recent site visits, youth continued to complain to Plaintiffs' counsel about the inefficacy of the grievance system and unavailability of grievance forms.

8. <u>Independent Juvenile Ombudsman</u>. DJJ will advocate for passage of proposed legislation to create Independent Juvenile Ombudsman for the purpose of securing the rights of youth committed to the DJJ. The Independent Juvenile Ombudsman shall be responsible for reviewing and monitoring the implementation of rules and standards established by the DJJ and the delivery of services to youth to ensure that the rights of youth are fully observed; providing assistance to a youth or family who the Ombudsman determines is in need of assistance; investigating and attempting to resolve complaints made by or on behalf of youth; reviewing or inspecting periodically DJJ facilities and procedures to ensure that the rights of youth are fully observed; being accessible to and meeting with youth, and serving as a resource by informing them of their rights.

### *DJJ Report: Substantial Compliance*

The Department concurs with the Monitor's assessment of substantial compliance.

### *Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree that the Department is in substantial compliance with this provision of the Remedial Plan. The Independent Juvenile Ombudsman, Kathleen Bankhead, was appointed in July 2015. The Ombudsman regularly meets with youth and fields phone calls from youths and parents to discuss youth concerns. Youth regularly report to Plaintiffs' counsel that they have either had contact with the Ombudsman, or at least know who she is and how to get in touch with her if needed. Plaintiffs' counsel also regularly communicates with the Ombudsman about matters pertaining to the treatment of youth in DJJ, and will continue to do so going forward.

9. <u>Limits on Mechanical Restraints.</u> DJJ shall adopt and implement a policy that limits that use of mechanical restraints

### *DJJ Report: Substantial Compliance*

The Monitor found the Department in substantial compliance with this requirement and recommended that the Department ensure that staff utilize descriptive language when documenting their use of physical restraints, including descriptions of the technique used and descriptions of the type of resistance encountered, so that the appropriateness of the use of mechanical restraints can be better assessed. As part of its revised Administrative Directive on Use of Physical Intervention, the Department issued a new form (DJJ 434a). The new form solicits more detailed information about any use of physical intervention, including mechanical restraints, and is required to be completed by staff after use of physical intervention.

***Plaintiffs' Response: Substantial Compliance***

Plaintiffs agree with DJJ and the Safety & Welfare Monitor (Dkt. 225-1, p. 34) that DJJ is in Substantial Compliance with this provision.

> 10. <u>General Programming</u>. DJJ shall create and implement a policy to provide opportunities, subject to reasonable security concerns, for all DJJ youth to spend at least eight hours per day outside of their rooms engaged in supervised activities (not including meals or showers), so that during hours when they are not participating in school or treatment, they have opportunities to participate in an appropriate mix of physical exercise, recreational activities, and work details.

***DJJ Report: Partial Compliance***

The Monitor recommended ensuring that youth are not locked in their rooms during scheduled programming hours and ensuring that staff seek approval and properly document any deviations from the schedule for serious operational issues. The Monitor also recommended limiting the amount of unstructured leisure time for youth and boosting the amount of structured programs, ensuring the youth in the ABU specifically receive full-day structured programming, and developing a quality assurance strategy to quantify the amount and type of programming the average youth receives at each facility.

As noted in part IV.1, the Deputy Director of Programs issued a Policy Bulletin on January 12 requiring staff to submit program schedules, post the schedules, and notify supervisors and track anytime the scheduled programming does not take place. The Department plans to use this data to help craft appropriate remedial efforts for ensuring youth receive the out-of-room time and programming required by the Remedial Plan. The Department also plans to use this data to identify facilities or times/days for infusing additional programming and resources. For the ABU specifically, full-day programming is hampered by the staffing shortage, and the Department's efforts to employ a sufficient number of security staff at IYC-St. Charles will lead to more programming for these youth.

***Plaintiffs' Response: Partial Compliance***

Plaintiffs agree that the Department is in partial compliance with this provision of the Remedial Plan. Security and education staffing shortages at IYC St. Charles result in tremendous amounts of in-room and/or idle time for youth. These idleness concerns have carried over to IYC Chicago, where teacher shortages have resulted in half-day schooling since October 2017.

