**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 12-cv-7289 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| HEIDI MUELLER, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLIANCE REPORT OF MENTAL HEALTH MONITOR
<u>LOUIS J. KRAUS, M.D.</u>**

This Report assesses the status of the DJJ's compliance with the provisions of the remedial plan relating to mental health services. (Dkt. No. 73, Part II).

The facilities evaluated in this report include: IYC Pere Marquette (evaluated on June 27, 2017), IYC Harrisburg (evaluated on June 28-29, 2017), IYC Chicago (evaluated on July 18, 2017), IYC St. Charles (evaluated on August 9, 10, and 11, 2017), and IYC Warrenville (evaluated on September 8, 2017).

Administratively there have not been any changes this year in IDJJ's central office. Christine Rothwell has remained the Acting Superintendent at IYC St. Charles since August 2016. The agency medical director was and continues to be filled by Dr. Justin Kwak. At the time of my evaluation at IYC Warrenville, IDJJ filled their child and adolescent psychiatry position. Lynn Maskel, MD is the new child and adolescent psychiatrist. She started on September 1, 2017.

During this assessment, I met with all of the treatment unit administrators except for the administrator at IYC Harrisburg who was away. I met with many of the therapists. They all appear quite motivated.

**General Summary:**

In summary, IDJJ has shown varying strengths and weaknesses in the past year. Although the overall population numbers within IDJJ have decreased, it is my opinion that the percentage of youth with more significant mental health issues has increased. This, in association with particular staffing struggles at IYC St. Charles, has presented difficulties. Staffing struggles at IYC St. Charles impacted the areas of mental health, security and education. IDJJ has repetitively commented on the fact that they have met required mental health staffing ratios, but not at St. Charles. However, it should be pointed out that when these staffing ratios were put into place, there was not a complete complement of staff and there was some question as to whether

or not the ratios would be ideal. That issue was left open for discussion and possible reconsideration.

The other area of struggle at IDJJ had to do with the setup of their Special Treatment Units. IDJJ has two Special Treatment Units, Adams Cottage and Lincoln Cottage, both of which are at IYC St. Charles. Both of these cottages house fewer than the number of youth that they can potentially handle. However, there have been struggles within these cottages. They have not wanted to house youth who are particularly externalizing, acting out, or even potentially dangerous, primarily due to concern about other youth being potentially victimized. The problem with this is that it is clear that in certain facilities there are youth who are in need of a Special Treatment Unit, but have no place to go. This was most notable at IYC Harrisburg where three youth I evaluated were 13 and 14 years old with significant mental health issues and, because of their acting out behaviors, they were not considered appropriate for placement at IYC St. Charles.

The other issue at hand on the Special Treatment Units has to do with security. On one occasion, during my observation of one of the cottages (Adams), there were two female staff as the only security on the cottage. This certainly does not seem safe.

It is important to point out that there was a prior youth center, IYC Kewanee, which had Special Treatment Units for more aggressive youth. There has been nothing put into place to replace this.

Another area of concern centers on the use of solitary confinement. Although placement into what is typically characterized as solitary confinement remains minimal, there are youth who are placed on medical holds and administrative holds for varying reasons who do not have particular behavioral plans or other interventions put into place. In addition, both IYC Harrisburg and IYC St. Charles have behavioral dorms where the youth are supposed to have behavioral plans. IYC Harrisburg, based on my review, has continued to do a reasonable job in implementing their behavioral plans. In contrast, however, for varying reasons, none of the youth I observed in the St. Charles behavioral dorm had any type of implemented behavioral plan. As such, it seems IDJJ is back to utilizing a certain level of solitary confinement, which is of concern.

There were a number of youth who were on extended periods of solitary confinement for varying reasons, including staff not being able to control them in a dorm, or other mental health concerns. For at least one of the youth, the rationalization was the youth wanted to be on solitary confinement and didn't want to be in a dorm. I think that for any youth like this, daily mental health interventions and more frequent psychiatric interventions should at least be a starting point. However, it seems as though there is a progressive number of youth who are having these extended stays in solitary confinement and are set up in dorms without programming. This is seen at IYC Harrisburg and at IYC St. Charles.

Another struggle is that there continues to be a lack of informed consent. I checked with mental health staff and I checked with nursing staff to see if there was anything I have missed, but there was not. Although it appears that DJJ is beginning to put together informed consent, this is still somewhat fragmented. It is striking that the original consent decree described that they should have this done within 90 days of entry of the remedial plan.

Another problem has to do with youth who are on particular psychotropic medications. There was a youth taking 100mg of Seroquel a day for an extended period of time. This type of medication increases the risk for metabolic syndrome, including the development of high cholesterol, high triglycerides, elevated sugars and even the potential for causing diabetes. For uncomplicated youth it is typically recommended to get lab work every six months. For higher risk youth, more frequently than that. This youth had not had any lab work completed, either looking at his lipid panel, fasting blood sugar or a hemoglobin A1C.

