**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 12-cv-7289 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| HEIDI MUELLER, | ) | |
| | ) | |
| Defendant. | ) | |

**MONITORS' JOINT REPORT ON PRIORITY ISSUES
HINDERING DJJ'S COMPLIANCE WITH THE REMEDIAL PLAN
<u>Kelly Dedel, Ph.D., Louis Kraus, M.D., and Peter Leone, Ph.D.</u>**

During the Status Hearing on January 29, 2018, the Court requested a joint report from the R.J. Monitoring Team that detailed "pressing problems and solutions" regarding DJJ's compliance with the Remedial Plan. All of the issues below were discussed in the Monitoring Team's most recent reports to the Court, submitted in late 2017. They are reiterated here in an abbreviated format.

In the Monitoring Team's opinion, there are four main issues that are hindering compliance with the Remedial Plan. They are: (1) excessive use of solitary confinement; (2) excessive idle time; (3) failure to address certain youth's mental health needs; and (4) inconsistent implementation of the positive incentive behavior system and responses to misconduct. These problems are interrelated, linked by two overarching concerns—(a) how to attract and retain sufficient numbers of qualified staff who are well-prepared for difficult jobs, and (b) how to positively impact the behavior of DJJ's most challenging youth. In essence, these issues are the opposite of "low-hanging fruit." Instead, they are enormously complicated issues with complex solutions. In Dr. Dedel's 20 years of experience with other jurisdictions, these are the same issues that are typically the crux of the matter in conditions of confinement cases because they are very difficult problems to solve.

### (1) <u>Excessive Use of Solitary Confinement</u>

As noted in both Dr. Dedel's and Dr. Kraus' recent reports, certain subpopulations of youth—those with significant behavior issues, medical issues, and other administrative statuses—are placed in units that rely heavily on the use of solitary confinement due to a lack of structured activity and effective behavior support. The problem appears to be present at St. Charles (the ABU and Self-Confinement units) and Harrisburg (the ABU). *See p. 12 of Dr. Dedel's report and p.2 of Dr. Kraus' report for additional details*.

**Recommendations:**
- Devise a program model for the ABU that requires youth to be out of their cells and engaged in structured activities during all waking hours. Structured activities should include a full-day

of school; hygiene, meals and showers; large muscle activity; an array of programming designed to address the underlying causes of their behavior issues; and an array of structured recreational activities (e.g., games, reading materials, letter writing, staff-led discussions/competitions, etc.).
- Develop and implement behavior plans for youth on the ABU that identify a set of behavior goals, objectives designed to help the youth achieve them, interventions to be implemented by staff, and a method for evaluating the youth's progress.
- Identify the conditions underlying the reasons for youth's placement in Self Confinement and develop individualized plans to integrate them into the general population or place them on a special housing unit, as appropriate.
- For youth on long-term administrative statuses and medical holds, ensure that the conditions of confinement also meet the requirements of the Remedial Plan, i.e., youth are engaged in a full day of school and a full array of structured activities throughout the waking hours and that appropriate medical and/or behavioral health plans are in place to address the underlying reasons for their placement on the administrative status.

The Monitoring Team notes that DJJ has reported that efforts are already underway with regard to all three recommendations. We include the issue here to underscore the importance of addressing the conditions of confinement in the ABU and Self-Confinement units, and the need to make individualized plans to ensure access to a full-day of structured activities for youth in other confinement statuses.

### (2) Excessive Idle Time

As noted in all of the Monitoring Team's recent reports, youth in certain facilities experience an excess of idle time during waking hours primarily due to education staffing shortages, security staffing shortages, and to some extent, staff's failure to follow the daily schedule. Education and security staffing shortages appear to drive the problem at St. Charles, while a lack of compliance with the daily schedule was noted at Harrisburg and to some extent, Chicago. *See pages 36-37 of Dr. Dedel's report, pages 4-5 of Dr. Leone's report, and p.12 of Dr. Kraus' report for additional details*.

**Recommendations:**
- Ensure a full complement of security staff are available at St. Charles to enable youth to access school and other structured programming. DJJ reports that recent recruit classes have brought St. Charles security staffing levels to the minimum requirements. While this is a very positive development, subsequent staff turnover needs to be minimized and vacancies need to be anticipated and addressed in a timely manner in order to stabilize the facility.
- Ensure a full complement of education staff are available at St. Charles to allow youth to access a full day of school. This will require multiple steps, some of which are already in progress:
    - Create regional salary parity with the public schools;
    - Create the ability for both 9- and 12-month teacher contracts;
    - Implement a hiring timeline that allows DJJ to compete with public schools (i.e., 6-8 weeks for hire, rather than the 4 months currently required);
    - Provide for short-term summer contracts to cover for teaching positions with 9-month contracts, so that students may access school year-round. A corollary

2

       benefit of summer contracts is their ability to allow teachers to "test" working with DJJ students and encourage them to apply for a full-time position.
- Ensure that Reception and Classification Units have a robust daily program schedule.
- Ensure that security staff implement the daily program schedule as it was designed, ensuring that all youth are out of their cells during waking hours, except during scheduled time for shift change and other emergent, operational needs.

