**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-7289 |
| | ) | |
| HEIDI MUELLER, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT STATUS REPORT
AS TO PRIORITY ISSUES IDENTIFIED BY THE MONITORS**

On February 23, 2018, this Court entered an order directing the Parties to file a joint status report commenting on the monitors' priority issues report and identifying proposed next steps. Dkt. 232. The Parties' Status Report is set forth below.

In the monitors' priority issue report, they identified four main issues which they believe are hindering compliance with the Remedial Plan: (1) excessive use of solitary confinement; (2) excessive idle time; (3) failure to address certain youths' mental health needs; and (4) inconsistent implementation of the positive incentive behavior system and responses to misconduct. The Parties are in agreement that these are the key areas for focus. The Parties also agree that IYC St. Charles currently presents the most complex set of interlocking problems and thus requires the most immediate attention.

**(1) Excessive Use of Solitary Confinement**

The Parties agree with the monitors that IYC-St. Charles has struggled with programming and effective behavior support for certain subpopulations of youth; specifically, those with significant behavior issues, medical issues, and other administrative statuses such as youth refusing housing (*i.e.*, "self-confiners). Historically, these youth have been housed on Taylor

1

Cottage. The Department is in the process of implementing a plan for relocating these youth and increasing their access to education and programming.

### Alternative Behavior Unit Youth

Under the plan, the Alternative Behavior Unit (ABU), which houses the youth with the highest behavior needs, will be housed on Pierce Cottage.[1] The cottage will be capped at eight residents, will have a higher staff to youth ratio (2-3 security staff at all times), and will include a specially assigned Youth and Family Specialist (youth counselor) and Mental Health Professional whose workspaces will be on the cottage. The cottage will have a recreation schedule like all other General Population cottages including school and recreation, and all youth will be expected to be out of their rooms unless serving a timeout/behavioral hold. Currently, the ABU youth are receiving education on the cottage Mondays, Wednesdays, and Fridays, with a goal of ultimately integrating them into the school building. The designated Youth and Family Specialist starts the week of March 26, 2018, and the mental health clinician will start in the beginning of April 2018.

These ABU youth also receive Intensive Intervention Plans, which identify triggers for their problem behaviors, positive replacement behaviors, and steps for implementing the plan. The Department has shared sample Intensive Intervention Plans with the monitor for her review and has received some initial feedback from her. The Department is scheduling a call in mid-April for her to discuss her feedback with all of the Assistant Superintendents of Programs.

### Self-Confining Youth

In March 2018, IYC-St. Charles implemented a new procedure for self-confining youth when they request a different housing unit or transfer due to safety concerns. Rather than placing

---

[1] Currently, ABU youth are temporarily being housed on Taylor Cottage until repairs on Pierce Cottage can be completed in a few weeks.

these youth on Taylor Cottage as had been the past practice, the facility now immediately begins reviewing the youth for mediation with peers, a possible change in housing units, or a transfer to a different facility. Until such relocation can be accomplished, youth are kept in their regularly assigned room for their safety while the other youth are present on the housing unit, but are moved to a neutral space while the other youth are off the unit.

**(2) Excessive Idle Time**

The monitors noted that educator and security staff shortages have resulted in an excess of idle time during waking hours at IYC-St. Charles. This has been an ongoing area of concern.

With respect to educator hiring, the Department has been focusing on reducing delays in the hiring process and is pursuing many of the educator monitor's suggestions, including:

- proposed legislation currently pending in the Illinois General Assembly to (1) completely eliminate Central Management Services (CMS) from reviewing candidates eligibility for hire and (2) require salary parity with regional school districts;

- began offering a nine-month option for new educator positions, which eventually will be expanded to all school district employees;

- holding bi-monthly conference calls with all facility HR representatives and Public Safety Shared Services to discuss all pending school district positions; and

- working with Department of Corrections to hire a Backgrounds Unit employee (who started on March 16, 2018) specifically designated to handle DJJ applicants.

The Parties have been in consistent communication with the education monitor on the hiring initiatives and have another call scheduled with him to discuss progress on April 11, 2018.

Coordination between school district staff and security staff is critical for functional operation of the school. To improve communication, in January 2018 the Principal at IYC-St. Charles began sending emails every morning identifying which cottages would be attending school in the morning and afternoon and explaining any deviations from the established schedule.

