**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J. et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 12-cv-7289 |
| | ) | |
| HEIDI MUELLER, | ) | Hon. Matthew F. Kennelly |
| | ) | |
| Defendant. | ) | |

**PARTIES' JOINT PROGRESS REPORT AS TO PRIORITY ITEMS IDENTIFIED**

On April 18, 2018, this Court entered an order directing the parties to file a joint progress report on the priority items identified in a conference held the same day. Dkt. 234. This report summarizes the Illinois Department of Juvenile Justice's (DJJ or Department) efforts to address the priority items and Plaintiffs' response as to those efforts.

**I. REASSESS MENTAL HEALTH LEVEL SYSTEM**

The first priority item is for the Department to conduct a reassessment of its system for assigning youth to mental health levels and providing mental health services sufficient to serve the needs of youth on each level. At the conference on April 18, the Parties and Monitors agreed that the first step is to review the criteria for youth assignment to each mental health level, followed by a review of the mental health services to be provided at each level. The next step is then to improve service delivery for youth at each level, including youth with the most intensive psychiatric needs.

1. Identifying criteria for youth assignment to mental health levels and expectations for services at each level.

**DJJ's Progress**

First, the Parties and Mental Health Monitor agreed that an additional mental health consultant would provide beneficial assistance to the Mental Health Monitor as he conducts a reassessment of the Department's mental health services system. The Parties provided the Mental Health Monitor with resumes of three potential candidates, two recommended by the Department and one recommended by Plaintiffs' counsel. The Parties have followed up with the Mental Health Monitor and are awaiting his feedback on the candidates.

Second, the Department's Child and Adolescent Psychiatrist, Dr. Maskel, is conducting a census of youth psychiatric diagnoses and medication profiles. Dr. Maskel is reviewing data for

each DJJ psychiatrist to identify outliers and trends in mental health diagnoses and treatment that run counter to best practices in Child and Adolescent Psychiatry. When an outlier or concerning trend is identified, Dr. Maskel is conducting a more comprehensive review of the youth's file and treatment in order to determine whether adjustments should be made. Dr. Maskel will complete her initial review of each psychiatrist by September 30. This clinical oversight is also an ongoing part of Dr. Maskel's role. The Department's goal is to ensure youth receive high-quality treatment, aligned with best practices, and to maintain an efficient and effective way to make diagnostic, treatment, and staffing adjustments moving forward when appropriate.

Third, the Department is revising its mental health policies and procedures based on priorities identified by the Mental Health Monitor. On May 18, the Director, Deputy Director of Programs, Chief of Mental Health Services, Chief of Professional Development and Training, and Child and Adolescent Psychiatrist met with the Mental Health Monitor. The Department shared information about its current mental health level system, how youth are assigned to a level, and the services provided at each level. The Department and Mental Health Monitor agreed on the following areas of focus for revisions to its mental health policies and will provide drafts to Plaintiffs' counsel and the Mental Health Monitor for review during site visits scheduled for this summer and early fall:

- The Department will strengthen its policies for mental health services offered to 13 and 14 year old youth to ensure the youngest youth receive services and programming appropriate for their developmental levels. The Department has already increased its level of scrutiny of new admissions who are 13 and 14 year olds to ensure appropriate mental health services and facility placement. A Director's Bulletin describing these new practices will be issued by June 30; formal policy changes will be finalized and issued by the end of 2018.

- The Department will develop protocols to ensure review of a youth's mental health level when certain indicators are present, for example, when a youth engages in repeated aggressive behaviors or is identified for an intensive intervention plan. These triggers will prompt the Department to review any diagnoses and update the treatment plan as needed. The Chief of Mental Health is drafting revisions to Mental Health Protocols to reflect this approach; a final revision is anticipated by September 30.

- In addition to mental health levels, the Department will identify and mark factors that indicate the need for additional mental health support or more individualized attention, such as high levels of trauma, significant histories of interpersonal aggression, and multiple hospitalizations. Once the factors are defined, the Department will develop a system for communicating the factors and adjusting programs and support accordingly. The Chief of Mental Health is drafting revisions to Mental Health Protocols to reflect this approach; a final revision is anticipated by September 30.

