IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| R.J. et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 12 C 7289 |
| ) | |
| HEIDI MUELLER, Director, Illinois ) | |
| Department of Juvenile Justice, ) | |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2012, the plaintiffs—a class consisting of youth housed at the Illinois Department of Juvenile Justice (IDJJ)—sued IDJJ over, among other things, inadequate education and mental health services at its facilities. Later that year, the parties resolved the suit via a consent decree, which the Court approved. In 2014, the Court approved a remedial plan as contemplated by the consent decree, and compliance efforts began thereafter. The most recent monitors' reports filed in October 2019 stated that two IDJJ facilities are still not in compliance with the remedial plan's educational staffing requirement, and another facility is not in compliance with a provision of the remedial plan requiring each facility to have a chief mental health administrator. The plaintiffs have moved for an order to force compliance with these requirements.

### Background

The plaintiffs are youth housed at IDJJ. In September 2012, they sued IDJJ on behalf of themselves and a class of those similarly situated. The plaintiffs alleged,

among other things, that they were not receiving minimally adequate mental health and education services and that this violated their rights under the Fourteenth Amendment and the Individuals with Disabilities Education Act.

In October 2012, the parties agreed to resolve the case through a consent decree, which the Court preliminarily approved. The Court also certified a class consisting of all youth who were or would be confined by IDJJ and a subclass of youth with special education needs. In December 2012, the Court granted final approval of the consent decree, which required two years of "substantial compliance" with a remedial plan by each IDJJ facility. In April 2014, the Court approved the remedial plan, which included thirty-seven requirements. Relevant to the plaintiffs' present motion are two requirements: an educational staffing requirement, which established a student-to-teacher ratio of no more than 10:1 for general education and no more than 6:1 for special education at each facility, and a requirement that each facility have a Treatment Unit Administrator (TUA) to oversee mental health services.

Monitors appointed by the Court began assessing IDJJ's compliance with the plan's requirements in 2016, and they have issued annual compliance assessments each year since then, through 2019. With respect to the educational staffing requirements, there are three possible compliance ratings issued by the education monitor: substantial compliance, noncompliance, and "partial compliance." Substantial compliance means that "any violations of the relevant remedial plan(s) are minor or occasional, and are neither systemic nor serious," or, if there is a serious violation, the facility promptly identifies it and "develops and implements a timely and appropriate remedy that results in compliance." Am. Consent Decree ¶ 36. Partial compliance, as

the monitors have used the term, signifies some level of noncompliance: it indicates that in a particular subject matter area, IDJJ is in substantial compliance with some of the plan's requirements but not in compliance with others—or, as pertinent here, some IDJJ facilities are in substantial compliance with the particular requirement but others are not.

The education monitor's yearly assessments over the past five years reflect gradual progress toward substantial compliance at IDJJ as a whole, but persistent educational staffing problems at the St. Charles and Chicago facilities. The Court summarizes the pertinent data in the following paragraphs.

In 2016 and 2017, the monitor found that all IDJJ facilities were in partial compliance with the education staffing requirements. For those two years, however, no IDJJ facility met those requirements in full. The education monitor attached to his 2017 report data as of October 2017. The data reflected that at the Chicago facility, there were forty-five general education students and four teachers, yielding a student-to-teacher ratio of 11:1, and there were nineteen special education students and three special education teachers, yielding a student-to-teacher ratio of 6:1. Thus, the Chicago facility was deemed to be in "partial compliance" because it satisfied the required special education ratio but not the general education ratio—though, to be sure, having one more teacher on staff would have resulted in substantial compliance at that facility. At the St. Charles facility, there were fifty-eight general education students and six teachers, yielding a student-to-teacher ratio of 10:1, and there were forty-four special education students and six teachers, yielding a ratio of 7:1. One more special education teacher would have put St. Charles in substantial compliance at that facility.

The 2018 assessment showed some improvement: the education monitor found that the Pere Marquette facility was in substantial compliance. The Warrenville, Harrisburg, and Chicago facilities, however, were still only in partial compliance. The monitor assessed the St. Charles facility as noncompliant. The monitor did not attach to his 2018 report data regarding numbers of students and staff at each facility.

