**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| R.J., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.:  12-cv-07289 |
| vs. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| | ) | |
| HEIDI MUELLER, in her official capacity | ) | |
| as Director of the Illinois Department of | ) | |
| Juvenile Justice, | ) | |
| Defendant. | ) | |

## SECOND AMENDED REMEDIAL PLAN

For good cause shown, the Court orders, adjudges, decrees, and finds as follows:

### PART I:  GENERAL PROVISIONS

1. <u>Prior proceedings.</u>

   (a) <u>Complaint.</u>  On September 12, 2012, plaintiffs filed this civil rights class action pursuant to 42 U.S.C. §§ 1983 and 1988 and 28 U.S.C. § 2201 *et seq.*  Plaintiffs are youths confined in secure facilities operated by the Illinois Department of Juvenile Justice ("DJJ").  Defendant is the DJJ Director.  The complaint alleges that certain DJJ conditions, services, and treatment violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution and the federal Individuals with Disabilities Education Act.  Specifically, the complaint addresses DJJ mental health services, general and special education services, room confinement, safety, and commitment beyond release dates for lack of a community placement.  The complaint seeks declaratory and injunctive relief.  *See* Dkt. 1.

   (b) <u>Class certification.</u>  On September 26, 2012, this Court certified a plaintiff class consisting of all youths who now are, and/or in the future will be, confined by the DJJ, and of a sub-class consisting of class members with special education needs.  *See* Dkt. 12-13, 17.

   (c) <u>Consent decree.</u>  On December 6, 2012, this Court entered and approved a consent decree and appointed three experts.  *See* Dkt. 32-34.  The consent decree required the court-appointed experts to investigate DJJ conditions and services, and then to file a report of their findings and recommendations.  *See* Dkt. 33 at ¶¶ 6, 10-11.  The court-appointed experts are Louis Kraus on mental health issues, Peter Leone on education issues, and Barry Krisberg on general juvenile justice issues.  *Id.* at ¶ 7.  Next, the

1

consent decree required the parties, with expert input, to prepare and file either an agreed proposed remedial plan, or separate proposed remedial plans from each party. *Id.* at ¶¶ 12-15. The consent decree then required this Court, subject to its review and approval, to enter the final remedial plan as a new order. *Id.* at ¶ 16.

(d) <u>Expert reports.</u> On September 23, 2013, the parties filed the reports of the court-appointed experts, including their findings and recommendations. *See* Dkt. 51.

2. <u>PLRA Findings and Stipulations.</u> The Court finds, based among other reasons on the reports of the court-appointed experts, and the parties stipulate that this remedial plan complies in all respects with the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626(a). Specifically, the terms of this remedial plan are narrowly drawn; they extend no further than necessary to correct the violation of the federal rights of the plaintiffs, the plaintiff class, and the plaintiff sub-class; and they are the least restrictive means necessary to correct the violation. The court has given substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the terms of this remedial plan.

3. <u>Process for Developing Policies and Procedures.</u> When this remedial plan requires the DJJ to develop, revise, implement, or ensure policies, procedures, plans, calendars, models, and the like (together, "policies"), the DJJ shall, at least 30 days prior to the deadline specified in the plan, provide a draft to the court-appointed experts and plaintiffs' counsel for their review and comment. DJJ shall consider in good faith any proposed revisions and meet and confer on request. DJJ shall, on or before the deadline specified in the plan, submit each policy required under the plan to the Court for its review and approval. Also, if plaintiffs object to the policy, plaintiffs may seek the Court's determination of whether such drafts comply with federal law, the consent decree, and this remedial plan. DJJ shall implement these policies.

## PART II: MENTAL HEALTH SERVICES

1. <u>Licensed Physician Medical Director.</u> DJJ shall, within 180 days of entry of this remedial plan, enter into a contract with a licensed physician to serve as DJJ medical director to provide oversight of all facility health care operations, oversight and monitoring of all vendor-provided health care services, and development of protocols and procedures for delivery of health care services. The contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

2. <u>Board-Certified Child and Adolescent Psychiatrist.</u> DJJ shall, within 180 days of entry of this remedial plan, enter into a contract with a board-certified child and adolescent psychiatrist. The child and adolescent psychiatrist shall provide oversight of all psychiatric services in all DJJ facilities, including monitoring all vendor-provided psychiatric services; ensure coordination of all psychiatric services with other health care and mental health services; consult with staff; assist with the development and

implementation of protocols and procedures for delivery of psychiatric and mental health services; and assess and evaluate youth in appropriate cases. The child and adolescent psychiatrist shall ensure that psychiatric staffing hours in DJJ facilities are sufficient to ensure that psychiatric services to youth comply with established professional standards, including (a) initial psychiatric evaluations of at least 90 minutes per patient and (b) medication follow-up and assessments of at least 30 minutes per patient. The contract shall require an adequate number of hours of work per week to ensure adequate mental health services, subject to review by the court-appointed mental health expert. DJJ shall promptly fill any vacancy in this position.