When there are sufficient staff at IYC St. Charles, Chicago, and Harrisburg, youths report that the majority of their out-of-room time is occupied by unstructured indoor leisure activities, such as playing cards or watching television. As a result, youths at these facilities frequently complain of boredom and heightened agitation. At St. Charles, many youth report that they receive very few, if any, opportunities for large muscle exercise. Long stretches of idle time also remain a significant problem for youth who have graduated or earned their GED, especially if they are not permitted to obtain facility jobs for one reason or another.

The Department maintains youth schedules that allow for at least twelve hours of out-of-room time during the week, and eight hours of out-of-room time on weekends; however, staffing shortages result in significant deviations from these schedules. Youths also complain that daily schedules are not adhered to because security shift staff have discretion over whether youth are permitted to leave their rooms during leisure time.

As the Safety & Welfare Monitor noted, the complete lack of programming on the Alternative Behavior Unit at IYC St. Charles is a major concern. (Dkt. 225-1, p. 37). Youths on the ABU have reported to Plaintiffs' counsel that they often spend 23 hours per day in their rooms. If they are permitted one hour of recreation, it is spent watching television silently in another room with, at most, one other youth. These are the youth "most in need of structure and rehabilitative services, and yet, ironically, they receive the least amount of programing of any youth at DJJ." (Dkt. 225-1, pp. 37-38).

While many youth at IYC Warrenville and IYC Pere Marquette, and some youth at IYC Chicago, report that their days are filled with compelling and structured activities, significant progress still needs to be made to ensure that youths at all facilities are receiving an appropriate mix of physical exercise, structured and pro-social activities, and work detail. Plaintiffs agree with the Safety & Welfare Monitor that "positive youth outcomes are unlikely to be achieved without an infusion of structured activities…throughout the youth's waking hours." (Dkt. 225-1, p. 37).

11. <u>Legal Assistance to Youths</u>. (a) Plaintiffs' counsel shall prepare a list of non-profit legal organizations that might assist youths who believe their rights have been violated by DJJ conditions or services, and DJJ shall review that list, and then post that list in a prominent location in the day and visitation rooms in all IDJJ youth centers; and (b) DJJ shall reasonably facilitate confidential communications between youths and such attorneys by means of face-to-face meetings, telephone calls from attorneys to youths, and telephone calls from youths to attorneys with whom they have an existing attorney-client relationship.

### DJJ Report: Substantial Compliance

The Department concurs with the Monitor's finding of substantial compliance with this provision.

### Plaintiffs' Response: Substantial Compliance

Plaintiffs agree that the Department is in substantial compliance with this provision of the Remedial Plan. The Department has facilitated confidential communications and visits between youth and Plaintiffs' counsel, and youths have confirmed during site visits that they are aware of legal resources and how to get in touch with certain organizations that might assist them if they

believe their rights have been violated. Plaintiffs' counsel will follow up with the Department to ensure that the resource list of non-profit legal service organizations, created by Plaintiffs' counsel in 2014, is posted in the day and visitation rooms at all youth centers.

## VI.  Community Placement

1.  <u>Placement Coordinator</u>.  DJJ shall assign a Placement Coordinator to oversee planning for community placement and identifying and resolving placement barriers.  DJJ shall provide the Placement Coordinator with monthly reports that identify all youths with placement barriers and provide details as to the barriers, placement plans, and status of each youth's placement. Such reports shall be made available to the court-appointed experts and Plaintiffs' counsel upon request.

***DJJ Report: Substantial Compliance***

The Department concurs with the Monitor's finding of substantial compliance with this provision.

***Plaintiffs' Response: Substantial Compliance***

Plaintiffs agree with DJJ and the Safety & Welfare Monitor (Dkt. 225-1, p. 39) that DJJ is in Substantial Compliance with this provision.