There is now a medical director and child and adolescent psychiatrist. I look forward to future policy and procedures to be addressed by the child psychiatrist and hope that in the future potentially more child psychiatrists can be hired to work with some of the more complex youth, even if through telepsychiatry.

Regarding the need to seek out immediate mental health care, plaintiffs had told the department that it needs to develop a more consistent way to monitor when and how youth request to see mental health professionals and the outcomes of such requests. I have not seen this yet; I hope to see it next year.

The department is in substantial compliance regarding issues of treatment interventions and education regarding LGBTQ youth and youth diagnosed with gender dysphoria (and transgender youth).

**Additional Facility-Specific Summaries:**

IYC Warrenville

Although with a low number of youth, the facility that is by far the most impressive is IYC Warrenville. Over the past two years they have begun to take males and essentially have a 50:50 population split. One of their cottages lost their roof and it still had not been replaced, so they have been down a cottage. They had 32 youth at the time when I evaluated them. They had a really impressive program set up for PBIS, including going off grounds for a variety of different activities, including Kantigny Gardens, Firmy labs, working at feeding My Starving Children, attending White Sox games, the Shedd Aquarium, theatre activities, and participating in an IYC basketball team. Certain staff had also made donations to assist in the positive behavioral plan as they are not able to get the incentives from the state, which are needed at all the facilities. It should not fall onto the staff to have to donate resources, and in my opinion it is somewhat embarrassing that the state cannot allocate and make easily accessible the appropriate amount of funds necessary to run this relatively uncomplicated and relatively inexpensive program.

IYC Warrenville had one clinical psychologist on leave, but beyond that they have a TUA, three LPCs, and one social worker. Two of the LPCs are going for their LCPC. There is a clinical psychologist practical psychologist student. The mental health services at IYC Warrenville go beyond any of the other facilities within the state as best I can tell. IYC Warrenville has consistently been like this.

There are certain vulnerable and complex youth with mental health issues that have been placed at IYC Warrenville. There is a high percentage of the female youth at IYC Warrenville who have significant mental health concerns. Every youth that comes in to IYC Warrenville is evaluated by a psychiatrist. Ideally, based on the complexity of the youth at IYC Warrenville, this evaluation should be completed by a child and adolescent psychiatrist, but the general psychiatrist is quite dedicated to spending the time necessary in assessing and treating these youth. IYC Warrenville has 16 psychiatric hours per week.

In my opinion, IYC Warrenville should be looked at as an Intensive Treatment Unit, not simply as a routine IYC facility. If one views it as a special treatment unit, there would be a better understanding of the need for the high ratio of mental health staff and of some of the complex youth that are sent there, and would perhaps allow for additional specialized programming in the future.

IYC Warrenville still has five different types of groups that are running. While I was there I could see active participation in groups. Staff appeared well-trained and youth participated. It should also be noted that the average length of stay at IYC Warrenville is somewhat longer than other facilities at approximately six months, with the longest youth being there for three years.

IYC Pere Marquette

Pere Marquette, although the smallest of facilities, is quite impressive. I had met with the superintendent at Pere Marquette, Jamie House. Mr. House has a wonderful understanding of the youth at the facility and has worked very hard regarding developing specialized programing, including junior college level classes and vocational programs. They have had no one in restraints other than brief handcuffs for walking.  They have had no isolation greater than an hour. There have been no psychiatric hospitalizations or youth in need of psychiatric hospitalizations. They have had no youth with any significant medical problems. Pere Marquette typically has older youth. Now the youth are staying, on average, six months or even longer, which allows them to take a semester of college or do additional vocational work. Some youth even choose to stay longer, which allows them to finish some of the programing they have started, including earning GEDs and high school degrees.

We had a chance to tour Youth Build, which is a vocational program where the youth do well-structured construction projects and help rehab old buildings. Issues at Pere Marquette here had to do with needing informed consent on charts. Aftercare, as with all of the facilities, struggles because they can't set up the appointments for youth because they have had their Medicaid taken away and not put back into place at the time they have left.

IYC Pere Marquette is without a Treatment Unit Administrator, which is problematic, although Dr. Motley is now in the role of assistant superintendent of programs. Their therapist, Bridgette Carter, LCSW and Hannah Lancaster are both quite professional and collegial. They work with staff within the facility and have a very positive working relationship with security. They do as many as six to seven groups a week and have a strong understanding of the youth they are responsible for. They have talked about the LGBTQ groups and the work they have done with students and staff regarding this. They describe the issue of implementing family therapy as an

4

ongoing struggle which has been particularly successful. They have had some youth and families in what has been described as Family Engagement. Most of the youth at IYC Pere Marquette are from south of I-80, with many from the Peoria, Decatur and Champagne regions of Illinois.