### (3) Failure to Address Certain Youth's Mental Health Needs

As noted in Dr. Kraus' recent report, a variety of issues in the mental health arena compromise youth's access to and quality of mental health care. Some youth's level of mental health need is not being properly assessed, and is ultimately minimized, and thus they are not being identified for the more intensive mental health services they appear to need. *See p.7 of Dr. Kraus' report for additional details*. This includes some youth who need intensive mental health services who are not being admitted to DJJ's Special Treatment Units due to their aggressive behaviors. *See p.2 of Dr. Kraus' report for additional details*. Additionally, DJJ has been unable to access psychiatric hospitalization for youth with acute treatment needs. *See p. 9 of Dr. Kraus' report for additional details.* Finally, follow-up mental health care is not being scheduled as required by the Remedial Plan, which DJJ attributes to issues with reinstating Medicaid for youth prior to release. *See p.13-14 of Dr. Kraus' report for additional details.*

**Recommendations:**
- Ensure that all youth with significant mental health histories (e.g., multiple prior hospitalizations or psychotropic medications) are discussed with and/or assessed by the child psychiatrist. Any decision not to provide intensive mental health services to such youth should be adequately justified and approved by a senior DJJ mental health staff.
- Conduct a census of DJJ's current population and level of mental health need. Once completed:
    - Re-assess the adequacy of staffing ratios; and
    - Ensure that Special Treatment Units are designed to address the issues that are common to DJJ youth (e.g., aggressive behaviors) and that sufficient bed space is available. Ensure these units have sufficient treatment and security resources.
- Create a dependable process for accessing psychiatric hospitalization by either creating a MOU with a local hospital system and providing the necessary security resources they may require or creating a hospital unit at one of the DJJ facilities that is adequately resourced (e.g., 24-hour nursing, daily mental health interventions, consulting physician, daily psychiatric treatment while medications are adjusted, etc.).
- Implement a strategy for ensuring that follow-up mental health treatment is available to youth who are released from DJJ facilities. This could involve suspending, rather than terminating, Medicaid benefits while the youth is in custody or making agreements with community mental health providers to serve DJJ youth and receive retroactive reimbursement.

### (4) Inconsistent Implementation of the Positive Behavior Incentive System (PBIS) and Responses to Misconduct.

The implementation of PBIS needs to be fortified in order to properly support and guide youth's behavior and to respond appropriately to serious misconduct. This includes having dependable access to an array of meaningful incentives that are delivered with fidelity and a system for responding to youth misconduct that includes both treatment-oriented responses and appropriate sanctions (e.g., a consequence or a limitation on a desired activity). Currently, the protocol for responding to youth misconduct lacks credibility among staff in some of the facilities, which has a negative impact on both safety and staff morale. *See p.20 of Dr. Dedel's report and p.14 of Dr. Kraus' report.*

**Recommendations:**
- Expand the array of rewards and incentives available to youth of different PBIS levels and ensure their consistent implementation by all staff.
- Implement a consistent structure for responding to serious misconduct that involves treatment-oriented responses to address underlying causes, and appropriate and proportional sanctions to shape behavior.
- Efforts to improve the implementation of PBIS and to increase the transparency, consistency and proportionality of consequences for misconduct are currently underway in DJJ's response to the Saline County prosecutions (see Dkt. 223). A high-quality behavior management system is essential to achieving the safety goals of the Remedial Plan and thus we want to underscore the point.

In conclusion, we believe that the Department can make significant progress toward compliance with the Remedial Plan when these issues are fully addressed, and we look forward to continuing to support DJJ's efforts.


DATED: February 20, 2018

Kelly Dedel, Ph.D.
Louis Kraus, M.D.
Peter Leone, Ph.D.

## **CERTIFICATE OF SERVICE**

      I, **Camille Bennett**, an attorney, hereby certify that I have caused a true and correct copy of the foregoing MONITORS' JOINT REPORT ON PRIORITY ISSUES HINDERING DJJ'S COMPLIANCE WITH THE REMEDIAL PLAN to be served on February 20, 2018 upon all counsel in this case via the Court's electronic filing system.

                                                /s/ Camille Bennett