With respect to security staff, an intern class graduates from the Training Academy on March 30, 2018; 9 staff from this class are designated for IYC-St. Charles. The Department also has scheduled a total of eight screenings for this year to hire security interns, and plans to hold another Intern Academy in June 2018. In general, security staffing levels at IYC-St. Charles are not negatively impacting programming opportunities for youth, although there have been occasions when a lack of communication has resulted in a non-optimal allocation of security staffing resources. To reduce this problem, the facility continues to send daily operational needs reports to the Executive Team, and either the Deputy Director of Operations or his staff are contacting the shift supervisors at the beginning of the 6 a.m. and 2p.m. shifts to identify what their staffing needs are and to ensure that the post assignments for the shift maximize the available staff.

Beyond hiring and retention issues, a significant number of staff at IYC-St. Charles (approximately 50) are on leave due to a claimed service-connected injury. On March 5, 2018, a former administrator returned to the facility to assist with managing workers' compensation claims to ensure that staff return to work as soon as they are medically able to do so.

**(3) Failure to Address Certain Youth's Mental Health Needs**

The Parties agree with the mental health monitor that the mental health treatment available to youth committed to the Department can be improved to better serve youth with

4

higher needs and more aggressive behaviors. The priority areas for the Department are: (1) improving the overall quality of services; and (2) securing treatment options for youth with the highest mental health needs.

To improve the overall quality of services, the Department is enhancing its trauma-informed treatment by offering SPARCS (Structured Psychotherapy for Adolescents Responding to Chronic Stress) treatment to all youth in custody who have experienced trauma. Mental health staff attended two, two-day SPARCS trainings (December 2017 and March 2018) and currently are participating in monthly training calls.

The Parties agree with the mental health monitor's general assessment that a greater number of youth require more intensive treatment than can be served by the existing special treatment unit at IYC-St. Charles. The Department is exploring options, including expanding the special treatment unit at St. Charles, enhancing mental health services across all facilities, or increasing beds with existing residential providers.

Securing hospitalization or more intensive treatment for the most acute, highest needs youth continues to be a challenge, as third-party providers often do not want to accept these youth due to their histories of violent and assaultive behaviors. Approximately 5% or fewer of the Department's youth require this level of treatment at a given time, with less than 1% actually requiring acute psychiatric hospitalization. Although the mental health monitor suggests creating a hospital unit within DJJ to serve these youth, the Department believes that a more realistic and easier-to-achieve solution is partnering with a residential provider with an existing relationship with the Department. One of the Department's current providers has expressed interest in creating a unit specifically for the highest-needs youths, and the Department anticipates that a

decision on whether the provider will have the capacity to expand the contract to accommodate these youths will be made in May or June 2018.

### (4) Inconsistent Implementation of the Positive Behavior Incentive System (PBIS) and Responses to Misconduct

The Parties agree with the monitors that the Department's behavior management system—PBIS—and responses to conduct need to be delivered with fidelity and consistency. The Department has revised its PBIS and discipline policies but is waiting to implement those policies until upgrades to its online database, Youth360, can be made. The upgrades will (1) allow the entire discipline process to be tracked online and completed within 7 days, and (2) also enable daily tracking of youth behavior levels. Both will help ensure that consequences can immediately follow problem behaviors. Microsoft estimates that the functionality upgrades will be in place by June 2018.

The Parties also agree with the monitors that an effectively functioning PBIS system requires expanded incentives and rewards, which require budgetary resources. One source of funding for PBIS resources is the Resident Benefit Fund at each facility. These funds are generated from vending machine sales and are intended to benefit the youth of the facility. Historically, the Department of Corrections has handled all approvals and payment processing for purchases using this fund, but DJJ's new Chief Financial Officer will be working on streamlining the approval to help reduce delays. Additionally, the Department intends to allocate General Revenue Funds from its FY2019 proposed budget for PBIS incentives and programming. Blending these two funding streams to ensure each facility can plan for a stable annual budget will allow for more consistent and sustained PBIS activity.

**<u>Plaintiffs' Supplemental Comments as to the Priority Issues Identified by the Monitors:[2]</u>**

Plaintiffs support the initiatives described above and have no doubt that they are needed. However, in a number of instances, the described initiatives fall short of addressing the express concerns of the monitors, and Plaintiffs believe that additional steps must be taken to address those concerns. By the time of the April 18 meeting with the Court and the monitors, Plaintiffs expect to have additional concrete suggestions as to how certain issues (in particular those relating to mental health) can be moved forward.