- The Department will conduct a review of the interventions utilized for each mental health level and for youth indicating the need for additional support. The Department will seek the Mental Health Monitor's input to ensure youth receive the appropriate type and level of services.

During the Mental Health Monitor's site visits, the parties will confirm with him that the plan outlined above reflects the Monitor's recommendations. The Department's goal is to finalize the revised policies, agreed to by Plaintiffs' counsel and the Mental Health Monitor, sometime this fall so it can move forward with improvements to its service delivery for youth.

**Plaintiffs' Response**

As a general matter, whether the new or ongoing initiatives described in this Report by the Department would be adequate to meet the Monitors' concerns about the "priority items" raised in their report (Dkt. 231) and addressed at the April 18, 2018 meeting will be a question for the Monitors as they prepare for and undertake their annual site visits. Plaintiffs expect that whether these initiatives have been (or are being) successfully implemented will be a focus of the Monitors' reporting for this calendar year. Plaintiffs therefore cannot offer much substantive comment in this Report except to express the concern that there should be clear timetables for the accomplishment of the projects described by the Department.[1]

With respect to the specific mental health initiatives described by the Department in this section, Plaintiffs' only additional comment is that, in order to avoid future delays or misunderstanding, they believe that the Mental Health Monitor should be consulted earlier than the time of his site visits (which are scheduled for late July – September) as to whether the initiatives comport with his understanding of the outcome of his May 18 meeting with the Department, and whether they also satisfy his recommendation for a "census" of the mental health needs of DJJ youth and possible re-assessment of mental health staffing ratios. Dkt. 231, p. 3.

2. <u>Improve service delivery for all youth, including youth with acute mental health needs</u>.

**DJJ's Progress**

As noted above, the Department intends to enhance service delivery in accordance with its revised policies once they are reviewed, agreed to, and finalized. However, the Department has taken steps to improve service delivery in recent months. First, the Department is expanding its offering of trauma-informed treatment. The Department trained additional staff members to implement SPARCS (Structured Psychotherapy for Adolescents Responding to Chronic Stress) and is in the process of rolling out additional treatment groups. The chart below summarizes SPARCS expansion at each facility.

---

[1] Plaintiffs expressed this concern to the Department in the exchange of comments about the draft of this Report, and the Department did add a number of additional timeframes as a result of Plaintiffs' comment.

| Facility | Current Number of Staff Trained | Current Number of Groups Operating | Projected Expansion |
|---|---|---|---|
| IYC-St. Charles | 5 | 3 | Will add 2 groups when new staff begin working |
| IYC-Harrisburg | 6 | 3 | Will utilize in Reception & Classification Unit and during incident debriefing |
| IYC-Pere Marquette | 3 | 3 | N/A; did not previously utilize so current operation is expansion |
| IYC-Chicago | 3 | 4 (SPARCS, SPARCS Alumni group, Mini Mindfulness, and SOS skills during station rotation) | Will utilize in family therapy |
| IYC-Warrenville | 6 | 1 | N/A; utilize Dialectical Behavior Therapy more frequently |

Second, for youth with significant and persistent mental health needs, the Department is continuing discussions with a current residential treatment provider partner about developing a unit specifically for DJJ. The Department has struggled historically to find long-term care for these youth in residential treatment settings. One youth has been accepted for placement with the provider, and if successful, additional youth with significant and persistent psychiatric needs will be placed there in the future. For youth in need of psychiatric hospitalization, the Department continues to follow the Illinois Services Screening, Assessment and Support Services (SASS) protocol – the statewide system for youth experiencing a mental health crisis – and seeks placement in collaboration with other State agencies.