The student-to-teacher ratio at each IDJJ facility in each month of the 2018-19 school year was reported in an IDJJ report dated October 2019. That report shows that at the Chicago facility, there was a significant shortfall in special education staffing, although the ratio improved over the course of the school year. Specifically, the special education student-to-teacher ratio started at 19:1 in August 2018, the first month of the term; it dropped throughout the term; and in July 2019, the last month of the term, the ratio was 9:1—better, but still significantly noncompliant. During that school year, the Chicago facility was consistently in compliance with the required general education student-to-teacher ratio; this fluctuated but was consistently at or below 10:1.

As for the St. Charles facility, there was noncompliance with both the general and special education student-to-teacher ratios for the majority of the 2018-19 term, as reflected in the monitor's assessment. There was, however, a trend of improvement in both these ratios over the course of the school year. At the start of the school year, in August 2018, the general education student-to-teacher ratio was 14:1, and it remained significantly out of compliance with the required 10:1 ratio until April 2019. The ratio then improved over the course of the rest of the year, but it was still out of compliance—at 7:1—in July 2019, the last month of the school year. St. Charles was noncompliant with the special education requirement for nearly the entire 2018-19 school year: 14:1 at

4

the start of the school term and above 6:1 for the majority of the term.  In May 2019, the ratio dropped to 6:1 and thus came into compliance, and at the end of the school year in July, the ratio was 5:1.

By the time the education monitor issued his 2019 assessment, three facilities—Warrenville, Harrisburg, and Pere Marquette—were in substantial compliance with the student-to-teacher ratios required by the remedial plan.  However, the monitor reported that Chicago and St. Charles did not have as good a record of compliance.  The data in IDJJ's October 2019 report includes monthly student-to-teacher ratios for the first three months of the 2019-20 school year.  At St. Charles, the student-to-teacher ratio for special education started at 5:1 in August 2019, rose to 8:1 the next month, but dropped back down to 6:1 in October 2019.  At the Chicago facility, this ratio was 9:1 in August 2019, dropped to 7:1 in September, and stayed at 7:1 in October—noncompliance for all three months.  The general education student-to-teacher ratios at both facilities, however, consistently met the 10:1 requirement for August through October 2019.  Indeed, the education monitor noted that, at the time of his 2019 assessment, all IDJJ facilities were in compliance with the remedial plan's staffing requirements for general education.

As for the other requirement on which the plaintiffs' motion focuses, satisfaction of the requirement to have a TUA in charge of mental health services at the Pere Marquette facility, the IDJJ's history of compliance has been spotty at best.  The facility has been unable to keep this position filled on a consistent basis.  The mental health monitors assessed the Pere Marquette facility as substantially compliant with the TUA requirement in 2016 and 2018, when the position was filled, but noncompliant in 2017

5

and 2019, when the position was vacant.

In January 2020, the plaintiffs filed a motion seeking a court order requiring IDJJ to immediately fill the educational staff vacancies at the St. Charles and Chicago facilities and the open TUA position at the Pere Marquette facility. The motion was fully briefed as of the end of April 2020. The Court apologizes for its delay in issuing this decision.

## Discussion

**A.    Compliance status**

### 1.    Education staffing requirements

In 2015, the education monitor identified two impediments to achieving compliance with the staffing requirements in the Remedial Plan: a slow-moving hiring process and teacher salaries that are not competitive with public school salaries in the relevant localities. Since then, IDJJ has made efforts to overcome these impediments. As of the education monitor's October 2019 report, however, the Chicago and St. Charles facilities were still not in compliance the remedial plan's special education staffing requirements. As indicated by the data in IDJJ's October 2019 report, both facilities continue to struggle to achieve and consistently maintain the required student-to-teacher ratio of 6:1. And the evidence, as detailed by the Court earlier in this decision, reflects a record of compliance at Chicago and St. Charles that is fairly characterized as checkered. The evidence reflects that, as the plaintiffs contend, this is attributable to the same persistent problems: the slow pace of the hiring process and non-competitive teacher salaries.