3. <u>Treatment Unit Administrator Positions.</u>  DJJ shall have qualified full-time treatment unit administrators ("TUAs") to oversee delivery of mental health services at each of its facilities. Qualified candidates must possess a doctoral degree (Ph.D or Psy.D) and appropriate licensure by the State of Illinois for those facilities that have Special Treatment Units or facilities that treat sexual offenders. Other facilities may employ TUAs who are licensed clinical social workers (LCSW) or licensed clinical professional counselors (LCPC) with at least three years of clinical experience and appropriate licensure by the State of Illinois.

4. <u>Mental Health Staffing Levels and Qualifications.</u>  Within 90 days of the hiring of the DJJ medical director and DJJ child and adolescent psychiatrist, DJJ shall, in consultation with the court-appointed mental health expert and plaintiffs' counsel, establish appropriate staffing levels and qualifications of mental health professionals to deliver individual and group therapy based on youths' diagnostic needs and services called for in each youth's individualized mental health treatment plan.  These staffing levels and qualifications shall be adopted in a supplemental order, including deadlines for implementation, subject to the Court's review and approval, and also subject to the PLRA findings as set forth above in paragraph I(2).

5. <u>Mental Health Records and Hospitalization.</u>  DJJ shall, within 90 days of entry of this remedial plan, implement uniform policies in all facilities to ensure (a) that the DJJ timely requests hospital and other outside mental health records for youth and (b) adequate identification and assessment of youth with significant mental health needs potentially in need of outside hospitalization.  DJJ shall ensure that any youth requiring psychiatric hospitalization is promptly hospitalized or, if DJJ is unable to secure psychiatric hospitalization, provided with an equivalent level of psychiatric care and treatment.

6. <u>Individualized Mental Health Treatment Plans and Coordination of Treatment.</u>  DJJ shall, within 180 days of entry of this remedial plan, ensure uniform policies and procedures are in place in all facilities requiring: (a) the development and implementation of an individualized mental health treatment plan for each youth, including the type and amount of mental health services each youth needs, (b) coordination by mental health staff with each other, and with other staff, in planning treatment, providing treatment, and planning community reentry (including integration with community mental health services), and (c) family therapy as appropriate.

7. <u>Medication Consent.</u>  DJJ shall, within 90 days of entry of this remedial plan, develop revised procedures and forms to ensure that appropriate informed consents are obtained for administration of psychotropic medications.  The consent forms shall (a) communicate the diagnosis; (b) identify the specific goals and potential side effects of the treatment; (c) provide for documentation of parental, guardian, or youth consent as legally required; and (d) provide for an assent signature for minor youth where consent is provided by a parent or guardian.

8. <u>Medication Management.</u>  DJJ shall, within one year of entry of this remedial plan, review and revise, in consultation with the DJJ medical director and child and adolescent psychiatrist, its policies and procedures relating to medication management.  The policies and procedures shall address the use of stimulant medications for youths with poly-substance abuse and shall ensure adequate monitoring of the consequences of medication.

9. <u>Youths in Reception and Classification Units.</u>  DJJ shall, within 120 days of entry of this remedial plan, create and implement policies and procedures to ensure appropriate group therapy is available to youths in Reception and Classification Units subject to reasonable safety and security considerations.

10. <u>Youths Seeking Immediate Mental Health Care.</u>  DJJ shall promptly fulfill, to the extent reasonably possible, requests by youths who ask to immediately speak with a mental health professional, without any presumption that such youths need crisis confinement.

11. <u>LGBTQ Youths.</u>  DJJ shall, within 90 days of entry of this remedial plan, create and implement a training program and promulgate and implement revised policies addressing needs and potential treatment of LGBTQ youth and youth diagnosed with Gender Dysphoria.  The revised policies shall include (a) protection of LGBTQ youths from violence, threats, and harassment from staff and others; (b) individualized decision-making, which includes the input of DJJ mental health staff, regarding the classification and housing of transgender youths, including whether to house them with male or female youths; (c) individualized decision-making, which includes the input of DJJ mental health staff, regarding whether to continue or begin hormone or hormone-blocker therapy for transgender youths; and (d) when body searches of transgender youths are necessary, allowing such youths to choose the gender of the staff who will search them.