2.  <u>Discharge Planning Upon Intake</u>. In conjunction with the statewide implementation of Aftercare Specialists for all youth in DJJ, DJJ shall engage in initial placement planning within fourteen days of a youth's commitment to DJJ and arrival at a DJJ facility, incorporating concurrent planning to minimize the number of youths who, but for a lack of placement, could be released on aftercare status.

***DJJ Report: Substantial Compliance***

The Monitor found the Department in substantial compliance with this requirement but recommended routinely assessing the reason that initial placement levels are not identified or entered within 14 days to understand the reasons for delay.  The Deputy Director of Programs will monitor this in 2018.

***Plaintiffs' Response: Substantial Compliance***

Plaintiffs agree with DJJ and the Safety & Welfare Monitor (Dkt. 225-1, p. 41) that DJJ is in Substantial Compliance with this provision.  During 2017, Plaintiffs requested and received data from DJJ as to compliance with this provision.

3.  <u>Preparation of Youth for Placement</u>. DJJ shall collaborate with placement providers to prepare youths for placement in residential facilities and enhance their prospects for success at those facilities.

***DJJ Report: Substantial Compliance***

The Monitor found the Department in substantial compliance with this requirement but recommended identifying metrics to assess process- and outcome-related measures to ensure

Parole School has been implemented according to design and to assess its impact on parole success. The Department is rolling out a new Aftercare Orientation program for youth leaving the youth centers. Staff at IYC-Chicago, IYC-Harrisburg, and IYC-Warrenville have been trained in the new program, and training for IYC-Pere Marquette and IYC-St. Charles is upcoming. The Department anticipates implementing the new Aftercare Orientation program by March 1, 2018. After implementation, the Department will review process- and outcome-related measures to monitor its success.

*Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree with DJJ and the Safety & Welfare Monitor (Dkt. 225-1, p. 41) that DJJ is in Substantial Compliance with this provision.

    4. <u>Placement</u>. DJJ shall take all steps necessary, including but not limited to requesting appropriations and seeking vendors, to establish a sufficient number of available beds in appropriate community facilities for juvenile sex offenders and other youths who require residential placement upon release in Illinois.

*DJJ Report: Substantial Compliance*

The Department concurs with the Monitor's finding of substantial compliance with this provision.

*Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree with DJJ and the safety and welfare Monitor (Dkt. 225-1, p. 42) that DJJ is in Substantial Compliance with this provision.

## VII. QUALITY ASSURANCE

    1. <u>Deputy Director of Quality Assurance</u>. DJJ shall appoint a Deputy Director of Quality Assurance to monitor the delivery of services and programs to youth, ensuring implementation of programs and operations are consistent with the agency's objectives and assisting with development and implementation of statewide policies, procedures, guidelines, and performance standards.

*DJJ Report: Substantial Compliance*

The Monitor recommended amending policy to require interviews with youth when auditing procedures that directly impact their experience in the facility. The Department is revising its audit instruments to include requirements for youth interviews and will be incorporating this in the audits beginning in January 2018.

The Monitor also recommended implementing external audits, crafting written quality assurance reports that identify facility performance issues, and ensuring that corrective action plans are utilized to drive improved performance in areas of identified weakness. The Department's Deputy Director of Operations is requiring all facilities to have external audits conducted in the next year. The external audits will be reviewed and corrective action plans will be developed to address any deficiencies for 2018.

*Plaintiffs' Response: Partial Compliance*

The Safety & Welfare Monitor assessed DJJ as only in "Partial Compliance" with this provision (Dkt. 225-1, p. 44); Plaintiffs agree with that assessment.

2. <u>Monitoring and Access to Data.</u> DJJ shall facilitate monitoring by the court-appointed experts and Plaintiffs' counsel in accordance with paragraphs 27 through 35 of the consent decree.

*DJJ Report: Substantial Compliance*

DJJ continues to provide data to the Monitors and Plaintiffs' counsel upon request.