IYC St. Charles

At present, IDJJ is quite focused on the mental health staff ratios at St. Charles. They are not meeting their mental health ratios. At IYC St. Charles there are seven vacant positions, including three CCS licensed social workers which are 40 hours per week, a CCS licensed clinical psychologist for 8 hours per week, two psychology II positions at 40 hours per week, a psychologist III position at 40 hours per week, and a psychiatry position at 20 hours per week.

At IYC St. Charles, there is a specialized housing unit for behavior concerns. This is the IYC St. Charles Robert L. Taylor Alternative Behavior Unit (ABU). I have reviewed the behavioral protocols for this unit. The protocols themselves seem reasonable. The problem, as described above, is they are not being used.

IYC Harrisburg

The struggles at IYC Harrisburg center on accurate identification of acute and chronic mental health issues in youth, particularly in young youth. There are a number of 13-year-old youth who had significant mental health concerns who are in the general population at IYC Harrisburg. This makes no sense. In my opinion, these youth have significant mental health histories or other significant family and developmental histories that place them at extremely high risk for underlying mental health concerns.

As of March 29, 2017, IDJJ reported that they are in need of 2.1 mental health professionals at IYC Harrisburg to meet the current youth ratios. They currently have 2. The concern I have at IYC Harrisburg, based on some of the interviews I have conducted, is that there are youth who are classified as having lower mental health needs than they actually should, and as such, this artificially lowers the needed mental health staff ratio.

IYC Chicago

IYC Chicago is now down a full time clinical psychologist. Dr. Karen Murphy, the TUA at IYC Chicago, left in November. IYC Chicago also had a vacant mental health professional. I don't know if the vacant mental health professional position has been filled. However, it appears that IYC Chicago is below their mental health staffing ratio as well.


**Assessment of Remedial Plan Compliance:**

1.   **Licensed Physicians Medical Director:** DJJ shall enter into a contract with a licensed physician to serve as DJJ medical director to provide oversight of all facility health care operations, oversight and monitoring of all vendor-provided health care services, and development of protocols and procedures for delivery of health care services. The

contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

| Facility | Compliance (Yes/No) |
|---|---|
| Agency-wide | **Yes** |

As of 2016, the agency continues to employ Dr. Kwak as their medical director.

2. **Board-Certified Child and Adolescent Psychiatrist:** DJJ shall enter into a contract with a board-certified child and adolescent psychiatrist. The child and adolescent psychiatrist shall provide oversight of all psychiatric services in all DJJ facilities, including monitoring all vendor-provided psychiatric services; ensure coordination of all psychiatric services with other health care and mental health services; consult with staff; assist with the development and implementation of protocols and procedures for delivery of psychiatric and mental health services; and assess and evaluate youth in appropriate cases. The child and adolescent psychiatrist shall ensure that psychiatric staffing hours in DJJ facilities are sufficient to ensure that psychiatric services to youth comply with established professional standards, including (a) initial psychiatric evaluations of at least 90 minutes per patient and (b) medication follow-up and assessments of at least 30 minutes per patient. The contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

| Facility | Compliance (Yes/No) |
|---|---|
| Agency-wide | **Yes** |

As of July 2017, the agency has employed Dr. Lynn Maskel, MD as their child and adolescent psychiatrist.

3. **Treatment Unit Administrator Positions:** DJJ shall have qualified full-time treatment unit administrators ("TUAs") to oversee delivery of mental health services at each of its facilities. The minimum qualifications for these positions shall include a doctoral degree (Ph.D. or Psy.D.) and appropriate licensure by the State of Illinois.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | **Yes** |
| IYC-Harrisburg | **Yes** |
| IYC-Pere Marquette | **No** |
| IYC-St. Charles | **Yes** |
| IYC-Warrenville | **Yes** |

At the present time IYC Harrisburg, IYC St. Charles and IYC Warrenville have treatment unit administrators. I interviewed all this year except the administrator at IYC Harrisburg who was

away on vacation. They all are at a Ph.D. or Psy.D. level and all have a reasonable understanding of their institution.

At IYC Chicago there is no TUA. Dr. Murphy left in November. At present, Dr. Jaworski is covering by coming in once a week. At IYC Pere Marquette there is not a TUA. Dr. Motley left to become Assistant Superintendent of Programs. They are currently being covered by their social worker. She has been in this new position since October 6th. There is nobody in place at present.