**(1) Excessive Use of Solitary Confinement:**

The Monitors' Joint Report stated that "certain subpopulations of youth . . . are placed in units that rely heavily on the use of solitary confinement due to a lack of structured activity and effective behavior support," adding that the problem appeared to be present at both IYC St. Charles and IYC Harrisburg. Dkt. 231, p. 1. However, the Department's plans described here as to ABUs (Alternative Behavior Units) and self-confining youth address only IYC St. Charles. While the Parties agree that remedies for St. Charles should be prioritized, the Department should also be tasked with ensuring that the monitors' concerns about excessive solitary confinement are addressed as well.

Under the Order Regarding DJJ's Updated Plan to Address Youth Prosecutions, the Safety and Welfare Monitor is due to return to IYC Harrisburg no later than mid-June to assess

---

[2] DJJ had hoped to file this document as a true joint report, which would narrow and prioritize the monitors' issues for the Court. On March 7, 2018, the parties met at DJJ's offices to discuss the monitors' observations, and DJJ's initial draft of this document, which it provided to plaintiffs' counsel on March 23, 2018, was based on that meeting. DJJ did not learn of plaintiffs' concerns as detailed in this section until plaintiffs provided their edits the evening of March 29, 2018, after the close of business. The parties will endeavor to discuss plaintiffs' concerns prior to the upcoming meeting with the Court and monitors.

the efficacy of the steps laid out in that Plan. Dkt. 226. Dr. Dedel should also be tasked with assessing whether steps like those laid out to address the excessive use of solitary confinement at IYC St. Charles should also be implemented at IYC Harrisburg.

Additionally, the Monitors' Joint Report stated that steps need to be taken to ensure that youth on long-term administrative statuses and medical holds receive the benefits of the Remedial Plan (full-day school, structured activities, appropriate medical and/or behavioral health plans). Dkt. 231, p. 2. This is not addressed by DJJ. The Department needs to develop a plan to address this problem as well.

Lastly, certain of DJJ's initiatives here would benefit from specific deadlines for implementation or for monitor review. For example, DJJ indicated that youth on the St. Charles ABU are currently receiving education on the cottage three days per week, with the goal of ultimately integrating them into the school building. The Department should set a deadline by which they expect this goal to be realized. Additionally, DJJ described a new procedure for addressing youth who self-confine due to safety concerns. A timeline should be established for monitor review of this new procedure.

**(2) Excessive Idle Time:**

In this area, in a number of cases, the Department either fails to address certain of the monitors' issues (and therefore needs to propose a plan), or fails to make clear whether the proposed remedy will in fact meet the monitors' concerns. First, the Monitors' Joint Report identified a problem at IYC Harrisburg and "to some extent" IYC Chicago, namely, staff's "lack of compliance with the daily schedule," Dkt. 231, p. 2, but the description of the Department's initiatives to address excessive idle time is silent as to this problem. The Monitors' Report also

8

recommends ensuring that Reception and Classification Units have a robust daily program schedule, Dkt. 231, p. 3, which is unaddressed in DJJ's report.

As to educator recruitment, the Department omits one of the Education Monitor's recommendations—short-term summer contracts to create year-round school. In addition, although there are a number of steps to expedite educator hiring—eliminating CMS eligibility review, regular conference calls with other involved State entities, and hiring a dedicated background check employee—there is no assurance given that these steps by themselves will reduce the hiring timeline to the 6-8 week period that the Education Monitor believes is necessary to find and get qualified teacher employees. Dkt. 231, p. 2.

The final and very serious issue in this section is IYC St. Charles security staff, whose presence is necessary for the functioning of other services, such as enabling students to get to school, and ensuring that recreational schedules can take place as planned. Plaintiffs' concern is that, as described, the steps being taken now—stepped-up security staff recruitment, and an effort to address the (staggeringly high) number of employees on leaves of absence—are the same steps that were presented to the Court a year ago, when IYC St. Charles faced the same problems. While Plaintiffs do not doubt the Department's efforts or sincerity, the Court needs an explanation of how the current measures are different, or why the Department expects the same measures that failed in 2017 to work in 2018.