Finally, at IYC-St. Charles specifically, the Department is in discussions with a "restorative justice hub" representing a collaboration of seven different social service agencies in the Chicago area. If finalized, the "hub" will provide support implementing peace circles, other restorative justice services (*i.e.* mediation), and prosocial programs and activities, all of which will promote the mental health and overall well-being of youth at the facility. The Department's goal is to implement these services by October 2018.

**Plaintiffs' Response**

There are three initiatives described here (the SPARCS expansion, the search for a reliable residential treatment placement location, and the "restorative justice hub"). Only one of these (the "restorative justice" initiative) has an associated timetable. As Plaintiffs stated above,

they believe that every initiative described herein by the Department should have projected dates for accomplishment.

## II. YOUTH IDLE TIME

The second priority item is for the Department to decrease the amount of youth idle time, particularly at IYC-St. Charles. To achieve this goal, the Department is focusing on decreasing use of confinement, adding security staff to improve staffing levels at IYC-St. Charles, and increasing youth programming.

1. <u>Decrease use of confinement</u>.

**DJJ's Progress**

The Department is working on a revised confinement policy, including accompanying revisions to the policies on medical holds and crisis status. Plaintiffs provided comments to the draft on April 27, which have been reviewed by the Department and shared with the Safety and Welfare Monitor. The Department's Deputy Director of Operations will be setting up a meeting with Plaintiffs' counsel and the Safety and Welfare Monitor to continue review of the policies later in the month of June.

As the Department described in the Parties' Joint Status Report as to Priority Issues Identified by the Monitors, filed on March 30, 2018 (Dkt. 233), a process is underway to improve access to education and programming for youth at IYC-St. Charles with significant behavior issues, medical issues, and other administrative statuses (*i.e.* "self-confiner") that led to their housing on Taylor cottage. The facility's new Alternative Behavioral Unit launched on May 30. Youth are now housed on the Pierce cottage and are being provided more structured individual work and greater access to education. The program plan is attached hereto as an Exhibit, along with a master program schedule for the unit, an eligibility checklist for youth considered for the unit, and a behavior plan checklist for youth residing on the unit. The Department shared these plans with the Safety and Welfare Monitor on June 8. The Safety and Welfare Monitor will be requesting information about youth who have been on the unit prior to her visits this summer and she will review youth files while on site. The Department looks forward to her assessment of the program's implementation and recommendations for improvement after her visit. The Department will also seek input from the Mental Health Monitor during his IYC-St. Charles site visit and looks forward to his recommendations.

Additionally, the Assistant Superintendent of Programs at IYC-Harrisburg has been focusing on youth programming for Unit 11, the behavioral unit at that facility, to make sure program protocols are being followed and youth receive the out-of-room time and educational programming they should.

5

**Plaintiffs' Response**

In addition to the more general statements about timetables made above, Plaintiffs believe that, as to the program for the new Alternative Behavior/Specialized Housing Unit at IYC St. Charles (Exhibit 1), the Mental Health Monitor should be consulted well in advance of his IYC St. Charles site visit, which is currently not scheduled to take place until mid-September. If the Mental Health Monitor has suggestions about the program plan, this would enable the Department to make changes in accordance with those suggestions prior to his review of the unit.

2. Improve security staffing levels at IYC-St. Charles.

**DJJ's Progress**

The Department has conducted screenings to hire Juvenile Justice Specialist Interns for IYC-St. Charles every-other month during calendar year 2018. Beginning in June, the Department will be holding screenings every month for the Northern region, with the exception of the month of September. The Department is also focusing on expanding its recruitment efforts at Illinois colleges and universities. In April and May, the Department's Equal Employment Opportunity/Affirmative Action Officer attended job fairs and career days hosted by Rend Lake College, University of Illinois Springfield, Wabash Valley College, Southeastern Illinois College, and Lighthouse Church of All Nations in Alsip, Illinois.

A major barrier for IYC-St. Charles security staffing levels is workman's compensation administration and returning staff to work following a service-connected leave of absence. The Department contracted with a retired employee who is working through staff files and returning as many staff to work as possible. The Department is also working to build internal capacity to take over this function when the contract ends. A staff member at IYC-Harrisburg is assisting IYC-St. Charles with their files. Additionally, the Department extended an offer to a candidate for a Human Resources Associate position at IYC-St. Charles to add capacity in the Human Resources Department at that facility. The Department anticipates finalizing a start date early next week and hiring for an additional position in the coming months.