### a. Hiring process

In January 2017, IDJJ reported that it had implemented the following measures to attempt to streamline its hiring process: posting vacancies without waiting for approval from a state government agency called Shared Services; eliminating Shared Services as an intermediary for communication between IDJJ and the state's Central Management Services (CMS) agency; weekly meetings including Shared Services, IDJJ's executive staff, and its human resources representatives; flagging IDJJ education job applications for priority review by CMS, thereby reducing its application turnaround time to a few days; and adopting a policy with a timeline for the hiring process, applicable to both IDJJ and Shared Services. Later in 2017, as IDJJ continued to struggle to meet staffing requirements, it identified other efforts to address the problem, such as outreach to other state agencies and outside organizations to help with recruiting.

In addition, new state legislation, passed in 2018, has helped to expedite IDJJ's hiring process by eliminating the requirement that CMS review candidates' eligibility for hire.

The education monitor reported in October 2019 that IDJJ has pursued other methods to address staff shortages more expeditiously. It has been using personal service contracts to cover vacancies, a faster alternative to hiring using state contracts. As the plaintiffs contend, however, personal service contracts are at best a temporary fix that is inadequate for the longer term, as they are limited to ninety days and can be renewed only one time.

**b.    Teacher salaries**

In 2017, the education monitor found that a key problem with filling teaching vacancies is that IDJJ cannot offer salaries that are competitive with public schools in the region.  He observed this was a problem that particularly affected the northern facilities—St. Charles, Chicago, and Warrenville.  In 2018, the average vacancy level at the northern facilities was 37%, while at the southern facilities it was 4%.  The education monitor's October 2019 report stated that the three northern facilities still consistently struggle to fill teaching vacancies.

As the Court has outlined, in both 2018 and 2019, the St. Charles and Chicago facilities failed to meet or maintain staffing consistent with the requirements of the remedial plan.  The St. Charles facility did not meet the required 6:1 special education student-to-teacher ratio for the majority of the 2018-19 school year, although it did meet this requirement for the last three months of that term.  By September 2019, just one month into the 2019-20 school year, the ratio had risen to 8:1, thus putting St. Charles out of compliance.  The Chicago IDJJ facility had even more persistent staffing problems—its student-to-teacher ratio for special education exceeded 6:1 for all but one month of the 2018-19 schoolyear.  At the end of that year, the ratio was 9:1, and it had dropped to only 7:1—still noncompliant—by October 2019.

In his 2017 report, the education monitor suggested that IDJJ explore ways to offer pay competitive with local public schools.  IDJJ does not dispute that lack of salary parity with regional public schools makes it challenging to fill vacancies.  To address this, IDJJ proposed and supported state legislation permitting it to set salaries at parity with regional schools, but the legislation ultimately did not pass.

In his October 2019 report, the monitor opined that a new state law that prohibits inquiry into a job applicant's salary history would allow IDJJ to offer salaries competitive with area public schools. *See* dkt. no. 294-3 at 2 n.3 (citing 820 ILCS 112/10(b-5), (b-10)). IDJJ seems to agree. *See* dkt. no. 317 at 2-3. This does not make sense to the Court—there is no indication that IDJJ was given authority to exceed its current salary schedule—and neither the monitor nor IDJJ has explained their thinking in this regard. The monitor also concluded that under the new law, IDJJ will be able offer an additional recruitment incentive by granting new hires enhanced credit for prior years of service. *See* dkt. no. 294-3 at 2.

## 2. Mental health staffing

The second major focus of the plaintiffs' motion is IDJJ's failure to hire and retain a TUA at its Pere Marquette facility. A TUA supervises mental health staff, coordinates communication across departments at a facility, serves on facility crisis teams, and coordinates implementation of IDJJ's mental health policies and procedures. This position became vacant at Pere Marquette in 2017 (the specific date is unclear). IDJJ struggled to fill the position, and in 2018, it changed the required qualifications to make it easier to fill. Near the end of 2018, it was able to hire a Pere Marquette TUA. But in August 2019, this position was vacant again because the TUA resigned. IDJJ had not been able to hire a replacement as of the October 2019 monitors' report. In that report, the mental health monitors stated that it had been difficult to recruit qualified mental health staff to the southern region of the state and that IDJJ's lengthy hiring process exacerbated this problem.