## PART III:  EDUCATION SERVICES

1. <u>Full-Time, Full-Day Instruction.</u>  DJJ shall provide full-time, full day instruction on all scheduled school days in each facility.  Specifically, DJJ shall make available at least five hours of instruction per day, on all scheduled school days, to all youths committed to the DJJ, regardless of their status or security classification, except that: (a) DJJ shall offer at least two and one-half hours of educational programming per scheduled school day to youths who have a high school diploma or GED; and (b) within 120 days of the entry of this plan, and in consultation with the court-appointed education expert and plaintiffs' counsel, DJJ shall develop and implement a policy regarding the kind and minimum

amount of alternative educational programming for youth in reception and classification units. During scheduled non-school days, DJJ shall offer alternative educational programming and online coursework.

2. <u>Teacher Staffing Levels.</u> Within one year of entry of this remedial plan, DJJ shall create and fill additional teacher positions to ensure that full-time, full day instruction is provided on all scheduled school days in each facility, and that all special education services required by youths' IEPs are provided. DJJ shall ensure student to teacher ratios of 10:1 or lower for a general classroom setting and 6:1 or lower for students with intensive needs; however, with approval of the court-appointed education expert higher ratios may be utilized where para-professionals such as teachers' assistants are available. DJJ shall also work to streamline the teacher hiring process to eliminate any barriers to timely hiring of teachers and duplicative efforts or other inefficiencies in the hiring process.

3. <u>Other Education Staffing Levels</u>. Within 90 days of the entry of this plan, and in consultation with the court-appointed education expert and plaintiffs' counsel, DJJ shall establish (a) appropriate staffing levels for school librarians, school counselors, and school clerical staff, and (b) an appropriate number of special education instructional specialists to assist special education teachers. The responsibilities of the school counselors shall include timely obtaining youths' prior school records, assessing credits needed for graduation, and monitoring implementation and compliance with youths' Individualized Education Plans. These staffing levels shall be adopted in a supplemental order, including deadlines for implementation, subject to the Court's review and approval, and also subject to the PLRA findings as set forth above in paragraph I(2).

4. <u>Substitute Teacher Policy.</u> DJJ shall, within 180 days of entry of this remedial plan, create and implement a plan to provide for certified substitute teachers in its facilities to minimize the impact of teacher absences on instruction in its schools.

5. <u>Modified School Calendar.</u> DJJ shall reduce teacher absences and ensure continuity of instruction by implementing a modified school calendar. The modified school calendar shall have defined vacation times for teachers, and minimize the use of vacation time by teachers during school instruction periods. DJJ shall, within 60 days of entry of this remedial plan, prepare a draft school calendar for 2014-15 that specifies school holidays and other vacation time, staff development days, and a summer break for teachers while providing alternative educational programming for youths. Following review and input from the education expert and plaintiffs' counsel, DJJ shall, within 90 days of entry of this remedial plan, publish its final school calendar for 2014-15.

6. <u>Blended Instruction.</u> DJJ shall ensure that it provides both traditional classroom instruction and web-based instruction, individually tailored to students' needs.

7. <u>Curriculum.</u> DJJ shall provide an academic curriculum sufficient to make available, to every youth without a high school diploma or GED, instruction in: (a) all subjects in which they must earn credit under state law in order to earn a high school diploma; (b) all

subjects they need in order to prepare to take the GED exam; and (c) career and technical education programs for which high school credit can be earned. DJJ shall also offer vocational programming in which youths who already have a high school diploma or GED, or who are not on a diploma track, can earn vocational certification. Within one year of entry of this remedial plan, DJJ shall offer at least two vocational programs at each facility (except that facilities with fewer than 50 youths need only have one), and the DJJ shall ensure that at least one vocational program at each facility leads to certification. DJJ shall provide intensive literacy instruction to all youths who score below the 25th percentile on standardized reading tests upon DJJ admission.

8. <u>Special Education Policies and Procedures.</u>  DJJ shall, within 180 days of entry of this remedial plan, revise and update its policies and procedures relating to special education. The policies and procedures shall provide for (a) timely obtaining youths' IEPs and related materials from their prior schools, (b) identification and assessment of youths with learning disabilities, (c) development and implementation of IEPs, and (d) monitoring to ensure that youths are receiving the services specified in their IEPs.