*Plaintiffs' Response: Substantial Compliance*

Plaintiffs agree that DJJ is in Substantial Compliance with this provision. During 2017, Plaintiffs' counsel have requested and received a variety of data and information from DJJ as to numerous provisions of the Consent Decree and Remedial Plan.

3. <u>Monitoring of chemical agents</u>. The court-appointed experts and the Plaintiffs' counsel may monitor DJJ's use of chemical agents.

*DJJ Report: Substantial Compliance*

The Monitor found the Department in substantial compliance with this provision and recommended that the Department continue to track data on the use of chemical agents along with written documentation and videotaped footage of each incident. The Department will continue conducting investigations when chemical agents are used and will closely monitor the data.

*Plaintiffs' Response: Substantial Compliance*

Based on the Department's data, Plaintiffs agree that the Department is in substantial compliance with this provision of the Remedial Plan. Department data indicates that OC spray is utilized relatively infrequently and only by certain facilities. Nonetheless, based on youth reports and Plaintiffs' counsel's own observations during site visits, Plaintiffs have concerns about some of the circumstances under which staff use and rely upon chemical agents at certain facilities, and encourage the Department and the Safety & Welfare Monitor to further analyze the situation and revise policies and/or institute corrective actions as needed.

In 2017 youths rarely, if ever, reported on the use of chemical agents to Plaintiffs' counsel at IYCs Chicago, Warrenville, and Pere Marquette. At IYCs St. Charles and Harrisburg, however, reports of chemical agent use are more frequent and occasionally disturbing. Youths have reported to Plaintiffs' counsel on numerous occasions that they have seen OC spray deployed directly into a youth's room to force out a youth who, for one reason or another, refuses to leave his room. This tactic is sometimes repeated until the youth emerges from his room due to pain or an inability to breathe comfortably. Separately, at St. Charles, Plaintiffs' counsel observed a situation where staff threatened the use of chemical agents in a common area in order to direct agitated but non-violent youth back into their rooms. Youths have reported on similar instances where OC spray is deployed against youths who disobey direct orders, even when the

disobedience is non-violent and doesn't appear to pose an immediate physical safety threat. Others report that staff use OC spray against individual youth who are being disruptive, destroying property, or to prevent flight.

These accounts are quite troubling to Plaintiffs' counsel. Department policy permits the use of OC spray when a youth's behavior escalates to the point that physical holds and mechanical restraints are impossible to apply or insufficient to diminish an immediate safety threat. (Dkt. 225-1 p. 34). In other words, chemical agents are to be used as a last resort. (Dkt. 225-1, p. 34). Unfortunately, reports to and observations by Plaintiffs' counsel suggest that OC spray is not always being used in this manner.

In previous monitoring reports, Dr. Krisberg, has expressed the view that chemical agents "have almost no productive role in juvenile corrections agencies," and the use of chemicals "should never be utilized to stop one-on-one fights, as punishment, or for instances of youth defiance of staff instructions." (Dkt. 154-1 p. 29). DJJ is one of only six state juvenile justice agencies in which staff are authorized to carry OC spray on their person. (Dkt. 225-1, p. 34). In Plaintiffs' view, DJJ should consider phasing out OC spray use in all facilities to be more in line with best practices across the country. At a minimum, the Department should devote more time and training to ensure that OC spray use complies with Department policy, and institute corrective action as needed.


DATED:  January 24, 2018

Respectfully submitted,

**For the Plaintiffs:**                                    **For the Defendant:**

By: /s/ Lindsay S. Miller                         By: /s/ Michael T. Dierkes

Benjamin S. Wolf                                  Michael T. Dierkes
Camille Bennett                                   Office of the Illinois Attorney
Lindsay S. Miller                                 General
Roger Baldwin Foundation of ACLU, Inc.            General Law Bureau
180 North Michigan Avenue, Suite 2300             100 West Randolph Street, 13th Floor
Chicago, IL 60601                                 Chicago, IL  60601
(312) 201-9740                                    (312) 814-3672

Maja C. Eaton
Kevin M. Fee, Jr.
Joseph R. Dosch
Sidley Austin LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000