4.  **Mental Health Staffing Levels and Qualifications:** DJJ shall, in consultation with the court-appointed mental health expert and plaintiffs' counsel, establish appropriate staffing levels and qualifications of mental health professionals to deliver individual and group therapy based on youths' diagnostic needs and services called for in each youth's individualized mental health treatment plan. Pursuant to the May 10, 2016 supplemental order, DJJ shall achieve and maintain the following average staffing ratios for mental health professionals: at least one mental health professional per 35 youths at MHL 0; at least one mental health professional per 20 youths at mental health acuity level MHL 1; at least one mental health professional per 10 youths at MHL 2; at least one mental health professional per 8 youths at MHL 3; and at least one mental health professional per 5 youths at MHL 4. *See* Dkt. No. 165.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | No |
| IYC-Harrisburg | Yes |
| IYC-Pere Marquette | Yes |
| IYC-St. Charles | No |
| IYC-Warrenville | Yes |

The difficulty here is that although IDJJ has maintained staffing levels at the minimal requirements at some facilities, I have a number of concerns about certain youth with significant mental health issues who are coming into IDJJ and, in my opinion, are not being adequately assessed and their mental health needs are not being adequately addressed. I evaluated several youths at IYC Harrisburg. IDJJ knows who these youths are as we recently reviewed their histories at a meeting in late November. I evaluated two 13-year-old youths and one 14-year-old youth, two of whom had significant mental health histories, residential placement, multiple psychiatric hospitalizations, had been on numerous psychotropic medications, and for various reasons were not found in need of being transferred to IYC St. Charles to a Special Treatment Unit. In spite of this, at the time of my interview, all three remained at IYC Harrisburg. Their need for more intensive mental health treatment interventions, whether related to their age or their prior mental health history, had been minimized.

This is a complex issue. I met with the parties and began to discuss this. When we first negotiated the mental health staffing ratios, we agreed to what would be best called "preliminary" staffing ratios, as setting appropriate staffing ratios was quite hard to do with the changing youth population. In my opinion, as the youth population has decreased, the percentage

of youth with more significant mental health needs increased. This is an area of debate. IDJJ reported that the percentages of youth with more significant mental health issues have not worsened. In my opinion, this is not the case.

At IYC St. Charles, there are youth being held on ongoing administrative holds. There were two youth who have waited months for hospitalization. There are other youth at St. Charles who have had significant prior mental health histories but now are being identified as having no mental health history. At IYC Harrisburg, as discussed in our most recent meeting in the end of November, there were three young youth, ages 13 and 14, who had significant mental health histories who have been placed at IYC Harrisburg from reception. IYC Harrisburg offers fewer mental health services than IYC St. Charles and has no Special Treatment Units. At least in part, these youth were not placed on the Special Treatment Unit at IYC St. Charles because of their aggressive nature, though one of the boys only weighed 98 pounds.

Staff at IYC Chicago informed me that they've had a number of mental health level 2 youth, whereas previously they had not had any. Staff felt that behavioral issues had increased. Mental health staff and teachers were in more conflict over the issue of who would take care of a youth when they are acute. Mental health staff felt that security needed to intervene. Others felt that mental health staff needed to intervene. IYC Chicago has consistently been stable. They have had relatively uncomplicated youth in terms of mental health needs. Historically, the mental health levels of youth at IYC Chicago were 0 or 1. IYC Chicago offers all kinds of wonderful outside activities for youth to do within the community, such as attending activities at Ravinia Park. However, at the time of my interview, there were struggles. Youth were throwing concoctions of feces and soapy water onto staff. Some staff reportedly felt traumatized by this and were off work for a period of time. Regarding mental health, there were no changes in mental health ratios. Psychiatric services seemed about the same, although there was a new psychiatrist in place. At the time when I was at IYC Chicago, the psychiatrist was ill, and reportedly Dr. Chandra was seeing the youth as their psychiatrist instead. However, I did not see examples of that during the time of my visit.

Although IYC Warrenville was down a psychology position, they have been doing quite well and, as described at the beginning of this report, are taking care of quite complex youth.

In my opinion, there has to be a better overall review of the most seriously mentally ill youth within the facilities and perhaps a reassessment of the mental health classification of youth. In addition, I am extremely concerned about the barriers to hospitalizing youth. In my opinion, this is a monetary issue. I think if the state would put up the money necessary to safely hospitalize these youth, hospitals would potentially take them. At present, this is not occurring. In addition, the additional specialized mental health services for these youth are not occurring.

5.      **Mental Health Records and Hospitalizations**: DJJ shall implement uniform policies in all facilities to ensure (a) that the DJJ timely requests hospital and other outside mental health records for youth and (b) adequate identification and assessment of youth with significant mental health needs potentially in need of outside hospitalization, and as appropriate facilitation of such hospitalization.

| Facility | Compliance re 5(a): (Yes/No) | Compliance re 5(b): (Yes/No) |
|---|---|---|
| IYC-Chicago | Yes | No |
| IYC-Harrisburg | Yes | No |
| IYC-Pere Marquette | Yes | No |
| IYC-St. Charles | Yes | No |
| IYC-Warrenville | Yes | No |

Number 5 could easily be split into two areas. Records are consistent, mostly uniform and quite helpful. It would be particularly helpful to get pertinent records if there is something acute that is going on with any youth. At times, the only way I find out about a problem is a call from the ACLU with a concern about a particular youth. However, the records are reasonable.