Plaintiffs have expressed to the Department their view that 2018 is the year that IYC St. Charles needs to come into compliance with the Consent Decree and Remedial Plan. If this does not occur, alternative remedies need to be considered. One possible remedy recently reiterated by the Education Monitor, in view of the long-term lack of education at IYC St. Charles, is providing compensatory education services for discharged youth who did not receive services

9

while in custody. Plaintiffs recently learned that the Department does in fact provide compensatory education services on a case-by-case basis to individual DJJ youth who have separate representation. This would certainly be an expensive and administratively complex remedy if applied to all affected IYC St. Charles youth, but it may be necessary to consider this if the Department is unable to achieve compliance soon.

**(3) Failure to Address Certain Youth's Mental Health Needs:**

Plaintiffs believe that this is an especially significant problem area which is, so far, scanted in the Department's planned initiatives. Throughout the second half of 2017, the Mental Health Monitor has expressed his views that there are youth in DJJ who need more intensive mental health services than they receive, and that the problem begins with improper assessment. Specifically, as summarized in the Monitors' Joint Report, the levels of mental health services youth need are not evaluated properly at the outset, and, equally problematic, youth with behavioral problems stemming from untreated mental health needs are not being admitted to the Department's Special Treatment Units because of the youth's aggressive behaviors. Dkt. 231, p. 3. Plaintiffs, from their own observations and from discussions with other advocates, believe that insufficient mental health services may be at the core of many of the Department's current problems in complying with the Consent Decree and Remedial Plan. For instance, Plaintiffs believe that teacher and other staff attrition at IYC St. Charles and, more recently, at IYC Chicago, is likely driven by the challenges of staff having to deal with youth with significant but unaddressed mental health issues.

The Mental Health Monitor proposed (i) an initial assessment of all youth with significant mental health histories by the Department's child psychiatrist, and (ii) a census of the youth population's mental health needs, which in turn would drive a re-evaluation of the current

10

mental health staffing ratios and size, services, and staffing of Special Treatment Units. These proposals—which Plaintiffs regard as essential—are mostly ignored by the Department.

The Department notes that it is "exploring options" to address the fact that a greater number of youth require more intensive treatment than can be served by the existing Special Treatment Unit at IYC St. Charles, but little in the way of specifics are provided. In discussions with Plaintiffs the Department has shared some more specific visions and goals for how Special Treatment might be expanded throughout the system, but this is not highlighted in this report. Such plans need to be formalized, time-limited, and discussed with monitors and the Court.

Finally, as the Mental Health Monitor emphasizes, the Department needs to find an immediate solution to the problem of psychiatric hospitalization of youth. During the course of 2017, there were two youth who needed hospitalization for acute needs but DJJ struggled to place them (one was finally placed recently). Like any form of hospital care, this must be available for those who need it (it is also a requirement of the Consent Decree. Dkt. 33 ¶17.)

Plaintiffs believe that, bluntly, the likely problem here is money. The State may have to be ordered to provide adequate funding for necessary hospitalizations.

### (4) Inconsistent Implementation of the Positive Behavior Incentive System (PBIS) and Responses to Misconduct:

Plaintiffs believe that the Department, in consultation with the Safety and Welfare Monitor, has a reasonable plan to ensure the consistent implementation of the PBIS system. However, a critical part of the implementation of that plan, as acknowledged here, is the availability of adequate resources—money, again—to provide the incentives required by PBIS. The Department suggests that its incoming CFO may be able to "streamline" the availability of certain funds, and also that it may be able to allocate funds from its FY19 budget. Unfortunately, on Plaintiffs' review of the FY19 proposed budget for DJJ, there does not seem to be any

11

additional money allocated to the agency—but it needs more money to make this program work.

Here again, the State may have to be ordered to provide the funds for this.

DATED: March 30, 2018

Respectfully submitted,

| For the Plaintiffs: | For the Defendant: |
|---|---|
| By: /s/ Camille Bennett | By: /s/ Michael T. Dierkes |
| Benjamin S. Wolf<br>Camille Bennett<br>Lindsay S. Miller<br>Roger Baldwin Foundation of ACLU, Inc.<br>150 North Michigan Avenue, Suite 600<br>Chicago, IL 60601<br>(312) 201-9740 | Michael T. Dierkes<br>Office of the Illinois Attorney General<br>General Law Bureau<br>100 West Randolph Street, 13th Floor<br>Chicago, IL 60601<br>(312) 814-3672 |
| Maja C. Eaton<br>Kevin M. Fee, Jr.<br>Joseph R. Dosch<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7000 | |