**Plaintiffs' Response**

Plaintiffs do not doubt that the Department is making concerted efforts as to the chronic staff shortages at IYC St. Charles, but again, Plaintiffs would like to see additional and more concrete timeframes for these initiatives and when the Department expects them to bear fruit.

3. Increase youth programming.

**DJJ's Progress**

The Deputy Director of Operations began conducting quarterly facility audits in January. The audits include observation of program schedules posted on youth living units. The

Department's larger facilities continue to struggle in implementation of this requirement. The Deputy Director of Programs has instructed the Assistant Superintendents of Programs to reinforce this expectation and monitor compliance by regularly checking to see if schedules are posted.

The Safety and Welfare Monitor recommended that the Department develop and implement a quality assurance strategy to quantify the amount and type of programming that youth receive at each facility. The Deputy Director of Programs began requiring reports of any deviations from the facilities' program schedules in order to accurately assess the amount and type of programming youth are receiving. May was the first month to receive reports from all five facilities.

Three of the five facilities – IYC-Chicago, IYC-Pere Marquette and IYC-Warrenville – reported few, if any, deviations from their program schedules:

- IYC-Chicago reported schedule deviations on three occasions in May, all based on staff absences or cancellation by volunteers. Youth received alternate recreation time in the gym or on the housing unit as a result.

- IYC-Pere Marquette reported no schedule deviations in May.

- IYC-Warrenville reported schedule deviations on seven occasions in May. Five of these were cancellations of mental health or substance abuse groups based on youth crises requiring mental health staff attention or staff absences. Youth received alternate recreation time in lieu of the scheduled programming.

Two facilities – IYC-Harrisburg and IYC-St. Charles – struggled to implement programming as scheduled. At IYC-Harrisburg, the facility reported partial-day school cancellations because of power outages and teacher shortages, and recreational activity cancellations (such as gym, outdoor recreation, and volunteer-led religious activities) based on inclement weather and volunteer cancellations. IYC-St. Charles reported a high number of schedule deviations throughout the month.

Based on an evaluation of the reports, IYC-Pere Marquette provides programming according to its pre-approved schedule; IYC-Chicago, IYC-Harrisburg, and IYC-Warrenville provide programming in keeping with their pre-approved schedules the overwhelming majority of time. IYC-Harrisburg reported a number of school cancellations but otherwise provides programming in keeping with the schedule. Additionally, the school cancellations were due to short-term problems and are not anticipated to continue over the next few months. On the other hand, IYC-St. Charles did not follow its schedule on a number of occasions in May. Based on this data, the Department is focusing its efforts on improvements to programming at IYC-St.

7

Charles and will continue close monitoring of IYC-Harrisburg to ensure partial-day school cancellations do not continue.

At IYC-St. Charles, as noted in more detail above, the Deputy Director of Programs is in discussion with a "restorative justice hub" that would provide prosocial programs and activities at the facility. If finalized, this partnership will result in enhanced programming for youth.

At IYC-Chicago, the facility is expanding its college programming for youth who are high school graduates. One youth at IYC-Chicago completed his first semester at Malcolm X Community College, and three youth are currently taking courses during the summer session. An IYC-Chicago educator has volunteered to serve as College Coordinator for the youth, providing college enrollment and homework assistance to the youth a few days per week in the late afternoons.

Finally, a key point for increasing youth programming is returning to a full-day school schedule at IYC-Chicago and IYC-St. Charles. Both facilities have not been operating full-day school during the current school year due to staff shortages. At IYC-Chicago, the Special Education Resource Coordinator is scheduled to begin work on June 18, one educator candidate has been selected and is in the backgrounds process, and the interview process is underway for another educator position. The Department anticipates that a regular full-day school program will resume in the coming months with the addition of these new staff members.