**B.     Remedy**

IDJJ has made important strides towards overall compliance with the education requirement by, among other things, streamlining its hiring process and attempting to pursue avenues for offering salaries in parity with regional public schools.  The agency has achieved substantial compliance with these requirements at most of its facilities for at least some significant periods of time, and partial compliance at others.

IDJJ has been unable, however, to sustain adequate educational staffing levels at the St. Charles and Chicago facilities over any extended period, particularly in the area of special education.  IDJJ points out that it has been found to be in "partial compliance," but as the Court has discussed, that amounts to significant *non*compliance.  This state of affairs has persisted for far too long since the entry of the consent decree and the adoption of the remedial plan.  And the Court sees nothing on the horizon—no new measures or initiatives—that offers the promise of substantial compliance for the sustained period required by the consent decree and remedial plan.

The Court is faced with essentially two alternatives at this point.  The first is to continue on the previous course, without compelling further action by IDJJ, and hope for the best.  The second is to compel IDJJ to take further steps along the lines that the plaintiffs propose.

The Court is hesitant to step in and compel a state government agency to undertake actions beyond what state law requires.  But continuing on the previous course—monitoring and reliance upon voluntary efforts—does not appear to be any more likely to produce substantial compliance at any time soon than it has in the past.  Following this course almost certainly would mean regarding IDJJ's persistent "partial

compliance"—i.e., persistent noncompliance—as sufficient. It would amount to saying that partial compliance is good enough so long as IDJJ is trying hard. The Court does not consider this to be an acceptable alternative. The consent decree and remedial plan were developed after lengthy consideration and with the input of experts. IDJJ's noncompliance is not simply a matter of statistics. The required student-to-teacher ratios were put in place to ensure that youth in IDJJ's custody are provided the constitutional and statutory minima for educational services to incarcerated youth. When teachers are stretched too far in the number of students they must serve, the students' education is likely to suffer. The Court is unwilling to set aside the plan's and the consent decree's requirements and conclude, in effect, that coming close to compliance at least some of the time is good enough.

In short, the Court concludes that more must be done. The conditions that have prevented the IDJJ from attaining substantial compliance on an extended basis are persistent and, it appears, structural. A good deal has been done to remove structural barriers, but some of them remain, and they are preventing substantial compliance despite the fact that IDJJ has had five years to come into compliance. IDJJ has had ample time to satisfy these requirements, without success. And the record offers no basis to believe that further voluntary efforts by the IDJJ will bear fruit. Unless the Court is going to throw up its hands and give up, it must take further action. The Court concludes that the plaintiffs are entitled to relief to address the significant educational and mental health needs of the individuals housed in IDJJ's facilities and ensure compliance with the consent decree and the remedial plan.

## Conclusion

For the foregoing reasons, the Court grants the plaintiffs' motion [307] to enforce the staffing requirements of the remedial plan. The Court orders as follows: [1]

1. IDJJ must, by no later than October 23, 2020, fill any teaching vacancies at its St. Charles and Chicago facilities such that it is in compliance with the student-to-teacher ratios for general and special education set out in the remedial plan.

2. IDJJ must, by no later than October 23, 2020, fill the TUA position at its Pere Marquette facility. If IDJJ has not made a hiring offer for the position by September 25, 2020, it must propose to the Court by October 2, 2020 a modification to the remedial plan that provides an alternative mechanism for providing youth at Pere Marquette equal or better mental health services during any period that the TUA position is unfilled for more than 60 days.

3. Within 21 days of this order, IDJJ must issue a written hiring policy that establishes a timeline of no more than eight weeks from the date applications for a position close to the date to the date the first candidate offer is made. The Court advises that this does not lengthen the period for compliance provided in paragraphs 1 and 2.

4. Within 21 days of this order, IDJJ must provide to the Court a proposal for a regional salary schedule that enables it to offer for teaching positions salaries that are at parity with those for similar professional positions in the surrounding communities.

If IDJJ fails to implement the ordered changes to achieve substantial compliance

---

[1] The Court notes that IDJJ does not challenge the Court's authority to order the relief sought by the plaintiffs, but only whether action by the Court is necessary.

with the staffing requirements at the Chicago and St. Charles facilities, the plaintiffs may file a motion for an order requiring compensatory education.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: August 24, 2020