## PART IV:  USE OF CONFINEMENT

1. <u>Confinement and Restricted Movement Policy.</u>  DJJ shall, within 180 days of entry of this remedial plan, rewrite its policy regarding use of confinement and restricted movement. For purposes of this Part IV, (i) "Confinement" shall refer to the removal of a youth from his or her assigned housing unit and placement of the youth into a confinement unit room, segregated from other youth, and (ii) "Restricted Movement" shall refer to youth who are not held on a confinement unit in confinement status but nevertheless have restricted movement. The new policy regarding the use of confinement and restricted movement shall include the following features:

    (a) <u>Limits on confinement for behavior management.</u>  Confinement shall be allowed for purposes of safely managing a youth who has exhibited aggressive or uncontrolled behavior or movement and presents an immediate risk to staff, other youths, or facility security.   When the youth regains self-control, such confinement must end. In no case shall confinement solely for behavior management last for a duration of more than twenty-four (24) hours.

    (b) <u>Limits on mental health crisis confinement.</u>  Confinement shall be allowed when (i) based on the youth's mental health status such confinement is necessary to prevent physical harm to self or others, (ii) no less restrictive intervention is available, and (iii) such confinement does not pose an undue risk to the youth's health.  Such confinement must end when the risk of harm to self or others ends.  Such confinement shall be re-evaluated every 24 hours by a mental health professional, subject to the same three findings above.  If such confinement is still necessary after three days, the youth shall be evaluated by a psychiatrist, psychologist, or other qualified mental health professional for hospitalization.

(c) <u>Limits on investigative confinement</u>.  If DJJ has probable cause to believe that a youth has committed a serious offense while in DJJ custody, they may confine such a youth during the pendency of an investigation of the alleged offense.  The policy must address the maximum duration of such confinement, and which offenses allow such confinement.

(d) <u>Limits on confinement for transfer to DOC</u>.  If DJJ has temporary custody of an individual who is of adult age with a criminal conviction and a sentence to the Department of Corrections ("DOC"), DJJ may confine such an adult while awaiting their transfer to a DOC facility, but in no event for longer than three business days.

(e) <u>Limits on medical confinement</u>.  The policy must address whether, and if so when, DJJ medical staff may order the confinement of a youth for purposes of medical quarantine or isolation.

(f) <u>Other confinement prohibited.</u>  All other forms of confinement shall be prohibited, including but not limited to: for purposes of disciplining or punishing a youth, or for purposes of protecting one youth from another youth.

(g) <u>Periodic visual inspections.</u>  The policy must require that at regular intervals, staff must visually inspect the well-being of all youths in confinement or restricted movement and have verbal communication with such youths during these visual checks.

(h) <u>Appropriate services.</u>  The policy must define the appropriate services for youths in confinement or restricted movement, including medical care, mental health services, education, recreation, visiting, telephone contacts and meals.

(i) <u>Process for entering, continuing, and exiting confinement or restricted movement.</u>  The policy must establish the criteria and process for entering and continuing confinement or restricted movement, and the criteria and process for exiting confinement and returning to regular living units or terminating restricted movement, including who makes such decisions, how they are reviewed and by whom, and timeframes for such decision and review.

(j) <u>Documentation</u>.  For youths in confinement or restricted movement, the policy shall address appropriate documentation of the foregoing visual inspections, verbal communications, appropriate services, and processes for entry, continuation, or exit.

(k) <u>Restricted movement on other living units.</u>  The policy must address limitations on all forms of restricted movement, including "room confinement" to the youth's own room, any behavioral management units, reception and classification units, medical infirmary units, mental health crisis observation units, visitor or guest units for youth temporarily assigned to a facility for any reason, and institutional restricted movement.

2. <u>Confinement Conditions.</u>  DJJ shall, within 180 days of entry of this remedial plan, develop and implement policies and procedures ensuring adequate thorough cleaning and sanitation of all confinement rooms after they are vacated before the room is used for another youth, and as needed during any period of use with an individual youth to ensure rooms remain free of food or human waste and/or graffiti.  DJJ shall also, within 180 days of entry of this remedial plan, ensure that all confinement rooms are well lit with functional plumbing, are appropriately heated or cooled, and contain adequate bedding and blankets.