The problem here and why I have two columns, has to do with hospitalizations. There are two youth at IYC St. Charles who need hospitalizations and IDJJ has been unable to hospitalize them. This has essentially resulted in months of solitary confinement. It may be medical, it may be in the "administrative hold" building, but it is solitary confinement. Something needs to be done about this. Either the state needs to be able to work and fund a hospital unit that will allow them to have the capabilities to have a youth on the unit or they need to set up a hospital-like unit that can allow for more intensive mental health interventions, education, recreation activities, etc. This would require a separate cottage just for this purpose. In my opinion, staff were attempting to do what they could do, but there were limitations. There were limitations regarding assessment of child and adolescent mental health issues, psychopharmacological interventions, and then all of the ancillary needs required in a hospital-like treatment program. Simply saying nothing is available is not sufficient. There is an obligation to meet the basic mental health needs of these youth, in particular when they are in acute, dire, and potentially life-threatening states.

6. **Individualized Mental Health Treatment Plans and Coordination of Treatment:** DJJ shall ensure uniform policies and procedures are in place in all facilities requiring: (a) the development and implementation of an individualized mental health treatment plan for each youth, including the type and amount of mental health services each youth needs, (b) coordination by mental health staff with each other, and with other staff, in planning treatment, providing treatment, and planning community reentry (including integration with community mental health services), and (c) family therapy as appropriate.

| Facility | Compliance re 6(a) (Yes/No) | Compliance re 6(b) (Yes/No) | Compliance re 6(c) (Yes/No) |
|---|---|---|---|
| IYC-Chicago | Yes | Yes | Partial |
| IYC-Harrisburg | Yes | Yes | Partial |
| IYC-Pere Marquette | Yes | Yes | Partial |
| IYC-St. Charles | Yes | Yes | Partial |
| IYC-Warrenville | Yes | Yes | Partial |

Individualized mental health treatment plans are in place for all applicable youth. Coordination of treatment within facilities is in place. Coordination of treatment between facilities, such as transferring a youth with more acute mental health needs, seem to be in process. I have listened

to several of the telephone communications when there is an attempt to transfer a youth. More often than not, a youth that is deemed appropriate for transfer to a higher level mental health facility, such as St. Charles or Warrenville, is accepted. The difficulty is that there are not enough Special Treatment Units for youth in need of mental health services and as such these youth will need to stay at facilities, such as IYC Harrisburg, that are less equipped to meet their underlying mental health or developmental needs. There is a plan for a generalized substance abuse education program throughout all facilities. This has not yet been fully implemented.

There has been some improvement regarding family therapy. Facilities are using a youth/family checklist. They talk about family engagement. There is some level of discussion with families. IDJJ has stated that in some facilities they have felt that this overlaps the time for family therapy as well.

IDJJ has consistently described difficulties with family therapy, in particular because they have felt that families have not been willing to attend. It is unclear whether or not this is actually the case. Constructs of teletherapy or other types of interventions have not been attempted. Of all the facilities, it appears that IYC Warrenville has been the most successful at family therapy, but in general this has been an area of deficit and in my opinion, still needs to be worked on. It seems all too easy to simply say families don't want to participate. For example, at IYC St. Charles they have stated that the only family therapies they have had have essentially been by telephone, although periodically will have a visit from a family and can have family therapy.

Out of the 69 youth at IYC Chicago, there were 36 who had family engagement and 5 or 6 in family therapy. However, most of these are also done by telephone. There has been no attempt to begin any type of teletherapy although this continues to be looked into.

7. **Medication Consent:** DJJ shall develop revised procedures and forms to ensure that appropriate informed consents are obtained for administration of psychotropic medications. The consent forms shall (a) communicate the diagnosis; (b) identify the specific goals and potential side effects of the treatment; (c) provide for documentation of parental, guardian, or youth consent as legally required; and (d) provide for an assent signature for minor youth where consent is provided by a parent or guardian.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | No |
| IYC-Harrisburg | No |
| IYC-Pere Marquette | No |
| IYC-St. Charles | No |
| IYC-Warrenville | No |

For the first time, IDJJ seems to be making a concerted effort in obtaining verbal consents. I saw this at several of the facilities, but at this point, only in part. Many of the charts still had no consents in place. Some of the charts had verbal consents with some type of appropriate side effect sheets put into place. Some of the charts had side effect sheets in place and a form to write out the verbal consents, but nothing written. It was clearly a process not fully in place. I would

hope by the next time I visit the facilities, it is fully implemented. An acknowledgment on the signature page that they actually discussed the side effect sheet with the parent or whoever is signing it would be needed. It would also be helpful to have a printed name next to the signatures so that it is possible to identify who is getting these consents, and so that I can speak to them about what they are actually saying to parents or guardians.