At IYC-St. Charles, the Department continues to struggle making progress towards a full-day school program. Details about Department-wide efforts to improve hiring practices are outlined below, and a more comprehensive status report specific to the school at IYC-St. Charles will be provided in the Parties' semi-annual joint status report. The Department is acutely aware of the critical need to resolve this issue and continues pushing to identify solutions.

**Plaintiffs' Response**

In anticipation of the Department's more comprehensive discussion promised above, Plaintiffs will reserve comment on the issues raised by this section until the semi-annual report.

### III. IMPROVE DJJ HIRING PROCESS

1. Background unit position dedicated to DJJ.

**DJJ's Progress**

On May 9, the Department finalized a memorandum of understanding with the Illinois Department of Corrections (IDOC) for an IDOC backgrounds unit employee dedicated only to IDJJ positions. The Department historically faced a long delay in its background clearance for candidates hired to fill positions. The Department is hopeful that this dedicated staff member will greatly improve the wait time for a selected candidate to be approved to start work, and thus,

improve the Department's recruitment of desirable employees. One DOC backgrounds staff member is currently dedicated to DJJ positions, and the hiring process will begin for a second position dedicated to the Department this month.

2. Legislation to improve hiring process for educators.

The Department introduced legislation this spring, House Bill 5005, to improve the hiring process for educators. The legislation exempts DJJ educators from the Illinois Central Management Services "pre-qualification" process, eliminating one step in the bureaucratic process that caused delay in the process.[2] House Bill 5005 passed both houses of the Illinois General Assembly on May 24 and will become law once signed by the Governor.

**Plaintiffs' Response**

As to the backgrounds staff initiative and the legislative change to the "pre-qualification" process, given the Education Monitor's historic concerns about the extended periods of time required to "onboard" education staff (*see*, *e.g*, Dkt. 225-2, p. 3), Plaintiffs believe that the Department should be prepared to explain how much time in the total hiring process it expects to eliminate as a result of these changes, and when the Department expects to see the full benefits of these changes. This explanation should also include a date by which the Department anticipates the new backgrounds staff position will be filled.

Finally, as to the portion of the legislative initiative that the Department was forced to withdraw (as described in FN 2), Plaintiffs believe that the Education Monitor should be consulted as to whether, based on his experience, there are other options to address the salary problem in the near(er) term.

---

[2] The legislation also originally included language that would require DJJ educators to be offered a salary commensurate with the school districts in the surrounding geographic area. DJJ struggles to onboard qualified educator candidates in the Northern region because the State salary for new educators is significantly less than the school districts in the surrounding areas, and DJJ educators generally work one hour longer each day and for 12 months per year instead of nine. AFSCME expressed strong concerns about the legislation, and the Department agreed to remove the language and instead negotiate with AFSCME to address the salary disparity administratively. The Department is currently in discussion with AFSCME and the Illinois Central Management Services department to reach a compromise and anticipates being able to adjust salaries through CMS by August 2018. If IDJJ is not able to come to agreement with AFSCME by the veto session, the Department will run a bill proposing amendment to the legislation that adds the salary language back into the bill.

DATED: June 15, 2018

Respectfully submitted,

| For the Plaintiffs: | For the Defendant: |
|---|---|
| By: /s/ Camille Bennett | By: /s/ Michael T. Dierkes |
| Benjamin S. Wolf<br>Camille Bennett<br>Lindsay S. Miller<br>Roger Baldwin Foundation of ACLU, Inc.<br>150 North Michigan Avenue, Suite 600<br>Chicago, IL 60601<br>(312) 201-9740 | Michael T. Dierkes<br>Office of the Illinois Attorney General<br>General Law Bureau<br>100 West Randolph Street, 13th Floor<br>Chicago, IL 60601<br>(312) 814-3672 |
| Maja C. Eaton<br>Kevin M. Fee, Jr.<br>Joseph R. Dosch<br>Sidley Austin LLP<br>One South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7000 | |