## **PART V:  SAFETY AND GENERAL ISSUES**

1. <u>Comprehensive Treatment Model.</u>  DJJ shall, within one year of entry of this remedial plan, develop and implement a strategic plan for an evidence-based or evidence-informed comprehensive treatment and rehabilitation model to be used for all youths in all DJJ facilities, including but not limited to youths in special treatment units and for juvenile sex offenders.  Such a model shall ensure general uniformity and cohesive programming in all DJJ facilities, across educational, mental health, substance abuse, behavioral management, and other programming for youths.

2. <u>Department-Wide Behavioral Management System.</u>  DJJ shall, within one year of entry of this remedial plan, adopt and implement a comprehensive, department-wide, evidence-based or evidence-informed behavioral management system, to provide a consistent model for youth behavior throughout the facilities.

3. <u>Individualized Youth Development Plans.</u>  DJJ shall, within 180 days of entry of this remedial plan, implement policies and procedures requiring preparation and implementation of a youth development plan ("YDP") for each youth committed to DJJ custody. Within fourteen days of a youth's arrival at his or her assigned facility, DJJ facility and Aftercare staff will begin collaborating to develop the youth's YDP.  The YDP will, through the use of screening and assessment, identify needed services based on the youth's strengths and needs, and will serve as a plan for the youth carrying through to the youth's release on aftercare.

4. <u>Security Staffing Levels.</u>  DJJ shall increase the number of security staff posts to ensure adequate staffing at each facility.  Specifically, DJJ shall comply with the Prison Rape Elimination Act ("PREA") Juvenile Facility Standards (28 CFR 115.313(c)) by achieving and maintaining youth to security staff ratios of (a) 12:1 for waking hours and 20:1 for sleeping hours by October 2015, (2) 10:1 for waking hours and 18:1 for sleeping hours by October 2016, and (3) 8:1 for waking hours and 16:1 for sleeping hours by October 2017.

5. <u>Youth and Family Specialist Staffing Levels.</u>  Within 90 days of the entry of this plan, and in consultation with the court-appointed general juvenile justice expert and plaintiffs' counsel, DJJ shall establish an appropriate staff-to-youth ratio for Youth and Family Specialists.  This ratio shall be adopted in a supplemental order, including a deadline for implementation, subject to the Court's review and approval, and also subject to the PLRA findings as set forth above in paragraph I(2).

6. <u>Training of Staff with Youth Contact.</u>  DJJ shall provide training to ensure that all staff who have direct contact with juveniles are adequately trained in the following areas: (a) adolescent social and intellectual development; (b) gender responsive and cultural competent interaction with youth; (c) the mental health and trauma needs of justice-involved youth; (d) conflict resolution techniques (including conflict de-escalation); (e) the participation of mental health staff in resolving conflicts; (f) effective behavioral management including alternatives to use of confinement; (g) report writing on use of force incidents, including the time, location, and reasons for force;  (h) alternatives to the use of force when appropriate; (i) the basic principles of the Americans with Disabilities Act ("ADA") and the Prison Rape Elimination Act ("PREA"); and (j) zero tolerance for verbal and sexual abuse and harassment.

7. <u>Youth Grievance Reporting.</u>  DJJ shall ensure that all youths have adequate means to report allegations of abuse and/or submit grievances.  DJJ has instituted and shall maintain a hotline which youth can use at any time to report sexual abuse or harassment. In addition, within 180 days of entry of this remedial plan, DJJ shall ensure a grievance box and grievance forms are available on each unit, provide enhanced education to youths and staff about the grievance process, and  require each facility to submit a monthly report to the Director of the DJJ describing all grievances and their resolutions. DJJ shall provide these monthly reports to the court-appointed experts and plaintiffs' counsel.

8. <u>Independent Juvenile Ombudsman.</u>  DJJ has proposed legislation (SB 2352) that would create within the DJJ an Independent Juvenile Ombudsman for the purpose of securing the rights of youth committed to the DJJ.  The Independent Juvenile Ombudsman will be appointed by the Governor for a term of four years, and shall be responsible for reviewing and monitoring the implementation of rules and standards established by the DJJ and the delivery of services to youth to ensure that the rights of youth are fully observed; providing assistance to a youth or family who the Ombudsman determines is in need of assistance; investigating and attempting to resolve complaints made by or on behalf of youth; reviewing or inspecting periodically DJJ facilities and procedures to ensure that the rights of youth are fully observed;  being accessible to and meeting with youth, and serving as a resource by informing them of their rights.  DJJ will continue to advocate with the General Assembly for passage of this legislation.