8.    **Medication Management:** DJJ shall review and revise, in consultation with the DJJ medical director and child and adolescent psychiatrist, its policies and procedures relating to medication management. The policies and procedures shall address the use of stimulant medications for youths with polysubstance abuse and shall ensure adequate monitoring of the consequences of medication.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | No |
| IYC-Harrisburg | No |
| IYC-Pere Marquette | No |
| IYC-St. Charles | No |
| IYC-Warrenville | No |

The child and adolescent psychiatrist was only coming into play while I was at IYC Warrenville. She was beginning to review medication issues and assist with policies and procedures. I would expect by the next time I am assessing IDJJ that she will have completed this process and we can review it and discuss it in completion. I would like to note that many of the policies and procedures are in place. Now that the child and adolescent psychiatrist is in place, this will allow further assessment and development of policies and procedures. In our last meeting in late November of 2017, I already saw this process at hand, as she was reviewing policies and procedures regarding the use of stimulant medication.

The actual use of medications focusing on child and adolescent disease states, understanding differences with children and adults, and the use of mood stabilizers, stimulants, and antipsychotic medication are all areas of need that will benefit from having a child and adolescent psychiatrist in place.

9.    **Youth in Reception and Classification Units:** DJJ shall create and implement policies and procedures to ensure appropriate group therapy is available to youth in Reception and Classification Units subject to reasonable safety and security considerations.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | N/A |
| IYC-Harrisburg | Yes |
| IYC-Pere Marquette | N/A |
| IYC-St. Charles | Yes |
| IYC-Warrenville | Yes |

Overall, groups are in place within the classification units. I sat in at groups at IYC St. Charles R&C and as with prior years they have been consistent. The problem with both Reception and Classification areas are that the youth are kept there for typically 10 to 14 days. They have an incredible amount of down time where they are sitting around the unit for many hours a day, with no activities. I spoke with numerous youth at IYC St. Charles who all appeared comfortable in Reception and Classification. They talked about the groups and the groups have been consistent as described, including PREA. However, there is down time, with nothing for them to do. I think this should be looked at closely and the amount of time on Reception and Classification should be decreased or there should be more activities for the youth to participate in.

10. **Youth Seeking Immediate Mental Health Care:** DJJ shall promptly fulfil, to the extent reasonably possible, requests by youth who ask to immediately speak with a mental health professional, without any presumption that such youth need crisis confinement.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | **Questionable** |
| IYC-Harrisburg | **Questionable** |
| IYC-Pere Marquette | **Yes** |
| IYC-St. Charles | **No** |
| IYC-Warrenville | **Yes** |

This is another complex issue. One of the things that makes it complex is that there are times that youth are in need of mental health care and do not receive it. Youth are not always capable, due to limited abstract reasoning ability or insight, of asking for care when they need it. Staff have to be available to assess and intervene with appropriate mental health interventions, whether a youth is requesting assistance or not.

There are other issues at hand. In my opinion, diagnoses are being missed. For example, youth with unipolar depression and ADHD and perhaps a behavior disorder are being diagnosed with Bipolar Disorder. Youth with ADHD are being treated with neuroleptics to control impulsive acting out behavior. The facilities which are least likely to have these problems are the facilities with the highest functioning youth with the fewest mental health issues, such as IYC Chicago and IYC Pere Marquette.

There was a noteworthy conflict which was brought up to me by mental health staff and by others, regarding youth who were acting out and potentially having mental health issues within school (at IYC Chicago). The conflicts could not be easily rectified, and based on my interview with staff, I could not tell whether or not these were youth in need of acute mental health interventions or whether they were security and safety issues.

In my opinion, IYC Pere Marquette does an adequate job with the youth that they have. IYC Warrenville, in my opinion, does an exceptional job. I will talk further about IYC Warrenville and their interventions with youth with acute and chronic mental health issues.

In my opinion, this issue is more complex at IYC St. Charles and IYC Harrisburg. These are the two major Reception and Classification facilities for the state. Both facilities have shown that they are struggling on some level with youth with acute mental health issues. IYC St. Charles, although down in numbers, has also been down a 20-hour-a-week psychiatry position for over a year. In my opinion, there are far more acute mental health issues that are being readily identified at IYC St. Charles. They would benefit from additional psychiatric services, ideally from a child and adolescent psychiatrist whether at the facility or through telepsychiatry. I have brought this issue up since my initial assessment and continue to feel this is an area of concern. At IYC Harrisburg, there are continued areas of concern regarding diagnoses and treatment interventions for youth, having youth at the appropriate mental health level and in my opinion, having numerous youth that are at a more significant mental health level than IYC Harrisburg is set up to treat. Ideally, it would make sense to have more intensive mental health services in place at IYC Harrisburg to assist with this problem.