9. <u>Limits on mechanical restraints</u>.  Within 180 days of the adoption of this remedial plan, the DJJ shall adopt and implement a policy that limits the use of mechanical restraints.

10. <u>General Programming.</u>  DJJ shall, within 180 days of entry of this remedial plan, create and implement a policy to provide opportunities, subject to reasonable security concerns, for all DJJ youths to spend at least eight hours per day outside of their rooms engaged in supervised activities (not including meals or showers), so that during hours when they are not participating in school or treatment, they have opportunities to participate in an appropriate mix of physical exercise, recreational activities, and work details.

11. <u>Legal assistance to youths</u>.  Within 90 days of the adoption of this remedial plan: (a) plaintiffs' counsel shall prepare a list of non-profit legal organizations that might assist youths who believe their rights have been violated by DJJ conditions or services, and DJJ shall review that list, and then post that list in a prominent location in the day and visitation rooms in all IDJJ youth centers; and (b) DJJ shall reasonably facilitate confidential communications between youths and such attorneys by means of face-to-face meetings, telephone calls from attorneys to youths, and telephone calls from youths to attorneys with whom they have an existing attorney-client relationship.

## PART VI:  COMMUNITY PLACEMENT

1. <u>Placement Coordinator.</u>  DJJ shall, within 90 days of entry of this remedial plan, assign a Placement Coordinator to oversee and monitor implementation of this Part VI.  The Placement Coordinator shall be a full-time DJJ staff member whose primary job responsibility is to coordinate and monitor activities of facility and Aftercare staff responsible for overseeing planning for community placement and identifying and resolving placement barriers. DJJ shall provide the Placement Coordinator with monthly reports that identify all youths with placement barriers and provide details as to the barriers, placement plans, and status of each youth's placement. Such reports shall be made available to the court-appointed experts and plaintiffs' counsel upon request.

2. <u>Discharge Planning Upon Intake.</u>  In conjunction with the statewide implementation of Aftercare Specialists for all youth in DJJ, DJJ shall engage in initial placement  planning within fourteen days of a youth's commitment to DJJ and arrival at a DJJ facility, incorporating concurrent planning to minimize the number of youths who, but for a lack of placement, could be released on aftercare status.

3. <u>Preparation of Youths for Placement.</u>  DJJ shall collaborate with providers to  prepare youths for placement in residential facilities and enhances their prospects for success at those facilities.

4. <u>Placement.</u>  DJJ shall take all steps reasonably necessary, including but not limited to requesting appropriations and seeking vendors, to establish a sufficient number of available beds in appropriate community facilities for juvenile sex offenders and other youths who require residential placement upon release in Illinois.

## PART VII:  IMPLEMENTATION AND MONITORING

1. <u>Deputy Director of Quality Assurance.</u>  DJJ shall, within 180 days of entry of this remedial plan, appoint a Deputy Director of Quality Assurance whose responsibilities will include monitoring the delivery of services and programs to youth; ensuring that the implementation of agency programs and operations are consistent with the agency's objectives and mandates; and assisting with development and implementation of statewide policies, procedures, guidelines, and performance standards.

2. <u>Monitoring and Access to Data.</u>  DJJ shall facilitate monitoring by the court-appointed experts and plaintiffs' counsel in accordance with paragraphs 27 through 35 of the consent decree.  In addition, DJJ shall confer with the court-appointed experts and plaintiffs' counsel within 60 days of entry of this remedial plan regarding the data they will require to monitor the DJJ's compliance with this remedial plan and when and how that data shall be provided.

3. <u>Monitoring of chemical agents.</u>  The court-appointed experts and the plaintiffs' counsel may monitor DJJ's use of chemical agents.

IT IS SO STIPULATED AND AGREED:

For the plaintiffs:

By:  /s/ Camille E. Bennett

Date: January 4, 2021

Benjamin S. Wolf
Camille E. Bennett
Allyson M. Bain
Rick Mula
Roger Baldwin Foundation of ACLU, Inc.
180 North Michigan Avenue, Suite 2300
Chicago, IL 60601
(312) 201-9740

Maja C. Eaton
Kevin M. Fee, Jr.
Joseph R. Dosch
Sidley Austin LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

For the defendant:

By:  /s/ Heidi Mueller

Date: January 4, 2021

Heidi Mueller
Director of the Illinois Department of Juvenile Justice
1112 South Wabash Avenue, 2nd Floor
Chicago, IL  60605

IT IS SO ORDERED:

By: _____
    Matthew F. Kennelly
    United States District Court Judge

Date:  Jan. 19, 2021