11. **LGBTQ Youth:** DJJ shall create and implement a training program and promulgate and implement revised policies addressing needs and potential treatment of LGBTQ youth and youth diagnosed with Gender Dysphoria. The revised policies shall include (a) protection of LGBTQ youths from violence, threats, and harassment from staff and others; (b) individualized decision-making, which includes the input of DJJ mental health staff, regarding the classification and housing of transgender youths, including whether to house them with male or female youths; (c) individualized decision-making, which includes the input of DJJ mental health staff, regarding whether to continue or begin hormone or hormone-blocker therapy for transgender youths; and (d) when body searches of transgender youths are necessary, allowing such youths to choose the gender of the staff who will search them.

| Facility | Compliance (Yes/No) |
|---|---|
| IYC-Chicago | Yes |
| IYC-Harrisburg | Yes |
| IYC-Pere Marquette | Yes |
| IYC-St. Charles | Yes |
| IYC-Warrenville | Yes |

There has clearly been a greater understanding at IDJJ regarding LGBTQ youth. Staff training, specialized programming, interventions for Transgender and Gender Dysphoric youth have all assisted with this process.

**Miscellaneous:**

- **Developing appropriate aftercare plans for youth while still in placement:**

As has been consistent with my other reports, in my opinion this area is inadequate. The reason this area is inadequate is because Medicaid services are stopped for youth when they come into IDJJ. The great majority of youth coming into IDJJ have Medicaid. The Medicaid is not put back into place prior to leaving and it is left up to the families and aftercare to put Medicaid back into place. As a result, appointments in community mental health programming for alcohol and substance abuse treatment, for individual therapy, family therapy and medication management

cannot be made for those youth in need. Again, there is a high percentage of youth that are recidivistic, that have relapsed on their alcohol and substance use, and are typically noncompliant on their medications, primarily because they have not been able to have the appropriate medication interventions. This is an area that IDJJ says they have no control over. It may be that they have no control over this area. However, this then results in an area of deficit that has not been fixed. The reason it has not been fixed is because nothing has been done to reassess the Medicaid problem. A simple solution would simply be to hold Medicaid services while in IDJJ, allowing them to be reinstated prior to leaving so there would not be a dearth of services which according to aftercare, can last up to two months, even with appropriate attempts to put back into place.

- **Consistent Behavioral Plans:**

There is a need for consistent behavioral interventions to be in place. For the last several years, there has been an attempt to have consistent PBIS in all of the IDJJ facilities. In discussing PBIS in all facilities, the facilities have stated that "it is a work in progress." Some of the difficulties with PBIS have included inconsistencies in its implementation. Inconsistencies occur within facilities, as well as comparing one facility to another. There has been an attempt to have better consistency, but this has not occurred at the present time.

I would like to give some examples of the struggles at hand. When speaking to the mental health professionals at IYC Chicago, they could not tell me who was implementing PBIS and they also informed me that it was inconsistently being used. At IYC Harrisburg they told me they couldn't get the funding from the state for the positive reinforcements, so they had no rewards to give the students for the positive behavioral plan that they were attempting to implement. They were doing some very noble things, such as staff cooking special meals for youth as rewards, and having some isolated positive reinforcements, but not what they consistently need to run the program. IYC Warrenville seemed to be doing some of the strongest work with this. They, along with IYC Pere Marquette, were doing a reasonable job. However, it took staff's assistance and quiet donations to make this process occur. I would like to see this process corrected during the 2018 review. There is simply no reason that they cannot have a consistent positive behavioral plan that has the fiscal support from the state to make the process occur. Without a consistent positive behavioral plan, one will expect to see worsening behavioral issues, as has been described in the larger facilities.

- **Youth Summaries:**

I wanted to discuss some of the youth I evaluated at IYC Harrisburg. The first is youth MJ. He was 14 years old at the time of my assessment. He was diagnosed with a mood disorder and a conduct disorder and was placed on BuSpar, an antianxiety medication; Trazadone, an antidepressant to help with sleep; and Risperdal, an antipsychotic medication. I interviewed the youth. What was most noteworthy was his level of anxiety. There was also a subtle paranoid component, feeling he wasn't sure whether the staff had it out for him or not and somehow wanted to get at him. As I interviewed him, he continued to describe feeling fearful of staff, wanting to be removed from IYC Harrisburg, and feeling he was being treated unfairly.

JR was 13 years old. I reviewed his chart and interviewed him. He was quite guarded in his presentation. He presented to IYC Harrisburg on March 31th and remained on R&C until April 18th. He was described as being cooperative on R&C. Prior to placement at Harrisburg, this youth had numerous psychiatric hospitalizations, primarily due to aggressive behavior. He was at one residential center for 66 days. He had a prior diagnostic history of Post-traumatic Stress Disorder, Major Depressive Disorder, Attention Deficit Hyperactivity Disorder (ADHD), Oppositional Defiant Disorder, and of a Reactive Attachment Disorder. At the time of admission, he was prescribed Seroquel (an antipsychotic), Prozac (an antidepressant), and Tenex (medication for ADHD). Prior to his placement at Rice, he was at a second residential home for several years. He had also been in specialized foster care programs, secondary to his underlying mental health issues. While he was at one residential center, he had three psychiatric hospitalizations over an 18-month period. This youth had been placed in a variety of alternative care placements, since 9-months of age. His current medications include Prozac 20mg a day, Seroquel 100mg in the morning and 200mg in the evening, and Tenex 1.5mg three times a day. There are numerous questions about the medications, including this youth being on Seroquel for years with the only differences being potentially progressive increase. Again, there is a problem with no acceptable informed consent. My suggestion after seeing this youth, based on his young age and very significant mental health issues, is that he be considered for placement on Lincoln Cottage at St. Charles. My evaluation of the youth was on June 28, 2017. At the time, monthly reevaluation from psychiatry had not occurred. It had been 6 to 7 weeks since this youth had been seen by a psychiatrist. In my opinion, this youth continued to present in a very guarded way and was continuing to struggle. It was unclear whether he was on the right psychotropic medications and he was not seeing a psychiatrist in a routine and regular manner.

Youth AB was one of the other young youth that I evaluated. He weighed 98 pounds and was 4' 10". He was known because his older brother had previously been at IYC Harrisburg. It was quite impressive that this young child minimized his behavioral issues but in reviewing his chart, had 40 prior police contacts before this admission. He was placed at IYC St. Charles on June 2, 2017 in the R&C and then to the general population on June 6, 2017. There was a mental health treatment note, but no psychiatric assessment. In my opinion, this was a very small, very young 13-year-old child who was from a very highly conflictual family environment, with a disabled father with cerebral palsy and a mother that he has variable contact with. He was struggling and clearly had behavioral issues. He is impulsive, minimally, with a likely history of ADHD. I was shocked that he had not been referred to psychiatry for assessment. AB had a history of 15 prior unfounded DCFS cases. He had been in prior outpatient programs, but discontinued because of a lack of attendance. He attended a therapeutic school and failed the 2016/2017 year.

There were other youth with complex histories. Youth RS had a history of Soto syndrome. He had been in four different dorm placements at IYC Harrisburg. Shortly after seeing him, he was placed at IYC St. Charles where he continued to have struggles behaviorally and otherwise. At the time of my evaluation, he was on Prozac 50mg per day and BuSpar 10mg per day. He had not gotten into any fights at IYC Harrisburg but had agitated gang members, which ultimately resulted in him being placed in Dorm A, essentially in isolation. The longstanding isolation was the primary reason for looking for an additional placement where he might feel more comfortable.

Youth DK was an example of a youth diagnosed with Bipolar Disorder. His diagnosis was unclear. In my opinion, he did not meet criteria for Bipolar Disorder. Youth DK also exemplifies a youth who was not able to follow-up with mental health interventions following release and ultimately returned to IYC Harrisburg, essentially being identified as being noncompliant on medication. In Youth DK's last note, the doctor wrote about not needing to see him again for 90 days. All youth on psychotropic medication should be seen every 30 days.

Another youth at IYC Harrisburg, Youth BW, was diagnosed as not having any signs of a Major Depression. He has a history of K-2 use. Both of his parents have a history of opioid and cannabis use. He had previously been diagnosed with PTSD and has a history of mood symptoms. In my opinion, this youth needed to be further assessed for Major Depressive symptomatology.

Youth JE had been diagnosed with a Conduct Disorder and Disruptive Mood Dysregulation Disorder, as well as an intellectual disability. He had been quite aggressive and would hit people. He broke the jaw of a security guard at St. Charles and broke the nose of another student at a recent placement. He has had a variety of other potential prior psychiatric diagnoses. There have been numerous prior assessments of youth JE. Youth JE is one of two youths that I saw where there is consideration for hospitalization. He has essentially been kept in solitary confinement for months, secondary to his behavioral issues, and has never been hospitalized.

I had a chance to interview youth JE. What was most notable about Youth JE was his intellectual disability. He presents essentially as a large child. He was able to describe the episodes with staff and the difficulty he has controlling his temper when he gets upset. He always seemed to have some rationalization for his behavior. His medications included Trilithon (an antipsychotic) 4mg twice a day, Haldol and Ativan as needed for acute agitation.

Louis J. Kraus, MD